1  **MILBERG WEISS BERSHAD
     & SCHULMAN LLP**
2  Jerome M. Congress (admitted *pro hac vice*)
   Janine L. Pollack (admitted *pro hac vice*)
3  Kim E. Miller (State Bar No. 178370)
   Michael R. Reese (State Bar No. 206773)
4  One Pennsylvania Plaza
   New York, New York  10119-0165
5  Telephone:     (212) 594-5300
   Facsimile:      (212) 868-1229
6  ***Court Appointed Lead Counsel***

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  RONALD SIEMERS, Individually And On Behalf   ) Case No. 05-04518 WHA
    Of All Others Similarly Situated,            )
12                                               )
                                   Plaintiff,    ) **CONSOLIDATED AMENDED CLASS**
13                                               ) **ACTION COMPLAINT FOR**
               vs.                               ) **VIOLATION OF THE FEDERAL**
14                                               ) **SECURITIES LAWS AND FOR**
    WELLS FARGO & COMPANY, H.D. VEST             ) **VIOLATION OF THE INVESTMENT**
15  INVESTMENT SERVICES, LLC, WELLS              ) **COMPANY ACT**
    FARGO INVESTMENTS, LLC, WELLS FARGO          )
16  FUNDS MANAGEMENT, LLC, WELLS                 )
    CAPITAL MANAGEMENT INC., STEPHENS            )
17  INC., WELLS FARGO FUNDS DISTRIBUTOR,         ) **JURY TRIAL DEMANDED**
    LLC, and WELLS FARGO FUNDS TRUST,            )
18                                               )
                                  Defendants.    )
19  _____ )

20

21

22

23

24

25

26

27

28  | CLASS ACTION CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATION OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA) | |

Lead Plaintiff Ronald Siemers, by and through his counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, and media reports about Wells Fargo & Company and its related entities also named herein as defendants (collectively "Defendants" or "Wells Fargo").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal class action arising out of Defendants' failure to disclose an unlawful and deceitful course of conduct in which they engaged that was designed to improperly enrich Defendants to the detriment of Plaintiff and other members of the class.  This claim is brought by Plaintiff against Wells Fargo on behalf of a Class (defined below) consisting of all persons or entities who purchased one or more of the Wells Fargo Funds and/or one or more non-Wells Fargo funds participating in Wells Fargo revenue sharing and directed brokerage arrangements (collectively, the "Shelf Space Funds"[1]) through Wells Fargo, from June 30, 2000 through June 8, 2005, inclusive (the "Class Period").

2.      Wells Fargo has stated that its goal is "to help you achieve financial success at every stage of your life."  Wells Fargo, Brokerage Welcome, http://www.wellsfargo.com/welcome/brokerage_account (last visited Apr. 6, 2006).  Wells Fargo calls its brokers "financial consultants" and claims that its "financial consultants" are "dedicated to helping you [the investor] achieve your goals and objectives." http://www.wellsfargo.com.investing.  In truth, to the detriment of its clients, Wells Fargo participated in an insidious kickback scheme euphemistically referred to as selling "Shelf Space Funds," whereby Wells Fargo used its broker/dealers to push its clients into buying shares of the Shelf Space Funds in exchange for illegal kickback payments and other improper incentives that Wells Fargo received from the Shelf Space Funds.

---

[1] A list of the Shelf Space Funds is attached hereto as Exhibit A.

3.      Defendants, in clear contravention of their disclosure obligations and fiduciary responsibilities to investors, pursued abusive and unlawful sales practices of mutual funds to benefit themselves.  Defendants failed to properly disclose that they had been aggressively pushing the sale of Shelf Space Funds in exchange for kickbacks.  Instead of offering fair, honest, and unbiased recommendations to Plaintiff and other clients (i.e. Class members), the Wells Fargo financial consultants gave pre-determined recommendations, endorsing a pre-selected, limited number of mutual funds to clients so that Wells Fargo could reap millions of dollars in kickbacks from the Shelf Space Funds, with whom they had struck secret, highly-lucrative deals at shareholders' expense.  The NASD has already fined and censured both Defendants Wells Fargo Investments and H.D. Vest millions of dollars for their role in this scheme.

4.      Defendants cultivated a clandestine, incentive-driven culture to sell Shelf Space Funds to the exclusion of other mutual funds, regardless of their clients' best interests.  Defendants' sales practices created an insurmountable conflict of interest between Wells Fargo and its own clients by providing substantial monetary incentives for its broker/dealers to sell the Shelf Space Funds, sales of which increased Defendants' overall profits.  During the Class Period, Wells Fargo used its nationwide network of financial consultants to improperly steer Plaintiff and other members of the Class into the Shelf Space Funds, which generally carry higher expenses.  As detailed below, while Wells Fargo and its subsidiaries claimed to provide unbiased, objective financial planning advice and fund investment recommendations to their clients, they instead made it standard business practice to give their customers self-serving and biased investment guidance, solely to herd their customers into the Shelf Space Funds as part of their secret scheme to enjoy the profits improperly generated by the collection of kickbacks from the Shelf Space Funds.

5.      Realizing that disclosure of this scheme and the inherent conflicts of interest it created would undermine any investment recommendation made by Wells Fargo "financial consultants," Defendants failed to disclose any of their improper conduct to Plaintiff and other members of the Class, thereby concealing information significant to any reasonable person deciding how to invest his or her money.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

2

6.     Furthermore, to add insult to injury, the revenue garnered by Wells Fargo from the kickback scheme originated substantially from the fees paid by the Shelf Space Funds investors who had already been steered into owning the Shelf Space Funds mutual fund portfolios.

7.     Pursuant to the secret deal between Defendants and the Shelf Space Funds, Wells Fargo's "financial consultants" had an institutional mandate to direct their clients into investing in the Shelf Space Funds, including their own Wells Fargo Funds, instead of any other funds.  This manipulation was achieved by financial consultants under the guise of providing "investment advice."

8.     Defendants' sales practices created a material insurmountable conflict of interest between themselves and their clients by providing monetary incentives to Defendants' financial consultants to sell Shelf Space Funds, sales of which increased Defendants' overall profits, but improperly diminished their clients' returns.  Defendants also failed to disclose any of these financial incentives reaped by selling the Shelf Space Funds, knowing that if the truth were revealed, no reasonable investor would invest in the Funds based upon Wells Fargo's advice.  This conflict of interest created by Defendants' failure to disclose these incentives is a clear violation of federal securities laws.

9.     Additionally, the Investment Advisers and Distributors to the Wells Fargo Funds (as defined below) are named as Defendants because they created further undisclosed material conflicts of interest by entering into revenue-sharing agreements with brokerages to push investors into the Wells Fargo Proprietary Funds, regardless of whether such investments were in the investors' best interests.  The Investment Advisers financed these arrangements by illegally charging excessive and improper fees to the Wells Fargo Funds and their investors that should have been invested in the underlying portfolio.  In doing so, the Wells Fargo Investment Advisers breached their fiduciary duties to the Wells Fargo Funds and their investors under the Investment Company Act.

10.     In other words, Defendants' undisclosed incentive arrangements operated as a fraudulent scheme that exploited the misplaced trust of Wells Fargo clients.  Moreover, the advice that investors received was not only biased by Wells Fargo's undisclosed interest in pushing the Shelf Space Funds onto investors, it was also financially damaging to Wells Fargo clients because

the return on the Shelf Space Funds were diminished due to the improper payments paid from the assets of Shelf Space Funds investors that were used as kickbacks to reward Wells Fargo for pushing the Shelf Space Funds. Furthermore, Plaintiff and other members of the Class paid fees and commissions that they would not have paid otherwise had the kickback scheme been disclosed, and, as result, received lower returns from their investments.

11.     The truth was finally disclosed on June 8, 2005, the end of the Class Period, when the NASD fined and censured Wells Fargo broker/dealer entities for their involvement in this insidious scheme that betrayed the trust of their clients.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v; and Sections 36(b) and 48(a) of the Investment Company Act ("ICA"), 15 U.S.C. §§ 80a-33(b), 80a-35(a), 80a-35(b), 80a-43 and 80a-47(a); and 28 U.S.C. §§ 1331, 1337 and 1367(a).

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391. Substantial acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information, occurred within this District. Defendant Wells Fargo is headquartered in San Francisco.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Court Appointed Lead Plaintiff

15.     Court appointed Lead Plaintiff Ronald Siemers purchased shares of the Wells Fargo Shelf Space Funds during the Class Period and was thereby damaged. The Wells Fargo Shelf Space Funds acquired by Mr. Siemers are listed in attachment B.

**The Parent Company**

16.     Wells Fargo & Company is the ultimate parent of all Defendants named in this Complaint and is incorporated in Delaware.  Wells Fargo & Company is a diversified financial services company providing banking, insurance, investments, mortgage and consumer finance services.  Through its subsidiary, Wells Fargo & Company also markets, sponsors, and provides investment advisory, distribution, and administrative services to mutual funds, including the Wells Fargo Funds.  Defendant Wells Fargo & Company is headquartered at 420 Montgomery Street, San Francisco, California 94104.  It was the ultimate beneficiary of the secret plan and scheme to endorse the Shelf Space Funds to the detriment of the Funds and their investors, as alleged herein. Defendant Wells Fargo & Company is herein referred to as the "Control Person Defendant."

**The Broker/Dealers**

17.     Defendant Wells Fargo Investments, LLC  ("WF Investments") is a broker/dealer. WF Investments also entered into "Shelf Space" arrangements during the Class Period that pushed clients into purchasing the Shelf Space Funds in exchange for financial gain.  The firm's address is 420 Montgomery St., San Francisco, California 94104.

18.     Defendant H.D. Vest Investment Services, LLC ("H.D. Vest") is a broker/dealer incorporated in Texas.  H.D. Vest is an affiliated non-bank subsidiary of Wells Fargo & Company. H.D. Vest entered into "Shelf Space" arrangements during the Class Period that steered clients into purchasing the Shelf Space Funds in exchange for financial gain.  Its address is 6333 North State Highway 161, 4th Floor, Irving, Texas 75038-2200.

19.     Defendants WF Investments and H.D. Vest, as defined above, will be collectively referred to herein as the "Broker/Dealer Defendants."

**The Investment Advisers**

20.     Defendant Wells Fargo Funds Management, LLC ("the Fund Management Defendant") is a Delaware corporation registered as an investment adviser under the Investment Advisers Act.  Its offices are located at 525 Market St., San Francisco, California 94105.  It is an indirect, wholly-owned subsidiary of Wells Fargo & Company.  As the Investment Adviser, the Fund Management Defendant is responsible for implementing the investment policies and

guidelines for the Wells Fargo Funds and for supervising the sub-adviser responsible for their day-to-day management, including the placing of orders for the purchase and sale of portfolio securities. In return, the Fund Management Defendant receives fees calculated as percentage of net assets under management.  As of June 30, 2004, the Fund Management Defendant managed over $75 billion in mutual fund assets.  In breach of their fiduciary duties, the Investment Adviser Defendants (as defined below) provided self-serving information to the Funds' Board of Trustees and created a secret plan with broker/dealers to promote the Wells Fargo Funds which resulted in the Funds' investors footing the bill.

21.    The Fund Management Defendant is also referred to herein as the "Investment Adviser."

**Investment Sub-Adviser**

22.    Defendant Wells Capital Management Inc. ("Wells Capital Management") is an affiliate of Funds Management, a sub-adviser for each of the Funds, and is responsible for the day-to-day investment management activities of the Funds.  Wells Capital Management is compensated by Funds Management for its services as adviser.  It is located at 525 Market St., San Francisco, California 94105.

23.    Defendant Wells Capital Management is also referred to herein as the "Investment Sub-Adviser."

24.    Collectively, the Fund Management Defendant and Defendant Wells Capital Management, as defined above, are referred to herein as the "Investment Adviser Defendants."

**The Distributors**

25.    Wells Fargo Funds Distributor, LLC is the distributor of all Wells Fargo Funds. Wells Fargo Distributor is located at 525 Market Street, San Francisco, California 94105 and is an affiliate of the Fund Management Defendant.

26.    Defendant Stephens Inc. has served as the Distributor of the Wells Fargo Funds since July 26, 2004.  Stephens Inc. is located at 111 Center Street, Little Rock, AR 72201.

27.    Defendant Stephen Inc. and Wells Fargo Funds Distributor, LLC., will be collectively referred to as the "Distributor Defendants."

**The Registrant**

28.     Defendant Wells Fargo Funds Trust is the Registrant of all the Wells Fargo Funds for the purposes of filing financials with the SEC, under which the Wells Fargo Funds are organized as several portfolios/series.  Defendant Wells Fargo Funds Trust is an open-ended management company incorporated in Delaware and is registered with the SEC under the Investment Company Act.  Wells Fargo Funds Trust has its principal executive offices at 525 Market Street, San Francisco, California  94105.  Defendant Wells Fargo Funds Trust is herein referred to as the "Registrant Defendant."

## SUBSTANTIVE ALLEGATIONS

29.     The illegal activity set forth herein involves the interrelated activities of two groups of Wells Fargo Defendants.  The Broker/Dealer Defendants, in clear contravention of their disclosure obligations and fiduciary responsibilities, failed to disclose that they had been coercing their sales personnel to sell the Shelf Space Funds which provided them with financial incentives. In addition to the wrongdoing of the broker/dealer arm of Wells Fargo, the Wells Fargo Investment Adviser Defendants, who were investment advisers of the Wells Fargo Funds, entered into illegal kickback arrangements with several broker/dealers, including the Wells Fargo Broker/Dealer Defendants.  As part of this scheme, the Investment Adviser Defendants financed these arrangements by illegally charging excessive and improper fees to those Wells Fargo Funds, thereby breaching provisions of the federal securities laws and the Investment Company Act.

### THE WELLS FARGO BROKER/DEALERS
### ENGAGED IN IMPROPER CONDUCT

**Background**

30.     Wells Fargo provides banking, insurance, investments, mortgage and consumer finance services to more than 23 million customers through an international network of over 6,160 financial services offices, the internet and other distribution channels.  Wells Fargo has $435 billion in assets and over 150,000 employees.  Wells Fargo calls its financial consultants "team members" and states on its website that the "team members" will "provide sound financial advice for customers … and create new wealth for them."  WellsFargo.com, Vision and Values: What is Wells Fargo, http://www.wellsfargo.com/ invest_relations/vision_values/4.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

7

31.     Investors often turn to financial consultants for guidance on savings and retirement vehicles that will maximize the growth of their assets.  Brokers, such as those at Wells Fargo and H.D. Vest, refer to themselves as financial consultants. Wells Fargo states on its website that among its core values are that its employees "[v]alue and reward open, honest, two-way communication…[a]void any actual or perceived conflict of interest…[and] [c]omply with the letter and the spirit of the law."  WellsFargo.com, Vision and Values: What Are Our Values, http://www.wellsfargo.com/invest_relations/vision_values/11.  Indeed, the "Wells Fargo Team Members Code of Ethics and Business Conduct" states that team members must avoid conflicts of interest or the appearance of conflicts of interest, and also notes that it is unlawful for team members to accept anything of value from any person intending to be influenced or rewarded in connection with any business or transaction of Wells Fargo.  WellsFargo.com, Wells Fargo Team Members Code of Ethics and Business Conduct, June 1, 2004, at 6, http://www.wellsfargo.com/ pages/about/corporate/ethics/team_member_code_of_ethics_2004.pdf.  These internally-published prohibitions on conflicts of interest are, of course, in addition to the matrix of market regulations governing the broker/dealers and prohibiting such conduct.

32.     However, Defendants' mutual funds sales practices clearly contradict their statements made to investors.  Undisclosed conflict of interests were rampant in the relationships between financial consultants and mutual fund investors.  As detailed below, Defendants' financial consultants were influenced by these conflicts of interests when determining in what fund a client should invest.

**THE BROKER/DEALER DEFENDANTS RECEIVED UNDISCLOSED KICKBACKS TO PUSH INVESTORS INTO THE SHELF SPACE FUNDS**

33.     Throughout the Class Period, the Broker/Dealer Defendants received undisclosed kickbacks from the Shelf Space Funds in exchange for steering investors into the Shelf Space Funds.  Defendants received these kickback payments in several forms.

34.     One method of kickback payment received by the Broker/Dealer Defendants was "Directed Brokerage."  Directed Brokerage involves allotting trades — and the lucrative commissions that are a result of the trades — in the securities that make up a mutual fund

investment portfolio to a particular brokerage (such as Wells Fargo) in exchange for that brokerage pushing the sale of those mutual funds onto investors.  As stated by the NASD in its sanction and fine of the Broker/Dealer Defendants, such conduct violates NASD Rule 2830(k):

The rule provides in pertinent part:

(1)  No member shall directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account.

*     *     *

(3)  No member shall…request or arrange for the direction to any member of a specific amount or percentage of brokerage commissions conditioned upon that member's sales or promise of sales of shares of an investment company.

*     *     *

By arranging for and accepting brokerage commissions to pay for the fund familes's participation in the programs [described above], Respondents [Wells Fargo Investments] violated NASD Conduct Rue 2830(k) and 2110.

NASD Letter of Acceptance, Waiver and Consent against Wells Fargo Investments, No. CE10500006; *see also* NASD Letter of Acceptance, Waiver and Consent against H.D.Vest Investment Services, No. CE1050007.

35.    As stated by the NASD in its censure and multi-million dollar fine of the Broker/Dealer Defendants, Defendants violated NASD rule 2830(k) by arranging and accepting more than $21 million dollars of directed brokerage during the Class Period.  *Id.*

36.    Another type of kickback payment received by the Broker/Dealer Defendants from the Shelf Space Funds was through "revenue sharing."  Revenue sharing occurs when a mutual

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

9

fund's investment adviser or its affiliate makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that fund over other funds.  Revenue sharing arrangements are problematic, *inter alia*, because financial consultants cannot uphold their fiduciary responsibilities when they choose to include or exclude a fund based solely on the fund's participation in a revenue sharing arrangement rather than based on the benefit to the investor.  Additionally, the SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds."  69 Fed. Reg. 6438, 6441 n.21 (Feb.10, 2004)

37.    Additionally, according to Wells Fargo documents, payments from the Shelf Space Funds were based upon the amount of assets of the Shelf Space Fund held under management, as well as on the sale of their products to Wells Fargo clients.

38.    The "directed brokerage" "revenue sharing"  and other payments received by Wells Fargo during the Class Period are jointly referred to as "kickback payments" below.

**Wells Fargo Demanded and Received Kickback Payments from the Shelf Space Funds Systematically Throughout the Class Period, Providing Wells Fargo Financial Consultants Strong Incentives to Push Clients into the Shelf Space Funds**

39.    According to former Wells Fargo and Shelf Space Funds employees, the kickback payments described above were made systematically throughout the Class Period.  For example, according to a former Shelf Space Fund executive and Board member, during the Class Period, Wells Fargo regularly sent invoices out on a monthly basis to the Shelf Space Funds detailing the amount owed to Wells Fargo pursuant to the kickback arrangements stated above.  These invoices could be paid by the Shelf Space Funds through "directed brokerage," "revenue sharing dollars" or both.  The invoices were generated by Wells Fargo's Corporate Trust department and totaled hundreds of thousands of dollars at a time.  Additionally, according to this Shelf Space Fund executive, the Shelf Space Fund would then pay Wells Fargo, either on a monthly or quarterly basis.

40.    Additionally, according to internal Shelf Space Fund documents, at the beginning of each year during the Class Period, Wells Fargo would set an annual quota of kickback payments that the Shelf Space Funds were required to pay to Wells Fargo by the end of the year.  According

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

10

to these internal Shelf Space Fund documents, the Shelf Space Funds then tracked on a quarterly basis the amount of kickback payments that the Shelf Space Funds had already paid to Wells Fargo to date for the year, keeping account of the amount remaining to be paid before the end of the year.

41.     According to former Wells Fargo "financial consultants" who worked for Wells Fargo during the Class Period and who were responsible for advising investors on which mutual funds to invest in, as a result of the kickback payments described above, Wells Fargo's management exerted incredible pressure on brokers -- both through higher payouts for those who pushed clients into the Shelf Space Funds and threats of demotion or termination for those who did not. Additionally, according to a former Wells Fargo Vice President, who worked for Wells Fargo during the Class Period, branch managers would insist that Wells Fargo financial consultants place investors into the Shelf Space Funds, as the magnitude of the managers' bonuses depended on having their financial consultants push their clients into the Shelf Space Funds

42.     Additionally, according to a Senior Vice President who worked for Wells Fargo in California during the Class Period, other methods employed by Wells Fargo management to coerce Wells Fargo financial consultants to push investors in the Shelf Space Funds also included threats and acts of demotion and termination.

**The Broker/Dealer Defendants Created Various Additional Incentives
to Ensure that the Financial Consultants Sold Shelf Space Funds**

43.     The Broker/Dealer Defendants ensured that their financial consultants sold Shelf Space Funds by creating incentives and bonuses for financial consultants who sold them.  For example, financial consultants who were big sellers of Shelf Space Funds would be eligible for free trips to conferences or for free conference registration. Karen Damato, *Questions on Conflicts Can Extend to Planners -- U.S. Regulators Examine Financial Consultants' Ties To Mutual-Fund Families,* WALL ST. J. EUROPE, June 17, 2005, at M1.

44.     During the Class Period, H.D. Vest had two programs entitled "Vest Guest" and "Chapter Directors," that reimbursed H.D. Vest financial consultants for "expenses" incurred in connection with "conferences" called "the National Conference" and "VestFest."  H.D. Vest Investment Services, NASD Letter of Acceptance, Waiver and Consent (No. CE1050007).

Between 2001 and 2003, H.D. Vest selected the top 20 profit-producing financial consultants based upon sales of the Shelf Space Funds to participate in the Vest Guest program. H.D.Vest sent financial consultants who were selected as Vest Guests personal invitations that disclosed its unequally weighted Shelf Space Funds sales criteria. *Id.*

45.     Additionally, H.D. Vest organizes its financial consultants into approximately 115 Chapters nationwide, each Chapter consisting of one Chapter Director and approximately 40 members. During the Class Period, H.D. Vest's criteria for becoming a Chapter Director included a requirement that financial consultants place 90% of their new business with Shelf Space Funds. H.D. Vest told its financial consultants this was a criterion for selection as a Chapter Director, even though the new business requirement did not weigh sales of all mutual funds equally. *Id.*

**Wells Fargo Broker/Dealers Also Received Incentives to Give
the Wells Fargo Funds Preferential Treatment**

46.     Wells Fargo Funds also received preferential treatment by the Broker/Dealer Defendants due to financial quid pro quo arrangements similar to those described above. WF Investments and H.D. Vest would promote the Wells Fargo Funds to clients without disclosing the magnitude of bias in selling these Funds over some other fund. As a result, investors in the Wells Fargo Funds footed the bill for the financial incentives given to Wells Fargo's brokerage firms as kickbacks.

47.     WF Investments received revenue from its affiliate, Funds Management, for pushing Wells Fargo Funds based on customer assets held by the Wells Fargo Funds. *See* Wells Fargo Investments, LLC, *An Investor Guide to Mutual Funds* 6 (Dec. 2005), *available at* http://a248.e.akamai.net/7/248/1856/f61e334331442a/www.wellsfargo.com/pdf/online_brokerage/mf_disc.pdf. However, unlike non-proprietary funds, the Investment Adviser Defendants did not pay a negotiated fee rate to participate in revenue sharing arrangements with Defendants WF Investments and H.D. Vest. Instead, the Investment Adviser Defendants and the Distributor Defendants allocated revenue net of certain expenses to the various Wells Fargo & Company affiliates, including WF Investments, based on WF Investments' sales of Wells Fargo Proprietary

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

12

Funds.  Wells Fargo Investments, LLC, NASD Letter of Acceptance, Waiver and Consent (No. CE1050006).

48.     According to a former financial consultant who worked at WF Investments during the Class Period, a wholesaler for the Wells Fargo Funds would be allowed to pressure Wells Fargo financial consultants to push their client into the Wells Fargo Funds.  In addition, the wholesaler would offer the Wells Fargo financial consultant an extra 50 basis points in compensation if the financial consultant could get clients into the Wells Fargo Funds.  These pressure tactics were not disclosed to investors.

49.     Additionally, pressure to steer clients into Wells Fargo Funds was placed on financial consultants by their supervisors.  For example, according to the former Wells Fargo financial consultant described immediately above, the supervisor would offer extra commissions and payouts to financial consultants who pushed clients into the Wells Fargo Funds.  These additional payouts were not disclosed to investors.

**Specific Programs Were Designed By WF Investments**
**to Push the Shelf Space Funds on Investors**

50.     WF Investments managed its kickback arrangements with the Shelf Space Funds through a program entitled the "Preferred Partner Program."  This program required the Shelf Space Fund families to pay WF Investments in order for Wells Fargo financial consultants to promote the Shelf Space Funds to their investors.

51.     According to Wells Fargo documents, while promoting the Shelf Space Funds to its clients, WF Investments represented the Shelf Space Funds as being better for its clients than other funds available.  Wells Fargo clients were led to believe that Wells Fargo financial consultants were recommending the Shelf Space Funds based on objective analysis which indicated that such Funds would perform better than offerings from other fund companies.  For example, 18 mutual fund families out of the 325 fund families with which Wells Fargo had distribution agreements were ranked to lead investors to believe those 18 funds were superior and distinct in some way.  However, these so-called superior performers were merely Shelf Space Funds that had paid WF

Investments enough in kickback payments to be given priority over other fund families by WF Investments' financial consultants.

52.  According to Wells Fargo documents, WF Investments received the following kickback payments from the Shelf Space Funds during the Class Period:

- A minimum of $50,000 from each Shelf Space Fund family annually;
- A 35 basis point ("bp") charge (0.35%) on the sales of shares;[2] and
- Annual fees of 125 bp for holding equity mutual fund assets; 75 bp for holding fixed income mutual fund assets; and higher rates for money market mutual fund assets.

53.  Consequently, these kickback payments to Wells Fargo resulted in the Wells Fargo financial consultants steering investors into Shelf Space Funds because of the extra compensation and perks they received, created undisclosed conflicts of interest, and led the financial consultants to disregard the negative consequences to their clients.  Thus, investors were sold Shelf Space Funds that were aligned with the Wells Fargo financial consultants' own interests instead of that of the investor.

**Specific Programs Were Designed By H.D. Vest to Push the Shelf Space Funds on Investors**

54.  At the beginning of 2001, H.D. Vest was acquired by Wells Fargo.  This acquisition gave the Wells Fargo parent company control over H.D.Vest's network of more than 6,000 tax and financial consultant independent contractors, who manage more than $16 billion in assets. According to Wells Fargo documents, with Wells Fargo's acquisition of  Defendant H.D. Vest, Defendant H.D. Vest also entered into kickback arrangements with certain of the Shelf Space Funds in exchange for pushing the Shelf Space Funds on investors.  Moreover, in exchange for the kickbacks received from the Shelf Space Funds, H.D. Vest provided the Shelf Space Funds' investment advisers with enhanced access to the H.D. Vest broker/dealer sales force, and

---

[2] These fees are often measured in basis points.  A basis point "bp" is one-hundredth of a percentage point (0.01%).  For example, 10bp of $1 billion equals $1 million.

heightened visibility in the firm.  H.D. Vest referred to its Shelf Space Funds as "Level One Sponsors."

55.     According to Wells Fargo documents, H.D. Vest received the following amounts in revenue sharing payments from the Shelf Space Fund's investment adviser or its affiliates:

- A 10 to 25 bp charge on sales of shares;

- Annual fees of 5 to 15 bp for holding mutual fund assets;

- Significant lump sum payments; and

- Cost sharing of educational, training, record-keeping and other sales costs.

56.     As a result of these arrangements, investors were misguided into mutual funds that were not suitable for them and had inferior performance to other funds.

**The Sales Loads Paid To The Brokers Were Not Justified**

57.     Approximately 98% of mutual fund shareholders say their investments constitute long-term savings and about 77% cite retirement savings as their primary financial goal.  David J. Carter, *Mutual Fund Board and Shareholder Action,* 3 Vill. J. of Law & Inv. Mgmt. 1, 8 (2001). Many investors purchase mutual funds through brokers such as Wells Fargo Investments and H.D. Vest, ostensibly paying their financial consultant to guide their fund selection.  According to a recent survey by the SEC, investors believed that anyone with a title other than a broker, for example a "financial consultant" or "financial adviser," provided something more than a broker.  In addition, many assumed that investment advisers, financial consultants and financial advisers all provided financial planning.  Cynthia A. Glassman, Speech by SEC Commissioner, SEC in Transition: What We've Done and What's Ahead, June 15, 2005, *available at* http://ftp.sec.gov/news/speech/spch061505cag.htm.

58.     When investors speak to financial consultants regarding the purchase of mutual funds, financial consultants can help the investor by providing (a) assistance selecting funds that are harder to find and evaluate; (b) access to funds with lower costs (excluding distribution costs); and (c) access to funds with better performance.  Daniel Bergstresser et al., *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry* (Jan. 16, 2006) (Working Paper Series, Am. Fin.

Assoc. 2006 Boston Meetings), *available at*

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=616981.

59.     Investors can avoid the huge fees associated with the services of distribution professionals, such as financial consultants, by determining all the above-mentioned issues for themselves and purchasing mutual funds directly from a fund company.  Many investors choose, however, to pay the substantial fees and commissions to obtain financial guidance from financial consultants.  These commissions are often known as a "sales load" or "sales charge."  There are two general types of sales loads—a front-end sales load investors pay when they purchase fund shares and a back-end or deferred sales load investors pay when they redeem their shares.  12b-1 fees can also be used to compensate brokers in place of part of their sales load.[3]  Securities and Exchange Commission, Mutual Fund Fees and Expenses, http://www.sec.gov/ answers/mffees.htm (last visited Apr. 3, 2006).

60.     According to a recent study, in 2002, mutual fund investors paid as much as $3.6 billion in front-end loads, $2.8 billion in back-end loads and another $8.8 billion in 12b-1 fees, all in addition to the $23.8 billion investors paid during that same year for investment management fees and other operational expenses.  Bergstresser et al., *Assessing the Costs, supra*.  Thus, the effort to sell a mutual fund consumes material resources from the investors, often deducting around 5% from their total investments in a fund.  In 2002, the fees associated with funds sold through a broker were twice as large as the fees charged to investors who purchased funds directly from the mutual fund family.  *Id.*

61.     Defendants WF Investments and H.D. Vest gave the impression of providing the benefits of objective investment advice to investors.  In order to attract mutual fund investors that would result in a heavy sales load for financial consultants, the Wells Fargo website suggested that

---

[3] SEC Rule 12b-1 under the Investment Company Act permits a fund to pay "12b-1" distribution fees out of fund assets, but only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its investors.  Distribution fees are comprised of fees paid to the Distributor Defendants for marketing and selling fund shares, including compensation for advertising, the printing and mailing of prospectuses and sales literature to investors, and payments to brokers and others who sell fund shares.

investors, "[c]hoose professional management and diversification from more than 8000 mutual funds, including Wells Fargo Funds, available through Wells Fargo Investments …Get a personal investment planning and advice from an experienced and knowledgeable investment professional whose goal it is to constantly monitor the markets so you don't have to." WellsFargo.com, Mutual Funds Center, http://web.archive.org/web/20031204203746/wellsfargo.com/investing/ mutual_funds.jhtml (last visited Apr. 3, 2006).

62.    However, Defendants WF Investments and H.D. Vest failed to provide any benefits to the investors who used their services to purchase the Shelf Space Funds. Defendants' unlawful mutual funds sales practices focused on maximizing Defendants' profit to the detriment of investors, placing investors in mutual funds that did not perform as well as their peers and were more expensive with respect to fees. Defendants did this for undisclosed kickbacks received from Shelf Space Funds. Defendants took advantage of investors' reliance on their financial expertise and steered those investors into unsuitable mutual funds, inappropriate class shares and brokerage programs that incurred higher costs to the investor.

## **THE TRUTH IS DISCLOSED**

63.    The truth about Wells Fargo's kickback arrangement started to be revealed on June 8, 2005, when the NASD censured and fined the Broker/Dealers Defendants. As detailed in the NASD's press release, the:

> NASD found that the [Broker/Dealer Defendants], most of which sold funds offered by hundreds of different mutual fund complexes, operated "preferred partner" or "shelf space" programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage. The benefits to mutual fund complexes of these quid pro quo arrangement included, in various cases, higher visibility on the firms' internal web sites, increased access to the firms' sales forces, participation in "top producer" or training meetings, and promotion of their funds on a broader basis than was available for other funds

> \*    \*    \*

> The retail firms generally monitored the amount of directed brokerage received to ensure that the fund complexes were satisfying their revenue sharing obligations. The use of directed brokerage allowed the fund complexes to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations.

Press Release, NASD, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes Fines Totaling More Than $34 Million (June 8, 2005), *available at* http://www.nasd.com/web/ idcplg?IdcService=SS_GET_PAGE&ssDocName=NASDW_014340 ("June 8, 2005 NASD Press Release").

64.     Specifically, the NASD found that the Broker/Dealer Defendants operated Shelf Space programs that provided certain benefits to a relatively small number of mutual fund complexes in return for directed brokerage.

65.     Then, in December 2005, the full extent of Defendants' conflicts of interest were revealed when in a Wells Fargo document entitled: "**WELLS FARGO INVESTMENTS, LLC POTENTIAL CONFLICTS OF INTEREST DISCLOSURE STATEMENT**" was publicly circulated.  In this document, Wells Fargo disclosed that:

> - Wells Fargo had entered into financial arrangements with a limited number of mutual fund companies (*i.e.* the Shelf Space Funds) that Wells Fargo referred to as "Platform Participants";
>
> - said mutual funds typically paid Wells Fargo up to 12 basis points on equity assets and 7.5 basis points on fixed income assets, with a minimum of $50,000 being paid annually from each said mutual fund family;
>
> - in addition to payments received from third-party mutual fund families, Wells Fargo Investments received revenue from Wells Fargo Funds Management, LLC
>
> - as a result of these payments, these limited number of mutual funds "receive enhanced access to Wells Fargo's Investments' sales force" [i.e. "financial consultants"] and meet with said "financial consultants" in training events, conference calls and private meetings; and
>
> - "the above-referenced payments and compensation arrangements are *in addition to the sales charges and fees that are disclosed in the fee tables, prospectuses and statements of additional information*."  (emphasis added).

In other words, in this document, Wells Fargo admitted that it received the payments from the Shelf Space Funds that are at issue in this Complaint, that said payments created "Potential

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

18

Conflicts of Interests" and that, finally, such payments were not disclosed in either the Shelf Space Funds' prospectuses or statements of additional information.

**The Performance of Most of H.D. Vest's and WF Investments**
**Shelf Space Funds Was Below The Industry Average**

66.     Defendants' decision to steer investors into Shelf Space Funds over other funds was detrimental to investors, as is illustrated by the Shelf Space Funds' poor performance.  For example, during the Class Period, AIM Mutual Funds, a Shelf Space Fund for both WF Investments and H.D. Vest, posted returns that were below the industry's category average returns:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| **AIM's Total Return** | -23.3 | 28.7 | 10.3 |
| **Industry Category Average** | -20.8 | 30.0 | 11.3 |

Morningstar.com, AIM Investments Mutual Funds Family Snapshot, Mar. 31, 2006, http://quicktake.morningstar.com (password required).

67.     More evidence of the Shelf Space Funds' poor performance can be found in industry analysts' publications.  For example, industry analyst Morningstar provides a fund family score, which is an asset-weighted average of all of a fund company's Morningstar ratings (also known as star ratings) within an asset class. The fund family score can help investors determine a firm's overall profitability within a specific asset class (domestic stock, international stock, municipal bond or taxable bond), and can range from 1.0 to 5.0.  A score below 2.5 is an indication that the fund company has met with little success in that asset class.  A score between 2.5 and 3.5 indicates the fund company is about average, while a score above 3.5 indicates the fund company has a fair amount of prowess.  The more funds a firm manages per asset class, the stronger the significance of the fund family score with respect to fund's performance.  In this regard, the majority of AIM's assets were not successful and the remaining were only average, as illustrated by the chart below:

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.3 | 74.25 |
| **Taxable Bond** | 1.6 | 5.33 |
| **International Stock** | 3.0 | 13.53 |
| **Municipal Bond** | 2.9 | 2.03 |

*Id.*

68.     John Hancock Mutual Funds, which was also one of H.D. Vest's Shelf Space Funds, also had total returns below the category average and a poor fund family score:

| | **2002** | **2003** | **2004** |
|---|---|---|---|
| **JH's Total Return** | -12.8 | 19.4 | 9 |
| **Industry Category Average** | -10.9 | 24.4 | 10.2 |

| Asset Class | Score | % of Assets |
|---|---|---|
| **Domestic Stock** | 2.3 | 59.11 |
| **International Stock** | 2.1 | 5.49 |
| **Taxable Bond** | 2.8 | 17.47 |
| **Municipal Bond** | 2.8 | 1.96 |

Morningstar.com, *John Hancock Fund Family Snapshot*, Feb. 28, 2006, http://quicktake.morningstar.com (password required).

69.     MFS, another of H.D. Vest's and WF Investments' Shelf Space Fund participants, also followed the same trend as other Shelf Space Funds, yielding total returns that were below the industry's category average returns.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

20

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| MFS's Total Return | -18.2 | 21.1 | 11.5 |
| Industry Category Average | -16.5 | 23.5 | 9.9 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.4 | 50.40 |
| Taxable Bond | 2.6 | 10.39 |
| Municipal Bond | 2.8 | 6.79 |
| International Stock | 3.4 | 14.35 |

Morningstar.com, *MFS Mutual Funds Family Snapshot,* Mar. 31, 2006, http://quicktake.morningstart.com (password required).

70.    Putnam, another of Defendants' Shelf Space Funds, followed the same trend, having total returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Putnam's Total Return | -16.9 | 23.2 | 9.9 |
| Industry Category Average | -16.0 | 25.4 | 10.7 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 2.1 | 58.29 |
| Taxable Bond | 2.5 | 12.40 |
| Municipal Bond | 2.6 | 7.99 |
| International Stock | 2.6 | 12.39 |

Morningstar.com, *Putnam Mutual Funds Family Snapshot,* Mar. 31, 2006, http://quicktake.morninstar.com (password required).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

21

71. Phoenix, another participant in the Shelf Space Funds, followed the same trend, having total returns that were below the industry's category average returns.

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Phoenix's Total Return | -16 | 23.5 | 9.3 |
| Industry Category Average | -15.7 | 24.4 | 10.5 |

| Asset Class | Score | % of Assets |
|---|---|---|
| Domestic Stock | 1.8 | 47.53 |
| Municipal Bond | 1.4 | 1.63 |
| International Stock | 2.5 | 4.60 |
| Taxable Bond | 3.1 | 25.47 |

Morningstar.com, Phoenix Mutual Funds Family Snapshot, Mar. 31, 2006, http://quicktake.morningstar.com (password required).

72. As is illustrated by the pattern of their under-performance relative to their peers, the Shelf Space Funds' performance played no role in why WF Investments and H.D. Vest promoted these fund families over others. In fact, the performance of the Shelf Space Funds relative to their peers demonstrates that Defendants' financial consultants should have referred other funds than the Shelf Space Funds to investors, but that the incentives and pressure biased WF Investments and H.D. Vest's financial consultants.

**The Shelf Space Arrangements Resulted in Investors Paying Higher Fees To Brokers**

73. Investors paid more than a sales load to Wells Fargo's brokerage firms as a result of the Shelf Space arrangements. As a result of these kickback arrangements, additional assets were deducted from investors' invested principal in the Shelf Space Funds to compensate the Wells Fargo financial consultants for providing biased pre-determined advice to investors. Specifically, brokerage commissions, shareholder fees, advisory fees and 12b-1 fees were deducted from the

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT — Case No.: 05-cv-4518 (WHA)

22

investors' principal to pay financial consultants for their role in steering investors into the Shelf Space Funds.

74.     As explained above, directed brokerage is the practice whereby investment advisers direct underlying portfolio securities transactions to broker dealers that sell shares of the fund in order to remunerate those brokers for pushing the advisers' mutual funds shares onto investors. This practice directly harms investors, especially where, as here, the fund is alleged to be "paying up," or trading securities at commission rates higher than the fund would otherwise pay if it were not indirectly paying for distribution through directing brokerage.  Directed brokerage creates a material conflict of interest because the investment adviser has a strong incentive to use brokerage commissions to increase the size of its funds (thereby increasing management/advisory fees) and to avoid paying financial consultants out of its own assets.  Directed brokerage may also be used to circumvent NASD rules on sales charges, undermining the protection afforded to investors under §22(b) of the ICA, which states that:

> [T]he price at which such security is offered or sold to the public shall not include an excessive sales load but shall allow for reasonable compensation for sales personnel, broker-dealers, and underwriters, and for reasonable sales loads to investors…

17 C.F.R. 270.22(b)(1).

75.     In connection with managing the underlying portfolios' funds, the Shelf Space Funds' investment advisers often directed excessive commissions on such trades to WF Investments and H.D. Vest, among others.  In return for the efforts of WF Investments and H.D. Vest to steer their clients into the Shelf Space Funds, the Funds paid them directed brokerage commissions that were in excess of what they would have paid under an agreement reached with the broker/dealers through arm's-length bargaining.  The investment advisers would use these excessive commissions, which are Fund assets belonging to investors, to meet their revenue sharing commitments.

76.     According to both Wells Fargo documents and documents from Shelf Space Funds, from January 2001 through December 31, 2003, six Preferred Partners (AIM, Franklin/Templeton, Hartford, MFS, Oppenheimer and Putnam) paid Defendant WF Investments more than nine million dollars in kickback payments by directing brokerage commissions for portfolio transactions to WF

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

23

Investments, for its benefit.  Wells Fargo Investments, LLC, NASD Letter of Acceptance, Waiver and Consent (No. CE1050006).

77.     WF Investments arranged for a Wells Fargo affiliate to execute Fund portfolio transactions for the commission on such transactions against revenue sharing costs at a rate of approximately $1.00 to $1.30 in commissions per dollar of fees.  *Id.*

78.     The Shelf Space Funds directed WF Investments, through an affiliate, to apply the commission for a specific portfolio transaction to satisfy its revenue sharing obligations.  When the Shelf Space Fund placed an order, the trading desk at the WF Investments affiliate deducted and retained a portion of the brokerage commissions for its trade execution and overhead expenses, and paid the rest to WF Investments, even though WF Investments provided no services in connection with the trade.  WF Investments credited its portion of the brokerage commissions against the Preferred Partner's revenue sharing fees.  *Id.*

79.     At the same time, H.D. Vest received directed brokerage commissions from six Shelf Space Funds (AIM, John Hancock, LFD, MFS, Oppenheimer, Putnam and Scudder) totaling more than twelve million dollars between January 31, 2001 and December 31, 2003.  Typically, these Shelf Space Funds would pay brokerage commissions at a rate of approximately $1.20 to $1.30 in commissions for each dollar owed to H.D. Vest.  H.D. Vest Investment Services, NASD Letter of Acceptance, Waiver, and Consent (No. CE1050007).

**THE SHELF SPACE FUNDS' PROSPECTUSES, THEIR STATEMENTS OF ADDITIONAL INFORMATION AND DEFENDANTS' PUBLIC STATEMENTS WERE MATERIALLY FALSE AND MISLEADING REGARDING THE SHELF SPACE ARRANGEMENTS**

80.     The kickback activities engaged in by Defendants as described above created conflicts of interest with respect to the financial consultants' investment advice given to their clients and the management of their client accounts.  These conflicts of interest were not disclosed to Plaintiff and the Class, and were actively concealed from clients.  Disclosure of these sales incentives and compensation structures were necessary for Wells Fargo's clients to make informed investment decisions.

81.     Wells Fargo disclosed information to its customers concerning mutual fund purchases primarily through supplying customers with the prospectuses and if requested, the statements of additional information ("SAIs") issued by the mutual funds.

82.     A mutual fund's prospectus and its SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.  *See* Plain English Disclosure, SEC Release Nos. 33-7497, 34-39593 (Oct. 1, 1998) (to be codified at 17 C.F.R. pts. 228, 229, 230,  239 and 274).

83.     Prior to investing in any of the Shelf Space Funds, Plaintiff and each member of the Class were entitled to receive the appropriate prospectuses.  The SAI is not distributed to investors, but is available to them on request.  The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Shelf Space Funds.

84.     Each of the Shelf Space Funds prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them.  As seen below, each of the prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding directed brokerage, 12b-1 fees and soft dollars.  For example, the April 1, 2003 Prospectus for the Massachusetts Financial Services ("MFS") Investors Growth Stock Fund — one of the Shelf Space Funds identified in Exhibit A — is identical in substance to all the other Shelf Space Fund prospectuses issued during the Class Period in that it states under the heading "Portfolio Transactions And Brokerage Commissions":

> In connection with the selection of broker dealers and the placing of Fund portfolio transactions, the Adviser seeks to achieve for the Fund the best overall price and execution available from responsible brokerage firms, taking account of all factors it deems relevant, including by way of illustration: price; the size of the transaction; the nature of the market for the security; the amount of the commission; the timing and impact of the transaction taking into account market prices and trends; the reputation, experience and financial stability of the broker or dealer involved; and the quality of services rendered by the broker or dealer in other transactions.

In the case of securities traded in the over-the-counter market, the Adviser normally seeks to deal directly with the primary market makers, unless in its opinion, best execution may be available elsewhere. In the case of securities purchased from underwriters, the cost of such securities generally includes a fixed underwriting commission or concession. From time to time, soliciting dealer fees are available to the Adviser on tender or exchange offers. Such soliciting or dealer fees are in effect recaptured by the MFS Funds. At present, no other recapture arrangements are in effect.

As permitted by Section 28(e) of the Securities Exchange Act of 1934, as amended, the Adviser may cause the Fund to pay a broker or dealer which provides brokerage and research services to the Adviser an amount of commission for effecting a securities transaction for the Fund in excess of the amount other brokers or dealers would have charged for the transaction if the Adviser determines in good faith that the greater commission is reasonable in relation to the value of the brokerage and research services provided by the executing broker or dealer viewed in terms or either a particular transaction or the Adviser's overall responsibilities to the Fund and its other clients. "Commissions," as interpreted by the SEC, include fees paid to brokers for trades conducted on an agency basis, and certain mark-ups, mark-downs, commission equivalents and other fees received by dealers in riskless principal transactions placed in the over-the-counter market.

Although commissions paid on every transaction will, in the judgment of the Adviser, be reasonable in relation to the value of the brokerage and research services provided, commissions exceeding those which another broker might charge may be paid to broker-dealers who were selected to execute transactions on behalf of the Fund and the Adviser's other clients in part for providing such brokerage and research services.

The term "brokerage and research services" includes advice as to the value of securities, the advisability of investing in, purchasing or selling securities, and the availability of securities or purchasers or sellers of securities; furnishing analyses and reports concerning issues, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement).

Broker-dealers may be willing to furnish statistical, research and other factual information or service ("Research") to the Adviser for no consideration other than brokerage or underwriting commissions. Securities may be bought or sold from time to time through such broker-dealers on behalf of the Fund and the Adviser's other clients.

The Adviser's investment management personnel seek to evaluate the quality of Research provided by brokers. Results of this effort are made available to the Adviser's Equity Trading Department which sometimes uses this information as a consideration in the selection of brokers to execute portfolio transactions. However, the Adviser is unable to quantify the amount of commissions which were paid as a

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

26

result of such Research because a substantial number of transactions are effected through brokers which provide Research but which were selected principally because of their execution capabilities.

The advisory fee paid by the Fund to the Adviser is not reduced as a consequence of the Adviser's receipt of Research. To the extent the Fund's portfolio transactions are used to obtain Research, the brokerage commissions paid by the Fund might exceed those that might otherwise be paid, by an amount which cannot be currently determined. The Research received is useful and of value to the Adviser in serving both the Fund and other clients of the Adviser. While the Research is not expected to reduce the expenses of the Adviser, the Adviser would, through the use of the Research, avoid the additional expenses which would be incurred if it should attempt to develop comparable information through its own staff.

In effecting portfolio transactions on behalf of the Fund and the Adviser's other clients, the Adviser from time to time may instruct the broker-dealer that executes a transaction to allocate, or "step out," a portion of such transaction to another broker-dealer. The broker-dealer to which the Adviser has "stepped out" would then settle and complete the designated portion of the transaction, and the executing broker-dealer would settle and complete the remaining portion of the transaction that has not been "stepped out." Each broker-dealer would receive a commission or brokerage fee with respect to that portion of the transaction that it settles and completes.

Consistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser as a factor in the selection of broker-dealers to execute the Fund's portfolio transactions.

MFS Investors Growth Stock Funds, prospectus effective Mar. 30, 2003 (Form N-1A)

(Mar. 28, 2003).

85.    This MFS Shelf Space Fund prospectus cited above is false and misleading, as are all of the Shelf Space Fund prospectuses, in that it fails to disclose that directed brokerage commissions were paid from MFS to Wells Fargo (or to any other broker-dealers) to satisfy pre-determined, negotiated arrangements for specific amounts of brokerage commissions with Wells Fargo.  *See also, e.g.*; Putnam Discovery Growth Fund, prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 30, 2003); AIM Real Estate Fund, prospectus effective Apr. 30, 2003 (Form N-1A) (Apr. 25, 2003); Oppenheimer Multiple Strategies Fund, prospectus effective Nov. 21, 2003 (Form N-1A) (Nov. 21, 2003); Columbia Growth Fund, prospectus effective Jan. 1, 2004 (Form N-1A) (Dec. 31, 2003).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT  — Case No.:  05-cv-4518 (WHA)

27

86.   In an SEC action against MFS filed March 31, 2004 for violation of the federal securities laws, the SEC determined that such statements as those made in the Shelf Space Fund prospectus cited above are ***inadequate and in violation of the federal securities laws***.  The SEC concluded that such statements "did not adequately disclose to … shareholders that [MFS] allocated fund brokerage commissions to satisfy strategic alliances."  SEC Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions, In the Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *available at* http://www.sec.gov/litigation/admin/ia-2224.htm.  The SEC further explained that such statements in Prospectuses did not effectively communicate and "***did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts to fund brokerage commissions for specified marketing and distribution services.***"  *Id.* (emphasis added).  Therefore, as the statements in the Shelf Space Funds' prospectuses are identical in substance to the inadequate disclosures made by MFS referenced above, the Shelf Space Funds' Prospectuses similarly violated the disclosure requirements mandated by the federal securities laws.

87.   For example, the SEC has also fined and sanctioned Shelf Space Fund Franklin/Templeton for failing to adequately disclose the Shelf Space arrangements it had with broker/dealers.  The SEC noted that:

> Although the SAIs stated that [Franklin/Templeton] could consider a broker-dealer's sales of fund shares when selecting a broker-dealer to execute portfolio transactions, they did not describe FTDI's practice of annually negotiating shelf space arrangements with certain broker-dealers.  They did not make clear to fund shareholders that brokerage commissions were used to offset shelf space payment obligations under at least some of these shelf space arrangements.  They also did not make clear that use of brokerage payments in this manner was specifically authorized by the funds' distribution plans approved by the FT [Franklin/Templeton] Fund Boards pursuant to Rule 12b-1.

SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc., *available at* http://www.sec.gov/litigation/admin/34-50841.htm (emphasis added).  *See also* SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of OppenheimerFunds, Inc. and

1  OppenheimerFunds Distributor, Inc., Sept. 14, 2004, *available at* http://www.sec.gov/litigation/

2  admin/34-52420.pdf; SEC Order Instituting Administrative And Cease-And-Desist Proceedings,

3  Making Findings, And Imposing Remedial Sanctions, In the Matter of Putnam Investment

4  Management, LLC, Mar. 23, 2005, *available at* http://www.sec.gov/litigation/admin/ia-2370.pdf

5     88.     Additionally, the Broker/Dealer Defendants' reliance on the Shelf Space Funds'

6  prospectuses and SAIs to disclose the revenue sharing arrangements was insufficient to make

7  investors aware of the costs and risks associated with these arrangements.  The SEC recently

8  brought administrative actions against broker-dealers for failing to adequately disclose their revenue

9  sharing relationships to investors by solely relying on Shelf-space Funds' prospectuses and SAI.  As

10  was explained in the SEC Administrative Cease-and-Desist Order brought against Citigroup Global

11  Corp ("CGMI"):

12

13     CGMI relied on the participating funds' prospectuses and SAIs to satisfy its
       disclosure obligations with regard to its revenue sharing program….[M]ost of

14     the disclosures were generally vague and lacked sufficient information to
       inform CGMI's customers of the nature and scope of CGMI's revenue sharing

15     program.  For example, the prospectuses and SAIs did not specifically
       disclose the magnitude of the revenue sharing payments that CGMI received

16     from the fund complexes or that certain fund complexes had greater access to,
       or increased visibility in, CGMI's retail network.  As a result, CGMI's

17     customers were not provided with sufficient information to appreciate the
       dimension of the conflict of interest the revenue sharing program created.

18

19  In the Matter of Citigroup Global Markets, Inc., Order Instituting Administrative and Cease-and-

20  Desist Proceedings, SEC Act Release No. 8557, March 23, 2005.

21     Likewise, in an SEC action against Edward D. Jones, another broker-dealer, the SEC also

22  came to the same conclusions, and noted that the:

          [P]referred families' prospectuses and SAIs fail to disclose adequate
23        information about the source and the amount of revenue sharing payments to
          Edward Jones and the dimensions of the resulting potential conflicts of

24        interest.  Although the Preferred Families' prospectuses and SAI's contained
          various disclosures concerning payments to broker-dealers distributing their

25        funds, few of these disclosures adequately described Edward Jones' potential

26        conflict of interest.

27  In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and

28  Desist Proceedings, SEC Release No. 8520, December 22, 2004.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

29

89.     Here, as in the SEC's actions against Edward Jones and Citigroup, the Broker/Dealer Defendants improperly relied on prospectuses and SAIs that failed to disclose the financial quid pro quo arrangements discussed above.  The Shelf Space prospectuses and SAIs also failed to disclose that participants in the Broker/Dealers' financial quid pro quo arrangements paid with brokerage commissions, a portion of advisory fees and other fees derived from the Shelf Space Funds and their investors, in addition to the sales loads accompanying the initial purchase of shares.  The Broker/Dealer Defendants took no other steps to ensure that investors were made aware of the material scope of these arrangements, the nature of which was also not disclosed, leaving Shelf Fund investors unaware that the payments made by Shelf Space Funds to the Broker/Dealer Defendants were in exchange for the Broker/Dealer Defendants' "financial consultants" steering investors into the Shelf Space Funds.  In fact, the additional fees were paid to sway the financial consultants into misrepresenting the value and performance of the Shelf Space Funds.  Defendants, therefore, misled investors into believing that the Shelf Space Funds were given priority over other mutual funds due to their performance and the consultants' objective analyses of different mutual funds.

**Defendants Were Misleading in Their Public Statements Regarding Brokers' Compensation**

90.     Both WF Investments' and H.D. Vest's statements regarding their revenue sharing arrangements and financial consultants' compensation were misleading.  The website of both retail broker/dealers states that financial consultants do not receive "any portion of, or any additional compensation as a result of these payments or compensation arrangements."  *See* HDVest.com, Important Information About Mutual Funds, *available at* http://www.hdvest.com/investor-mutualfunds.html; and Wells Fargo Investments, LLC, An Investor Guide to Mutual Funds, *supra*.

91.     However, the NASD explicitly censured and fined H.D. Vest for reimbursing "brokers' expenses incurred in connection with certain firm training and educational conferences based, in part, on the brokers' sales of funds that participated in its preferred partner program -- instead of giving equal weight to the sales of all mutual funds, as required."  *See* June 8, 2005 NASD Press Release, *supra*.  Likewise, WF Investments sponsored and/or participated in lunches, seminars, conference calls and workshops for financial consultants to encourage them to sell the

1   Shelf Space Funds.  Wells Fargo Investments, LLC, NASD Letter Of Acceptance, Waiver And

2   Consent (No. CE1050006).

3   **Additional Scienter Allegations**

4        92.    As alleged herein, Defendants acted with scienter in that Defendants knew that the

5   public statements issued or disseminated in the name of the Shelf Space Funds and Wells Fargo

6   were materially false and misleading, knew that such statements would be issued or disseminated to

7   the investing public, and knowingly and substantially participated or acquiesced in the issuance or

8   dissemination of such statements as primary violations of the federal securities laws.  As set forth

9   elsewhere herein in detail, Defendants, by virtue of their knowledge of the true facts regarding the

10  kickback scheme and improper influence exerted to push the Shelf Space Funds on Wells Fargo

11  clients, and their control over, and/or receipt and/or modification of Shelf Space Funds' materially

12  misleading omissions and misstatements and/or their associations with Wells Fargo which made

13  them privy to confidential proprietary information concerning the Wells Fargo incentive scheme,

14  culpably participated in the fraudulent scheme alleged herein.  Defendants were highly motivated to

15  allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual

16  knowledge of the fraudulent conduct alleged herein.

17  **Plaintiff And Other Members Of The Class Have Suffered Damages As A Result Of**
    **Defendants WF Investments and H.D. Vest's Illegal And Improper Actions**
18

19       93.    As a result of Defendants' conduct alleged above, Plaintiff and the other members of

20  the Class have suffered damages.  The damages suffered by Plaintiff and the other members of the

21  Class were a foreseeable consequence of Defendants' omissions and conduct, particularly in light of

22  the fact that the net returns on the Shelf Space Funds were diminished as a result of the improper

23  kickbacks Wells Fargo broker/dealers took from the Shelf Space Funds.  Plaintiff and other

24  members of the Class would not have purchased the Shelf Space Funds, and paid the related

25  commissions and fees associated with them, had they known of the illegal and improper practices

26  Defendants used to direct them into the Shelf Space Funds as alleged above.  By investing in the

27  Shelf Space Funds, Plaintiff and other members of the Class received a return on their investment

28  that was substantially less than the return they would have received had they invested the same

---

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)      31

dollars in a comparable fund.  Alternatively, investors could have invested fewer dollars in a non-Shelf Space Fund to obtain a rate of return equal to or greater than that obtained at a higher price from the comparable Shelf Space Fund.

94.   Additionally, Plaintiff and other members of the Class were deceived into buying shares of the Shelf Space Funds at an artificially inflated value.  Plaintiff and other members of the Class accepted, as an integral aspect of purchasing shares of the Shelf Space Funds, that they would be required to pay fees and expenses against their ownership interests in the Shelf Space Funds, with the understanding that those charges were legitimate outlays for services that would benefit the mutual fund and contribute positively to its value.  In truth, a significant portion of those expenses was not being used to provide the services promised, but rather to increase the profits of Wells Fargo and its affiliates by financing the programs challenged in this lawsuit.  As a result, the values of the Shelf Space Funds were less than they appeared to be to members of the Class.  Plaintiff and the other members of the Class have also suffered damages through commissions paid by Plaintiff and the other members of the Class for their purchase of shares of the Shelf Space Funds.  Had Plaintiff and the other members of the Class known about the practices alleged above, Plaintiff and the other members of the Class would not have paid such commissions.  Plaintiff's and the other members of the Class' damages, as a result of the commissions they paid for shares of the Shelf Space Funds, were a foreseeable consequence of Defendants' failure to disclose.

95.   Additionally, as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Shelf Space Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of the fact that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired the shares or interest in the Shelf Space Funds during the Class Period at distorted prices and were damaged thereby.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

32

## THE WELLS FARGO FUNDS' INVESTMENT ADVISERS AND DISTRUTORS ENGAGED IN IMPROPER CONDUCT

96.     During the relevant timeframe, compensation and fees paid to the Investment Adviser and Distributor Defendants  rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds or their investors in return for the additional fees.  As a result, the advisory and distribution fees were excessive

97.     A major reason for the dramatic increase in compensation to the Investment Adviser Defendants, Distributor Defendants and affiliates was the growth in the size of the Wells Fargo Funds, resulting from Defendants' use of Wells Fargo Fund assets to promote the sale of Wells Fargo Fund shares through participation in revenue sharing or "Shelf Space" programs.  Among other things, these programs included: (a) cash payments to financial consultants in return for the financial consultants' agreement to promote sales of Wells Fargo Fund shares; (b) the directing of Wells Fargo Fund portfolio brokerage to brokerage firms in return for agreements by the financial consultants to promote the shares of the Wells Fargo Funds; and (c) "Soft Dollar" commission arrangements with financial consultants.  These payments resulted in the growth of the Wells Fargo Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their advisory and other asset-based fees to increase.  The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations.  Defendants engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Wells Fargo Funds or their investors, or by additional benefits to the Wells Fargo Funds or their investors.

98.     Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the Wells Fargo  Funds or their investors. Instead, they utilized the economies of scale for their own benefit.

99.     The fee structure imposed by Defendants on the Wells Fargo Funds and their investors far exceeded the fees that would be paid as a result of arm's-length bargaining.  Fees for essentially the same services that were paid by similar funds not affiliated with Defendants were substantially less.

100.     In addition, Wells Fargo Fund assets were used to pay large amounts of "Rule 12b-1" fees to the Distributor Defendants without any benefit accruing to the Wells Fargo Funds or their investors from those payments.  The Investment Advisers Defendants' management fees were also excessive because they used Fund assets to pay for their out-of-pocket expenses although they were already being compensated on a basis that reimbursed them for such expenses.  For example, they caused the Wells Fargo Funds to make "Soft Dollar" commission payments to financial consultants, through which financial consultants were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions, in return for services that would normally be provided by the advisers and for which the advisers were already being paid.  Soft Dollar commissions were utilized by Defendants to shift significant expenses from the investment advisers to the Wells Fargo Funds and their investors without any corresponding offset in the level of the management fee.

101.     Furthermore, the Directors of the Wells Fargo Funds ("Directors") failed to satisfy their duty to independently and conscientiously evaluate the Funds' 12b-1 and advisory fee arrangements, a factor which strongly supports a finding of fee excessiveness.  The Directors were unable to perform their duties as the "watchdogs" of the Wells Fargo Funds because they failed to obtain enough information adequately to evaluate the Wells Fargo Funds' distribution fees as required by Rule 12b-1.  As a result of the Directors' failure to be adequately informed, they were unable to evaluate whether Defendants' use of Wells Fargo Fund assets for Shelf Space agreements was in the Wells Fargo Funds' and their investors' best interest and whether the fees being charged were excessive.  Moreover, the increase in the Wells Fargo Funds' net assets, accompanied by an increase in the expense ratios and Defendants' failure to reduce their fees, were red flags which the Directors disregarded.  As a result, the Directors did not perform their duties as "watchdogs" of the Wells Fargo Funds because they failed to ensure that any economies of scale that were being realized from the increase in Wells Fargo Funds assets were passed to the Wells Fargo Funds and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

34

their investors.  The Directors' failure to satisfy their duties resulted in excessive fees being charged to the Wells Fargo Funds that were disproportionate to the services rendered and were not the product of arm's-length bargaining.

**THE INVESTMENT ADVISER AND DISTRIBUTOR DEFENDANTS BREACHED THEIR DUTIES BY CHARGING EXCESSIVE FEES NOT REASONABLY RELATED TO THE SERVICES PROVIDED**

102.     The fees charged to a mutual fund and its investors should be the equivalent of fees that would have been negotiated within the bounds of arm's-length bargaining.  Directors are responsible for negotiating the fees charged to the fund on behalf of the investors who, individually, are unable to negotiate such fees.  At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to investors, in that such fees must be reasonably related to the services provided.

103.     Congress has underscored directors' duties by adopting Section 15(c) of the Investment Company Act, requiring directors to be adequately informed of the terms of any investment advisory contracts, and giving them the authority to demand documents and other information from investment advisers in order to make informed and independent decisions when evaluating such contracts.  *See* 15 U.S.C. § 80a-15(c).  However, as alleged below, the Directors were beholden to the Investment Adviser Defendants, failed to adequately  inform themselves and disregarded red flags showing that the advisory and distribution fees were excessive.  Furthermore, the Directors failed to hold the Investment Adviser Defendants accountable for revenue sharing agreements entered into by them with various brokerage firms, or for other Shelf Space payments for which the Investment Adviser and Distributor Defendants charged the Funds, and therefore their investors, excessive fees and commissions.

**The Excessive Fees At Issue**

104.     **Investment Advisory Fees**:  Investment advisory fees are calculated as a percentage of assets under management.  As the fund assets increase, the dollar amount of such fees parallels this growth.  Directors are charged with ensuring that such growth does not result in a windfall to advisers where commensurate services are not provided.  Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.*, choosing the securities in which a

mutual fund should invest and conducting the operations required to support the management of the portfolio, and include the overhead and administrative costs involved in conducting the business of the investment adviser.

105.    **Rule 12b-1 Fees**:  SEC Rule 12b-1 permits a fund to pay "12b-1" distribution fees out of fund assets, but only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its investors.  Distribution fees are comprised of fees paid to the Distributor Defendants for marketing and selling fund shares, including compensation for advertising, the printing and mailing of prospectuses and sales literature to investors and payments to financial consultants and others who sell fund shares.  Like the investment advisory fees, 12b-1 fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

106.    **Service Fees And Administrative Fees**:  Service and administrative fees are paid to persons to respond to investor inquiries, furnish investors with information about their investments, and to provide other services required to enable the functioning of the fund.  These two types of fees may pay for similar expenses or may significantly overlap, as described more fully below.  Unlike distribution fees, a fund may pay shareholder service and administrative fees without adopting a 12b-1 plan.  Accordingly, such fees are often not visible to investors and are highly susceptible to manipulation by the Investment Advisers.  Like the investment advisory fees and the 12b-1 fees, the service and administrative fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

107.    **Transfer Agency Fees**:  Transfer agency fees are paid to an in-house, affiliated or independent third party to handle sales and redemptions of fund shares, maintain shareholder records, compute the net asset value (the "NAV") of the fund daily, and pay out dividends and capital gains.  Like the investment advisory fees, the 12b-1 fees and the administrative/service fees, the transfer agency fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

108.    These foregoing fees are the principal components of a funds "expense ratio," which is the ratio of total expenses to net assets.  The expense ratio determines the fund's efficiency and

cost effectiveness, and consequently a lower number is desirable because it reflects higher total returns.

**Factors That Show The Fees Charged To The Wells Fargo Funds And Their Investors Were Not Reasonably Related To The Services Provided Them And Were Excessive**

109. Courts recognize that certain factors indicate that fees are excessive. In particular, the following factors bear on whether the investment adviser and its affiliates are charging excessive fees to a fund and its investors:

- the nature and quality of services being paid for by the fund and its investors;

- whether the investment advisory fees are reduced to reflect the "fall-out benefits" the advisers receive, which are those benefits other than the advisory fees that flow to the adviser and its affiliates as a result of the adviser's relationship with the fund;

- what fees other fund families or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- whether the funds' directors or trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory and distribution agreements.

110. These factors, when applied to the Wells Fargo Funds, demonstrate that the fees charged to the Wells Fargo Funds and their investors were not reasonably related to the services provided and were excessive.

**The Economies Of Scale Were Not Passed On To Investors**

111. While Defendants were profiting from the Funds' growth, they failed to pass the economies of scale generated from such growth to the Funds and their investors. The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted … that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), as reprinted in 1970 U.S. Code Cong. & Ad. News, at 4901-02.

112.    An investment adviser's profit is a function of revenue minus the costs of providing services.  Defendants' incremental costs of providing advisory services to the Wells Fargo Funds were nominal.  The additional fees received by Defendants were disproportionate given that the nature, quality and level of the services they provided remained the same.  On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur at both the fund complex and portfolio levels for various costs incurred.  For example, many of the costs, such as the costs of research for a particular investment, remain fixed regardless of the amount of assets in a given fund devoted to that investment.  As has been noted, the mutual fund industry is a business in which economies of scale are present and are statistically significant.  *See* Jim Saxton, Chairman, Joint Economic Committee of the United States Congress, *The Mutual Fund Industry: An Overview and Analysis* 19 (2002) (citing William Baumol, *The Economics of Mutual Fund Markets: Competition Versus Regulation* 186, 190 (Kluwer Academic 1990)), *available at* http://www.house.gov/jec/mutual2.pdf.

113.    The growth of assets under management by the Investment Adviser Defendants has generated substantial economies of scale which, to the great benefit of the Investment Adviser and Distributor Defendants, have not been passed on to the Funds and their investors through lower fees.  Instead, Defendants retained these economies of scale for themselves as a windfall and continued charging greatly increased expenses without providing additional, commensurate services.

114.    In regard to Wells Fargo Advantage Asset Allocation, industry analyst Morningstar noted that "the fund's rising costs disappoint us.  Despite having below-average fees for a front-load offering in this category, fees have steadily trended upward over the past decade."  Lawrence Jones, *Morningstar's Take: We think This Fund's Aggressive Allocation Stance and Increasing Costs*

*Limit Its Appeal*, Dec. 1, 2005, http://quicktake.morningstar.com (password required).

Morningstar's conclusions are supported by the increase in assets under management between 2002

and 2005, when the Fund grew from $1.13 billion to $1.16 billion and the expense ratio

simultaneously increased from 1.84% to 1.90%.[4]

115.    Additionally, in regards to Wells Fargo Small Cap Value Fund, Morningstar analysts

have observed that, "[t]he fund's asset growth could have provided shareholders with one benefit: a

lower cost, had this fund's advisor lowered expenses significantly as assets grew.  Unfortunately, it

has not done so.  Lower costs could provide the fund a better opportunity to replicate past successes

with a less nimble offering."  Lawrence Jones, *Morningstar's Take: Could Wells Fargo Advantage*

*Small Cap Value Become a Victim of Its Own Success*,  Feb. 27, 2006,

http://quicktake.morningstar.com (password required).  The increase in assets under management

and the expense ratio demonstrates Morningstar's point.

116.     Several other Wells Fargo Funds illustrate the same historical trends with their

expense ratios:

- Between 2002 and 2005, Wells Fargo Advantage Growth Equity Fund increased in assets from $390,546,000 to $560,779,000, and the Class B expense ratio also increased from 2.22% to 2.25%;[5]

- Wells Fargo Advantage Outlook 2020 Fund's assets also increased between 2000 and 2005, growing from $230,820,000 to $363,586,000, and its Class B expense ratio rose from 1.30% to 2.02% during the same period;[6]

---

[4] Wells Fargo Asset Allocation Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Asset Allocation, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[5] Wells Fargo Growth Equity Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Growth Equity, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[6] Wells Fargo Outlook 2020 Fund, annual report for fiscal year ending Feb. 28, 2005 (Form N-CSR) (Apr. 27, 2005); Wells Fargo LifePath 2020 Fund, annual report for fiscal year ending Feb. 28, 2001 (Form N-30D) (May 10, 2001).

- Wells Fargo Advantage Diversified Equity Fund increased in assets between 2002 and 2005, from $1.16 billion to $1.37 billion, while its expense ratio remained constant.[7]

- Wells Fargo Montgomery Emerging Markets Focus Funds grew between 2002 and 2005 from $23,020,221 to $237,387,000 and its Class B expense ratio increased from 2.31% to 2.65%.[8]

- Between 2004 and 2005, Wells Fargo Advantage Small Cap Growth Fund increased from $131,274,000 to $246,389,079, and the Fund's Class B expense ratio remained at 2.15%.[9]

117.    Additionally, when looking at how much higher Wells Fargo Funds' expense ratios are than the expense ratios of similar sized funds that would experience the same economies of scale, it is clear that the economies of scale were not passed to investors.  As illustrated below, the Funds were, on average, 55 bps more expensive than other funds:

---

[7] Wells Fargo Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec 7, 2005).

[8] Wells Fargo Montgomery Emerging Markets Focus Fund, annual report for fiscal year ended June 30, 2003 (Form N-CSR) (Sept. 8, 2003); Wells Fargo Montgomery Emerging Markets Focus Fund, annual report for fiscal year ended Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[9] Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ended Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004); Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ended Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

| Comparison of 2004 Fees on Wells Fargo Funds to CRSP[10] | | |
|---|---|---|
| Value-Weighted[11] Benchmark of Same-Sized Funds[12] | | |
| Retail Share Classes Only | | |
| Differences in Terms of Basis Points | | |
| | | |
| Fund Name | S&P Objective | Expense Ratio bps Higher than Industry Average |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 58 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 50 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 15 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 32 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 11 |
| | | |
| Arithmetic Average Across Share Classes | | 55bps |

118.    Wells Fargo Funds' historical trend of failing to pass economies of scale to investors resulted in a huge windfall for the Investments Adviser Defendants, all to the detriment of investors. The fees were not reasonably related to the services provided to the Funds and therefore investors were paying excessive fees.

**The Illusory Breakpoints In The Funds' Advisory Agreements Illustrate That The Economies of Scale Were Not Passed On To The Funds And Their Investors**

119.    A "fee breakpoint" has been explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase…. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 Iowa J. Corp. L. 609, 620 n.59 (2001).

[10] The University of Chicago Center for Research in Securities Prices ("CRSP") Benchmark is the value weighted average (defined below) of all funds in the same-size quartile that had the same CRSP Strategic Objective Designation.

[11] The value weighted benchmark is calculated by obtaining the contemporaneous monthly asset valuation for each fund and the averages of the funds' expense ratios that have the same strategic objective.

[12] Same-sized funds refers to funds that have similar size of class shares.

120.     While some of the advisory contracts for the Funds include breakpoints, many of these breakpoints were meaningless because, as a practical matter, they did not pass any of the economies of scale to Fund investors.  For example, prior to August 1, 2004, Wells Fargo Advantage Outlook 2020 Fund had no advisory fee breakpoints.  Additionally, when the Fund finally adopted breakpoints on that date, the first breakpoint started at $500 million, even though the Fund held $363,585,000 in assets.[13]

121.     Wells Fargo Advantage Asset Allocation Fund also lacked breakpoints until August 1, 2004.  The breakpoints that were adopted were illusory because after the Fund grew to $1 billion in assets, its structure required the Fund to swell to $3 billion in assets before any economies of scale would be passed to the investor.  For example, as of September 30, 2004, the Fund had $1.1 billion in assets under management, but it would need to grow by another $2 billion before any more breakpoints would impact the Fund and pass any economies of scale to the investors.[14]

122.     Funds such as the Wells Fargo Advantage Diversified Equity Fund have no advisory fee breakpoints and therefore fail to pass on any economies of scale.[15]

123.     Following this trend, prior to August 1, 2004, Wells Fargo Advantage Small Cap Growth Fund lacked advisory fee breakpoints.  Additionally, when the Fund finally adopted breakpoints, the first breakpoint started at $500 million, even though the Funds were only at $131,274,000.[16]

124.     Prior to August 1, 2004, Wells Fargo Advantage Montgomery Emerging Markets Focus Fund also had no advisory fee breakpoints.  Additionally, when the Fund finally adopted

---

[13] Wells Fargo Outlook 2020 Fund, annual report for fiscal year ending Feb. 28, 2005 (Form N-CSR) (Apr. 27, 2005).

[14] Wells Fargo Advantage Asset Allocation Fund, annual report for fiscal year ending Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004).

[15] *See, e.g.,* Wells Fargo Advantage Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[16] Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ending Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004).

1  breakpoints, the first breakpoint started at $500 million, even though the Funds were only at

2  $195,486,000.[17]

3      125.    Additionally, fund companies sometimes hire outside money managers, known as

4  sub-advisers, to do the day-to-day stock or bond picking for their portfolios.  As New York

5  Attorney General Eliot Spitzer noted when he testified in front of the Senate, typically when parties

6  engage in arms'-length negotiations, the sub-adviser agrees to be compensated with a portion of the

7  advisory fee governed by breakpoints that kick in as the fund grows larger.  Rachel McTague,

8  *Spitzer Says Advisers Overcharged Funds; Fund Boards Breached Duty to Shareholders*, Securities

9  Regulation & Law Report, Feb. 02, 2004, *available at*

10 http://corplawcenter.bna.com/pic2/clb.nsf/id/BNAP-5VPRZJ?OpenDocument.  This "typical"

11 arrangement stands in sharp contrast to the facts in the instant matter.  Despite the fact that the

12 Advisers did negotiate lower breakpoint fees with the sub-advisers (that yield more profits for them

13 as the funds grow), the advisers continued to charge shareholders their full fee for "management

14 services," pocketing the difference.  The charts below illustrate this phenomenon:

15

16  **Wells Fargo Advantage Outlook 20/20 Advisory Fee Breakpoints**

17  **from 7/1/2005 Prospectus**

| Advisory Fees | Average Daily Net Assets | Fee % | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | | | *Average Daily Net Assets* | *Fee %* |
| after 8/1/2004 | 0 - 499 million | 0.65 | *0-100 million* | *0.25* |
| | 500 - 999 million | 0.60 | *100 - 200 million* | *0.20* |
| | 1 - 2.99 billion | 0.55 | *over 200 million* | *0.15* |
| | 3 - 4.99 billion | 0.525 | | |
| | over 4.99 billion | 0.50 | | |

---

[17] Wells Fargo Advantage Montgomery Emerging Markets Focus Fund, annual report for fiscal year ending Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004).

126.   Because the sub-adviser's fee breakpoints only apply to the Wells Fargo Fund when its assets are under $200 million, the adviser is able to couch its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $500 million. Therefore, when the assets in Wells Fargo Advantage Outlook 2020 Fund grew between $0 and $500 million, the sub-advisers' breakpoint structure resulted in the Investment Adviser Defendants receiving an additional 10bps without performing any additional work.

**Wells Fargo Advantage Asset Allocation Advisory Fee Breakpoints**

| from 2/1/2005 Prospectus | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| **Advisory Fees** | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **after 8/1/2004** | 0 - 499 million | 0.65 | *0-100 million* | *0.15* |
| | 500 - 999 million | 0.60 | *over 100 million* | *0.10* |
| | 1 - 2.99 billion | 0.55 | | |
| | 3 - 4.99 billion | 0.525 | | |
| | over 4.99 billion | 0.50 | | |
| **prior to 8/1/2004** | n/a | 0.75 | | |

127.   Again, because the sub-adviser's fee breakpoints only apply to the Fund when its assets are under $100 million, the adviser hides its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $500 million.  Thus, when Wells Fargo Advantage Asset Allocation Fund 's assets increased from $0 to $500 million, the Investment Adviser Defendant received an additional 5 bps in fees without performing any additional work as a result of the sub-advisers' breakpoints.

128.   As seen above, the sub-adviser's fee breakpoints only apply to the Fund when its assets are under $275 million, allowing the adviser to tuck its savings inside its own breakpoints, which do not kick in until the Fund's assets reach $500 million.  Therefore, while the assets in Wells Fargo Advantage Growth Fund grew from $0 to $500 million, as a result of the sub-advisers'

breakpoints the Investment Adviser Defendant was receiving an additional 45 bps without performing any additional work.

### Wells Fargo Advantage Growth Fund Advisory Fee Breakpoints

| | Average Daily Net Assets | Fee % | (under Sub-Adviser agrmt) Average Daily Net Assets | Fee % |
|---|---|---|---|---|
| effective 2/1/2006 | 0-499 million | 0.75 | 0-25 million | 0.75 |
| (LCGF Prosp. | 500-999 million | 0.70 | 25-50 million | 0.60 |
| dated 2/1/06) | 1-2.99 billion | 0.65 | 50-275 million | 0.50 |
| | 3-4.99 billion | 0.625 | over 275 million | 0.30 |
| | over 5 billion | 0.60 | | |
| | | | | |

129.    Again, because the sub-adviser's fee breakpoints only apply to the Fund when its assets are under $200 million, the adviser retains its savings through its own breakpoints, which do not kick in until the Fund's assets reach $500 million.  Thus, when Wells Fargo Advantage Small Cap Fund's assets grew from $0 to $500 million, the Investment Adviser Defendant received an additional 5 bps without performing any additional work, all as a result of the sub-advisers' breakpoints.

### Wells Fargo Small Cap Fund Advisory Fee Breakpoints

| | Average Daily Net Assets | Fee % | (under Sub-Adviser agrmt) Average Daily Net Assets | Fee % |
|---|---|---|---|---|
| effective 8/1/2004 | 0-499 million | 0.90 | 0-200 million | 0.25 |
| | 500-999 million | 0.85 | over 200 million | 0.2 |
| | 1-2.99 billion | 0.80 | | |
| | 3-4.99 billion | 0.775 | | |
| | over 4.99 billion | 0.75 | | |
| | | | | |

As demonstrated above, the advisory fee breakpoints' lack of impact on fees levied on the Funds and their clear contrast to the savings gleaned by the Investment Adviser Defendant from the sub-advisers' contract further illustrates that the economies of scale were not passed to the Funds' investors.

**The Nature and Quality of Services Does Not Justify The Excessive Fees**

130.   The nature of the advisory services provided to the Wells Fargo Funds did not justify the excessive expense ratios carried by the Funds.  Defendants cannot justify their high fees by arguing that their managers and analysts are of superior quality and provide superior performance.  The performance of these Funds was not up to par with other, similar funds in the industry, and thus could not justify the higher fees.

131.   According to the Lipper Research Center, Wells Fargo Diversified Equity Fund received an average score in terms of the total returns, a low score in terms of providing consistent returns, and a low score in terms of expenses.  Lipper.com, *Scorecard: Wells Fargo Funds Management LLC*, Feb. 28, 2006, http://www.lipperweb.com/research/fund.asp?fundno=40019707 (password required).  Additionally, according to Lipper's Leader Scorecard, while the return on Wells Fargo Diversified Equity over one year would be 14.76%, other funds in the multi-cap core category would have a 16.50%; the Fund's three year annualized performance was estimated to be at 18.81%, even though the multi-cap core funds had a 20.30% return; and the Funds five year performance was 4.52% whereas the multi-cap funds have an annual return of 5.90%.  *Id.*

132.   In regard to Wells Fargo Advantage Asset Allocation Fund, analysts have noted that, "[w]ith high volatility and middle performance, we have yet to see this strategy add the value investors are paying for."  Lawrence Jones, *Morningstar's Take: We Think This Fund's Aggressive Allocation Stance and Increasing Costs Limit Its Appeal*, Dec. 1, 2005, http://quicktake.morningstar.com (password required).

133.   When comparing Wells Fargo Advantage Emerging Markets Fund with comparable funds, it underperformed its benchmark peers with the same S&P objective by 14.73%.  Wells Fargo Advantage Small Cap Growth Fund also significantly underperformed benchmark funds with the same S&P objective by 13.55%.  Wells Fargo Advantage Outlook 20/20 Fund also underperformed its peer funds by 0.22%.

134.   Additionally, most of the Wells Fargo Funds' returns were highly correlated with the S&P 500 Index, indicating a level of performance that is consistent with the passive type of fund management characteristics of an index fund, rather than the purported active fund management for

which the Investment Adviser Defendants are being paid.  As illustrated below, the performance of

Plaintiffs' Funds is highly correlated to the S&P 500 Index, ranging from a .59 to .98 correlation in

returns.

| Correlation Between Monthly Returns on the Wells Fargo Funds (A Shares) and the S&P 500 Market Index - January 2004 through December 2005 | | |
|---|---|---|
| Ranked by Asset Size | | |
| Fund Name | Correlation Coefficient | Total Net Assets as of 12/04 |
| Wells Fargo Advantage Small Cap Value Fund | 0.73* | $601.1m |
| Wells Fargo Funds: Asset Allocation Fund | 0.97* | $915.5 m |
| Wells Fargo Funds: Diversified Equity | 0.98* | $112.5 m |
| Wells Fargo Funds: Growth Equity Fund | 0.94* | $21.7 m |
| Wells Fargo Funds: Outlook 2020 Fund | 0.96* | $153.4 m |
| | | |
| * denote statistical significance at the 1% level | | |

**The Fees Charged To The Funds And Their Investors Were Excessive
Relative To Similar Funds Offered In The Industry**

135.    When examining the expense ratios of other fund families that provide the same

types of funds as Wells Fargo, it is apparent that the Investment Adviser Defendants charged higher

fees than other investment advisers who manage the same type of portfolio.  As noted by

Morningstar, even while some of Wells Fargo's expense ratios have declined,  "many still rank

above their respective categories."  Morningstar.com, *Stewardship Grade: Wells Fargo Advantage*

*Asset Allocation Fund*, Aug. 25, 2004, http://quicktake.morningstar.com (password required).

136.    Wells Fargo Advantage Diversified Equity Fund Class B charges a significantly

higher expense ratio than the category average, charging 2% when the category average is 1.21%.

Yahoo! Finance Profile, Wells Fargo Advantage Diversified Eq B (NVDBX), Feb 28, 2006,

http://finance.yahoo.com/q/pr?s=nvdbx.

137.    Similarly, Wells Fargo Advantage Asset Allocation Class B had a higher expense

ratio than similar funds, with the Fund charging 1.90% when the category average was 1.22%.

Yahoo! Finance Profile, Wells Fargo Advantage Asset Allocation B (SASBX), Feb. 28, 2006,

http://finance.yahoo.com/q/pr?s=sasbx.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

47

138.    Wells Fargo Advantage Small Cap Value Fund Class B also carries an expense ratio that is significantly higher than the category average of its type of fund, charging 2.24% when the category average is 1.49%.  Yahoo! Finance Profile, Wells Fargo Advantage Small Cap Value B (SMVBX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=smvbx.

139.    Wells Fargo Advantage Outlook 2020 Class C Fund charged a higher expense ratio than the category average, charging 2.02% when the category average is .68%. Yahoo! Finance Profile, Wells Fargo Advantage Outlook 2020 C (WFLAX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=wflax.

140.    Wells Fargo Advantage Growth Equity Fund Class B share fees were also excessively high, carrying an expense ratio of 2.25% when the category average is 1.49%.  Yahoo! Finance Profile, Wells Fargo Advantage Growth Equity B (NVEBX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=nvebx.

141.    As also illustrated below, the Wells Fargo Funds had a trend of carrying higher expense ratios than comparable funds:

| Comparison of Wells Fargo Funds Fees to the CRSP Benchmark | | |
|---|---|---|
| Benchmark is the Equally-Weighted Average[18] of all Funds Existing During  2004 With the same CRSP S&P Objective as the Wells Fargo Funds | | |
| | | |
| **All Share Classes Only** | | |
| Differences in Terms of Basis Points | | |
| | | |
| **Fund Name** | **S&P Objective** | **Expense Ratio - bps Higher than Industry Average** |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 75 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 52 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 53 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 78 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 74 |
| Wells Fargo Funds: Outlook 2020 Fund | Asset Allocation USA Flexible | 58 |

[18] Equally-weighted average means that all funds were given equal value when determining the average of their expense ratio.

| | | 69 |
|---|---|---|
| **Arithmetic Average Across Share Classes^** | | **64bps** |

142.   The lower fees charged by similar funds is also demonstrative of how Wells Fargo Funds carry excessively high expense ratios.  Additionally, it illustrates that investors can obtain the same services for lower fees from other funds and that Wells Fargo's fees are not reasonably related to the services they are providing investors.

### THE FEES CHARGED WERE NOT REASONABLY RELATED TO SERVICES PROVIDED TO THE WELLS FARGO FUNDS AND THEIR INVESTORS

**The Investment Adviser Defendants Placed The Expense Of**
**Revenue Sharing Payments On The Funds And Their Investors**

143.   The Investment Adviser and Distributor Defendants also charged excessive fees by charging the Well Fargo Funds and their investors for Defendants' revenue sharing expenses described above.

144.   Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold.  Smita Madhur, *Revenue-Sharing Boosts Mutual Fund Sales Tenfold*, Financial-Planning.com, Jan. 24, 2005, http://www.financial-planning.com/pubs/fpi/20050124101.html.  At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and potentially excessive fees levied upon shareholders.

145.   Defendants participated in revenue sharing programs with various brokerage houses, including, but not limited to WF Investments, H.D. Vest, AG Edwards, American Express, Morgan Stanley and Wachovia.  *See* H.D. Vest Investment Services, NASD Letter Of Acceptance Waiver and Consent (No. CE1050007); June 8, 2005 NASD Press Release, *supra* ¶57; *see also* WF Investments, LLC,  NASD Letter of Acceptance, Waiver and Consent (No. CE1050006); Morgan Stanley.com,  Information on the Mutual Fund Network, http://www.morganstanley.com/about/pressroom/network.html (last visited Apr. 11, 2006); A Guide to Mutual Fund Investing at Wachovia Securities, and Understanding Compensation Received By A.G. Edwards.  These payments to brokers increased the fees levied on the Funds and their investors because the

Investment Adviser Defendants, in determining the amount they would charge for their advisory fees, accounted for the costs of the revenue sharing agreements for which they paid broker dealers and others, in order to ensure the recovery of their full profit after the revenue sharing payments were made.

**The Investment Advisory Fees Were Excessive Because They Were Not Reasonably Related To The Services Provided To The Funds Or Their Investors**

146.   A recent report on revenue sharing by Cerulli Associates notes that advisory fees are the most significant source of revenue sharing.  Cerulli Associates, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* (2005).  The advisory fee can be inflated in order to finance the adviser's revenue sharing obligations and, as shown herein, the Investment Adviser Defendants did just this with respect to the Wells Fargo Funds.

147.   Investment advisory fees are meant to cover management of the invested funds, including management and administrative activities related to managing the fund's portfolios. Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966).

148.   The investment advisory fees implemented by the Investment Adviser Defendants for revenue sharing do not fit either of these categories.  As explained in the NASD Letter of Acceptance, Waiver and Consent, "the investment adviser to the Wells Fargo Proprietary Funds allocated revenue net of certain expenses to various Wells Fargo & Company affiliates, on their sale of the Wells Fargo Funds proprietary mutual funds."  H.D. Vest Investment Services, NASD Letter Of Acceptance Waiver and Consent (No. CE1050007); June 8, 2005 NASD Press Release, *supra* ¶57; *see also* WF Investments, LLC,  NASD Letter of Acceptance, Waiver and Consent (No. CE1050006).

149.   The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds.  Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they

charge the fund to finance those distribution activities . . .  Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees."  Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.R.F. pts. 239, 240 and 274).

150.   The nature of Defendants' revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts on behalf of the Wells Fargo Funds. As a result of such activities, the aggregate net assets—against which the management fees were charged on a percentage basis—increased, with a consequent increase in the dollar amount of the advisory fees.  The Investment Adviser Defendants therefore received "something for nothing" from the Wells Fargo Funds and their investors because the fees were not the result of any increase or improvement in the services being provided, and did not reflect any legitimate increase in the cost of the services being provided to the advisers and their affiliates.

151.   In addition, the advisory fee payments made by the Funds and their investors that were utilized for revenue sharing were charged in violation of Rule 12b-1.  Advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, are regulated under Rule 12b-1 and Section 36(b).  As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources . . . 'if any allowance were made in the investment adviser's fee to provide money to finance distribution.'"  Investment Company Institute, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing Payment of Asset-Based Sales Loads By Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)) (emphasis added).  Defendants paid for part of these revenue sharing arrangements through advisory fees to circumvent limits placed on such distribution payments by Rule 12b-1.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

51

**Defendants Received Massive 12b-1 Fees But Provided No Benefit
To The Wells Fargo Funds Or Their Investors In Return**

152.     As discussed above, Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-1 conditions are, amongst others, that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." 17 C.F.R. § 270.12b-1(b).  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).  The directors may continue the plan "only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and sections 36(a) and (b) (15 U.S.C. § 80a-35(a) and (b)) of the Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).  As noted above, Rule 12b-1 fees are assessed as a percentage of assets under management and, accordingly, grow proportionately with the size of the Funds.

153.     Additionally, the 12b-1 fees charged to Wells Fargo Funds were higher than those charged to comparable funds.  As illustrated below, the Funds on average, charged 12b-1 fees that were 32 bps higher than other funds:

| Comparison of Wells Fargo Funds Fees to the CRSP Benchmark | | |
|---|---|---|
| Benchmark is the Equally-Weighted Average of all Funds Existing During 2004 With the same CRSP S&P Objective as the Wells Fargo Funds | | |
| | | |
| Retail Share Classes Only | | |
| Differences in Terms of Basis Points | | |
| | | |
| Fund Name | S&P Objective | 12b-1 Fees - bps Higher than Industry Average |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 59 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 19 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 27 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 27 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 37 |
| Wells Fargo Funds: Outlook 2020 Fund | Asset Allocation USA Flexible | 34 |
| | | 19 |
| **Arithmetic Average Across Share Classes** | | **32bp** |

**The Directors' Failure To Act Independently And Conscientiously Resulted In Defendants Charging Excessive Fees To The Funds And Their Investors**

154.    Mutual funds are typically created and managed by investment advisers for a profit. Investment advisers usually supervise a mutual funds' daily operations, and often select affiliated persons to serve on the board of directors.  As former SEC Commissioner Manuel Cohen remarked when referring to testimony by investment advisers:

> They also made the point that the investment advisor creates the fund, and operates it in effect as a business.  Many of them stated that "It is our fund, we run it, we manage it, we control it," and I don't think there is anything wrong with them saying it.  They were just admitting what is a fact of life.  The investment advisor does control the fund.

Freeman & Brown, Mutual Fund Advisory Fees, 26 Iowa J. Corp. L. at 615 n.24 (citing Statement of Manuel Cohen, Commissioner, SEC, Investment Company Act Amendments of 1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce (1967)).

155.    As a result of the investment adviser's control of the fund, the relationship between investment advisers and mutual funds contains many potential conflicts of interest.  This conflict arises because part of the fees the investment advisers charge, which reduce investors' returns, represents revenue and a source of profit to the investment adviser.  *See* GAO Report, *Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition* 14, 82 ("GAO Report") (June 2000), *available at* http://www.gao.gov/new.items/gg00126.pdf.

156.    The Investment Company Act ("ICA") was enacted in response to concerns that mutual fund shareholders were not being adequately protected as a result of these conflicts of interest.  As a result, the Directors were made responsible for overseeing the investment advisers' activities.  GAO Report at 14.  More specifically, the Investment Company Act requires the presence of independent directors on the board of directors to review and approve the fees the funds and their investors are charged.  *See* 15 U.S.C. § 80a-10(a).  The board of directors is responsible for approving the investment advisory agreements, 12b-1 plans, and fees paid to Investment Adviser Defendants.  In reviewing and approving the foregoing, the Directors are required to act in the best interest of the investors.

157.    Acting in the investors' best interests requires the Directors to exercise due care in approving the fees charged to those Funds that the Directors have the responsibility to oversee.  This is why the expertise of the independent Directors, whether they are fully informed about all facts bearing on the adviser's fee, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined in evaluating whether the compensation fund advisers and distributors receive is reasonable under §36(b) of the ICA.  *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 930 (2d Cir. 1982).

158.    One of the ways to evaluate whether the Directors fulfilled their duties with adequate care and conscientiousness is to determine whether they acted independently in approving the Funds' fee arrangements or whether the Directors' actions were controlled by the Funds' investment advisers.  In determining whether or not a Director is considered an "interested person," the ICA states that "[a] natural person shall be presumed not to be a controlled person."  15 U.S.C. § 80a-2(a)(9).  The term "interested person" is defined to include "any affiliated person" of an investment

company, investment adviser, or principal underwriter. *Id.* at § 80a-2(a)(19)(A)(i); (B)(i). "Affiliated person" is further defined as "any person directly or indirectly controlling, controlled by, or under common control with, such other person." *Id.* at § 80a-2(a)(3)(C) (emphasis added). Finally, the ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company." *Id.* at § 80a-2(a)(9) (emphasis added).

159.   The presumption that a Director is not a "controlled person" under the ICA may be rebutted by "evidence." *Id.* at § 80a-2(a)(9).  Such evidence may include allegations that non-employee directors followed a course of action suggested by the investment adviser which prejudiced the Funds' shareholders.  If the Directors rubber-stamp follow suggestions of the Investment Adviser Defendants, they cannot fulfill their statutory duties to act as "watchdogs" for the Funds.

160.   The Directors who served on the Board of Directors of the Wells Fargo Funds during the relevant time period include: Robert C. Brown, J. Tucker Morse, Thomas S. Goho, Peter G. Gordon, Richard M. Leach, Timothy J. Penny and Donald C. Willeke.

161.   All the Directors are on the boards of all the Wells Fargo Funds.  However, the fee structures in place show that the Directors failed to earnestly considered the shareholders' interests when negotiating the various fees of the Wells Fargo Funds.

162.   A wealth of evidence demonstrates that the purportedly "non-interested" Directors blindly followed the Investment Adviser Defendants' suggested courses of action by rubber-stamping fees and arrangements which prejudiced the Wells Fargo Funds' investors.  This evidence also firmly establishes that, even if the Directors were considered "independent," they failed to fulfill their duties with the care and conscientiousness necessary to ensure that the fees paid to Defendants from Wells Fargo Fund and investor assets were reasonable and not excessive. Specifically, Directors failed to genuinely consider and recognize that the Wells Fargo Funds should be considered individually instead of as part of a fund family unit; that no economies of scale were passed to investors as the Wells Fargo Funds grew; that the fees were significantly more expensive than comparable funds; and that the advisory fees should be reduced to reflect the fall out benefits received by Defendants.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

55

163.    Directors breached their duties because their service on all the Wells Fargo Funds allowed them to treat the Wells Fargo Funds as a unit of the Wells Fargo Fund complex, instead of examining each fund individually and diligently.  As industry analyst Morningstar notes, "there is just one board for all mutual funds in the Wells Fargo complex.  That structure could make it more difficult for the board to focus on what is happening to each fund."  Morningstar.com, *Stewardship Grade: Wells Fargo Advantage Asset Allocation Fund*, Aug. 24, 2004, http://www.quicktake.morningstar.com (password required).  For example, the Wells Fargo Fund complex would enter in agreements on behalf of all the Funds, instead of Directors determining whether the administrative services and fees or shareholder services fees were appropriate for the individual Funds.  For example, according to the transfer agency and service agreement dated August 10, 2004, the Wells Fargo Fund Trust, the registrant for all the Wells Fargo mutual funds, entered into an arrangement with Boston Financial Data Services, evidenced by the most recent annual agreement approved by the Wells Fargo Board of directors on May 18, 2004.  These transfer agency agreements included 'complex base fees' to be applied to all of the Portfolios of Wells Fargo Funds Trust and Wells Fargo Variable Trust Portfolios.  Wells Fargo Funds Trust, Transfer Agency & Service Agreement and Shareholder Servicing Plan, effective Nov. 8, 1999 (Oct. 30, 2000), amended Mar. 1, 2003 (Exh. 99.B(H)(3)) (Aug. 30, 2003), Schedule A amended Feb. 8, 2005 (EX-99.B(H)(3)) (Apr. 11, 2005).  Administrative agreements were also entered into by the Board on behalf of the Wells Fargo Trust incurring fees for the retail class shares of 0.33%, regardless of each individual Fund's needs.  Wells Fargo Funds Trust, Administration Agreement, June 9, 2003 (Exh. 99.B(H)(1)) (Aug. 15, 2003), Appendix A amended Aug. 10, 2004 (Exh. 99.B(H)(1)) (Apr. 11, 2005).

164.    The Directors knew that the cost of these revenue sharing and directed brokerage payments should have been borne by the Defendants as their own out-of-pocket expenses, yet did nothing to prevent the siphoning of these payments from Fund and investor assets or to appropriately reduce the advisory fee.  The fact that the Directors did not even question the acts or recommendations of the Defendants with respect to these programs (which only benefited

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

56

Defendants) demonstrates the Directors' failure to act as a "watchdog" of the Investment Adviser Defendants.

165.    Another of these instances was the Directors' lack of action with respect to the fee levels and structures in place for the Wells Fargo Funds.  Again, by failing to act to reduce the Wells Fargo Funds' fees, the Directors neglected to represent the Wells Fargo Funds and their investors with the degree of care and conscientiousness required of them.

166.    Another example of the Directors following a course of action set by the Investment Adviser Defendants instead of acting in the investors' best interest is found in the Directors' failure to implement fee structures that had meaningful—or even any—breakpoints for certain Wells Fargo Funds, while adopting them in others.  The SEC has made clear that it is the duty of the directors to carefully scrutinize the advisory and other fees to ensure that the economies of scale are being passed to investors as Fund assets grow so that the increases in advisory and other fees are not a windfall to the investment advisers and their affiliates:

> If the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract.  If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm.

167.    While Plaintiffs and other Wells Fargo investors have contributed to the growth of Fund assets, they received no benefits in return.  The Directors continually allowed investor assets to be used for only the benefit of the Investment Adviser Defendants and their affiliates.  As purportedly "independent" Directors, they had a duty to question the Investment Adviser Defendants' and their affiliates' practices, and to ensure that any economies of scale that were being realized from the increase in the Wells Fargo Funds' assets were being passed on to shareholders, the rightful recipients.  The Directors ultimately failed to exercise the requisite care and conscientiousness in performing their statutory duties by approving a course of action suggested by

1  the Investment Adviser Defendants that was of no benefit to the Wells Fargo Funds or their

2  investors.  The Directors' approval of such actions, which prejudiced the Wells Fargo Funds and

3  their investors, further demonstrates that they were controlled by the Investment Adviser

4  Defendants.

5       168.    Additionally, the Directors failed to ensure that the economies of scale were passed

6  to the Wells Fargo Funds and their investors and that the Funds' expense ratios are reasonable in

7  relation to comparable funds.

8

9                        **CLASS ACTION ALLEGATIONS**

10      169.    Plaintiff bring this action as a class action pursuant to Federal Rule of Civil

11  Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities who purchased shares or

12  like interests in any of the Shelf Space Funds between June 30, 2000 and June 8, 2005, inclusive,

13  and/or who held shares of the Wells Fargo Funds between June 30, 2000 and June 8, 2005 and who

14  were damaged thereby.  Excluded from the class are Defendants, members of their immediate

15  families and their legal representatives, heirs, successors, or assigns and any entity in which

16  Defendants have or had a controlling interest (the "Class").

17      170.    The Class is divided into the following subclasses:

18          **The Purchasers Subclass**:  This Class includes persons or entities

19          who purchases shares or like interests of any of the Shelf-Space Funds

20          at any time during the Class Period (the "Purchasers Subclass").

21

22          **The Holders Subclass**:  This subclass includes all persons or entities

23          who held shares or like interests of any of the Wells Fargo Funds at

24          any time during the Class Period (the "Holders Subclass").

25      171.    The members of the Class are so numerous that joinder of all members is

26  impracticable.  While the exact number of the Class members is unknown to Plaintiff at this time

27  and can only be ascertained through appropriate discovery, Plaintiff believes that there are

28  thousands of members in the proposed class.  Record owners and other members of the Class may

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES
LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

58

be identified from records maintained by the Wells Fargo and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

172.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   Whether the federal securities laws were violated by Defendants' acts as alleged herein; and

b.   To what extent the members of the Class have sustained damages and the proper measure of such damages.

173.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

59

## SECURITIES ACT CLAIMS

## COUNT I

## ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE BROKER/DEALER DEFENDANTS FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

174. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

175. This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Plaintiff and other members of the Purchasers Subclass against the Broker/Dealer Defendants for failure to disclose sales practices that created an insurmountable conflict of interest.

176. The Broker/Dealer Defendants were the sellers, or the successors in interest to the sellers, within the meaning of the Securities Act, for one or more of the Shelf Space Fund shares sold to Plaintiff and other members of the Purchasers Subclass because they either: (a) transferred title of shares of the Shelf Space Funds to members of the Purchasers Subclass; (b) transferred title to shares of the Shelf Space Funds to the Shelf Space Funds distributors that in turn sold shares of the Shelf Space Funds as agents for the Shelf Space Funds; and/or (c) solicited the purchase of shares of the Shelf Space Funds by members of the Purchasers Subclass.

177. During its sale of the Shelf Space Funds to members of the Purchasers Subclass, the Broker/Dealer Defendants failed to disclose the kickback payments and other improper inducements alleged herein that they received. These inducements created an insurmountable conflict of interest. Wells Fargo also caused to be issued to members of the Purchasers Subclass the Prospectuses that failed to disclose that fees and commissions from the Shelf Space Funds would be used to pay brokers for directing investors into the Shelf Space Funds.

178. As set forth herein, when they became effective, all Shelf Space Funds' Prospectuses were misleading as they omitted the following material facts:

      a.     that the Shelf Space Funds' had a quid pro quo financial arrangement with the Broker/Dealer Defendants whereby the Broker/Dealer Defendants received payments from the Shelf Space Funds in exchange for pushing the Shelf Space Funds on their clients;

      b.     that the Shelf Space Funds' investment advisers authorized the payment from Shelf Space investors assets through directed brokerage and revenue sharing payments to Wells Fargo in exchange for Wells Fargo pushing its clients into the Shelf Space Funds; and

      c.     that by accepting payment from the Shelf Space Funds to push the Shelf Space Funds onto their clients, Wells Fargo had a conflict of interest material to investors.

179.     At the time they purchased the Shelf Space Funds shares traceable to the defective Prospectuses, members of the Purchasers Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

### COUNT II

### ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE REGISTRANT AND DISTRIBUTOR DEFENDANTS FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

143.     Members of the Purchasers Subclass repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, members of the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

144.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Purchasers Subclass against the the Distributor Defendants and Registrant.

145.     Each of the Distributor Defendants and the Registrant, was the seller, or the successor in interest to the seller, within the meaning of the Securities Act, for one or more of the respective Wells Fargo Fund shares sold to members of the Purchasers Subclass because they either: (a) transferred title to members of the Purchasers Subclass of the Wells Fargo Funds; (b) transferred title to shares of the Wells Fargo Funds to the Wells Fargo Funds Distributors that in

turn sold shares of the Wells Fargo Funds as agents for the Wells Fargo Funds; and/or (c) solicited the purchase of shares of the Wells Fargo Funds by members of the Purchasers Subclass.

146.    Each of the Registrant Defendant and Distributor Defendants issued, caused to be issued and participated in the issuance of its respective misleading Prospectus that omitted material facts and is statutorily liable under Section 12.

147.    Prior to purchasing shares of the Wells Fargo Funds, members of the Purchasers Subclass were provided with a Wells Fargo Fund Prospectus.  Members of the Purchasers Subclass purchased shares of the Wells Fargo Funds traceable to a misleading Prospectus and were damaged thereby.

148.    As set forth herein, when they became effective, the Prospectuses were materially false and misleading as they omitted the following material facts:

(a)     that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b)     that the Investment Adviser Defendants directed brokerage payments to firms that favored the Wells Fargo Funds, which was a form of marketing that was not disclosed in or authorized by the Funds Rule 12b-1 plans;

(c)     that the Wells Fargo Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Wells Fargo Funds' Directors and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

(d)     that by paying brokers to aggressively steer their clients to the Wells Fargo Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(e)     that any economies of scale achieved by marketing the Wells Fargo Funds to new investors were not passed on to the Wells Fargo Funds investors; on the contrary, as the Wells

Fargo Funds grew, fees charged to the Wells Fargo Funds investors continued to increase;

(f)     that Defendants improperly used soft dollars and excessive commissions, paid from the Funds assets, to pay for overhead expenses the cost of which should have been borne by the Company and the Investment Adviser Defendants and not the Wells Fargo Funds investors; and

(g)     that the Directors failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Wells Fargo Funds and their investors.

149.     Members of the Purchasers Subclass have sustained damages due to these violations.

150.     At the time they purchased the Wells Fargo Funds shares traceable to the defective Prospectuses, members of the Purchasers Subclass were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

## COUNT III

### ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE CONTROL PERSON DEFENDANT FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

180.     Members of the Purchasers Subclass repeat and re-allege each and every allegation contained above, except that for purposes of this claim, the Purchasers Subclass expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

181.     This claim is brought pursuant to Section 15 of the Securities Act against the Control Person Defendant as control persons of the Broker/Dealer Defendants.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misleading information complained about herein is the collective action of the Control Person Defendant.

182.     The Broker/Dealer Defendants and the Distributor and Registrant Defendants are liable under Section 12(a)(2) of the Securities Act as set forth herein.

183.     The Control Person Defendant was a "control person" of the Broker/Dealer Defendants and the Distributor and Registrant Defendants within the meaning of Section 15 of the

Securities Act, by virtue of its position of operational control and/or ownership.  At the time that members of the Purchasers Subclass purchased shares of one or more of the Shelf Space Funds from the Broker/Dealer Defendants - by virtue of their positions of control and authority over the Broker/Dealer Defendants – the Control Person Defendant directly and indirectly, had the power and authority, and exercised the same, to cause the Broker/Dealer Defendants to engage in the wrongful conduct complained of herein.  Likewise, at the time that members of the Purchasers Subclass purchased one of more shares of the Wells Fargo Funds, the Control Person Defendant directly and indirectly had the power and authority, and exercised the same, to cause the Distributor and Registrant Defendants to engage in the wrongful conduct complained of herein.

184.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the Control Person Defendant is liable to members of the Class to the same extent as the Broker/Dealer, Distributor and Registrant Defendants are for their primary violations of Section 12(a)(2) of the Securities Act.

185.    By virtue of the foregoing, members of the Purchasers Subclass are entitled to damages against the Control Person Defendant.

**EXCHANGE ACT CLAIMS**
**FRAUD-ON-THE-MARKET ALLEGATIONS**

186.    At all relevant times, the market for the Shelf Space Funds was efficient for, *inter alia*, the following reasons:

a.    The Shelf Space Funds met the requirements for listing, and were listed and actively traded through a highly efficient and automated market;

b.    Regulated entitles, periodic public reports concerning the Shelf Space Funds were regularly filed with the SEC;

c.    Persons associated with the Shelf Space Funds regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      The Shelf Space Funds were followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

187.      As a result of the foregoing, the market for the Shelf Space Funds promptly digested current information regarding the Shelf Space Funds from all publicly available sources and reflected such information in the respective value for the Shelf Space Funds as well as the market trend and demand for the shares of the Shelf Space Funds.  Investors who purchased or otherwise acquired shares or interests in the Shelf Space Funds relied on the integrity of the market for such securities.  Under the circumstances, all purchasers of the Shelf Space Funds during the Class Period suffered similar injury through their purchase or acquisition of the Shelf Space Funds at a value that did not reflect the risks and costs of the continuing course of conduct alleged herein, and a presumption of reliance applies.

## COUNT IV

### ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

188.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

189.      During the Class Period, all Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiff and other Purchaser Subclass members, as alleged herein and caused Plaintiff and other members of the Purchaser Subclass to purchase Shelf Space Funds at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, all Defendants took the actions set forth herein.

190.      Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct which operated as a

fraud and deceit upon the purchasers of the Shelf Space Funds, including Plaintiff and other members of the Purchaser Subclass, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

191. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Shelf Space Funds' operations, as specified herein.

192. Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and/or commissions paid to them as a result of its undisclosed kickback arrangement described above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon Plaintiff and members of the Purchasers Subclass.

193. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

194. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Shelf Space Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of the fact that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

66

members of the Purchasers Subclass acquired the shares or interest in the Shelf Space Funds during the Class Period at distorted prices and were damaged thereby.

195.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Purchasers Subclass were ignorant of their falsity, and believed them to be true.  Had Plaintiff and other members of the Purchasers Subclass known the truth concerning the Shelf Space Funds' operations, which Defendants did not disclose, Plaintiff and other members of the Subclass would not have purchased or otherwise acquired their shares, or, if they had acquired such shares during the Class Period, they would not have done so at the distorted prices which they paid; would not have paid the commissions or fees paid as a result of their acquisition of the Shelf Space Funds; and would not have paid the fees and costs associated with ownership of the Shelf Space Funds.

196.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Purchasers Subclass suffered damages in connection with their purchases and acquisitions of Shelf Space Funds during the Class Period.

## COUNT V

**ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE CONTROL PERSON
DEFENDANT FOR VIOLATIONS OF
SECTION 20(a) OF THE EXCHANGE ACT**

198.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

199.    This claim is brought pursuant to Section 20(a) of the Exchange Act against the Control Person Defendant.

200.    The Control Person Defendant acted as a controlling person of the Broker/Dealer Defendants, the Investment Adviser Defendants, Distributor Defendants and the Registrant Defendant within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein. By virtue of their operational and management control of the Broker/Dealer Defendants, the Investment Adviser Defendants, Distributor Defendants and the Registrant Defendant's respective

businesses and systematic involvement in the fraudulent scheme alleged herein, the Control Person Defendant  had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the Broker/Dealer Defendants, the Investment Adviser Defendants, Distributor Defendants and the Registrant Defendant, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Control Person Defendant had the ability to prevent the issuance of the statements alleged to be false and misleading or could have caused such statements to be corrected.

201.    In particular, the Control Person Defendant had direct and supervisory involvement in the operations of the Broker/Dealer Defendants, the Investment Adviser Defendants, Distributor Defendants and the Registrant Defendant and, therefore, is presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged herein, and to have exercised same.

202.    As set forth above, the Broker/Dealer Defendants, the Investment Adviser Defendants, Distributor Defendants and the Registrant Defendant  each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of its positions as a controlling person, the Control Person Defendant is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Purchasers Subclass suffered damages in connection with their purchases of Shelf Space Funds securities during the Class Period.

## INVESTMENT COMPANY ACT CLAIMS

## COUNT VI

**BY THE HOLDERS SUBCLASS FOR THE BENEFIT OF THE WELLS FARGO FUNDS AGAINST THE INVESTMENT ADVISER DEFENDANTS AND DISTRIBUTOR DEFENDANTS PURSUANT TO SECTION 36(B) OF THE ICA**

203.    Plaintiff repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

68

204.     This Count is brought by the Holders Subclass for the benefit of the Wells Fargo Funds against the Distributor Defendants and the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

205.     The Distributor Defendants and the Investment Adviser Defendants had a fiduciary duty to the Funds and the Holders Subclass with respect to the receipt of compensation for services and of payments of a material nature made by and to the Distributor Defendants and the Investment Adviser Defendants.

206.     The Distributor Defendants and the Investment Adviser Defendants violated Section 36(b) by charging excessive Rule 12b-1 marketing fees and advisory fees.  These Defendants caused the Wells Fargo Funds and their investors to pay inflated commissions (including soft dollar payments) and recouped from the Wells Fargo Funds and their investors, through management and other fees, the cost of any revenue sharing payments purportedly made from adviser or distributor assets.  These Defendants also charged excessive advisory fees under 36(b) because they improperly inflated management fees and shifted expenses from the Investment Advisers to the Funds and their investors without a corresponding reduction in their management fees to reflect that shift in expense; failed to pass along economies of scale; imposed an usually large fee schedule; and charged for active management of the Wells Fargo Funds, when, in fact, the Funds were passively managed.

207.     By reason of the conduct described above, the Distributor Defendants and the Investment Adviser Defendants violated Section 36(b) of the Investment Company Act.

## COUNT VII

**BY THE HOLDERS SUBCLASS FOR THE BENEFIT OF THE WELLS FARGO FUNDS AGAINST THE CONTROL PERSON DEFENDANT FOR VIOLATION OF SECTION 48(A) OF THE INVESTMENT COMPANY ACT**

208.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

209.     This Count is brought pursuant to Section 48(a) of the Investment Company Act against the Control Person Defendant as control person of the Distributor Defendants and the

1  Investment Adviser Defendants, who caused the Distributor Defendant and the Investment Adviser

2  Defendants to commit the violations of the Investment Company Act alleged herein.

3      210.    The Distributor Defendant and Investment Adviser Defendants are liable under

4  Section 36(b) of the Investment Company Act as set forth herein.

5      211.    The Control Person Defendant was a "control person" of the Distributor Defendant

6  and the Investment Adviser Defendants and caused the violations complained of herein.  By virtue

7  of its positions of operational control and/or authority over the Investment Adviser Defendants

8  and/or Distributor Defendant – the Control Person Defendant, directly and indirectly, had the power

9  and authority, and exercised the same, to cause the Distributor Defendant and/or the Investment

10  Adviser Defendants to engage in the wrongful conduct complained of herein.

11      212.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the

12  foregoing, Wells Fargo is liable to Plaintiff and other members of the Holders Subclass to the same

13  extent as are the Distributor Defendant and the Investment Adviser Defendants for their primary

14  violations of Section 36(b) of the Investment Company Act.

15      213.    By virtue of the foregoing, the Funds, Plaintiff and other members of the Holders

16  Subclass members are entitled to damages against Wells Fargo.

## **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiff prays for relief and judgment as follows:

19      (a)    Determining that this action is a proper class action and certifying the Lead

20  Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

21      (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

22  members against all Defendants, jointly and severally, for all damages sustained as a result of

23  Defendants' violations of the federal securities laws, in an amount to be proven at trial, including

24  interest thereon;

25      (c)    Awarding the Funds the return of the excessive fees pursuant to the

26  Investment Company Act claims;

27      (d)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred

28  in this action, including counsel fees and expert fees; and

---

1   (e)  Such other and further relief as the Court may deem just and proper.

2

**<u>JURY TRIAL DEMANDED</u>**

3  Plaintiff hereby demands a trial by jury.

4 DATED: April 11, 2006    **MILBERG WEISS BERSHAD &**
               **SCHULMAN LLP**

5

6            By:_____/s/ Michael R. Reese_____
            Jerome M. Congress (*admitted pro hac*)

7            Janine L. Pollack (*admitted pro hac*)
            Kim E. Miller (178370)

8            Michael R. Reese (206773)
            One Pennsylvania Plaza

9            New York, New York  10119-0165
            Telephone: (212) 594-5300

10           Facsimile: (212) 868-1229

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF SERVICE**

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of New York, New York, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One Pennsylvania Plaza, New York, New York 10119.

2.      That on April 11, 2006, declarant served the CONSOLIDATED CLASS ACTION AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATION OF THE INVESTMENT COMPANY ACT, by electronic notice to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

4.      That on April 11, 2006, declarant served via email to:  scac@law.stanford.edu.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of April, 2006, at New York, New York.


                                                          /s/ Michael R. Reese
                                                    _____
                                                          MICHAEL R. REESE

# Wells Fargo & Co.

## Service List

| | |
|---|---|
| Bruce A. Ericson<br>Jacob R. Sorensen<br>Kristin M. Lefevre<br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>50 Freemont Street<br>P.O. Box 7880<br>San Francisco, CA 94105-7880<br>Tel.: (415) 983-1000<br>Fax: (415) 983-1200<br><br>-and-<br><br>Clifford C. Hyatt<br>David L. Stanton<br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>725 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017-5406<br>Tel.: (213) 488-7100<br>Fax: (213) 629-1033<br><br>*Counsel for Defendants Wells Fargo & Co., Wells Fargo Funds Management, LLC, Wells Capital Management, Inc., H.D. Vest Investment Services, Wells Fargo Funds Trust, and Stephens Inc.* | Thomas O. Jacob<br>Vanessa M. Hoffmann<br>**OFFICE OF GENERAL COUNSEL, WELLS FARGO & CO.**<br>633 Folsom Street, 7th Floor<br>San Francisco, CA 94107<br>Tel.: (415) 622-6656<br>Fax: (415) 975-7864<br><br>*Counsel for Defendants Wells Fargo & Co., Wells Fargo Funds Management, LLC, Wells Capital Management, Inc., Wells Fargo Funds Trust, and Wells Fargo Investments, LLC* |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

73