1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    BRUCE A. ERICSON  #76342
2   CLIFFORD C. HYATT  #196458
    DAVID L. STANTON  #208079
3   JACOB R. SORENSEN #209134
    KRISTIN M. LEFEVRE #221541
4   50 Fremont Street
    Post Office Box 7880
5   San Francisco, CA  94120-7880
    Telephone: (415) 983-1000
6   Facsimile: (415) 983-1200
    bruce.ericson@pillsburylaw.com
7
    Attorneys for All Defendants
8
    THOMAS O. JACOB  #125665
9   VANESSA M. HOFFMANN  #206086
    OFFICE OF GENERAL COUNSEL
10  WELLS FARGO & CO.
    633 Folsom Street, 7th Floor
11  San Francisco, California  94107
    Telephone: (415) 396-4425
12  Facsimile: (415) 975-7867
    tojacob@wellsfargo.com
13
    Attorneys for Defendants
14  WELLS FARGO & CO. and affiliates

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

19  THE McDANIEL FAMILY TRUST,                    No. C-05-04518-WHA
    Individually And On Behalf Of ALL OTHERS
20  SIMILARLY SITUATED,                           **CLASS ACTION (PSLRA)**

21                          Plaintiff,            **MOTION BY THE BROKER-
                                                  DEALER AND REGISTRANT
22              vs.                               DEFENDANTS TO DISMISS
                                                  COUNTS I, II AND IV OF
23  WELLS FARGO & COMPANY, et al.,                PLAINTIFF'S CONSOLIDATED
                                                  AMENDED CLASS ACTION
24                          Defendants.           COMPLAINT**

25                                                Date:  June 22, 2006
                                                  Time: 8:00 a.m.
26                                                Ctrm:  9, 19th Floor
                                                  Honorable William H. Alsup
27                                                Filed concurrently:
                                                  1.    Request for judicial notice
28                                                2.    Proposed order

1

# TABLE OF CONTENTS

2

**Page**

3   NOTICE OF MOTION AND MOTION TO DISMISS..........................................................1

4   ISSUES TO BE DECIDED ...........................................................................................1

5   MEMORANDUM OF POINTS AND AUTHORITIES...........................................................2

6   I.   INTRODUCTION.................................................................................................2

7   II.  STATEMENT OF THE CASE. ...............................................................................3

8        A.   The Parties. .............................................................................................3

9             1.   The defendants—and the non-party "Shelf-Space Funds"................3

10            2.   The lead plaintiff. ...........................................................................5

11       B.   Plaintiff's Allegations of Disclosure Violations............................................5

12  III. ARGUMENT. ......................................................................................................6

13       A.   Legal Standards Applicable to Motions to Dismiss. ......................................6

14       B.   The CAC Does Not Allege a Cognizable Duty to Disclose...........................6

15            1.   The CAC does not allege a duty required by law or
                   regulation. .....................................................................................7

16                a.   Mutual fund disclosure is regulated under Form N-1A..........7

17                b.   Revenue-sharing is lawful. ............................................8

18                c.   Recent case law rejects the CAC's duty to disclose
19                     theories. ......................................................................9

20                d.   Under existing law, general prospectus disclosure of
                       revenue-sharing arrangements suffices. ...............................12
21
                  e.   Defendants meet the existing legal requirements for
22                     disclosure......................................................................16

23            2.   The CAC does not adequately allege that the purported
                   omissions were material or rendered the prospectuses
24                 misleading....................................................................................18

25       C.   Plaintiff's '33 Act Claims Fail for Additional Reasons. ...............................20

26            1.   Plaintiff lacks standing to sue the broker-dealers and
                   distributors....................................................................................20
27
              2.   Plaintiff has not stated a cognizable claim for damages...................20
28

- i -

1        D.      Plaintiff's '34 Act Claims Fail for Additional Reasons. ..............................21

2                1.      The CAC does not adequately allege scienter................................22

3                2.      The CAC does not adequately allege loss causation. ......................23

4                3.      The CAC does not adequately allege transaction causation.............24

5        E.      The Applicable Statutes of Limitations Bar Plaintiff's Claims....................25

6   IV.  CONCLUSION. .....................................................................................................26

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2
**Page**

3
**Cases**

4

Auer v. Robbins,
   519 U.S. 452 (1997) ......................................................................................... 15

5

Benzon v. Morgan Stanley Distrib, Inc.,
   420 F.3d 598 (6th Cir. 2005) ...................................................................... 9, 10

6

7

Benzon v. Morgan Stanley Distrib., Inc.,
   2004 WL 62747 (M.D. Tenn. Jan. 8, 2004) ............................................... 9, 10

8

Blue Chip Stamps v. Manor Drug Stores,
   421 U.S. 723 (1975) ......................................................................................... 24

9

10

Castillo v. Dean Witter Discovery & Co.,
   1998 WL 342050 (S.D.N.Y. June 25, 1998) ......................................... passim

11

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
   511 U.S. 164 (1994) ........................................................................................... 7

12

13

DSAM Global Value Fund v. Altris Software, Inc.,
   288 F.3d 385 (9th Cir. 2002) ........................................................................... 21

14

Dumond v. Massachusetts Financial Services Company,
   2006 WL 149038 (D. Mass. Jan. 19, 2006) ...................................................... 9

15

16

Dura Pharmaceuticals, Inc. v. Broudo,
   544 U.S. 336, 125 S. Ct. 1627 (2005) ....................................................... 23, 24

17

Ernst & Young v. Hochfelder,
   425 U.S. 185 (1976) ......................................................................................... 22

18

19

Forsythe v. Sun Life Financial, Inc.,
   417 F. Supp. 2d 100 (D. Mass. 2006) ............................................................... 9

20

Geiger v. Soloman-Page Group, Ltd.,
   933 F. Supp. 1180 (S.D.N.Y. 1996) .......................................................... 16, 18

21

22

Gompper v. VISX, Inc.,
   298 F.3d 893 (9th Cir. 2002) ........................................................................... 22

23

In re AllianceBernstein Mut. Fund Excessive Fee Litig.,
   2005 WL 2677753 (S.D.N.Y Oct. 19, 2005) .................................................... 9

24

In re AllianceBernstein Mut. Fund Excessive Fee Litig.,
   2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ....................................................... 9

25

26

In re Davis Selected Mut. Funds Litig.,
   2005 WL 2509732 (S.D.N.Y. Oct. 11, 2005) ................................................... 9

27

28

- iii -

In re Digital Island Sec. Litig.,
    223 F. Supp. 2d 546 (D. Del. 2002) .............................................................. 15, 16

In re Dreyfus Mut. Funds Fee Litig.,
    2005 WL 3970836 (W.D. Pa. Sept. 30, 2005) .......................................... 9

In re Dreyfus Mut. Funds Fee Litig.,
    2006 WL 909434 (W.D. Pa. Apr. 10, 2006) ............................................. 9

In re Eaton Vance Mut. Funds Fee Litig.,
    403 F. Supp. 2d 310 (S.D.N.Y. Dec. 6, 2005) ........................................ 9

In re Evergreen Mut. Funds Fee Litig.,
    2006 WL 753000 (S.D.N.Y. Mar. 24, 2006) ....................................... 9, 11

In re Franklin Mut. Funds Fee Litig.,
    388 F. Supp. 2d 451 (D.N.J. Sept. 9, 2005) ............................................ 9

In re Goldman Sachs Mut. Funds Fee Litig.,
    2006 WL 126722 (S.D.N.Y. Jan 17, 2006) ............................................. 9

In re Lord Abbett Mut. Funds Fee Litig.,
    407 F. Supp. 2d 616 (D.N.J. Dec. 28, 2005) .......................................... 9

In re Merrill Lynch & Co. Inc. Research Reports,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................... 15

In re Morgan Stanley and Van Kampen Mut. Fund Securities Litig,
    2006 WL 1008138 (S.D.N.Y. Apr 18, 2006) .......................................... 9

In re Mut. Funds Investment Litig.,
    2006 WL 827339 (D. Md. Mar. 6, 2006) ................................................. 9

In re Oppenheimer Funds Fees Litig.,
    2006 WL 592881 (S.D.N.Y. Mar. 10, 2006) ........................................... 9

In re Silicon Graphics Sec. Litig.,
    183 F.3d 970 (9th Cir. 1999) ................................................................... 22

In re Syntex Corp. Sec. Litig.,
    95 F.3d 922 (9th Cir. 1996) ..................................................................... 22

Press v. Quick & Reilly, Inc.,
    218 F.3d 121 (2d Cir. 2000) ............................................................ passim

Randall v. Loftsgaarden,
    478 U.S. 647 (1986) ................................................................................. 20

TSC Indus., Inc. v. Northway, Inc.,
    426 U.S. 438 (1976) ................................................................................... 7

U.S. v. Alvarado,
    2001 WL 1631396 (S.D.N.Y Dec. 19, 2001) .................................... 10, 19

Wharf Holdings Ltd. v. United Int'l Holdings, Inc.,
         532 U.S. 588 (2001) ........................................................................ 22

**Statutes and Codes**

Securities Exchange Act of 1934
         Section 15(a)(1) ........................................................................... 4

United States Code
         Title 15, section 77l(a)(2) ........................................... 1, 2, 21
         Title 15, section 77m ................................................................ 25
         Title 15, section 78j(b) .............................................. 1, 2, 21
         Title 15, section 78o(a)(1) ....................................................... 4
         Title 15, section 78u-4(b)(2) ................................................. 22
         Title 28, section 1658(b)(1) .................................................. 25

**Rules and Regulations**

Code of Federal Regulations
         17, section 240.10b-10 ............................................................ 12
         Title 17, section 240.10b-5 ............................................ 1, 2, 6
         Title 17, section 220.22c-1 .................................................... 24

Federal Rules of Civil Procedure
         Rule 12 ............................................................................................ 3
         Rule 12(b)(6) ................................................................................. 1
         Rule 9(b) ................................................................................... 3, 6

NASD Regulation
         Rule 1021 ....................................................................................... 4
         Rule 2830(k)(7)(B) ................................................................... 20

**Other Authorities**

Adopting Release: Registration Form Used by Open-End Management
         Investment Companies, Release Nos. 35-7512, 34-39748 ........................................ 7

Brief of the Securities and Exchange Commission, Amicus Curiae,
         2000 WL 34447852 (Feb. 14, 2000) .................................................. 13, 14

Federal Register
         Volume 63, page 13916 (Mar. 23, 1998) ....................................... 7

NASD Notice to Members 97-50,
         NASD Regulation Requests Comment On Regulation Of Payment
         And Receipt Of Cash Compensation Incentives (Aug. 1997) .................................. 8

NASD Regulation Provides Interpretive Guidance on Registration
         Requirements, Notice to Members 99-49 (1999 ...................................... 4

NASD, Notice to Members 05-04, SEC Approves Amendments to NASD
         Rule 2830(k) to Strengthen Prohibitions on Investment Company
         Directed Brokerage Arrangements (Jan. 2005) ....................................... 20

1

Paul Roye, Director, SEC Division of Investment Management, Testimony
    Concerning the Mutual Funds Integrity and Fee Transparency Act of

2
    2003, H.R. 2420 (June 18, 2003)............................................................................... 8

3
SEC, Confirmation Requirements and Point of Sale Disclosure
    Requirements for Transactions in Certain Mutual Funds and Other

4
    Securities, and Other Confirmation Requirement Amendments, and
    Amendments to Registration Form for Mutual Funds,

5
    17 C.F.R. pts. 239, 240 and 274 (proposed Jan. 29, 2004) ...................................... 12

6
Securities Confirmations, Rel. No. 34-13508 (May 5, 1977) ............................................. 12

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                  **NOTICE OF MOTION AND MOTION TO DISMISS**

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3          PLEASE TAKE NOTICE that on Thursday, June 22, 2006, at 8 a.m., before the

4    Honorable William H. Alsup, United States District Judge, in Courtroom 9, 19th Floor,

5    450 Golden Gate Avenue, San Francisco, California, the "broker-dealer defendants" (**H.D.**

6    **VEST INVESTMENT SERVICES, LLC** and **WELLS FARGO INVESTMENTS,**

7    **LLC**) and the "registrant defendant" (**WELLS FARGO FUNDS TRUST**) will move and

8    hereby do move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to

9    dismiss Plaintiff's Consolidated Amended Class Action Complaint (Dkt. 58) ("CAC").

10         This motion is made on the grounds that the CAC fails to state facts sufficient to

11    state a claim upon which relief can be granted.  It addresses three claims:  Counts I and II

12    (allegedly arising under section 12(a)(2) of the Securities Act of 1933 ("'33 Act"),

13    15 U.S.C. § 77*l*(a)(2)); and Count IV (allegedly arising under section 10(b) of the Securities

14    Act of 1934 ("'34 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5).

15    These are the only claims against these defendants and hence the only one they need

16    address.  Other defendants also are named in Counts II and IV; to avoid burdening the

17    Court with repetitive arguments, those defendants will simply incorporate by reference the

18    arguments made here as to Counts II and IV.

19         This motion is based on this notice of motion and motion, the memorandum that

20    follows, the request for judicial notice filed herewith ("RFJN"), the motions to dismiss filed

21    concurrently by the other defendants (which motions these defendants hereby join in and

22    incorporate by reference), all pleadings and records on file in this action, and any other

23    arguments and evidence presented to this Court at or before the hearing on this motion.

24                      **ISSUES TO BE DECIDED**

25         1.      Can Plaintiff state a claim under section 12(a)(2) of the '33 Act against the

26    broker-dealer defendants by alleging that the broker-dealers did not make additional

27    disclosures about so-called "revenue sharing" beyond the disclosures in the prospectuses

28    and Statements of Additional Information ("SAI") issued by the mutual funds?

                                              

1       2.       Can Plaintiff state a claim under section 12(a)(2) of the '33 Act against the

2   registrant defendant by alleging that the "revenue sharing" disclosures it makes in its fund

3   prospectuses and SAIs did not contain disclosures beyond those required by existing

4   regulations and case law?

5       3.       Can Plaintiff state a claim against all defendants under section 10(b) of the

6   '34 Act and Rule 10b-5 thereunder by alleging that defendants' disclosures about revenue

7   sharing did not disclose more than existing regulations and case law require?

8              **MEMORANDUM OF POINTS AND AUTHORITIES**

9   **I.      INTRODUCTION.**

10      Counts I-V bring to the West Coast a series of non-disclosure claims that federal

11  courts across the East Coast have repeatedly dismissed.  They deserve the same fate here.[1]

12      Counts I-V allege that defendants did not disclose enough about revenue-sharing

13  arrangements to purchasers of mutual funds.  They allege that mutual funds and their

14  affiliates paid fees and commissions to the broker-dealers that sold their funds.  Although

15  such fees and commissions are disclosed in fund prospectuses and SAIs, and although each

16  purchaser is told precisely how much in fees and commissions he or she will be paying, this

17  is not enough disclosure to suit Plaintiff, who wants more.

18      The problems with these claims are manifold.  They allege duties that do not exist as

19  a matter of law.  They ignore the legal framework governing disclosure of revenue sharing

20  and the duties that do exist—as well as defendants' compliance with those duties.  They fail

21  to demonstrate loss causation and cannot come to grips with the lack of any connection

22  between the alleged omissions and the value of the funds purchased.  They fail to allege

23  transaction causation.  They fail to allege any cognizable theory of damages, instead resting

24  on theories rejected more than three decades ago.  Their theory of scienter was rejected by

25

26  [1]  Counts III and V allege claims for control person liability.  They name only one
     defendant—the parent, Wells Fargo & Co.—and are addressed in its separate motion to

27       dismiss.  Counts III and V are covered here because a failure to state a claim against the
     primary actors precludes a finding of liability against a control person.

28

1   the leading case and by the SEC.  And they are barred by the statute of limitations.  For all

2   these reasons, courts on the East Coast have overwhelmingly rejected these claims,

3   dismissing them under Rule 12 and Rule 9(b) .

4         This is an area of ferment, and we do not claim otherwise.  Congress and the

5   regulatory agencies have been active, both by changing some rules recently and proposing

6   comprehensive changes to others.  But legislative and regulatory activity is one thing;

7   private class actions seeking damages for fraud are quite another.  Plaintiff, like the

8   purported class he purports to represent, simply does not have any cognizable claim against

9   these defendants.  Accordingly, Counts I-V should be dismissed.

10  **II.    STATEMENT OF THE CASE.**

11  **A.    The Parties.**

12  **1.    The defendants—and the non-party "Shelf-Space Funds".**

13        There are eight defendants.  Seven are Wells Fargo entities.  The eighth is Stephens

14  Inc., a financial institution headquartered in Arkansas that is unaffiliated with Wells Fargo.

15        Functionally, the defendants fall into five categories:

16        **The fund company:**  Wells Fargo Funds Trust ("WF Funds Trust") is a "fund

17  company."  A Delaware business trust registered as an open-end management investment

18  company, it offered approximately 90 different mutual fund products during the Class

19  Period, many of which were offered in different share classes.[2]  CAC ¶ 28 labels these

20  products collectively as the "Wells Fargo Funds."

21        **The broker-dealers:**  Wells Fargo Investments, LLC ("WF Investments") and H.D.

22  Vest Investment Services, LLC ("H.D. Vest") are registered as broker-dealers with the U.S.

23  Securities and Exchange Commission ("SEC").  They are each members of the National

24  Association of Securities Dealers ("NASD").  During the Class Period, they had selling

25  agreements with roughly 325 mutual fund company distributors.[3]

26  ───────────────────

27  [2] RFJN Ex. 6 (press release notifying Wells Fargo Fund holders of this case).

28  [3] CAC ¶¶ 3, 17-19, 51.

1    **The investment advisers:**  Wells Fargo Funds Management, LLC ("WF Funds

2    Management") is a registered investment adviser responsible for "implementing the

3    investment policies and guidelines" for the Wells Fargo Funds.  It manages approximately

4    $75 billion in Wells Fargo Fund assets.[4]  Wells Capital Management, LLC is another

5    registered investment adviser, affiliated with and supervised by WF Funds Management,

6    and it acts as a sub-advisor to the Wells Fargo Funds.[5]

7    **The distributors:**  Stephens and Wells Fargo Funds Distributor, LLC ("WF Funds

8    Distributor") are distributors of the Wells Fargo Funds.[6]  In the mutual fund industry,

9    distributors are typically broker-dealers that act as wholesalers.  Distributors do not sell

10   directly to the public.

11   **The parent:**  Wells Fargo & Company ("Wells Fargo") is a diversified financial

12   holding company and the ultimate parent of the other defendants except Stephens.[7]  It has

13   no alleged role except as parent.  Wells Fargo is not licensed as a broker-dealer, and is

14   prohibited, under section 15(a)(1) of the '34 Act, from effecting securities transactions.[8]

15   **The "Shelf-Space Funds":**  The CAC labels 22 different fund companies as the so-

16   called "Shelf-Space Funds."[9]  Twenty-one of them are not affiliates of Wells Fargo and are

17   not parties to this case.  They include some of the world's largest and most prominent fund

18   families (*e.g,* AllianceBernstein, American, Dreyfus, Eaton Vance, Fidelity, Franklin

19   Templeton, Hartford, ING, John Hancock, Oppenheimer, Putnam and Scudder).  The

20   twenty-second is WF Funds Trust.[10]  Between them, the so-called "Shelf-Space Funds"

21   _____

22   [4] CAC ¶ 20; RFJN Ex. 4 (Advisory Agreement).

23   [5] CAC ¶¶ 20, 22; RFJN Ex. 5 (Sub-Advisory Agreement).

      [6] CAC ¶¶ 25-27.

24   [7] CAC ¶ 16.

25   [8] 15 U.S.C. § 78o(a)(1); *see also* NASD Rule 1021 (requiring registration for supervisory
      principals) NASD Regulation, *NASD Regulation Provides Interpretive Guidance on*
26   *Registration Requirements*, Notice to Members 99-49 (1999).

27   [9] CAC ¶ 1, n.1, Ex. A.

      [10] CAC Ex. A.

28

1   offer almost 6,000 mutual fund products, counting all share classes separately, in a wide

2   array of sizes, asset profiles, management styles, investment objectives and fee structures.[11]

3   **2.      The lead plaintiff.**

4   In the Class Period, lead plaintiff Ronald Siemers ("Plaintiff") purchased mutual

5   funds from just four of the 22 so-called "Shelf Space Fund" companies: Eaton Vance,

6   Fidelity, Hartford and Wells Fargo Funds.[12]  Plaintiff does not allege whether he dealt with

7   either of the broker-dealer defendants, and he does not allege that he met or spoke with a

8   single employee of the broker-dealers or the distributors.[13]  He purports to represent all

9   investors who dealt with either one of the broker-dealer defendants, or who purchased any

10  of the almost 6,000 mutual fund products offered by the "Shelf Space Fund" companies.

11  **B.      Plaintiff's Allegations of Disclosure Violations.**

12  Plaintiff alleges the investment advisers and distributors of the 22 "Shelf Space

13  Funds," including the Wells Fargo Funds, made revenue-sharing payments to broker-

14  dealers, including WF Investments and H.D. Vest, in connection with the sale of their

15  products.  The revenue-sharing payments took several forms.  Some consisted of money

16  paid to broker-dealers as compensation for sales and to defray sales costs.  Some consisted

17  of in-kind payments such as travel for training concerning fund products.  And some

18  consisted of executing a fund's brokerage business through broker-dealers who do a good

19  job of selling the fund company's products  (this is called "directed brokerage"; it has a set

20  of regulations all its own).[14]

21  Plaintiff alleges that these payments were "problematic" because they caused WF

22  Investments and H.D. Vest to "push" and "steer" clients into purchasing these companies'

23  products instead of products from the roughly 300 other companies with which WF

24  _____

    [11] Yahoo! Finance lists a total of 5,886 fund products sold by the "Shelf-Space Fund"
25      families.  *See* RFJN Ex. 7.

    [12] CAC Ex. B.
26
    [13] While this is outside the record, we know he has an account with WF Investments and
27      believe he never had an account with H.D. Vest.

    [14] CAC ¶¶ 33-56.
28

1   Investments and H.D. Vest had selling agreements.[15]  Plaintiff alleges that the broker-dealer

2   defendants failed to disclose the revenue-sharing payments they received from the Shelf-

3   Space Funds or the conflicts of interest created by their internal compensation plans.[16]

4   Plaintiff alleges these practices caused an overvaluation of the Shelf-Space Funds, whose

5   funds did not perform as well as comparable products from other fund companies.[17]

6        In large part, the CAC relies upon SEC consent decrees involving third parties and

7   NASD settlements involving the broker-dealer defendants.  For the reasons set forth in

8   defendants' motion to strike (filed herewith), these documents are not properly included in

9   the CAC.  There is no private right of action under the NASD regulations.  The consent

10  decrees involving the broker-dealer defendants concern only directed brokerage.  They do

11  not address any other form of revenue sharing.[18]

12  **III.    ARGUMENT.**

13  **A.    Legal Standards Applicable to Motions to Dismiss.**

14       This subject is addressed in the motion to dismiss filed by Wells Fargo & Co.  To

15  avoid repetition, we refer the Court to that discussion.  Here, we note only that because the

16  CAC sounds in fraud, Rule 9(b) applies to all claims—not only the 10b-5 claims (Counts

17  IV-V), to which it would apply in any event, but also the '33 Act claims (Counts I-III).

18  **B.    The CAC Does Not Allege a Cognizable Duty to Disclose.**

19       Counts I-V alleges that Plaintiff was not adequately informed about revenue-sharing

20  payments, internal incentive structures established by the broker-dealers,  and the conflicts

21  of interest these allegedly created.[19]  Because the securities laws contain no generalized

22  duty to disclose, Plaintiff must show that defendants had a duty to disclose this allegedly

23  _____

24  [15] CAC ¶¶ 17-18.

    [16] *See e.g.* CAC ¶¶ 4, 46, 83-84.

25  [17] CAC ¶¶ 93-95.

26  [18] Beyond the disclosure claims (Counts I-V), the CAC also alleges that fees paid to
        advisers were excessive (Counts VI-VII).  Because those claims are asserted only against

27      the advisers and distributors, they are addressed in their motion to dismiss, not here.

    [19] CAC ¶ 80.

28

1   omitted information.[20]  A duty to disclose can arise in two ways: (1) when required by law

2   or regulation; or (2) when the omission renders an affirmative statement misleading.[21]  To

3   be actionable, undisclosed information must be material.

4        The CAC fails to allege the basis of a duty to disclose under either standard and

5   does not demonstrate that the information allegedly concealed was material.[22]  Instead, the

6   CAC concedes that defendants made all the disclosures they were required by law to make.

7   **1.     The CAC does not allege a duty required by law or regulation.**

8   **a.     Mutual fund disclosure is regulated under Form N-1A.**

9        Form N-1A is the registration form used by mutual funds to register under the

10  Investment Company Act of 1940 ("'40 Act") and to offer securities under the '33 Act.[23]

11  Form N-1A sets forth detailed requirements for information that must be included in a

12  mutual fund's prospectus and statement of additional information ("SAI").  It includes "all

13  of the requirements necessary for funds to prepare registration statements."[24]

14       The CAC acknowledges that "Wells Fargo disclosed information to its customers

15  concerning mutual fund purchases primarily through supplying customers with

16  prospectuses, and if requested, the statement of additional information … issued by the

17  _____

18  [20] *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 174 (1994).

19  [21] *See e.g., Castillo v. Dean Witter Discovery & Co.,* 1998 WL 342050 (S.D.N.Y. June 25, 1998).

20  [22] *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976); *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 130 (2d Cir. 2000).

21  [23] *Adopting Release: Registration Form Used by Open-End Management Investment Companies,* Release Nos. 35-7512, 34-39748, 63 Fed. Reg. 13916 (Mar. 23, 1998).

22

23  [24] *Id.* at 13917.  Among other things, Form N-1A requires fund prospectus to include a "Fee Table" that discloses, in a uniform manner, all fees and expenses associated with a mutual fund investment.  The fee table reflects both (i) charges paid directly by a shareholder out of his or her investment, such as front- and back-end sales charges, or "loads," and (ii) ongoing expenses, which are deducted from fund assets, and divided into three categories: (a) management or advisory fees; (b) distribution (Rule 12b-1) fees; and (c) other expenses, such as shareholder service fees, custodial expenses, legal and accounting fees, and transfer agent expenses.  The fee table is accompanied by a numerical example that illustrates the dollar amounts that an investor could expect to pay on a $10,000 investment if he or she received a 5% annual return and remained invested for various time periods.

24

25

26

27

28

1    mutual funds."[25]  The CAC does not allege that the prospectuses referenced in the CAC

2    failed to include anything required by Form N-1A or omitted any of the costs borne by fund

3    investors when they purchase, sell or hold fund shares.  Form N-1A simply does not require

4    disclosure of the information that the CAC says that defendants failed to disclose.

5    **b.    Revenue-sharing is lawful.**

6             Revenue-sharing is a widespread industry practice, used by broker-dealers

7    (especially in an era of no-load funds) to finance the supervisory, compliance,

8    recordkeeping, operational and technological costs of offering a diverse selection of mutual

9    funds to the public.  In return for revenue-sharing (or more correctly *cost*-sharing), fund

10   companies often receive enhanced exposure on a broker-dealer's sales platform.[26]  These

11   arrangements are conducted in the open with the full knowledge of regulators, and the

12   disclosure of these arrangements has been the subject of public discourse for over almost 30

13   years.  The SEC and the NASD have been repeatedly recognized these practices as lawful.[27]

14   For example, in June 2003, the SEC's Director of the Division of Investment Management

15   testified before Congress on the subject.  He recognized the competitive pressures funds

16   face to "secure a prominent position in the distribution system that selling broker-dealers

17   maintain" and acknowledged that "selling broker-dealers have increasingly demanded

18   compensation for distributing fund shares that is in addition to the amounts they receive

19   from 12b-1 fees.  To meet this demand, fund investment advisers have increasingly made

20   revenue-sharing payments to the selling broker-dealers."  He explained that: "'Revenue-

21   _____

22   [25] CAC ¶ 81.

23   [26] *See, e.g.*, CAC ¶ 50.

24   [27] *See e.g,* Paul Roye, Director, SEC Division of Investment Management, *Testimony Concerning the Mutual Funds Integrity and Fee Transparency Act of 2003, H.R. 2420* (June 18, 2003)  (available at www.sec.gov/news/testimony/061803tspfr.htm.)

25   (hereinafter "Roye Testimony"); NASD Notice to Members 97-50, *NASD Regulation Requests Comment On Regulation Of Payment And Receipt Of Cash Compensation*

26   *Incentives* (Aug. 1997) (stating that "some of the cash compensation arrangements described may be of so little interest to investors or so far removed from any effective

27   point-of-sale influence that disclosure of such information would not serve a significant customer protection or other regulatory purpose.") (available at www.nasd.com).

28

1  sharing payments' are not a fund expense because they are made from the adviser's own

2  resources, rather than fund assets."[28]

3  **c.    Recent case law rejects the CAC's duty to disclose theories.**

4          Several district courts have already evaluated revenue-sharing programs and

5  dismissed complaints challenging them, holding that there is no duty to disclose the

6  particulars about such payments or broker-dealers' internal incentive programs.[29]  Defense

7  counsel know of no case in which a federal court held that allegations about revenue-

8  sharing stated a non-disclosure claim upon which relief could be granted.

9          *In re Morgan Stanley* is particularly relevant.  That case (like this and most of the

10  revenue-sharing cases) was brought by the Milberg Weiss firm.  On April 18, 2006, the

11  court dismissed the complaint even though the broker-dealer defendant had paid $50

12  million in an SEC settlement concerning facets of its revenue-sharing program.[30]  The court

13  held that "[t]he current SEC regulations impose no duty on defendants to disclose the

14

15  _____

16  [28] Roye Testimony at II.E.

17  [29] *See In re Morgan Stanley and Van Kampen Mut. Fund Securities Litig*, 2006 WL
     1008138 (S.D.N.Y. Apr 18, 2006); *In re Evergreen Mut. Funds Fee Litig.*, 2006 WL
18   753000 (S.D.N.Y. Mar. 24, 2006); *In re Oppenheimer Funds Fees Litig.*,
     2006 WL 592881 (S.D.N.Y. Mar. 10, 2006); *Dumond v. Massachusetts Financial
19   Services Company*, 2006 WL 149038 (D. Mass. Jan. 19, 2006); *In re Goldman Sachs
     Mut. Funds Fee Litig.*, 2006 WL 126722 (S.D.N.Y. Jan 17, 2006); *Forsythe v. Sun Life
20   Financial, Inc.*, 417 F. Supp. 2d 100 (D. Mass. Jan. 16, 2006); *In re Lord Abbett Mut.
     Funds Fee Litig.*, 407 F. Supp. 2d 616 (D.N.J. Dec. 28, 2005); *In re Eaton Vance Mut.
21   Funds Fee Litig.*, 403 F. Supp. 2d 310 (S.D.N.Y. Dec. 6, 2005); *In re AllianceBernstein
     Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753 (S.D.N.Y Oct. 19, 2005), later
22   opinion, 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006); *In re Davis Selected Mut. Funds
     Litig.*, 2005 WL 2509732 (S.D.N.Y. Oct. 11, 2005); *In re Dreyfus Mut. Funds Fee Litig.*,
23   2006 WL 909434 (W.D. Pa. Apr. 10, 2006); *In re Franklin Mut. Funds Fee Litig.*, 388 F.
     Supp. 2d 451 (D.N.J. Sept. 9, 2005); *Benzon v. Morgan Stanley Distrib., Inc.*, 2004 WL
24   62747 (M.D. Tenn. Jan. 8, 2004), *aff'd.*, 420 F.3d 598 (6th Cir. 2005); *Castillo v. Dean
     Witter Reynolds, Inc.*, 1998 WL 342050 (S.D.N.Y. June 25, 1998); *Press v. Quick &
25   Reilly, Inc.* 218 F.3d 121 (2d Cir. 2000); *but see In re Dreyfus Mut. Funds Fee Litig.*,
     2005 WL 3970836 (W.D. Pa. Sept. 30, 2005); *In re Mut. Funds Investment Litig.*, 2006
26   WL 827339 (D. Md. Mar. 6, 2006).

27  [30] *Morgan Stanley*, 2006 WL 1008138 at *1 (citing Securities Act Release No. 8339,
     Exchange Act Release No. 48789, 81 S.E.C. Docket 1993, 2003 WL 22703073 (Nov. 17,
28   2003)).

1   allocation of broker compensation."[31]  Instead: "Form N-1A sets forth the requirements for

2   information that must be contained in offering prospectuses and statements of additional

3   information," and "Form N-1A requires the disclosure of the total fees paid by the investor

4   in connection with a securities purchase, as well as the total commissions paid by the fund,

5   *but it does not require disclosure of how differential compensation is allocated.  Nor does it*

6   *require disclosure of the sales contests or management bonuses*."[32]  Thus, "defendants did

7   not have the duty to disclose the differential compensation, bonuses, and sales contests, and

8   any failure to disclose them is not actionable."[33]  The same holds true in this case.

9         *Benzon v. Morgan Stanley* held that broker-dealers have no duty to disclose

10   differential compensation paid to individual registered representatives for selling certain

11   funds.  The plaintiffs alleged that Morgan Stanley had failed to disclose the higher

12   compensation given to managers and representatives for selling proprietary products.  The

13   court dismissed the complaint, stating:  "The Court finds that Defendants had no duty to

14   provide more specific information in the prospectus concerning specific allocation or

15   incentives given to brokers.  Plaintiffs have failed to show that Defendants had a duty to

16   disclose more specific information about fees in this case."[34]  In affirming, the court of

17   appeals held that all needed information about charges could be found in the prospectuses,

18   as required by Form N-1A, and that "[t]he alleged omissions in this case are not material."[35]

19         *Castillo v. Dean Witter Discovery & Co.* also held that a broker-dealer has no duty

20   to disclose its internal compensation arrangements.  [36]  The inexperienced, elderly investors

21   _____

22   [31] *Id*. at *11 (*citing U.S. v. Alvarado*, 2001 WL 1631396 (S.D.N.Y Dec. 19, 2001)).

23   [32] *Id*. at *7.

       [33] *Id*. at *8.

24   [34] *Benzon*, 2004 WL 62747, at *4; *see also In the Matter of Morgan Stanley DW, Inc.*, No.
       E-2003-31, No. E-2003-53, at 1 (Sec'y Mass. Comm. Sec. Div. May 24, 2004)), *aff'd In*
25   *the Matter of Morgan Stanley DW, Inc.*, No. E-2003-31, No.E-2003-53 (Sec'y Mass.
       Comm. Sec. Div. June 22, 2004) (holding that Morgan Stanley had "no duty to disclose
26   'compensation incentives and conflicts of interest to … client investors.'").

27   [35] *Benzon,* 420 F.3d at 609.

       [36] *Castillo v. Dean Witter Discovery & Co.*, 1998 WL 342050 (S.D.N.Y. June 25, 1998).

28

1   who sued alleged that the defendants had failed to disclose an incentive compensation

2   system that created material conflicts of interest causing them to sell and promote

3   proprietary funds with higher fees and poorer performance than other similar products.[37]

4   The court held that Form N-1A established the applicable disclosure obligations with

5   respect to mutual fund fees and expenses, and that: "the total fees, commission, and charges

6   deducted from the assets were disclosed in the prospectuses[, and it] is the total fees

7   charged that would affect the asset value of a mutual fund and the decision to invest . . . ."[38]

8   Accordingly, the court held that there was "no violation of antifraud provisions of the

9   securities laws" where "total fees were disclosed as was the fact that those fees would be

10  used to pay commissions and incentives to brokers."[39]  The judge rejected the notion that

11  defendants had a duty to disclose extra compensation paid to individual sales agents or the

12  conflicts of interest such compensation could create.  It was properly the responsibility of

13  the SEC or Congress, rather than courts, to establish and define such a duty to disclose:

14          If such a duty should exist, it is for the SEC or Congress, not this Court, to
            create a definition of the extent and nature of such a duty to disclose.  Absent
15          a duty to disclose this information, no violation of the antifraud provisions of
            the securities laws is stated.[40]
16

17          These cases, and several others like them,[41] specifically address the type of broker-

18  dealer revenue-sharing program and differential compensation arrangements at issue here.

19  In each, the court concluded that broker-dealers had no duty to disclose their revenue-

20  sharing programs or their internal compensation arrangements.

21

22

23

   _____

24  [37] *Id.* at *2.

25  [38] *Id.*

    [39] *Id* at *9.
26  [40] *Id.* at *30.

27  [41] *See, e.g., In re Evergreen Mut. Funds Fee Litig.*, 2006 WL 753000 (S.D.N.Y. Mar. 24,
        2006) and other cases cited *supra* at n.29.

28

**d.      Under existing law, general prospectus disclosure of revenue-sharing arrangements suffices.**

SEC Rule 10b-10 "requires broker-dealers to disclose specified information to customers at or before the completion of a transaction."[42]  It lists the items that the broker-dealer must disclose, including "the source and amount of any other remuneration received or to be received by the broker in connection with the transaction."[43]  Broker-dealers, however, are not required to disclose such information for remuneration they receive for selling mutual funds.  Rather, in footnote 41 to the 1977 adopting release for Rule 10b-10 ("Footnote 41"), the SEC said that broker-dealers could rely upon mutual fund prospectuses, rather than make separate disclosures themselves.[44]  The SEC confirmed this interpretation in a 1979 no-action letter, saying that it would *not* recommend an enforcement action against broker-dealers that did not provide transaction-specific disclosure about mutual fund loads and related charges, so long as the customer received a prospectus.[45]

More recently, the SEC reconfirmed this position in statements made about its January 2004 proposal to change disclosure of mutual fund sales costs in confirmation statements and at the point of sale (the "Proposed Confirm/POS Rule").[46]  Specifically, the SEC stated:

---

[42] 17 C.F.R. § 240.10b-10.

[43] 17 C.F.R. § 240.10b-10(a)(2)(i)(D).

[44] *Securities Confirmations*, Rel. No. 34-13508 (May 5, 1977) at n.41:

> Of course, in the case of offerings registered under the Securities Act of 1933, the final prospectus delivered to the customer should *generally* set forth the information required by the proviso with respect to source and amount of remuneration. . .  In such situations the information specified in the proviso need not be separately set forth on the confirmation.

[45] RFJN Ex. 9 (SEC, Letter Regarding Investment Company Institute (March 19, 1979, available April 18, 1979).)

[46] SEC, *Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to Registration Form for Mutual Funds*, 17 C.F.R. pts. 239, 240 and 274 (proposed Jan. 29, 2004)) (hereinafter "Proposed Confirm/POS Rule").

1   The Commission and its staff have taken the position, with respect to mutual
    fund transactions, that a broker-dealer may satisfy rule 10b-10 obligations
2   without providing customers with a transaction-specific document that
    discusses information about loads or third-party remuneration, so long as the
    customer receives a fund prospectus that adequately discloses that
3   information.[47]

4

5        This Proposed Confirm/POS Rule, if adopted, would change the disclosure rules for

6   revenue-sharing programs, but the proposed rule remains just that—a proposal.  Other

7   similar proposals have been made recently; the subject is being debated by the SEC, NASD

8   and Congress.[48]  During the Class Period, however, none of these proposed rules or

9   amendments was in effect.  Then, as now, they were merely proposals.

10        In 2000, the SEC clearly and expressly set out its interpretation of Rule 10b-10 in

11   the *amicus* brief it filed in *Press v. Quick & Reilly, Inc.*,[49] which during the Class Period

12   was the leading case on disclosure of revenue-sharing payments.  The plaintiffs alleged that

13   the broker-dealer defendants placed their customers' cash into money market funds "among

14   the poorest performers in the industry … because the funds and their advisers [made]

15   certain payments to defendants."[50]  The *Press* defendants, consistent with Footnote 41, had

16   not made any disclosures of their own about the payments and had relied instead on the

17   funds' prospectuses and SAIs.  The plaintiffs alleged that the broker-dealers defendants had

18   "intentionally failed to make such disclosures in order to conceal their receipt of payments

19   from the poorly performing money markets, and defendants therefore had a conflict of

20   interest."[51]  The SEC's *amicus* brief, written in support of the broker-dealers' position,

21   addressed "the disclosure of …fees paid by the …funds, which were not quantified in the

22   ────────────────

23   [47] *Id*. at 6442 (emphasis added).

     [48] *See, e.g.,* S. 1037, *Mutual Fund Transparency Act of 2005* (May 2005); H.R. 2420,
24   *Mutual Funds Integrity and Fee Transparency Act of 2003* (June 2003); NASD Notice to
     Members 03-54, *Compensation for the Sale of Investment Company Securities* (Sept.
25   2003).

     [49] RFJN Ex. 8 (Brief of the Securities and Exchange Commission, *Amicus Curiae*, 2000
26   WL 34447852 (Feb. 14, 2000) (hereinafter the "SEC *Amicus* Brief")).

27   [50] *Press v. Quick & Reilly*, 218 F.3d 121, 123 (2d Cir. 2000).

     [51] *Id*. at 124.
28

1   prospectuses …but were instead described as 'significant amounts.'"[52]  As the SEC

2   explained, at the time of *Press* "the Commission ha[d] not provided specific guidance with

3   regard to the disclosure, *if any*, required in fund prospectuses for these types of

4   payments."[53]  The SEC also said that "[n]either the Commission nor … its staff has ever

5   given specific guidance concerning disclosure of third-party remuneration beyond the

6   language of the Rule [10b-10] itself and of footnote 41."[54]  Accordingly, the SEC

7   concluded that broker-dealers who received revenue-sharing payments "could rely on the

8   disclosures in the fund prospectuses and SAIs to satisfy their Rule 10b-10 obligations."[55]

9          The SEC also distinguished third party remuneration from charges paid by the

10  customer and 12b-1 fees deducted from fund assets, saying: "[p]ayments made to broker-

11  dealers by third parties are not 'sales loads' or 'charges,'"[56] and the "precise amount"

12  disclosure is only required when "the customer is paying those charges and must be able to

13  determine exactly how much they are."[57]  The point is "'to inform customers of the nature

14  and extent of a broker-dealer's conflict of interest,' and, therefore, 'disclosure with

15  precision is not necessary.'"[58]  Accordingly, the SEC determined that "the prospectus

16  disclosure here—that 'significant amounts' of non-12b-1 fees were paid—was sufficient to

17  satisfy Rule 10b-10."[59]  This is the same disclosure defendants made in this case.

18         Adopting the SEC's position, the Second Circuit affirmed the dismissal of *Press*.

19  _____

20  [52] *SEC Amicus* Brief at *27 (RFJN 270).

20  [53] SEC *Amicus* Brief at *6 (RFJN 263)(emphasis added).

21  [54] SEC *Amicus* Brief at *21 (RFJN 268); *see  also id.* at *27 (RFJN 270)("these [revenue
22  sharing] fees have not been subject to specific disclosure requirements under the
     Investment Company Act or otherwise, or to guidance beyond footnote 41").

23  [55] *Id.  See also* Roye Testimony, *supra* n.28 (confirming the SEC's position on Rule 10b-10
24  compliance, and stating that a broker-dealer "may satisfy this disclosure obligation by,
     among other things, delivering to its customer a copy of the funds' prospectus, at or
25  before completing the transaction, if the prospectus contains adequate disclosures").

25  [56] SEC *Amicus* Brief at *21 (RFJN 268).

26  [57] *Press*, 218 F.3d at 127-28 (citing SEC *Amicus* Brief at *21 (emphasis added)).

27  [58] *Id.* (quoting SEC *Amicus* Brief at *10) (emphasis added).

     [59] SEC *Amicus* Brief at *27 (RFJN 270) (emphasis added).

28

1   The court acknowledged it was "bound by the SEC's interpretations of its regulations in its

2   *amicus* brief, unless they are 'plainly erroneous or inconsistent with the regulation[s].'"[60]

3   The court "concur[red] with the SEC's conclusion that, in light of footnote 41 to the release

4   accompanying Rule 10b-10, [broker-dealers] may rely on the fund prospectuses and other

5   documents publicly filed with the SEC to satisfy their 10b-10 obligations."[61]

6      *Press* holds that it is inappropriate to use Rule 10b-5 to expand a broker-dealer's

7   disclosure requirements.  Because the SEC had already determined, under Rule 10b-10,

8   what information a broker-dealer must disclose about revenue-sharing payments, the court

9   reasoned that it should "defer to the SEC's interpretation of its rule," and should not impose

10  a higher standard under Rule 10b-5.[62]  Since *Press* was decided in 2000, broker-dealers and

11  fund companies have followed the Second Circuit's lead in relying on the SEC's amicus

12  brief as setting forth the Commission's definitive position on revenue sharing disclosure,

13  and have modeled their disclosures accordingly.[63]

14     *In re Merrill Lynch & Co., Inc. Research Reports*, also is instructive.[64]  The

15  plaintiffs alleged that Merrill Lynch had not disclosed conflicts of interest from "investment

16  banking relationships between the companies whose stocks were purchased by a fund and

17  the broker-dealer affiliate of the fund's investment adviser."[65]  The court held that the

18  defendants had no duty to disclose these financial arrangements.  In light of the "extensive

19  congressional and regulatory oversight" of mutual funds, the fact that "no portion" of Form

20  N-1A required the disclosure of such information meant that no disclosure was required.[66]

21  Likewise, *In re Digital Island Sec. Litig.* held that where SEC regulations required

22

---

23  [60] *Press*, 218 F.3d at 128 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

    [61] *Id.* at 129.

24  [62] *Id.*; *see also id.* at 129-30.

25  [63] *See, e.g.*, RFJN Ex. 23 at RFJN 907, 909.

    [64] *In re Merrill Lynch & Co. Inc. Research Reports*, 272 F. Supp. 2d 243, 248-49 (S.D.N.Y.
26     2003)

27  [65] *Id.*

    [66] *Id.*

28

---

1  disclosure of specific information in a heavily regulated area (tender offers in that case),

2  defendants had no further obligations to make disclosures.[67]

3  **e.      Defendants meet the existing legal requirements for disclosure.**

4        The Complaint quotes at length from a prospectus of Massachusetts Financial

5  Services ("MFS") Investors Growth Stock Fund (Form N-1A), and asserts that "each of the

6  prospectuses and their SAIs contained the same materially false and misleading statements

7  and omissions."[68]  But the MFS prospectus and SAI satisfied Form N-1A, as well as the

8  general disclosure requirements under *Press*.  In particular, the SAI for the MFS Investors

9  Growth Stock Fund generally discloses payments made to broker-dealers in connection

10  with mutual fund sales.[69]  Part II of the SAI provides several details about these

11  arrangements, stating that the distributor, "MFD," pays *several* types of concessions to

12  dealers who sell fund shares, including financial assistance for conferences and contests,

13  and extra asset-based commissions up to .50% of NAV:

> Dealers may receive different compensation with respect to sales of Class A,
> Class B, Class C, Class R and Class J shares.  In addition, from time to time,
> MFD may pay dealers 100% of the applicable sales charge on sales of Class
> A and Class J shares of certain specified Funds sold by such dealer during a
> specified sales period.  In addition, MFD or its affiliates may, from time to
> time, pay dealers an additional commission equal to 0.50% of the net asset
> value of all of the Class B and/or Class C shares of certain specified Funds
> sold by such dealer during a specified sales period.  In addition, from time to
> time, MFD, at its expense, may provide additional commissions,
> compensation or promotional incentives ("concessions") to dealers which
> sell or arrange for the sale of shares of the Fund.  Such concessions provided
> by MFD may include financial assistance to dealers in connection with
> preapproved conferences or seminars, sales or training programs for invited
> registered representatives and other employees, payment for travel expenses,
> including lodging, incurred by registered representatives and other
> employees for such seminars or training programs, seminars for the public,
> advertising and sales campaigns regarding one or more Funds, and/or other
> dealer-sponsored events.  From time to time, MFD may make expense

[67] *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 552 (D. Del. 2002); *see also Geiger v. Soloman-Page Group, Ltd.*, 933 F. Supp. 1180, 1187-88 (S.D.N.Y. 1996) ("[t]he fact that the SEC does not require disclosure" of the omitted fact "is further support for this conclusion" that the alleged omission did not give rise to liability under Sections 11 and 12(a)(2) because "it reflects the SEC's expert view that such disclosure is not required").

[68] CAC ¶ 84.

[69] RFJN Ex. 19, at RFJN 456.

1     reimbursements for special training of a dealer's registered representatives
    and other employees in group meetings or to help pay the expenses of sales
2     contests. Other concessions may be offered to the extent not prohibited by
    state laws or any self-regulatory agency, such as the NASD.[70]

3         This disclosure far exceeds what the SEC and the Second Circuit found adequate in

4 *Press*. Thus, the very prospectus that Plaintiff alleges is *typical* of all the "Shelf-Space

5 Funds" adequately disclosed revenue-sharing arrangements with the broker-dealers selling

6 fund shares, consistent with Rule 10b-10.

7         Like the MFS prospectus, the Wells Fargo Funds prospectuses also disclosed

8 revenue-sharing arrangements with broker-dealers selling fund shares.  In particular, the

9 Wells Fargo Funds February 1, 2004 SAI discloses the compensation paid by the fund's

10 distributor to selling-agents of the fund:

11     The Distributor may enter into selling agreements with one or more selling
12     agents (which may include Wells Fargo Bank, Funds Management and their
    affiliates) under which such agents may receive *compensation for
13     distribution-related services from the Distributor, including, but not limited
    to, commissions or other payments to such agents based on the average
14     daily net assets of Fund shares attributable to their customers*.  The
    Distributor may retain any portion of the total distribution fee payable
15     thereunder to compensate it for distribution-related services provided by it or
    to reimburse it for other distribution-related expenses.[71]

16 The Wells Fargo Funds prospectus also discloses that the selling agents may receive

17 "significant additional payments" from the distributor or advisers, stating:

18

19     In addition to payments received from the Funds, selling or shareholder
    servicing agents may receive significant additional payments directly from
20     the adviser, the distributor, or their affiliates in connection with the sale of
    Fund shares.  These amounts may be fixed dollar amounts or a percentage of
    sales or both, and may be up-front or ongoing payments or both.  Agents
21     may agree to provide a marketing or servicing advantages (sic) to the Funds
    in return for the payments.  Selling or shareholder servicing agents, in turn,
22     may pay some or all of these amounts to their employees who recommend or
    sell Fund shares or make investment decisions on behalf of clients.
23     Payments made with respect to the Funds may differ from those made with
    respect to other mutual funds available through the agent and could
24     influence the agent's recommendations or decisions.  Prospective investors

25

26 _____

27 [70] RFJN Ex. 19 (Part II, Appx. B, "Dealer Commissions and Concessions"), p. 90 of 137.

[71] *See, e.g.*, RFJN Ex. 23, at RFJN 840.
28

should consult with their selling or shareholder servicing agent if they wish to request further information regarding these matters.[72]

This language satisfies the *Press* disclosure requirements in effect during the Class Period.

The Wells Fargo Fund prospectuses *did* disclose the existence of relationships between the funds and other Wells Fargo affiliates, stating, as quoted above, that the selling agents of the funds may include "Wells Fargo Bank, Funds Management and their affiliates…"[73]  "Wells Fargo" is a well-known trade name.  Customers receive ample notification through the common use of "Wells Fargo" trademarks and logos that defendants had a financial relationship.

**2.   The CAC does not adequately allege that the purported omissions were material or rendered the prospectuses misleading.**

An omission is only material if there "is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."[74]  Both the allegedly undisclosed information about revenue-sharing and the allegedly undisclosed information about internal compensation arrangements are immaterial as a matter of law.

Plaintiff received prospectuses and SAIs consistent with Form N-1A that disclosed all fees and expenses deducted from his investment or charged against assets of his funds. They disclosed the revenue-sharing arrangements between the broker-dealers defendants and the "Shelf-Space Funds."  This met the disclosure requirements of Rule 10b-10.  As held in *Press*, "defendants' compliance with Rule 10b-10 renders the allegedly omitted information immaterial as a matter of law."[75]

Also immaterial were the differential compensation arrangements allegedly

---

[72] *See, e.g.*, RFJN Ex. 22, at RFJN 840.

[73] *See, e.g.*, RFJN Ex. 23, at RFJN 907.

[74] *Press*, 218 F.3d at 130.

[75] *Id.  See also Geiger*, 933 F. Supp. at 1187 ("The absence of a regulation requiring disclosure, in the fact of the detailed requirements of what information [must be disclosed], is some evidence that the information plaintiff seeks to require is not in fact material.").

1   implemented by the broker-dealer defendants.  Such arrangements do not affect the amount

2   of the customers' investment or the value of the funds.  As stated in *U.S. v. Alvarado*:

3   "Since the registered representative's commission paid by the brokerage house is not

4   charged to the transaction, it is not material to the customer's transaction and it need not be

5   disclosed."[76]

6          The CAC alleges nothing that would make these arrangements material.  While it

7   mentions perks such as travel and "extra commissions and payouts,"[77] the CAC does not

8   specify the value of these purported benefits, or how free attendance at a training and

9   education conference or the designation "Chapter Director" could have a material effect.

10   Plaintiff also does not identify any registered representatives who ever received differential

11   compensation, including the individual sales agent who sold Plaintiff his funds.  Likewise,

12   while Plaintiff alleges that a wholesaler "offered" an unnamed financial consultant "an

13   extra 50 basis points in compensation,"[78] the CAC does not allege that this offer was made

14   to more than one individual, or even that the unnamed representative received the extra

15   compensation.  Taken as a whole, none of these alleged incidents of differential

16   compensation affected the "total mix" of information available to investors.[79]  Such

17   allegations do not satisfy Rule 9(b).

18          It also is far from clear that such arrangements narrowed the range of choices

19   offered customers to any material degree.  The 22 "Shelf-Space Funds" include some of the

20   largest fund companies in the world.  Collectively (counting all share classes separately),

21   they offer almost 6,000 mutual fund products.[80]  The CAC admits that the broker-dealer

22

_____

23   [76] *Alvarado*, 2001 WL 1631396, at *8 ; *see also Castillo*, 1998 WL 342050, at *9 ("[T]he
       allocation of fees would not affect the damages for the losses claimed by plaintiffs.  It is
24     the total fees charged that would affect the asset value of a mutual fund and the decision
       to invest.").

25   [77] CAC ¶¶ 43-45.

26   [78] CAC ¶ 48.

27   [79] *Press*, 218 F.3d at 130.

     [80] *See* RFJN Ex. 7.

28

1  defendants had selling agreements with another 300 fund companies that were not on the

2  list.[81]  There is no suggestion that defendants refused to sell these funds to anyone.

3       The CAC alleges that the "Shelf-Space Funds" directed brokerage transactions for

4  portfolio securities to favored broker-dealers for execution.[82]  This is immaterial for all of

5  the reasons set forth above and for the additional reasons addressed in the motion to strike

6  filed herewith.  Until February 14, 2005, NASD Rule 2830(k)(7)(B) specifically contained

7  a safe harbor provision that let fund advisers consider the volume of sales as a factor in

8  determining where to send portfolio transactions and permitted broker-dealers to sell

9  products from funds that employed this criterion.[83]  The Shelf-Space Fund prospectuses and

10  SAIs described and incorporated by reference in the CAC contained appropriate disclosures

11  of this practice, as dictated by applicable regulatory standards.[84]

12  **C.    Plaintiff's '33 Act Claims Fail for Additional Reasons.**

13  **1.    Plaintiff lacks standing to sue the broker-dealers and distributors.**

14       Nowhere in the Complaint does Plaintiff allege that he held an account or had any

15  dealings whatsoever with WF Investments or H.D. Vest (or any other defendant).  He does

16  not allege that he bought or sold a mutual fund based on a recommendation from any

17  defendant.  Accordingly, Plaintiff lacks standing to sue these entities.

18  **2.    Plaintiff has not stated a cognizable claim for damages.**

19       Plaintiff only has a claim for damages under section 12(a)(2) if he lost money as a

20  result of an investment made on the basis of the alleged omission, and if he no longer owns

21  the securities at issue.[85]  Otherwise, rescission is the only available remedy, and tender is a

22

23  ─────────────────

24  [81] CAC ¶ 51.

     [82] CAC ¶¶ 73-79.

25  [83] *See* NASD, Notice to Members 05-04, *SEC Approves Amendments to NASD Rule
     2830(k) to Strengthen Prohibitions on Investment Company Directed Brokerage*
26  *Arrangements* (Jan. 2005) (eff. Feb. 14, 2005).

27  [84] CAC ¶ 85.

     [85] *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986).

28

1    prerequisite to his section 12(a)(2) claim.[86]  Plaintiff has not met this standard.

2            Exhibit B to the CAC lists the funds Plaintiff allegedly purchased in reliance upon

3    the purportedly misleading representations:  three Wells Fargo Funds, seven Eaton Vance

4    funds, five Fidelity funds and five Hartford funds.  The CAC alleges that he purchased

5    these funds, but it does not allege he sold them, nor does it demand rescission or tender.

6            The CAC only discusses the performance of AIM, Hancock, MFS, Putnam and

7    Phoenix funds[87]—none of which Plaintiff alleges he owned.  Plaintiff has no standing to

8    assert claims based upon investments he never made.[88]  Therefore, Counts I-V should be

9    dismissed with respect to any fund that Plaintiff did not own, has not sold, or did not tender.

10           Plaintiff does not allege any damages as a result of the investments he did make.

11   The CAC is silent regarding the performance of Wells Fargo Funds, Eaton Vance, Fidelity

12   and Hartford.  Plaintiff has not shown, therefore, that he suffered any damages

13   whatsoever—much less as result of the omissions and misrepresentations alleged in the

14   CAC.

15   **D.      Plaintiff's '34 Act Claims Fail for Additional Reasons.**

16           A party can only be held liable under section 10(b) of the '34 Act and Rule 10b-5 if

17   there is "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on

18   which [plaintiffs] relied (5) which proximately caused their injury."[89]

19           The sections above demonstrate that the CAC does not allege a material

20   misstatement or omission.  The sections below show that it does allege the other elements

21   of a 10b-5 claim: scienter, loss causation and transaction causation.

22

23   _____

      [86] 15 U.S.C. § 77l(a)(2) (limiting an investor's recovery to "the consideration paid for such
24   security with interest thereon, less the amount of any income received thereon, upon the
      tender of such security, or for damages if he no longer owns the security").

25   [87] CAC ¶¶ 66-71.

26   [88] Section 12(a)(2) limits claims to "to the person purchasing such security." 15 U.S.C.
      § 77l(a)(2).  Section 10(b) applies only to claims "in connection with the purchase or sale
27   of any security." 15 U.S.C. § 78j(b).

      [89] *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002).
28

**1.      The CAC does not adequately allege scienter.**

Scienter is a "mental state embracing intent to deceive, manipulate or defraud."[90] "When determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."[91]  The Court should not give credence to unwarranted inferences or conclusory assertions.[92]  The PSLRA requires complaints alleging scienter to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[93]  To survive, the CAC must specifically allege "some degree of intentional or conscious misconduct" beyond "mere recklessness" or "motive to commit fraud and opportunity to do so."[94]

Revenue-sharing is a lawful practice.  Reliance upon prospectus disclosure has been sanctioned under Footnote 41 since 1977.  In *Press,* decided at the beginning of the Class Period, the SEC specifically endorsed general prospectus disclosure as satisfying a broker-dealer's Rule 10b-10 obligations, and the weight of case law speaking to the issue finds that defendants did not have a separate duty to disclose these practices.  Given their compliance with Form N-1A and Rule 10b-10, nothing suggests defendants' practices amounted to intentional or conscious misconduct.  The only reasonable inference here is that defendants, and the 21 unaffiliated "Shelf Space Funds," were following the law as they understood it to be at the time.  This is not a basis for Rule 10b-5 liability.

In an attempt to satisfy the scienter element, the CAC alleges that the "unlawful mutual fund practices [of the broker-dealer defendants] focused on maximizing Defendants'

---

[90] *Wharf Holdings Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 593 (2001) (quoting *Ernst & Young v. Hochfelder*, 425 U.S. 185, 193 (1976)).

[91] *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

[92] *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

[93] 15 U.S.C. § 78u-4(b)(2).

[94] In re Silicon Graphics Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).

1    profit to the detriment of investors"[95] and that "[i]nvestors were misguided into unsuitable,

2    inferior mutual funds because of [the revenue-sharing] arrangements."[96]   Allegations such

3    as these were specifically rejected in *Castillo*, where the court said that they "[do] not

4    satisfy the heightened pleading requirements of Rule 9(b)."[97]

5    **2.      The CAC does not adequately allege loss causation.**

6            To state a cause of action under section 10(b), Plaintiff must allege he has suffered

7    an economic loss and that the loss was caused by the alleged misrepresentation.[98]   In *Dura*

8    *Pharmaceuticals, Inc. v. Broudo*, the Supreme Court rejected the notion that mere price

9    inflation at the time of sale was sufficient to state loss causation.[99]   Here too, the CAC fails

10   to allege the Rule 10b-5 element of loss causation.

11           Plaintiff alleges not that he lost money, but that he could have made more money

12   had he invested in some other fund.[100]   Plaintiff also alleges he purchased "shares of the

13   Shelf Space Funds at an artificially inflated value,"[101] and that "the market prices of the

14   Shelf Space Funds were distorted during the Class Period such that they did not reflect the

15   risks and costs of the continuing course of conduct alleged herein."[102]   These alleged

16   "injuries" are not cognizable injuries under *Dura*.   The Supreme Court explicitly rejected

17   the notion that allegations of artificial price inflation could suffice.[103]   Plaintiff's use of the

18   term "price distortion" adds nothing to the analysis—the claim is still foreclosed.

19           Plaintiff does not, and indeed cannot, allege that there was a drop in share prices

20   resulting from the alleged revelation of the truth, which is the only way to satisfy the loss

21   ―――――――――――――――――

22   [95] CAC ¶ 62.

     [96] CAC ¶ 56.

23   [97] *Castillo*, 1998 WL 342050, at *10 (internal quotations omitted).

24   [98] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 1631 (2005).

     [99] *Id.*

25   [100] CAC ¶ 93.

26   [101] CAC ¶ 94.

27   [102] CAC ¶ 95; *see also* CAC ¶ 194.

     [103] *Dura*, 125 S. Ct. at 1639.

28

1   causation element under *Dura*.  The CAC purports to contain various "fraud on the market"

2   allegations,[104] but mutual funds are not sold in an efficient market, and these allegations are

3   specious.  Instead, pursuant to SEC Rule 22c-1, mutual fund share prices are based on the

4   value of the underlying assets, and are set daily by determining the net asset value of the

5   entire fund and dividing it by the number of outstanding shares.[105]  Plaintiff does not allege

6   the Shelf Space Funds failed to set their share prices appropriately.  Plaintiff paid the NAV

7   on the date of purchase and he got what he paid for.  The value of those shares is still

8   reflected in their price, and he *still* has what he paid for.  Plaintiff has not suffered a loss.

9   The *Castillo* plaintiffs, like Plaintiff in this case, also alleged it was the *decline* in

10   the value of the funds that they sought to recover.  But there, again, the court noted the lack

11   of a causal relationship, stating: "the decline in the net asset value of each fund is related to

12   the success of the investment strategies of that fund . . . .  Indeed the complaint contains no

13   allegation that any causal relationship exists between the compensation of the brokers . . .

14   and the performances of any fund."[106]  The same is true here, and Plaintiff has not alleged a

15   causal link between the alleged omissions and a decline in the value of his funds.

16   Plaintiff's allegation he might have made more with a different investment is the

17   kind of speculative claim the Court foreclosed in *Blue Chip Stamps v. Manor Drug Stores*,

18   when it required plaintiffs under section 10(b) to be purchasers or sellers.[107]  The sort of

19   "coulda, woulda, shoulda" testimony *Blue Chip* rejected is exactly what Plaintiff needs here

20   to establish the speculative claims that the CAC asserts.  They do not suffice.

21   **3.      The CAC does not adequately allege transaction causation.**

22   Reliance is an essential element of actions under section 10(b) and Rule10b-5.  To

23   survive dismissal, Plaintiff must allege that the purported misrepresentations caused him to

24   [104] CAC ¶¶ 186-87.

25   [105] 17 C.F.R. § 220.22c-1.

26   [106] *Castillo*, 1998 WL 342050, at *17.

27   [107] *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734-35, 747-49, 754-55 (1975);
       *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, ___ U.S. ___, 126 S. Ct.
       1503, 1510 (2006).

28

1   make his investment.  The CAC, however, fails to allege this element of "transaction

2   causation."  It contains no specific facts demonstrating that "but for" the alleged fraudulent

3   misstatements, Plaintiff would not have purchased his funds.

4        In particular, the CAC fails to identify what misstatements were made to Plaintiff,

5   personally, and what facts about his investments were misrepresented.  Among other things,

6   the CAC fails to allege how he came to make his investment decisions, or how that process

7   was impacted by any misrepresentations.  He also has not identified any inducements given

8   to the registered representative(s) who sold him his funds, and has not alleged any facts to

9   connect differential compensation to his investments, to show it had an effect, or to show

10  that anyone he had contact with even knew about the alleged revenue sharing arrangements

11  between the broker-dealers defendants and the so-called "Shelf-Space Funds."

12  **E.      The Applicable Statutes of Limitations Bar Plaintiff's Claims.**

13       The '33 Act limits actions under section 12(a)(2) to a period of "one year after the

14  discovery of the untrue statement or the omission, or after such discovery should have been

15  made by the exercise of reasonable diligence," and it also contains an absolute bar to claims

16  brought more "three years after the sale."[108]  In contrast, the '34 Act limits actions under

17  section 10(b) and Rule 10b-5 to two years after discovery or five years after the sale.[109]

18       This case was filed November 4, 2005.  Thus, Counts I-III must be dismissed

19  insofar as they are based on sales occurring before November 4, 2002 and Counts IV-V

20  must be dismissed insofar as they are based on sales occurring before November 4, 2001.

21       With the "exercise of reasonable diligence" Plaintiff could have known about the

22  revenue-sharing arrangements well before November 4, 2003.  For all the reasons explained

23  in the motion to dismiss Counts III, V and VII, filed herewith, revenue sharing has been a

24  very public subject for years and years—and many years before November 4, 2003.

25

26  ───────────────────

27  [108] 15 U.S.C. § 77mTitle 15 section .

    [109] 28 U.S.C. § 1658(b)(1)Title .

28

1    **IV.    CONCLUSION.**

2          For the foregoing reasons, Counts I-V of the Complaint should be dismissed.

3          Dated: May 2, 2006.

4                                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                                           BRUCE A. ERICSON
5                                          CLIFFORD C. HYATT
                                           DAVID L. STANTON
6                                          JACOB R. SORENSEN
                                           KRISTIN M. LEFEVRE
7                                          50 Fremont Street
                                           Post Office Box 7880
8                                          San Francisco, CA  94120-7880

9                                          Attorneys for All Defendants

10                                         THOMAS O. JACOB  #125665
11                                         VANESSA M. HOFFMANN  #206086
                                           OFFICE OF GENERAL COUNSEL
12                                         WELLS FARGO & CO.
                                           633 Folsom Street, 7th Floor
13                                         San Francisco, California  94107
                                           Telephone: (415) 396-4425
14                                         Facsimile: (415) 975-7867
                                           tojacob@wellsfargo.com

15                                         Attorneys for Defendants
16                                         WELLS FARGO & CO. and affiliates

17                                         By    /s/ Bruce A. Ericson
18                                                    Bruce A. Ericson

19

20

21

22

23

24

25

26

27

28