**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Jerome M. Congress (admitted *pro hac vice*)
Janine L. Pollack (admitted *pro hac vice*)
Kim E. Miller (State Bar No. 178370)
Michael R. Reese (State Bar No. 206773)
One Pennsylvania Plaza
New York, New York  10119-0165
Telephone:      (212) 594-5300
Facsimile:      (212) 868-1229
email: mreese@milbergweiss.com
***Court Appointed Lead Counsel***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD SIEMERS, Individually And On Behalf Of All Others Similarly Situated, | ) Case No. 05-04518 WHA |
| Plaintiff, | ) **MEMORANDUM OF** |
| | ) **POINTS AND AUTHORITIES IN** |
| | ) **OPPOSITION TO THE** |
| vs. | ) **BROKER/DEALER AND** |
| | ) **REGISTRANT** |
| WELLS FARGO & COMPANY, H.D. VEST INVESTMENT SERVICES, LLC, WELLS FARGO INVESTMENTS, LLC, WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS CAPITAL MANAGEMENT INC., STEPHENS INC., WELLS FARGO FUNDS DISTRIBUTOR, LLC, and WELLS FARGO FUNDS TRUST, | ) **DEFENDANTS' MOTION TO DISMISS** |
| | ) Date:  June 21, 2006 |
| | ) Time: 8:00 a.m. |
| | ) Ctrm:  9, 19th Floor |
| | ) Honorable William H. Alsup |
| Defendants. | ) |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

ISSUE TO BE DECIDED ...........................................................................................................1

INTRODUCTION AND STATEMENT OF FACTS ...............................................................1

ARGUMENT.................................................................................................................................5

POINT I      DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED
             IN ITS ENTIRETY.................................................................................................5

POINT II     CONTRARY TO DEFENDANTS' CONTENTIONS, *QUID PRO
             QUO* REVENUE SHARING ARRANGEMENTS ARE ILLEGAL.............5

POINT III    COUNT IV OF THE COMPLAINT ADEQUATELY PLEADS A
             CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF
             SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
             PROMULGATED THEREUNDER..............................................................8

     A.      Defendants Breached Their Duty to Disclose.................................................9

             1.    Defendants Did Not Comply with Regulatory Disclosure
                   Requirements .............................................................................................9

             2.    Defendants Failed to Satisfy the Disclosure Requirements of
                   SEC Form N-1A ......................................................................................11

             3.    Defendants' Argument that Their Disclosure Obligations Are
                   Defined Solely by the SEC's Rule 10b-10 and Form N-1A Is
                   Wrong ........................................................................................................13

             4.    Defendants Had a Duty to Disclose Based Upon Their
                   Relationship of Trust...............................................................................15

             5.    Having Chosen to Speak, Defendants Had a Duty to Speak
                   Truthfully .................................................................................................15

     B.      Defendant's Omissions Were Material..........................................................17

     C.      Plaintiff Has Adequately Alleged Causation ...............................................18

             1.    The Complaint Adequately Pleads Reliance, Which Is Properly
                   Presumed...................................................................................................19

             2.    The Complaint Adequately Pleads Loss Causation ............................20

     D.      The Complaint Adequately Pleads Scienter .................................................23

POINT IV   COUNTS I AND II OF THE COMPLAINT ADEQUATELY
PLEAD CLAIMS AGAINST THE BROKER/DEALER,
REGISTRANT AND DISTRIBUTOR DEFENDANTS FOR
VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT..........24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972) ............................................................................................. *passim*

*Auer v. Robbins*,
   519 U.S. 452 (1997) ........................................................................................................8

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...........................................................................................9, 19, 20

*Benzon v. Morgan Stanley*,
   2004 U.S. Dist. LEXIS 2669 (M.D. Tenn. Jan. 8, 2004) .........................................16

*Blackie v. Barrack*,
   524 F.2d 891 (9th Cir. 1975) ....................................................................................23

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................................9, 14, 16

*Caiola v. Citibank N.A.*,
   295 F.3d 312 (2d Cir. 2002) .....................................................................................23

*Castillo v. Dean Witter Discover & Co.*,
   1998 U.S. Dist. LEXIS 9489 (S.D.N.Y. Jun. 25, 1998) ..........................................16

*Chris-Craft Indust., Inc. v. Piper Aircraft Corp.*,
   480 F.2d 341 (2d Cir. 1973) .....................................................................................15

*Conley v. Gibson*,
   355 U.S. 41 (1957) .....................................................................................................5

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994) .......................................................................................15

*DCD Programs, Ltd.v. Leighton*,
   833 F.2d 183 (9th Cir. 1987) ....................................................................................25

*In re Daou Sys., Inc., Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ..................................................................................19

*Davis v. Merrill Lynch, Pierce, Fenner & Smith*,
   906 F.2d 1206 .............................................................................................................23

*DeMarco v. Robertson Stephens Inc.*,
   318 F. Supp. 2d 110 (S.D.N.Y. 2004) ...........................................................18, 19, 20

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................................................................21

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group*,
    343 F.3d 189 (2d Cir. 2003)........................................................................................................20

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................................................8, 9

*Fecht v. The Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ...............................................................................................16, 18

*Fogarazzo v.  Lehman Brothers, Inc.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004)........................................................................................19

*Freedman v. Louisiana-Pacific Corp.*,
    922 F. Supp. 377 (D. Or. 1996) ...........................................................................................15, 18

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) .......................................................................................................4

*Grandon v. Merrill Lynch & Co.*,
    147 F.3d 184 (2d Cir. 1998)..........................................................................................9, 15, 18

*Gray v. First Winthrop Corp.*,
    82 F.3d 877 (9th Cir. 1996) .......................................................................................................23

*Hecht v. Harris, Upham & Co.*,
    430 F.2d 1202 (9th Cir. 1970) .....................................................................................................4

*Hemming v. Alfin Fragrances, Inc.*,
    1990 U.S. Dist. LEXIS 9193 (S.D.N.Y. July 25, 1990) ...........................................................20

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)..................................................................................23, 24

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003)..........................................................................................9

*Joseph v. SEC*,
    104 F.3d 285 (9th Cir. 1997) .......................................................................................................8

*Keenan v. D.H. Blair & Co.*,
    838 F. Supp. 82 (S.D.N.Y. 1993)..............................................................................................15

*Klein v. PDG Remediation*,
    937 F. Supp. 323 (S.D.N.Y. 1996).............................................................................................8

*Lowry v. SEC*,
    340 F.3d 501 (8th Cir. 2003) .......................................................................................................8

*Mihara v. Dean Witter & Co.*,
   619 F.2d 814 (9th Cir. 1980) .................................................................................................4

*Miller v. NTN Comm., Inc.*,
   1999 U.S. Dist. LEXIS 8968 (S.D. Cal. May 21, 1999)........................................................24

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*,
   2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)........................................................................16

*Mutchka v. Harris*,
   373 F. Supp. 2d 1021 (C.D. Cal. 2005) ................................................................................25

*In re Mutual Funds Inv. Litig.*,
   384 F. Supp. 2d 845 (D. Md. 2005) ......................................................................................22

*In re NationsMart Corp. Sec. Litig.*,
   130 F.3d 309 (8th Cir. 1997) ...........................................................................................19, 25

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003), *judgment on the pleadings in def.'s favor on other grounds*,
   2004 U.S. Dist. LEXIS 28995 (D. Ariz. 2004)......................................................................17

*In re Omnivision Techs., Inc.*,
   2005 U.S. Dist. LEXIS 16009 (N.D. Cal. Jul. 29, 2005)...........................................5, 23, 24

*Pinter v. Dahl*,
   486 U.S. 622 (1988)..............................................................................................................24

*Press v. Quick & Reilly, Inc.*,
   218 F.3d 121 (2d Cir. 2000)............................................................................................ *passim*

*In re Prudential Sec. Inc. P'ships Litig.*,
   930 F.Supp. 68 (S.D.N.Y. 1996)...........................................................................................16

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986)...........................................................................................................3, 23

*Resnik v. Swartz*,
   303 F.3d 147 (2d Cir. 2002)..................................................................................................14

*Rolf v. Blyth, Eastman Dillon & Co.*,
   570 F.2d 38 (2d Cir. 1978), *aff'd in part rev'd in part*, 637 F.2d 77 (2d Cir. 1980)...............23

*Romine v. Acxiom Corp.*,
   296 F.3d 701 (8th Cir. 2002) ..................................................................................................9

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) ............................................................................................15, 16

*SEC v. Currency Trading Int., Inc.*,
   2004 U.S. Dist. LEXIS 24992, (C.D.Cal. Jan. 29, 2004), *aff'd*,
   2004 U.S. Dist. LEXIS 25001 (C.D. Cal. Apr. 28, 2004) ...................................................6, 8

*SEC v. Hasho*,
   784 F. Supp. 1059 (S.D.N.Y. 1992)...................................................................................15

*Singer v. Livoti*,
   741 F. Supp. 1040 (S.D.N.Y. 1990)...................................................................................6

*In re SupportSoft Sec. Litig.*,
   2005 U.S. Dist. LEXIS 31406 (N.D. Cal. Nov. 21, 2005).......................................................5

*In re TCW/DW N. America Gov't Income Trust Sec. Litig.*,
   941 F. Supp. 326 (S.D.N.Y. 1996)............................................................................11, 12, 13

*In re U.S.A. Classic Sec. Litig.*,
   1995 U.S. Dist. LEXIS 8327 (S.D.N.Y. Jun. 16, 1995) .......................................................14

*United States v. Alvarado*,
   2001 U.S. Dist. LEXIS 21100 (S.D.N.Y. Dec. 17, 2001) .....................................................16

*United States v. Santoro*,
   302 F.3d 76 (2d Cir. 2002)................................................................................................15

*In re WorldCom Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)...................................................................17, 18, 19, 25

*In re Worldcom, Inc. Sec. Litig.*,
   2003 U.S. Dist. LEXIS 19785 (S.D.N.Y. Nov. 6, 2003)........................................................21

## STATUES AND RULES

17 C.F.R. 240.10b-10(a) ..................................................................................................10

SEC Rule 10b-10(a)(2) ....................................................................................................6

SEC Rule 10b-10 ....................................................................................................7, 8, 16, 20

SEC Rule 10b-10 (1977 SEC LEXIS 1818 (May 5, 2977), *reprinted in*,
   42 Fed. Reg. 25318 (1977) ...........................................................................................10

## OTHER AUTHORITIES

*Dep't of Enforcement v. Reynolds*,
   2001 NASD Discip. LEXIS 17 (N.A.S.D.R. June 25, 2001) ..................................................15

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff Ronald Siemers respectfully submits this Memorandum of Points and Authorities in opposition to the Motion of the Broker/Dealer and Registrant Defendants to Dismiss Counts I, II and IV of the Consolidated Amended Class Action Complaint on the ground that the Complaint fails to state a claim upon which relief may be granted.  As demonstrated fully below, Defendants' Motion should be denied in its entirety.

## ISSUE TO BE DECIDED

1.     Do Defendants have a valid argument that they properly disclosed the kickback scheme detailed in the Consolidated Amended Class Action Complaint ("Complaint"), when both the NASD and SEC have found that the type of disclosures at issue are inadequate, and therefore violate the federal securities laws, and Defendants themselves have admitted that the kickback scheme was not disclosed in any prospectus provided to investors?

## INTRODUCTION AND STATEMENT OF FACTS

This is a federal securities class action alleging a deceptive and secret scheme by Wells Fargo whereby its brokers shoehorned as many investors as possible into a limited number of mutual fund families (referred to herein as the "Shelf Space Funds" or "Funds") in exchange for kickbacks from these Funds.  In other words, instead of offering fair, honest and unbiased recommendations to Plaintiff and the other investors, as it promised, Wells Fargo gave pre-determined recommendations, pushing clients into the pre-selected Shelf Space Funds in order to reap millions of dollars in kickbacks from these Funds with which it had struck secret deals.  In essence, Defendants' conduct is very similar to a broker's "churning" of a client's account merely to obtain commissions, a widely recognized violation of the federal securities laws.  The kickbacks injured the Shelf Space Fund shareholders directly as these payments came out of the pockets of investors, disguised as fees they paid as part of their investment in the Funds.  By failing to make any meaningful or adequate disclosure of these programs, Defendants misled the class members into falsely believing that they were purchasing Fund shares at a price that was reasonable in terms of the likely return on investment, when, in fact, the returns were greatly reduced by the improper kickbacks at issue here.

Defendants' Motion to dismiss is completely without merit and should be denied.  Most importantly, Defendants' contentions that they met all the disclosure requirements of the Securities Exchange Commission ("SEC"), the NASD and all applicable federal securities laws are wrong.  Notably, Defendants' arguments ignore the NASD's enforcement action against Wells Fargo and the SEC's actions against sister brokerage firms and mutual fund companies for engaging in the same type of scheme at issue here.[1]  In fact, language in the Shelf Space Fund prospectuses and accompanying Statements of Additional Information ("SAI") that Defendants rely upon to argue that the kickback scheme was properly disclosed (*see* Defendants' Brief ("Def. Br.") at 16-17 citing MFS Fund prospectus) has been specifically found by the SEC to be inadequate and grounds for liability under the federal securities laws.  Reese Decl., Ex. D.  Under the applicable law, these determinations by the SEC are entitled to substantial deference by this Court.  Moreover, Defendants also fail to address the fact that the NASD has already censured and fined Defendants Wells Fargo Investments, LLC and H.D. Vest Investment Services, LLC for the directed brokerage activities alleged in the Complaint.  Nor do they mention that Wells Fargo has publicly admitted that the prospectuses in question did not adequately disclose the payments it received from the Shelf Space Funds as part of the kickback scheme and that such payments caused undisclosed conflicts of interest with their investor clients.

Defendants also try to diminish the significance of the kickback scheme, arguing that the payments involved were not material.  Def. Br. at 7, 18-20.  To the contrary, the Complaint alleges with particularity that "Plaintiff and other members of the Class would not have purchased the Shelf

---

[1] *See, e.g.*, Declaration of Michael R. Reese in Support of Oppositions to Defendants' Motions to Dismiss ("Reese Decl."), Exs. A (Nov. 17, 2003 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of Morgan Stanley DW), B (Dec. 22, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of Edward D. Jones & Co., L.P.); C (Dec. 1, 2005 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of American Express Financial Advisors); D (Mar. 31, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of Massachusetts Financial Services ("MFS"); E (Dec. 13, 2004 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of Franklin Advisors, Inc., *et al.*); and F (March 23, 2005 SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions in the Matter of Putnam Investment Management, LLC).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE BROKER/DEALER AND REGISTRANT DEFENDANTS' MOTION TO DISMISS - CASE NO.: C-05-4518 (WHA)

2

Space Funds, and paid the related commissions and fees associated with them" had the kickback scheme been disclosed. *E.g.*, ¶ 93.[2]  Moreover, the detailed allegations of the Complaint confirm that Defendants felt highly motivated to push the Shelf Space Funds in exchange for kickbacks. ¶¶ 4, 7, 33-62.  Furthermore, such payments were material, creating undisclosed conflicts of interest that any reasonable investor would consider as crucial information when determining whether to trust his "financial consultant's" recommendation to buy a particular mutual fund. ¶¶ 5-6.

Additionally, Defendants are wrong to contend that the Complaint fails to plead reliance on the deceptive statements.  In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972), the United States Supreme Court made clear that where, as here, a claim is predicated on materially deceptive omissions rather than affirmative misrepresentations, reliance – and, therefore, transaction causation – is presumed.

Finally, Defendants' assertion that Plaintiffs have not been injured by the kickback scheme is also completely without merit and is directly belied by the allegations of the Complaint, as well as by the NASD's enforcement action against Wells Fargo.  Notably, the Complaint pleads several different bases for proving loss causation and damages under the federal securities laws.  For example, Plaintiff and the other class members were deceived into buying the Shelf Space Fund shares at an artificially inflated value.  They accepted, as an integral aspect of that purchase, the payment of fees and expenses to be charged against their ownership interests in the Shelf Space Funds on the understanding that those charges were legitimate outlays for services that would benefit the Funds and contribute positively to their return on investment.  As alleged in the Complaint, a significant portion of those expenses was not being used to provide the services promised, but rather to line the pockets of Wells Fargo through the kickback scheme detailed in the Complaint.  In such a situation, the correct measure of damages is "the difference between the fair value of all that [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Randall v. Loftsgaarden*, 478 U.S. 647, 668 (1986); *Affiliated Ute*, 406 U.S. at 155.

---

[2] References herein to "¶_" are to the paragraphs in the Complaint.

The Complaint also alleges loss causation in other respects.  Wells Fargo's recommendation of the Funds' shares merely to obtain increased compensation is analogous to a broker's "churning" of a client's portfolio, a well-recognized violation of Section 10(b) of the Securities Exchange Act. *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1207 (9th Cir. 1970); *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 820-21 (9th Cir. 1980).  Here, Defendants withheld from Plaintiff and the other class members the information that would have revealed that their brokers' advice was unreliable and highly suspect with respect to Shelf Space Fund shares because the brokers were being coerced and motivated to recommend those particular shares regardless of their true value.  Any one of the foregoing theories of loss causation is, in itself, enough to survive a motion to dismiss.[3]

In sum, it is beyond dispute that the Complaint states with great particularity the details of Wells Fargo's kickback scheme and the injury that it caused to Plaintiff.  The Complaint cites numerous internal Wells Fargo documents, interviews of former Wells Fargo employees, interviews of Shelf Space Fund employees who made the kickbacks to Wells Fargo and Shelf Space Fund documents that reflect the kickbacks made to Wells Fargo.  The Complaint meets all the applicable pleading standards and Defendants' Motion to dismiss should, consequently, be denied.

---

[3]  Furthermore, although as mutual fund investors, Plaintiff and the other Class members purchased their shares at net asset value rather than at a price set by the market, they were misled into believing those shares were a reasonable investment at net asset value.  Because the return on investment was less than it would have been if the revenue sharing payments had been actually used to benefit the Funds, loss causation exists regardless of whether a Fund's stock price declined after disclosure of the revenue sharing program.  Indeed, "stockholders can be damaged in ways other than seeing their stocks decline." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003).

# ARGUMENT

## POINT I

### DEFENDANTS' MOTION TO DISMISS
### SHOULD BE DENIED IN ITS ENTIRETY

Under the applicable standard, a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, ***must be denied*** except where "it appears ***beyond doubt*** that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Omnivision Techs., Inc.*, 2005 U.S. Dist. LEXIS 16009, at * 6 (N.D. Cal. Jul. 29, 2005)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) (emphasis added). Thus, "[t]he question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim." *In re SupportSoft Sec. Litig.*, 2005 U.S. Dist. LEXIS 31406, at * 13 (N.D. Cal. Nov. 21, 2005). "In answering this question, the [c]ourt must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor." *Id.* "Even if the face of the pleadings suggests that the chance of recovery is remote, ***the [c]ourt must allow the plaintiff to develop the case at this stage of the proceedings***." *Id.* (emphasis added). Considered in these frameworks, it is clear beyond question that the Complaint withstands dismissal.

## POINT II

### CONTRARY TO DEFENDANTS' CONTENTIONS,
### *QUID PRO QUO* REVENUE SHARING
### ARRANGEMENTS ARE ILLEGAL

In an attempt to mislead this Court, Defendants argue, that revenue sharing is lawful, completely ignoring the fact, that, time and again, both the SEC and the NASD have punished broker/dealers for the very conduct that is the gravamen of the Complaint as being clearly unlawful. Def. Br. at 8. Conspicuously, Defendants omit to mention the fact that the NASD has already ***censured and fined*** Defendants Wells Fargo Investments, LLC and H.D. Vest Investment Services, LLC millions of dollars for engaging in the exact same undisclosed directed brokerage activities at issue here. Indeed, in a June 8, 2005 press release, the NASD revealed its specific findings that, by operating *quid pro quo* "'preferred partner' or 'shelf space programs' that provided certain benefits

to a relatively small number of mutual fund complexes [out of hundreds whose funds they sold] in return for directed brokerage," these two Defendants enabled the Fund complexes involved to employ directed brokerage "to use assets of the mutual funds instead of their own money to meet their revenue sharing obligations." ¶¶ 3, 33-38; Reese Decl., Ex. G (June 8, 2005 NASD Press Release announcing fine and censure of Wells Fargo and H.D. Vest). As a result, the NASD concluded that "by arranging for and accepting brokerage commissions to pay for the fund families' participation in the programs," Defendants violated NASD Conduct Rule 2830(k) and 2110. ¶¶ 33-38; Reese Decl., Exs. H and I (NASD Letter of Acceptance, Waiver and Consent against Wells Fargo Investments, No. CE10500006 and NASD Letter of Acceptance, Waiver and Consent against H.D.Vest Investment Services, No. CE1050007, respectively).

Moreover, the disingenuousness of Defendants' attempt to paint their undisclosed revenue sharing activities as legal before this Court is further highlighted by their own prior public admission. As cited in the Complaint, in a document publicly circulated by Wells Fargo Investments, LLC in the aftermath of the NASD's enforcement action and the initiation of this lawsuit, Defendants conceded not only that they had failed to disclose their receipt of the same revenue sharing payments from the Shelf Space Funds at issue here, but also that such payments had created "[p]otential [c]onflicts of [i]nterest." ¶ 65.

Furthermore, both the SEC and NASD have punished other broker/dealers for engaging in the exact type of undisclosed, *quid pro quo* revenue sharing conduct alleged in the Complaint. For example, the SEC and NASD censured and fined sister brokerage Edward Jones $75 million for its failure to disclose a kickback scheme similar to that complained of here, finding that the broker/dealer had violated SEC Rule 10b-10, Section 17(a)(2) [4] of the Securities Act of 1933 (the

---

[4] Section 17(a)(2) of the '33 Act prohibits obtaining money through the offer or sale of any security by means of "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." In the instant case, Plaintiff's claims under Section 12(a)(2) of the '33 Act, Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act") and Rule 10b-5, promulgated thereunder, track the same language of Section 17(a)(2) that the SEC deemed Edward Jones to have violated. Courts have repeatedly recognized this similarity, holding that "Section 17(a)(2) prohibits the same type of conduct as §§11 and 12 [of the '33 Act]" as well as section 10(b) of the '34 Act. *Singer v. Livoti*, 741 F. Supp. 1040, 1046 (S.D.N.Y. 1990); *see also SEC v. Currency Trading Int'l, Inc.*, 2004 U.S. Dist. LEXIS 24992, at *19 (C.D.Cal. Jan. 29, 2004)

1   "'33 Act") and NASD Rule 2830.  Reese Decl., Exs. B and J (December 20, 2004 NASD

2   Department of Enforcement Letter of Acceptance, Waiver and Consent against Edward Jones).[5]

3          Similarly, the SEC censured and fined American Express Financial Advisors ("AEFA") $30

4   million for its failure to disclose a kickback scheme similar to that at issue here, finding that the

5   broker/dealer had violated, *inter alia*, SEC Rule 10b-10 and Section 17(a)(2).  Reese Decl., Ex. C.

6   After factual investigation, the SEC specifically found that AEFA did not adequately disclose the

7   revenue sharing payments it received to distribute mutual fund shares of Shelf Space Fund families

8   or the resulting conflicts of interest.  *Id*.[6]  In addition, AEFA also paid the NASD $12.3 million in

9   fines "in connection with its receipt of directed brokerage in return for providing preferential

10  treatment to certain mutual fund companies."  *Id.*, Ex. M (December 1, 2005 NASD Press Release,

11  NASD Fines Ameriprise Financial Services $12.3 Million for Directed Brokerage Violations).[7]

12

13  _____

    (antifraud provisions Section 17(a)(2) and Section 10(b) expressly prohibit same conduct), *aff'd*,

14  2004 U.S. Dist. LEXIS 25001 (C.D. Cal. Apr. 28, 2004).

15      [5]   The California Attorney General ("CAAG") has also brought a major securities fraud
    lawsuit against Edward Jones based on the broker/dealer's failure "to tell investors about 'shelf

16  space' payments it received from seven mutual funds to recommend and sell those funds."  Reese
    Decl., Ex. K (Dec. 20, 2004 CAAG's press release and complaint against Edward Jones).  The

17  complaint alleges Edward Jones violated California state law anti-fraud provisions "by failing to tell
    investors about the existence of the shelf space arrangements, and failing to disclose the potential

18  conflict of interest created by the arrangements."  *Id.*  The CAAG's press release states that the law
    "requires broker-dealers to disclose all material facts that investors need to make informed

19  decisions."  *Id.*  As averred in its complaint, "[s]helf space payments create an incentive for a
    broker-dealer to highlight, feature or recommend funds that best compensate the broker-dealer or to

20  meet other secret promises rather than to recommend the best performing investments and/or
    investments that meet the customer's personal investment needs."  *Id.*

21      [6]   Additionally, AEFA paid $7.4 million in fines, fees, restitution and reimbursement to settle

22  an enforcement action brought by the New Hampshire Bureau of Securities after a year-long
    investigation.  Reese Decl., Ex. M (July 12, 2005 New Hampshire Bureau of Securities Press

23  Release).  The Bureau's petition alleged "that AEFA failed to disclose to New Hampshire clients
    the conflicts of interest that permeated the company's investment advisor relationship, and that

24  AEFA financial advisors operated in a system in which they were pressured and rewarded for
    selling American Express and American Express partnered mutual funds."  *Id.* at Ex. L.

25      [7] As explained by the NASD:

26          The action announced today involves violations of NASD's Anti-Reciprocal Rule,

27          which prohibits firms from favoring the sale of shares of particular mutual funds on
            the basis of brokerage commissions received by the firm.  Among other things, the

28          rule prohibits a firm from recommending funds or establishing preferred lists of
            funds in exchange for receipt of directed brokerage.

_____

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE BROKER/DEALER AND REGISTRANT
DEFENDANTS' MOTION TO DISMISS - CASE NO.: C-05-4518 (WHA)                                          7

The above regulatory determinations that the revenue sharing activities engaged in by Defendants Wells Fargo Investments, LLC and H.D. Vest Investment Services, LLC and Edward Jones and American Express, along with their corresponding failures to disclose the resulting conflicts of interest, violated applicable rules and regulations carries great weight as to the interpretation of those rules and regulations and must be respected.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997)(an agency's interpretation of its own regulations "is, under our jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation"); *Joseph v. SEC*, 104 F.3d 285, 288 (9th Cir. 1997) (judicial deference accorded to an agency's own construction of its regulations); *Lowry v. SEC*, 340 F.3d 501, 504 (8th Cir. 2003)("[A]n agency's interpretation of its own regulations is entitled to substantial deference …"); *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000)(same).  Therefore, under *Press*, 218 F.3d 121  – a case Defendants emphasize throughout their Brief as authoritative – the SEC's finding that a kickback scheme similar to the one at issue here violated the SEC rules with respect to disclosure of the brokers' conflicts of interest carries great weight and warrants substantial deference.  *Id.*

## POINT III

### COUNT IV OF THE COMPLAINT ADEQUATELY PLEADS A CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND <u>RULE 10B-5 PROMULGATED THEREUNDER</u>

The main purpose of the federal securities laws "is disclosure, with the ultimate goal of investor protection."  *Klein v. PDG Remediation,* 937 F. Supp. 323, 328 (S.D.N.Y. 1996)("The ['33] Act was passed in order to ensure that investors had enough information to enable them to

---

This case demonstrates that NASD will remain vigilant in its efforts to eliminate conflicts of interest in the sale of mutual funds," said Barry Goldsmith, NASD Executive Vice President and Head of Enforcement.  "NASD's Anti-Reciprocal Rule is an important regulatory tool that is designed to ensure that firms recommend mutual funds on their merits and not because of the receipt of brokerage commissions, which are assets of the mutual fund shareholders and should not be used for marketing purposes."

*Id.*

arrive at their own rational decisions."); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) ("[T]he fundamental purpose of the ['34] Act [is one] implementing a philosophy of full disclosure . . ."); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976)(the Securities Act "was designed to provide investors with full disclosure of material information").  As shown below, Defendants violated the federal securities laws by failing to disclose material information.

**A.    Defendants Breached Their Duty to Disclose**

A duty to disclose material facts arises under any one of the following four scenarios: 1) when a statute or regulation requires such disclosure; 2) in the context of a mutual fund prospectus and corresponding Statement of Additional Information (collectively, the "prospectus"); 3) when one party has information that the other party is entitled to know because of a fiduciary or other similar relationship of trust and confidence between them; or 4) when a party chooses to make a disclosure, despite not having been required initially to disclose information, thereby triggering a duty to disclose all material facts to avoid making the voluntary disclosure "untrue or misleading" in any way.[8]  While failure to disclose under just any one of these scenarios constitutes an actionable violation under the federal securities laws, here, Defendants are liable under all four.

**1.    Defendants Did Not Comply with Regulatory Disclosure Requirements**

Defendants breached their disclosure obligations under SEC Rule 10b-10 and other rules and regulations by failing to disclose material information concerning the shelf space payments and the inherent conflicts of interest they created.  Rule 10b-10, promulgated under Section 10(b) of the Exchange Act of 1934, recites that it is:

---

[8] *See*, *e.g.*, *Ernst*, 425 U.S. at 195 (there is a "strong affirmative duty of disclosure" requiring all material facts to be completely and accurately stated in the prospectus because investors often have little other information to rely on in making their investment choice); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)("[T]he requirement is that any public statements companies make that could affect security sales . . . not be misleading or untrue."); *Romine v. Acxiom Corp.*, 296 F.3d 701, 707 (8th Cir. 2002)(holding that disclosure was required pursuant to SEC regulations); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998)(duty to disclose exists where there is a relationship of trust or other special circumstances between the parties); *In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 388 (S.D.N.Y. 2003)(duty to disclose exists pursuant to SEC rules and regulations).

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE BROKER/DEALER AND REGISTRANT DEFENDANTS' MOTION TO DISMISS - CASE NO.: C-05-4518 (WHA)

9

> [U]nlawful for any broker or dealer to effect for or with an account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . ***unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification disclosing . . . [the source and] amount of any other remuneration received or to be received by the broker from such customer in connection with the transaction . . . .***

17 C.F.R. 240.10b-10(a)(emphasis added).  This rule addresses the underlying policy concern that "dual agency representation [by a broker] presents a potential for abuse since there is a prima facie problem in representing fairly the rights of parties having conflicting interests."  Rule 10b-10 Adopting Release, Exchange Act Rel. No. 13508, 1977 SEC LEXIS 1818, at *24 (May 5, 1977), *reprinted in*, 42 Fed. Reg. 25318 (1977).

Likewise, the NASD, which is also responsible for regulating the Broker/Dealer Defendants, has extensive rules governing their conduct.  In March of 1994, the NASD issued Notice to Members No. 94-14 to "clarify the level of disclosure necessary to comply with NASD rules," specifically Article III, Section 26 of the NASD Rules of Fair Practice (current NASD Rule 2830).  Notice 94-14 states that NASD members, such as the Broker/Dealer Defendants, are prohibited from receiving "any discount, concession, fee, or commission" from mutual fund underwriters in selling mutual funds "unless the compensation is disclosed in the mutual fund prospectus."  Moreover, Notice 94-14 prescribes, "if special compensation arrangements have been made with individual members that are not generally available to all members, ***the details of the arrangements and the identities of the members receiving the special arrangements must be disclosed***."  *Id.* (emphasis added).  In other words, Notice 94-14 made clear to broker/dealers, including Defendants, that they could not accept compensation from mutual funds unless they assured themselves that the funds' prospectuses contained adequate disclosures.

Later that same year, the NASD reiterated that this obligation applied to members' current disclosure obligations and was a continuing duty, stating:

> In publishing Notice to Members 94-14, the NASD was addressing its concern that the current level of disclosure in many cases does not meet the requirements of Section 26 (1)(1)(C).  The NASD determined to remind members of their obligations under that provision and provide clear guidance to assist members in reviewing and, where necessary, modifying current disclosure in the fund prospectus.

NASD Notice to Members 94-41.  In addition, the NASD's Anti-Reciprocal rule, Rule 2830(k), prohibits members from favoring the distribution of shares of particular mutual funds on the basis of brokerage commissions to be paid by the mutual fund companies, as follows:

> (1)  No member shall directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account.
>
> *   *   *
>
> (3)  No member shall . . . request or arrange for the direction to any member of a specific amount or percentage of brokerage commissions conditioned upon that member's sales or promise of sales of shares of an investment company.

Defendants violated these requirements by accepting millions of dollars in improper kickback payments that were not disclosed in the corresponding Fund prospectuses or their own communications with customers.  Moreover, as cited in the Complaint, Defendants have admitted that they failed to disclose the kickback payments described therein to investors during the Class Period.  ¶ 65.

### 2.  Defendants Failed to Satisfy the Disclosure Requirements of SEC Form N-1A

SEC Form N-1A sets forth the information the SEC requires investment companies to disclose in registration statements.  Although, as explained below, the '33 Act and '34 Act impose broader disclosure requirements than those mandated by Form N-1A, a violation of Form N-1A often constitutes a *per se* violation of those Acts.  *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 339 (S.D.N.Y. 1996).  The purpose of Form N-1A is to "help investors to evaluate the risks of an investment and to decide whether to invest in a fund by providing a balanced disclosure of positive and negative factors.  Disclosure in the prospectus should be designed to assist an investor in comparing and contrasting the Funds with other funds."  Reese Decl., Ex. N (SEC Form N-1A, General Instruction C (1)(b)).  Item 15(c) of Form N-1A requires the SAI for a prospectus to include a detailed description of "how the Fund will select brokers to effect securities transactions for the Fund."  *Id*.  Item 15(c) further recites, "[i]f the Fund will

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE BROKER/DEALER AND REGISTRANT DEFENDANTS' MOTION TO DISMISS - CASE NO.: C-05-4518 (WHA)

11

consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services." *Id.*

Defendants' contention at pages 16-17 of their Motion to Dismiss that the MFS prospectus and SAI highlighted in the Complaint, as well as the Wells Fargo Funds prospectuses and SAI's in question, satisfied Form N-1A and all other applicable disclosure requirements is wrong and flies in the face of what the SEC has determined to constitute adequate disclosure under the federal securities laws. To wit, in an action filed against MFS on March 31, 2004 for violation of the federal securities laws, the SEC determined that statements such as those made in the MFS prospectus and SAI, *see* ¶¶ 84-86, "did not adequately disclose to . . . shareholders that [MFS] allocated fund brokerage commissions to satisfy strategic alliances." Reese Decl., Ex. D. As the SEC explained, such statements in prospectuses did not effectively communicate and ***"did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts to fund brokerage commissions for specified marketing and distribution services." Id.*** (emphasis added).

The SEC has also fined and sanctioned Shelf Space Fund Franklin/Templeton for failing to make adequate disclosures of the Shelf Space arrangements it had with broker/dealers, noting, *inter alia*, that "[a]lthough the SAI's stated that [Franklin/Templeton] could consider a broker-dealer's sales of fund shares when selecting a broker-dealer to execute portfolio transactions, ***they did not describe FTDI's practice of annually negotiating shelf space arrangements with certain broker-dealers."*** Reese Decl., Ex. E (emphasis added). The SEC also censured and fined Putnam, another Shelf Space Fund that made improper payments to Wells Fargo, for failing, like MFS and Franklin/Templeton, to disclose pursuant to Item 15(c) the very same type of shelf space programs at issue here. Reese Decl., Ex. F. While observing that the Putnam prospectuses stated that they "may consider sales of shares of the funds as a factor in the selection of broker-dealers to execute the Fund's portfolio transactions," the SEC concluded that ***"the SAI's did not make the distinction, however, between directing commissions in 'consideration of fund sales' and satisfying negotiated arrangements for specific amounts with brokerage commissions." Id.*** (emphasis added).

In a leading enforcement action on the issue, the SEC fined Edward Jones $75 million for "failure to adequately disclose revenue sharing payments that it received from a select group of mutual fund families that Edward Jones recommended to its customers." Reese Decl., Ex. B. The non-disclosed facts for which the SEC censured and fined Edward Jones are the same material facts that are the heart of the Complaint in this case. *Id.* The SEC further determined that the "***prospectuses and SAIS fail[ed] to disclose adequate information about the source and the amount of the revenue sharing payments to Edward Jones and the dimensions of the resulting potential conflicts of interests"*** and concluded that, as a result, Edward Jones's actions had violated Section 17(a)(2) of the Securities Act and SEC Rule 10b-5 under the Exchange Act. *Id.* (emphasis added.

Here, the Shelf Space Funds' Prospectuses and accompanying SAI's contained the same type of language that the SEC determined in the SEC enforcement actions again Edward Jones, MFS, Franklin/Templeton, Putnam and American Express (*see* discussion at Point II, *supra*), to be inadequate. In the instant case, Defendants did not adequately disclose in the prospectuses that they had investors rely upon that the corresponding Funds were engaged in "shelf-space programs" at Wells Fargo through which brokers were paid to push the Shelf Space Funds. Nor did they disclose that they were paying higher commissions to certain brokers for preferential marketing treatment rather than for research or other distribution services. Defendants further failed to reveal the conflicts of interest to shareholders that such "shelf space programs" created. Consequently, under the SEC's interpretation of its own rules and regulations, Defendants failed to meet the basic reporting requirements of Form N1-A. Moreover, as cited in the Complaint, since the initiation of this lawsuit, Defendants have now admitted that the Shelf Space Fund Prospectuses they provided to investors ***did not disclose these payments - payments that Defendants have conceded create the potential for "Conflicts of Interests."*** ¶ 65.

### 3. Defendants' Argument that Their Disclosure Obligations Are Defined Solely by the SEC's Rule 10b-10 and Form N-1A Is Wrong

As shown above, Defendants violated the disclosure requirements of SEC rules and regulations and Form N-1A, either of which is enough to impose liability under the federal

securities laws.  In addition, however, it is also well-settled that the duty of disclosure is not limited

merely to information explicitly required by SEC rules and regulations and that, "the requirement is

that any public statements companies make that could affect security sales . . . not be misleading or

untrue."  *Brody*, 964 F.2d at 1006.  Indeed, in *Press*, a case on which Defendants place great

reliance in arguing their case for dismissal, the Second Circuit cited with approval an SEC Release

referring to the SEC's "longstanding position that the antifraud provisions of the federal securities

law may impose, given the circumstances, greater than what may be required by a specific rule or

regulation."  *Press*, 218 F.3d at 131.

In their Motion, Defendants define their disclosure obligations to fall narrowly within the

purview of SEC Rule 10b-10 and Form N-1A .  Def. Br. at 7-18.  However, as the foregoing

authorities establish, Defendants' duties are much broader.  To be sure, in *In re U.S.A. Classic Sec.*

*Litig.*, 1995 U.S. Dist. LEXIS 8327, at *5-6 (S.D.N.Y. Jun. 16, 1995), the court rejected the very

same argument that Defendants make here, stating:

> In this regard [the defendants] note that the information allegedly not disclosed is not
> required to be disclosed by the applicable regulations of the Securities & Exchange
> Commission.  ***What defendants overlook, however, is that they were obligated not***
> ***to fail to state facts necessary to make those statements that were made not***
> ***misleading.***

*Id*. (emphasis added).  In fact, Defendants are under the same duty discussed in *U.S.A. Classic* to

make true statements that are not misleading, regardless of whether such duty is explicitly stated in

any SEC rule or regulation, or not.  *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002)

("[O]mission of information from a proxy statement will violate these provisions [of the Exchange

Act] if either the SEC regulations specifically require disclosure of the omitted information in a

proxy statement, ***or the omission makes other statements in the proxy statement materially false***

***or misleading.***")(emphasis added).

Defendants failed to satisfy this basis duty to disclose as well.  As detailed in the Complaint,

the Shelf Space Funds failed to disclose these payments.  ¶¶ 80-90.  Moreover, again as detailed in

the Complaint and as discussed above, since the initiation of this lawsuit, Defendants have admitted

in a Wells Fargo document that these payments ***were not publicly disclosed and that they created***

***"potential" conflicts of interests.***  ¶ 65.

### 4.    Defendants Had a Duty to Disclose Based Upon Their Relationship of Trust

By holding themselves out as "financial consultants" and convincing investors to place money in the Shelf Space Funds, Wells Fargo's brokers created a relationship of trust with Plaintiff and other investors. *See Keenan v. D.H. Blair & Co.*, 838 F. Supp. 82, 89 (S.D.N.Y. 1993) ("Securities dealers 'owe a special duty of fair dealing to their clients.'")(quoting *SEC v. Hasho*, 784 F.Supp. 1059, 1107 (S.D.N.Y. 1992); *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994)("The relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature.")). Because of this relationship, Defendants were under a duty to disclose all material aspects of the investments, including the practices and conflicts of interest complained of in this action. *See, e.g., United States v. Santoro*, 302 F.3d 76, 80 (2d Cir. 2002); *Grandon*, 147 F. 3d at 189; *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir. 1973). Defendants used this special relationship to convince investors to invest in the Shelf Space Funds that generated enormous fees for them. Liability has been repeatedly recognized for failure to disclose conflicts regarding compensation.[9] Here, Defendants failed to give "honest and complete information." Instead they misled investors by not disclosing their kickback scheme, their threats of coercion, their use of mutual fund fees to effectuate that kickback scheme, and the brokers' resulting conflicts of interest.

### 5.    Having Chosen to Speak, Defendants Had a Duty to Speak Truthfully

"[W]hen a corporation makes affirmative statements which are rendered misleading by omissions of material facts, that corporation has a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996)(citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything."). The Complaint details numerous instances where, although Defendants chose to speak, they failed to speak fully and truthfully concerning the facts at issue in this litigation and "specif[ies] the reason

---

[9]    *See, e.g., Grandon*, 147 F.3d at 189; *Dep't of Enforcement v. Reynolds*, 2001 NASD Discip. LEXIS 17 (N.A.S.D.R. June 25, 2001).

or reasons why the statements made by [Defendants] were misleading or untrue, not simply why the

statements were incomplete." *Brody*, 280 F.3d at 1006; ¶¶ 80-95.[10]  In any event, "whether a public

statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to

be decided by the trier of fact" and is not properly determined on a motion to dismiss.  *See Fecht v.*

*The Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).  For all the foregoing reasons, that Defendants

had a duty to disclose is unquestionable.[11]

---

[10]   For example, having chosen to speak as to the method by which brokers are selected to trade the securities in their mutual funds portfolios, Defendants were under a duty to disclose sufficient information regarding their selection process to make their statements both true and not misleading, something the prospectuses fail to do.  Conspicuously, they failed to disclose that brokers for the Funds were selected pursuant to bilateral "shelf space" arrangements whereby sales of the Fund shares were pushed in exchange for the broker receiving brokerage business in the underlying mutual funds portfolios, rather than the broker being chosen based on obtaining the most favorable prices.  *Id*. Moreover, stating that something is a mere possibility as the Shelf Space Funds prospectuses do, when it is in fact a certainty that has already occurred - as the Complaint and NASD action evidence - is also misleading.  *See, e.g.*, *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (securities disclosures are inadequate that misrepresent a certainty as a possibility, for it is "no protection to someone who warns his companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies only a foot away").  Also, payment to brokers handling trades of the securities in a mutual fund's portfolio is one of a mutual fund's major categories of expenses and, thus, information regarding the selection of the brokers to handle trading of the mutual fund's portfolio — and, thus, to reap the millions of dollars of fees paid by investors — is material information to investors.

[11]   Defendants' heavy reliance on *Press v. Quick & Reilly*, 218 F.3d 121 (2d Cir. 2000), *Castillo v. Dean Witter Discover & Co.*, 1998 U.S. Dist. LEXIS 9489 (S.D.N.Y. Jun. 25, 1998) and *United States v. Alvarado*, 2001 U.S. Dist. LEXIS 21100 (S.D.N.Y. Dec. 17, 2001), to support their argument that they did not have a duty to disclose anything beyond the disclosures required by the SEC's rules and regulations is completely unavailing.  *See* Def. Brf., *passim*.  In fact, *Press* strongly supports Plaintiffs' position that Defendants were required to disclose the practices and resulting conflicts of interest complained of here, as the Second Circuit held that the plaintiffs' "knowledge that their broker-dealers have a conflict of interest, i.e., that their broker-dealers are paid by the money market funds the broker-dealers selected for 'automatic sweeps' of plaintiffs' uncommitted account balances, *is material*." 218 F.3d at 130 (emphasis added).  Moreover, although the Second Circuit held, in spite of its concern as to the adequacy of the disclosures of the brokers' conflicts of interest, that defendants did not omit material information because defendants had fully complied with the requirements of SEC Rule 10b-10, it did so, out of deference to the SEC's expertise, only because the SEC had filed an *amicus* brief stating that, *on the particular facts of that case*, defendants' disclosure comported with Rule 10b-10.  *Id.*  Likewise, in *Castillo* and *Alvarado*, decided by the same judge, the court dismissed the complaint, finding it persuasive that the SEC had not stated that a duty to disclose differential compensation existed *on the particular facts of those cases*.  Although the SEC has not spoken in the instant case, it has in analogous cases such as in Edward Jones, in which it found that defendants had not properly disclosed the brokers' conflicts of interest.  Defendants' citation to *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006), is inapposite as in that case the court held that Defendants had disclosed all the payments at issue in the prospectuses, whereas here *Defendants have admitted that the payments at issue were not disclosed in the prospectuses or elsewhere.* ¶65.  Likewise, Defendants' reliance on *Benzon v. Morgan Stanley*, 2004 U.S. Dist. LEXIS 2669

**B.     Defendant's Omissions Were Material.**

As the Ninth Circuit observed in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, "a fact is material if there is a 'substantial likelihood' that a reasonable investor would consider it important in his or her decision making" and that "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 320 F.3d 920, 934 (9th Cir. 2003), *judgment on the pleadings in def.'s favor on other grounds*, 2004 U.S. Dist. LEXIS 28995 (D. Ariz. 2004).  In other words, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.*  Here, it is reasonable to assume that investors would not have acquired the Shelf Space Funds in the first place, let alone pay the mutual funds fees that financed the kickback scheme had they known the truth.  Despite Defendants' assertions to the contrary, the disclosures regarding revenue sharing and directed brokerage that Defendants omitted from the prospectuses are unquestionably material.  As stated by the Second Circuit in *Press*, "[investors'] knowledge that their broker-dealers have a conflict of interest…. is material." 218 F.3d at 130.

*In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003), is closely on point. There, plaintiffs sued the analyst Jack Grubman and Salomon Smith Barney ("SSB") for failing to disclose that recommendations to purchase WorldCom stock made by Grubman and other SSB analysts were tainted by conflicts of interest due to *quid pro quo* arrangements between WorldCom and the defendants.  In denying defendants' motion to dismiss, the court held that:

> [I]nvestors were misled by material misrepresentations and omissions by Jack Grubman and SSB in SSB's analyst reports and by SSB in WorldCom's Registration Statements. The SSB Defendants' analyst reports and the Registration Statements issued in connection with the 2000 and 2001 Offerings were false and misleading not only because they misrepresented WorldCom's financial condition, ***but also because they failed to disclose key information regarding the nature and extent of an illicit quid pro quo arrangement that existed between the SSB Defendants and WorldCom***.

(M.D. Tenn. Jan. 8, 2004), is inapposite, as the court there dealt with the limited issue of commissions charged for Class B shares — something simply not at issue here.

1    *Id*. at 404.  (emphasis added).  Here, Plaintiff has alleged essentially the same type of *quid pro quo*

2    arrangement that existed in *WorldCom*.  As stated in *WorldCom*, such information would,

3    necessarily, be material to an investor:

> Had that self-serving arrangement been adequately disclosed, it would have been apparent that Grubman's positive reports . . . and recommendations to buy . . . ***were not reliable advice from an independent analyst and trustworthy brokerage house***.

6    *Id*.  (emphasis added).  Here too, Plaintiff and the other class members would certainly have wanted

7    to know that the advice they were receiving was not reliable and was coming from an untrustworthy

8    source.[12]  Manifestly, facts concerning Defendants' revenue sharing and directed brokerage

9    arrangements with the Shelf Space Fund families created conflicts of interest that any reasonable

10    investor would certainly want to know before deciding whether to invest.  Moreover, "[w]hether an

11    omission is 'material' is a determination that 'requires delicate assessments of the inferences a

12    reasonable shareholder would draw from a given set of facts and the significance of those inferences

13    to him and these assessments are peculiarly ones for the trier of fact.'"  *Fecht*, 70 F.3d at 1080-81;

14    *Freedman*, 922 F.Supp. at 387 ("[W]hether an omission is material and whether a statement is

15    misleading are two interrelated, but separate, fact-specific inquiries.").

16    **C.    Plaintiff Has Adequately Alleged Causation**

17        As explained recently by the Ninth Circuit:

18        The causation requirement can be broken down into two necessary elements:  actual

19    cause ("transaction causation") and proximate cause ("loss causation") . . .  [T]o prove transaction causation, the plaintiff must show that, but for the fraud, the plaintiff would not have engaged in the transaction at issue; to prove loss causation,

20    the plaintiff must demonstrate a causal connection between the deceptive acts that

21

---

22       [12]    *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 118 (S.D.N.Y. 2004) is similarly on point.  There, plaintiffs alleged that analysts from Robertson Stephens, who wrote purportedly

23    unbiased recommendations to buy certain stocks, were in fact self-interested and that their reports were compromised by the resulting conflicts of interest.  In denying the defendants' motion to

24    dismiss, the court found that the type of information that Robertson Stephens failed to disclose was material, stating:  "it is entirely reasonable that investors would consider [it] as part of the 'total

25    mix' of information available when making purchases."  *Id*.  Here, the Complaint alleges the same type of conflicts of interest that the court in *DeMarco* found would be material information to an

26    investor.  *Grandon*, 147 F. 3d at 189, is also instructive.  In *Grandon*, the Second Circuit reversed the trial court's decision granting a motion to dismiss.  In that case, plaintiffs alleged that

27    defendants — as is alleged here — charged plaintiffs excessive amounts.  *Id*. at 187.  The excessive charges were deemed to be material.  Here, the Complaint alleges the same type of excessive

28    charges that the court in *Grandon* found would be material information to an investor.

---

form the basis for the claim of securities fraud and the injury suffered by the plaintiff.

*In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005)(quotation and citations omitted).[13]

1.    **The Complaint Adequately Pleads Reliance, Which Is Properly Presumed**

In federal securities cases, reliance, *i.e.*, transaction causation, is properly presumed under one of two scenarios — where, as here, the case is one that is based primarily on material omissions and under the fraud-on-the-market theory. *See Basic*, 485 U.S. at 224; *Affiliated Ute Citizens*, 406 U.S. at 155.  In *Affiliated Ute*, the United States Supreme Court clarified:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.  This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

406 U.S. at 153-54 (citations omitted).  Here, Defendants' omissions are the gravamen of Plaintiff's federal securities fraud claims.  *See Affiliated Ute*, 406 U.S. at 153.  Accordingly, Plaintiff is not required to plead reliance because it is presumed from the materiality of the omissions.  *See*, *e.g.*, *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997) ("In a case involving a failure to disclose information to investors, courts will presume reliance if the omitted information is shown to be material.").

Alternatively, Plaintiff has adequately pled that the fraud-on-the-market doctrine applies here to satisfy the transaction causation requirement.  Under that doctrine, it is presumed that, in an open and developed securities market, a securities investor relies on the integrity of the process by which security prices and market trends are affected and that a material misstatement or omission that affects the apparent value of a security will be relied upon by the investor, even if investors were not directly aware of, and cannot show direct reliance on, a fraudulent statement or omission. *See*, *e.g.*, *Worldcom*, 294 F. Supp. 2d at 413; *DeMarco*, 318 F. Supp. 2d at 119; *Fogarazzo v.*

---

[13]   Transaction causation is often also referred to as "reliance" and those terms are used interchangeably in this Brief.

*Lehman Bros.*, *Inc.*, 341 F. Supp.2d 274, 286 (S.D.N.Y. 2004)(presumption operates "even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale"). For the fraud-on-the-market theory to apply "it is sufficient that [the investor] bases her transactions on the market trends *or* securities prices that are altered by the fraud." *DeMarco*, 318 F. Supp. 2d at 119 (citing *In re Initial Public Offering Sec. Litig.*, 241 F. Supp.2d at 375, and *Basic*, 485 U.S. at 246).[14]

The Complaint avers sufficient facts to state a claim under the fraud-on-the-market doctrine. ¶¶ 186-87. To the extent Defendants were successful in promoting the sale of additional Fund shares to an investor, thereby increasing the total amount invested, they altered the market trend for these Funds, which led prospective investors to believe that many other investors were enthusiastic about these Funds. Plaintiff and the Class relied on the integrity of the market for Fund shares, unaware that the market was tainted because of Defendants' kickback scheme and the resulting conflicts of interest. Additionally, Plaintiff is entitled to invoke the fraud-on-the-market theory because Defendants' failure to disclose the existence, nature and materiality of the programs at issue misled the class members with respect to the prospective return on investment in the Shelf Space Funds. As a result, investors were misled into believing that the purchase prices of the Funds were fair value, when, in fact, they were not. For all these reasons, reliance is properly presumed here.

### 2.    The Complaint Adequately Pleads Loss Causation

Loss causation can be compared to the tort law concept of proximate cause, in that "damages suffered by plaintiff must be a foreseeable consequence of any. . . material omission." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group*, 343 F.3d 189, 197 (2d Cir. 2003). "If the allegations support an inference that a defendant could reasonably have foreseen that the misrepresentation pertained to an issue that would cause the eventual damage, loss causation will be

---

[14]    Moreover, if a plaintiff invokes the fraud-on-the-market theory by showing the price was altered, as opposed to showing the market trends were altered, it is enough to show that the price was affected in any manner, *i.e.*, either through an inflation or deflation of the market price. *Hemming v. Alfin Fragrances, Inc.*, 1990 U.S. Dist. LEXIS 9193, at *12 (S.D.N.Y. July 25, 1990) ("Where market prices have been artificially inflated or deflated by false and misleading statements or omissions, the open market purchasers or sellers are presumed to have relied upon the integrity of the market for the purposes of §10(b)."). As the Supreme Court has noted, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47. Either showing entitles a party to invoke the fraud-on-the-market theory. Here, Plaintiff has made both.

considered adequately pleaded." *In re Worldcom, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 19785, at

*17 (S.D.N.Y. Nov. 6, 2003).  As discussed below, the Complaint adequately pleads loss causation

on not one, but three grounds, to wit, that the class members:  1) paid commissions and inflated

prices to purchase their Shelf Space Fund investments;[15] 2) paid excessive fees and expenses as

owners of Shelf Space Funds; and 3) sustained foreseeable losses caused by Defendants' deception

in failing to disclose the nature and extent of their conflicts of interest attendant to their

recommendations of Shelf Space Funds.

Defendants argue that in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the

Supreme Court purportedly approved a loss causation analysis under which "Plaintiffs must

establish a decline in investment value in order to recover under Section 10(b)."  Def. Br. at 23.

Contrary to Defendants' suggestion, Plaintiffs are not required to show that a fraudulently inflated

stock price declined after disclosure of the wrongdoing in order to recover damages under § 10(b).

Stock price inflation was the particular scenario that was involved in *Dura*, and *Dura* did hold that

merely alleging stock price inflation without more was not enough to plead loss causation.

However, nothing in *Dura* or the law concerning § 10(b) limits loss causation in securities fraud

cases to situations in which deception inflated the price of stock and subsequent disclosure caused

the price to drop.

Here, Plaintiff alleges that they were misled into purchasing Funds in which the return on

investment would be impaired because of the impact of the undisclosed revenue sharing programs

on the shareholders' rate of return on their mutual fund investments.  By increasing the costs of the

Funds without any corresponding benefit to the Funds or their shareholders, the kickback programs

caused injury by reducing both the net asset value per share of the Funds, and reducing the Class

members' rate of return on their investments.  By concealing the existence and magnitude of the

kickback programs, Defendants misled the shareholders into purchasing shares, unaware that

---

[15]   Key considerations confronting any investor in determining whether to purchase mutual
fund shares are the fees and expenses that are part of the calculation of the price paid for the fund
shares.  SEC Form N-1A requires their disclosure in the prospectus because a significant part of the
costs paid by investors over time for investing in a mutual fund are reflected in these fees and
expenses.  These fees and expenses are paid, regardless of the quality of performance, and the fees
can aggregate to more than 10% of the initial investment during a ten-year period.

substantial Shelf Fund assets would be siphoned off for revenue sharing purposes, and that these programs would therefore adversely impact the value of Plaintiff's investments.

A recent decision involving mutual funds shows that damages may be recovered under § 10(b) when activity that is concealed from the investors diminishes a mutual fund's profits and rate of return, even if disclosure of that activity does not cause the market price of the fund's shares to drop.  *In re Mutual Funds Investment Litigation*, 384 F.Supp.2d 845 (D. Md. 2005) (MDL 15863) involved securities fraud claims against mutual fund investment advisers and traders who engaged in late traded or market-timed transactions and the broker-dealers that facilitated those transactions.  Upholding plaintiffs' § 10(b) claims, the court stated that plaintiffs there "were harmed as result of defendants' fraudulent scheme and course of business which ***diminished the value of their shares by, inter alia¸ siphoning off from the funds profits to which shareholders were entitled [and] substantially increasing transaction expenses and fees***."  *Id.* at 864 (emphasis added).  The court found those § 10(b) damages to be adequately pled, stating: "[t]hese allegations of loss are clear and direct, and while the theory upon which they are based must ultimately be put to the test of evidentiary proof, it is at least facially plausible."  *Id.* at 864-65.  Moreover, the court specifically held that a price drop subsequent to purchase was not a requirement for damages under § 10(b):

> Here, plaintiffs have not alleged facts demonstrating that they (or the other members of the putative class) have sold their shares (or could have sold their shares at the time suit was filed) for an amount less than they paid for the shares.  The failure to make such allegations is not fatal to their 10b-5 claims because, as I have previously indicated, ***plaintiffs have articulated and pled a theory of damages that does not depend upon their having paid more for their shares than they received (or could have received) in selling them.***

*Id.* at 867.

Plaintiff in the present case was harmed in much of the same manner as the plaintiffs in *In re Mutual Funds*.  The undisclosed kickback compensation Wells Fargo received increased the transaction fees and expenses of the Shelf Space Funds, diminishing their value and their rate of return.  In other words, a substantial portion of the fees and expenses paid by Plaintiff and the other class members was improperly inflated because the fees were upstreamed to finance the directed brokerage and "shelf space" kickback scheme rather than used to pay for services that would have

1    benefited the Funds, such as advice from an investment adviser as to which securities should be

2    held in the mutual fund's underlying portfolio.  Defendants' failure to disclose the true nature and

3    purpose of the fees, and the fact that no return on investment would be earned on the substantial

4    amounts paid as kickbacks, harmed Plaintiff and the other class members.[16]  Thus, they sustained

5    loss because they were deceived into paying more than fair value for Fund shares.[17]

6      Secondly, Plaintiff and the other class members are entitled to recover the excessive fees and

7    expenses they paid as owners of the Shelf Space Funds that went to Wells Fargo as kickbacks.  In

8    essence, Defendants collected kickbacks paid from the fees on the accounts of their clients invested

9    in the Shelf Space Funds.[18]

10   **D. The Complaint Adequately Pleads Scienter**

11     "'[F]alsity and scienter . . . are generally strongly inferred from the same set of facts . . .'"

12   *In re Immune Response Sec. Litig.*, 375 F. Supp.2d 983, 1019 (S.D. Cal. 2005).  "Thus, Ninth

---

14   [16] Their decision to pay net asset value per share at the time of purchase, plus significant
15   additional fees and charges for the duration that they would hold those shares, assumed a value at
least equal to net asset value per share plus the value, at the time of purchase, of a stream of future
16   charges that would be incurred.  Had Plaintiffs known that a substantial portion of those charges
was not a legitimate outlay for services that would benefit the Funds, but was merely being used to
17   line Defendants' pockets, without providing any benefit to the Fund shareholders, the value
placed on those shares at the time of purchase would have been diminished.  Similarly, investors
18   would have valued the Funds at less than the price at which they purchased them, had they known that
their prospective return on investment would be diminished by the massive program of improper
19   kickback payments to Defendants.  *See Gray v. First Winthrop Corp.*, 82 F.3d 877, 885 (9th Cir.
1996)("The requirement of loss causation means the plaintiffs must show not only that
20   [defendants'] fraud induced them to make the investment . . . but also that disclosure of the truth
would have 'reduced the proper valuation of their investment.'").

21   [17] Where, as here, the class members were mislead into overvaluing a security by deception
concerning the legitimacy of anticipated expenditures, "the correct measure of damages . . . is the
22   difference between the fair value of all that the [plaintiff] received and the fair value of what he
would have received had there been no fraudulent conduct."  *Randall*, 478 U.S. at 661-62; *Affiliated
23   Ute*, 406 U.S. at 155.  In other words, damages are measured by "holding the defendant to the
bargain by requiring him to pay [out-of-pocket] damages."  *Id.* (quoting *Blackie v. Barrack*, 524
24   F.2d 891, 909 (9th Cir. 1975)).

25   [18] *Caiola*, 295 F.3d at 324 ("Churning claims, which depend on a broker's liability for
excessive trading . . . have been recognized under Rule 10b-5."); *Rolf v. Blyth, Eastman Dillon &
26   Co.*, 570 F.2d 38, 49-50 (2d Cir. 1978), *aff'd in part rev'd in part*, 637 F.2d 77 (2d Cir. 1980)
(recovery of excessive commissions); *Davis v. Merrill Lynch, Pierce, Fenner & Smith,* 906 F.2d
27   1206, 1218-19 (recovery of commissions, even where churned investments resulted in a profit to
plaintiff).  Plaintiff's damages also include the commissions charged him and the other class
28   members by the Wells Fargo brokers for pushing them into Shelf Space Funds.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE BROKER/DEALER AND REGISTRANT
DEFENDANTS' MOTION TO DISMISS - CASE NO.: C-05-4518 (WHA)    23

Circuit decisional authority provides that 'these two requirements may be combined into a unitary inquiry under the PSLRA.'" *Id.* "Scienter can be established by direct or circumstantial evidence." *Omnivision*, 2005 U.S. Dist. LEXIS 16009 at *13. "The preferable way for a plaintiff to show scienter is by putting forth contemporaneous reports or data which contradict the allegedly misleading statements." *Id.* Plaintiff has more than carried this burden because the Complaint alleges the existence of contemporaneous documentation and data corroborating Plaintiff's allegations of what Defendants knew and further alleges "that Defendants had access to contrary facts and specifically identif[ies] the reports or statements containing this information." *Immune Response,* 375 F.Supp.2d. at 1022 ("The fact that the defendants published statements ***when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.***") (citations omitted; emphasis added).[19]

### POINT IV

### COUNTS I AND II OF THE COMPLAINT ADEQUATELY PLEAD CLAIMS AGAINST THE BROKER/DEALER, REGISTRANT AND DISTRIBUTOR DEFENDANTS FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

Section 12(a)(2) of the Securities Act imposes liability on anyone who either offers to sell or sells a security by means of an oral communication or a prospectus that contains an untrue statement of a material fact. Section 12(a)(2) defines a "seller" of a security to be either the issuer, who passes title to the mutual fund share to the customer, or the person who, as an agent or other person closely aligned with the issuer, solicits sales based on an elevated financial interest. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988). Thus, Defendants' assertion that, "Plaintiff lacks standing" to sue the Broker/Dealer, Registrant and Distributor Defendants because the Complaint fails to "allege that he held an account or had any dealings whatsoever with WF Investments or H.D. Vest (or any other defendant)" or that "he bought or sold a mutual fund based on a recommendation from any

---

[19] Furthermore, scienter is not an element of Plaintiff's Section 12(a)(2) claim, which, therefore, should survive Defendants' motion to dismiss regardless of how the Court determines the issue of scienter with respect to Plaintiff's securities fraud claims. Finally, scienter is a question of fact that is not properly determined on a motion to dismiss. *See Miller v. NTN Commc'ns, Inc.*, 1999 U.S. Dist. LEXIS 8968, at *21-22 (S.D. Cal. May 21, 1999).

1    defendant," falls of the weight of its own insubstantiality.  Def. Br. at 20.  *See In re NationsMart*,

2    130 F.3d at 319 ("[a] 'seller,' under § 12(a)(2), is 'anyone who successfully solicits the purchase of

3    securities, motivated at least in part by a desire to serve his own financial interests or those of the

4    securities owner.'").[20]

5                                              **CONCLUSION**

6            For all the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendants'

7    Motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss in its entirety.

8    DATED:   May 25, 2006                    **MILBERG WEISS BERSHAD &**
                                              **SCHULMAN LLP**
9

10                                           By:_____/s/ Michael R. Reese_____
                                              Jerome M. Congress (*admitted pro hac*)
11                                            Janine L. Pollack (*admitted pro hac*)
                                              Kim E. Miller (178370)
12                                            Michael R. Reese (206773)
                                              One Pennsylvania Plaza
13                                            New York, New York  10119-0165
                                              Telephone:     (212) 594-5300
14                                            Facsimile:      (212) 868-1229

15                                           *Court Appointed Lead Counsel*

16

17

18
     _____
19       [20] Additionally, Defendants' contention that Plaintiff has not stated a cognizable claim for
     damages because he fails to allege that he sold the Funds he purchased and to demand rescission or
20   tender is just plain wrong and is belied by Exhibit B to the Complaint.  Def. Br. at 20-21.
     Moreover, even if some class members have no damages under Section 12(a)(2), this would not
21   require dismissal of the claims of those class members that do indeed have damages.  Furthermore,
     pleading tender is not a strict requirement and, in any case, failure to do so can be cured by
22   amendment.  *See WorldCom*, 294 F.Supp.2d at 423; *see DCD Programs, Ltd.v. Leighton*, 833 F.2d
     183, 186 (9th Cir. 1987).  Similarly, Defendants statute of limitations argument is a complete red
23   herring for the statutes of limitations applicable to Plaintiff's claims did not begin to run until June
     8, 2005 — the date of the NASD's action.  Defendants' argument that Plaintiff lacks standing to sue
24   (Def. Br. at 20) is also devoid of merit because at the hearing held regarding the appointment of
     Lead Plaintiff, the Court determined that one Lead Plaintiff would suffice at this juncture of the case
25   and expressly reserved the standing issue for a later stage of the proceedings.  Reese Decl., Ex. O
     (Transcript of Feb. 23, 2006 Hearing); *see also Mutchka v. Harris*, 373 F.Supp.2d 1021, 1024 (C.D.
26   Cal. 2005)(no basis on standing grounds for precluding plaintiffs "from asserting claims against the
     defendants on the basis that they managed funds other than the one in which the [plaintiffs]
27   invested").

28

## DECLARATION OF SERVICE

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of New York, New York, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is One Pennsylvania Plaza, New York, New York 10119.

2.      That on May 25, 2006, declarant served the Memorandum of Points and Authorities in Opposition to the Broker/Dealer and Registrant Defendants' Motion to Dismiss by electronic notice to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

4.      That on May 25, 2006, declarant served via email to:  scac@law.stanford.edu.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of May 2006, at New York, New York.


_____
                    /s/ Michael R. Reese
                    MICHAEL R. REESE

## WELLS FARGO & CO.

### Service List

| | |
|---|---|
| Bruce A. Ericson<br>Jacob R. Sorensen<br>Kristin M. Lefevre<br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>50 Freemont Street<br>P.O. Box 7880<br>San Francisco, CA 94105-7880<br>Tel.: (415) 983-1000<br>Fax: (415) 983-1200<br><br>-and-<br><br>Clifford C. Hyatt<br>David L. Stanton<br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>725 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017-5406<br>Tel.: (213) 488-7100<br>Fax: (213) 629-1033<br><br>*Counsel for Defendants Wells Fargo & Co.,*<br>*Wells Fargo Funds Management, LLC, Wells*<br>*Capital Management, Inc., H.D. Vest*<br>*Investment Services, Wells Fargo Funds Trust,*<br>*and Stephens Inc.* | Thomas O. Jacob<br>Vanessa M. Hoffmann<br>**OFFICE OF GENERAL COUNSEL, WELLS FARGO & CO.**<br>633 Folsom Street, 7th Floor<br>San Francisco, CA 94107<br>Tel.: (415) 622-6656<br>Fax: (415) 975-7864<br><br>*Counsel for Defendants Wells Fargo & Co.,*<br>*Wells Fargo Funds Management, LLC, Wells*<br>*Capital Management, Inc., Wells Fargo Funds*<br>*Trust, and Wells Fargo Investments, LLC* |