1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RONALD SIEMERS, individually and on
behalf of all others similarly situated,

        Plaintiff,

  v.

WELLS FARGO & CO.; WELLS FARGO
FUNDS MANAGEMENT, LLC; WELLS
CAPITAL MANAGEMENT, INC.; H.D.
VEST INVESTMENT SERVICES; WELLS
FARGO INVESTMENTS, LLC; STEPHENS,
INC.; and WELLS FARGO FUNDS TRUST,

        Defendants.

_____/

No. C 05-04518 WHA


**ORDER GRANTING IN PART
AND DENYING IN PART
MOTIONS TO DISMISS**


**INTRODUCTION**

     In this action alleging securities fraud and excessive investment adviser fees, defendants

move to dismiss the consolidated amended complaint for failure to state a claim. This order

holds that plaintiff has failed to allege that he has standing to bring his claim for violation of

Section 36(b) of the Investment Company Act of 1940. There is no private right of action to

support plaintiff's claim for violation of Section 48(a) of the Act. The motions to dismiss those

counts are therefore **GRANTED**. Plaintiff, however, has properly pleaded violations of the

Securities Act of 1933 and the Exchange Act of 1934. The motions to dismiss counts brought

under those statutes therefore are **DENIED**.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT

The class-action complaint at issue here alleges a pattern of conflicts of interest and excessive fees in the mutual-funds business of several Wells Fargo companies. Defendants allegedly engaged in an undisclosed scheme to pay additional compensation to broker-dealers for steering their customers toward certain mutual funds. In one view, the trust's investment advisers and fund distributors merely bought "shelf-space" for their products in retail brokerages, much as a cereal manufacturer pays a grocery chain for placement of corn flakes at shoppers' eye level. In another view, they paid kickbacks. The broker-dealers allegedly did not adequately disclose this conflict of interest to investors, instead holding themselves out as providing unbiased investment advice to consumers. In return for steering investors toward particular funds, the broker-dealers received compensation from the funds' investment advisers. The investment advisers paid them in the form of direct payments, a practice called "revenue sharing," and/or guaranteed business in executing the mutual funds' securities trading, a practice called "directed brokerage." The broker-dealer companies allegedly pushed their brokers to sell particular funds by offering them higher bonuses and other benefits.

Such machinations helped the total assets of Wells Fargo mutual funds to grow. The income of the investment advisers and the distributors was a percentage of the fund assets. As the funds grew, so did their cut. To finance the purportedly secret payments to the broker-dealers, the investment advisers and distributors allegedly charged excessive adviser fees, breaching their own fiduciary duties to the funds.

Plaintiff thus alleges that he was harmed in two ways: (i) he got biased advice from broker-dealers when he thought he was getting impartial recommendations, and (ii) the fund assets were dissipated by paying excessive fees to the investment advisers and distributors.

The Securities and Exchange Commission addressed similar issues in eight recent orders (See Reese Decl., Exh. A (*Morgan Stanley DW, Inc.*, Exch. Act Release No. 48,789/Sec. Act Release 8,339 (Nov. 17, 2003)); Exh. C (*Am. Express Fin. Advisors, Inc.*, Sec. Act Release No. 8,637/Exch. Act Release No. 52,861 (Dec. 1, 2005)); *see also* Defs.' Req. for Judicial Notice, Exh. 13 (*Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release No. 2,224/Inv. Co. Act of

1940 Release No. 26,409 (Mar. 31, 2004)); Exh. 14 (*Franklin Advisers, Inc. &*

*Franklin/Templeton Distribs., Inc.*, Exch. Act Release No. 50,841/Inv. Advisers Act of 1940

Release No. 2,337/Inv. Co. Act of 1940 Release No. 26,692 (Dec. 13, 2004)); Exh. 15 (*Putnam*

*Inv. Mgmt., LLC*, Inv. Advisers Act of 1940 Release No. 2,370/Inv. Co. Act of 1940 Release

No. 26,788 (Mar. 23, 2005)); Exh. 16 (*Putnam Inv. Mgmt., LLC*, Inv. Advisers Act of 1940

Release No. 2,370/2,337/Inv. Co. Act of 1940 Release No. 26,788 (Mar. 23, 2005)); Exh. 17

(*Putnam Inv. Mgmt. LLC*, Inv. Advisers Act of 1940 Release No. 2,370/2,337/Inv. Co. Act of

1940 Release No. 26,788 (Mar. 23, 2005)); Exh. 18 (*Edward D. Jones & Co.*, Sec. Act Release

No. 8,520/Exch. Act Release No. 50,910 (Dec. 22, 2004)).

The SEC held that broker-dealers and other financial institutions had not disclosed

adequately the compensation they received for showcasing various funds or were paying for

such services.  For example, the SEC found that broker-dealer Morgan Stanley DW, in similar

circumstances to our own, did not "adequately disclose the preferred programs as such, nor [did

its disclosures] provide sufficient facts about the preferred programs for investors to appreciate

the dimension of the conflicts of interest inherent in them."  The SEC found that this failure to

disclose put Morgan Stanley DW in willful violation of Section 17(a)(2) of the Securities Act of

1933 (1933 Act), 15 U.S.C. 77q(a)(2), and SEC Rule 10b-10, 17 C.F.R. 240.10b-10 (Reese

Decl. ¶ 2, Exh. A (*Morgan Stanley DW, Inc.*, Exch. Act Release No. 48,789/Sec. Act Release

No. 8,339 at ¶ 25 (Nov. 17, 2003)).

In *Massachusetts Financial Services Co.*, an investment adviser disclosed that certain

funds awarded business to broker-dealers in part on the basis of their sales of fund shares.  The

disclosures, however, did not make the distinction "between directing commissions in

'consideration of fund sales' and satisfying [already-extant] negotiated arrangements for

specific amounts with brokerage commissions."  The SAIs [statements of additional

information, amendments of the prospectuses] did not adequately disclose to shareholders that

MFS [Massachusetts Financial Services] already had entered into bilateral arrangements in

which it agreed to allocate specific negotiated amounts of fund brokerage commissions . . . to

broker-dealers for 'shelf space' or heightened visibility within their distribution systems."  The

United States District Court

For the Northern District of California

1   SEC found that these failures had put the investment adviser in violation of Section 34(b) of the

2   Investment Company Act of 1940, 15 U.S.C. 80a-33(b) (Defs.' Req. for Judicial Notice, Exh.

3   13 (*Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release No. 2,224/Inv. Co. Act of 1940

4   Release No. 26,409 at ¶¶ 24–25 (Mar. 31, 2004)).

5        Plaintiff seeks to extend the principles in the foregoing SEC administrative proceedings

6   to private litigation under the Securities Act of 1933, the Exchange Act of 1934 and the

7   Investment Company Act of 1940.  In large part, the Court is persuaded by the SEC's

8   reasoning.

9                    *              *              *

10        Wells Fargo & Co. was a diversified financial-services company and the corporate

11   parent of the other Wells Fargo companies.  Wells Fargo Funds Trust controlled the Wells

12   Fargo complex of mutual funds.  Two companies, Wells Fargo Funds Management, LLC, and

13   Wells Capital Management, Inc., managed the trust's mutual funds.  Wells Fargo Funds

14   Management, LLC, implemented the trust's investment policies and supervised Wells Capital

15   Management, Inc., which handled day-to-day management, including placing orders for the

16   purchase and sale of securities.  Two companies were distributors for the funds:  Wells Fargo

17   Funds Distributor, LLC, and Stephens, Inc.  These entities performed marketing and other

18   services for Wells Fargo Funds Trust.  Two defendants were broker-dealers for shares in the

19   mutual funds:  Wells Fargo Investments, LLC and H.D. Vest Investment Services, LLC

20   (Consolidated Amended Complaint ("Compl.") ¶¶ 16–28).

21        The court-appointed lead plaintiff, a resident of Minnesota, bought and sold shares of

22   funds that participated in the Wells Fargo shelf-space program on many dates between July 14,

23   2000, and May 16, 2005.  He claims that he lost money in these transactions (Compl. ¶ 15, Exh.

24   B).  Plaintiff certified that these securities were held in or acquired through his Individual

25   Retirement Account (IRA) and general account (Reese Decl., Feb. 16, 2006, Exh. C).

26        Plaintiff alleges that the money flowed as shown in the diagram.  In brief, the investor

27   bought shares of a mutual fund.  Wells Fargo Funds Trust then took some of this investment,

28   charging it as a fee or expense to the investor, and paid it to Wells Fargo Funds Management,

LLC, Wells Capital Management, Inc., Wells Fargo Funds Distributor, LLC, and/or Stephens, Inc.  One or more of those companies already had reached an agreement with Wells Fargo Investments, LLC and/or H.D. Vest Investment Services, LLC.  In that agreement, the broker-dealer promised to promote the fund either directly or by making it easier for sales agents to market or process purchases of the preferred funds.  In return, the investment adviser and/or distributor guaranteed one of two things.  The first was to trade the fund's portfolio through the broker-dealer, thus guaranteeing it a steady flow of commissions, sometimes at higher rates than the broker-dealer otherwise could earn.  The second type of promise was to pay one or more lump sums to the broker-dealer.



**The Alleged Scheme**

5

Plaintiff claims violations of several federal laws.

- In Counts I and II, he claims that the broker-dealers, Wells Fargo Funds Trust and the distributors violated Section 12(a)(2) of the Securities Exchange Act of 1933 (1933 Act), 15 U.S.C. 77l(a)(2), which requires offerors and sellers of securities to make all statements that are necessary to prevent their other statements from misleading investors. Section 12(a)(2) allows successful plaintiffs who still own the security to recover the cost of it, with interest, less the amount of income they received from it, upon tender of the security. If the plaintiff already sold the security, he or she can recover damages.

- Count III accuses Wells Fargo & Co. of being liable, as a controlling entity, for the misdeeds alleged in Counts I and II, thus violating Section 15 of the 1933 Act, 15 U.S.C. 77o.

- In Count IV, plaintiff accuses all defendants of engaging in a scheme to deceive the investing public, in violation of Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. 78j(b) and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. 240.10b-5.

- Plaintiff also alleges, in Count V, that Wells Fargo & Co. was liable as a controlling entity for the violations in Count IV, thus violating Section 20(a) of the 1934 Act, 15 U.S.C. 78t.

- In Count VI, he accuses the investment advisers and distributors of breaching fiduciary duties to the Wells Fargo Funds Trust by charging excessive fees and expenses, in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. 80a-35(b).

- Count VII accuses Wells Fargo & Co. of causing the investment advisers and distributors to breach their fiduciary duties, in violation of Section 48(a) of the Investment Company Act, 15 U.S.C. 80a-47.

Defendants filed three motions to dismiss:

- The broker-dealers and Wells Fargo Funds Trust move to dismiss Counts I, II and IV. The other defendants all join in the motion to dismiss Count IV. The distributors join in the motion to dismiss Count II.

- Wells Fargo & Co. moves to dismiss Counts III, V and VII.[1]

- The distributors and investment advisers move to dismiss Count VI.

**ANALYSIS**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

In complaints that do not allege fraud, plaintiffs need only make "a short and plain statement of the claim," thus giving the defendant fair notice of the claim and of the grounds upon which it rests. *Conley*, 355 U.S. at 47 (quoting FRCP 8(a)(2)). Allegations of fraud, however, must meet the heightened pleading standards of FRCP 9(b). These require allegations of particular facts going to the circumstances of the fraud, including time, place, persons, statements made and an explanation of how or why such statements are false or misleading. *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 & n.7 (9th Cir. 1994) (en banc).

In addition, the Private Securities Litigation Reform Act of 1995 requires class-action plaintiffs alleging violations of the 1934 Act to specify each misleading statement, to explain why the statement was misleading and, if an allegation is made on information and belief, to list all facts upon which that belief is formed. 15 U.S.C. 78u-4(b)(1). The complaint must also state with particularity facts giving rise to a "strong inference" that the defendant knowingly or

---

[1] Wells Fargo & Co. claimed that these were the only claims asserted against it (Wells Fargo & Co. Mot. Dismiss Br. 2). In fact, it also is charged in Count IV (Compl. ¶ 189).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    with deliberate recklessness made false statements or omitted a material fact.  15 U.S.C.

2    78u-4(b)(2); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).

3         These PSLRA requirements are in "inevitable tension [with] . . . the customary latitude

4    granted the plaintiff on a motion to dismiss . . . ."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896

5    (9th Cir. 2002).  In considering whether to dismiss a securities-fraud claim, a court is not

6    required to draw all reasonable inferences in the plaintiff's favor, as it is for most Rule 12(b)(6)

7    motions.  *See Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987) (stating Rule 12(b)(6)

8    standard).  The court instead must consider all reasonable inferences, whether unfavorable or

9    favorable to the plaintiffs.  *Gompper*, 298 F.3d at 896.  Furthermore, the court is not required

10   "to accept legal conclusions cast in the form of factual allegations if those conclusions cannot

11   reasonably be drawn from the facts alleged."  *Clegg v. Cult Awareness Network*, 18 F.3d 752,

12   754–55 (9th Cir. 1994).

13        **1.**     **MOTION TO DISMISS — BROKER-DEALERS AND WELLS FARGO FUNDS TRUST.**

14        Defendants H.D. Vest Investment Services and Wells Fargo Investments (both broker-

15   dealers) and defendant Wells Fargo Funds Trust move to dismiss Counts I, II and IV.  Counts I

16   and II allege that the broker-dealers, Wells Fargo Funds Trust and the distributors violated

17   Section 12(a)(2) of the 1933 Act.  Count IV alleges that all defendants violated Section 10(b) of

18   the 1934 Act and Rule 10b-5.  Defendants Wells Fargo Funds Distributor and Stephens join in

19   the motion to dismiss Count II.  Wells Fargo & Co., Wells Capital Management, Wells Fargo

20   Funds Distributor, Stephens and Wells Fargo Funds Management join in the motion to dismiss

21   Count IV.

22                    **A.     Duty to Disclose and Materiality.**

23        Plaintiff has not alleged any false affirmative statement by defendants.  He alleges only

24   that defendants failed to disclose adequately the secret compensation paid for steering

25   customers toward certain mutual funds.  Defendants argue that they had no duty to disclose

26   those facts.  They argue that the alleged omissions were not material.  Plaintiff alleges that

27   defendants had a duty to disclose these facts pursuant to Section 12(a)(2) of the 1933 Act, 15

28   U.S.C. 77l(a)(2), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

8

**United States District Court**
For the Northern District of California

For a defendant to be liable under the general omissions provisions of Section 12(a)(2) of the 1933 Act and Rule 10b-5, there must have been, among other things, an affirmative statement that was materially misleading because of a failure to make additional disclosure. 15 U.S.C. 77l(a)(2); 17 C.F.R. 240.10b-5(b). That is, there must have been a half truth.

As an example of such a misleading statement, the complaint quotes a ten-paragraph passage from a prospectus for the Massachusetts Financial Services Investors Growth Stock Fund, one of the funds at issue. It stated that "[c]onsistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser in the selection of broker-dealers to execute the Fund's portfolio transactions" (Compl. ¶ 84). Plaintiff alleges this excerpt was representative of all others.

The prospectus was allegedly misleading because it stated merely that the investment adviser "may" consider sales of fund shares in deciding how to award future trading business when, in truth, the investment adviser had *already* entered into firm kickback arrangements. H.D. Vest and Wells Fargo Investments, the broker-dealer defendants, had "pre-determined, negotiated arrangements for specific amounts of brokerage commissions" that would flow from the investment adviser in return for pushing Massachusetts Financial's funds (Compl. ¶ 85).

This order agrees with the SEC administrative rulings that there is a difference between a circumstance where a fund *may* award future business on the basis of sales, on the one hand, and a circumstance where a fund *already has* fixed payback arrangements in place, on the other hand. Defendants had a duty to state all facts that were necessary to make their affirmative statements not misleading. The representation left the impression that the payback arrangement might (or might not) materialize when it was, in reality, already a done deal. This was misleading. This conclusion is consistent with the recent SEC orders holding that various broker-dealers had not disclosed adequately the paybacks they received to push various funds.

The next issue is whether the omissions were material. An omission is only material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made

9

United States District Court

For the Northern District of California

available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  The alleged omissions here were material under the *Basic* standard.  A reasonable investor is more likely to view the broker-dealer's recommendations with skepticism if he or she knows for sure that the broker-dealer's objectivity has already been compromised, as opposed to the mere possibility that the broker-dealer's objectivity might (or might not) be compromised.  If a reasonable investor knows the broker-dealer has a payback agreement to showcase a particular fund, the investor is likely to take a harder look at the recommendation.

The very nature of the program suggests that the failure to disclose it was material.  The investment advisers who compensated the broker-dealers obviously believed that the payments led to increased sales of their funds.  If the investment advisers believed that the payments were enough to drive sales, then it is reasonable now for us to infer the same.  If the payments were enough to drive sales, disclosure of them would have been material to an investor considering a broker's advice to buy those shares.

It is true that *In re Morgan Stanley and Van Kampen Mutual Funds Securities Litigation*, No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006), dismissed a complaint on a Rule 12 motion after finding that the alleged omissions were not material.  The alleged omissions were failures to disclose payments made to individual sales agents in return for selling certain funds' shares.  The court found that the omissions were immaterial because the payments were small.  To participate, funds had to pay 15 to 20 basis points on gross sales of mutual fund shares, as well as five basis points annually on shares that had been held by the investor for at least one year.  The broker-dealer corporation retained the 15 to 20 basis points but paid the other five points to individual selling agents.  Branch managers also got extra pay based on branch-wide sales of participating funds.  Short-term sales contests awarded winners with stays at a luxury hotel for a conference, tickets to a Britney Spears concert, expense-account allowances of $100 to $800, and spa packages.  The court found that "[m]inimal payments such as these are not material . . . ." *Id.* at *2–*4, *8.

Here, by contrast, plaintiff properly justifies his assertion that the omissions were material.  The broker-dealer defendants here collectively accepted "$21 million dollars of

United States District Court

For the Northern District of California

1   directed brokerage during the Class Period" (Compl. ¶ 35).  That is a significant amount, at

2   least at the pleading stage.  If defendants had disclosed that payments of such a scope were in

3   place — rather than a mere possibility — there is "a substantial likelihood" that a reasonable

4   investor would see the disclosure as significantly altering the "total mix" of information

5   available.  *See Basic Inc.*, 485 U.S. at 231–32.  By alleging significant payments, plaintiff

6   justifiably claims the omissions were material.  In *Morgan Stanley*, by contrast, the court did

7   not mention the total amount of the payments.

8           And, Wells Fargo Investments received a 35 basis-point fee on sales of shares, which is

9   at least ten basis points more than received by the defendants in *Morgan Stanley*.  Wells Fargo

10  Investments also received annual fees of 125 basis points for holding equity mutual fund shares

11  and 75 basis points for holding fixed-income mutual fund shares (Compl. ¶ 52).  These fees are,

12  respectively, 100 basis points and 70 basis points more than the similar payments made in

13  *Morgan Stanley*.  Because this cut was significantly higher than that received by the defendants

14  in *Morgan Stanley*, investors were more likely to have seen disclosure of the true payments as

15  significantly altering the "total mix" of information available.  H.D. Vest was paid 10 to 25

16  basis points for sales of preferred shares and earned five to 15 basis points annually for holding

17  funds.  True, these latter amounts were more in line with those in *Morgan Stanley*.  H.D. Vest,

18  however, also received "[s]ignificant lump sum payments" (Compl. ¶ 55).  *Morgan Stanley*

19  involved no such additional payments.  This difference is enough to justify a finding of

20  materiality, at least at the pleading stage.

21          In *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598 (6th Cir. 2005), a

22  prospectus disclosed that individual financial investment advisers "*may* receive different [*i.e.*,

23  additional] compensation" for selling certain funds.  In fact, there was an *actual* agreement to

24  pay extra for trading in certain funds.  The court called the plaintiff's distinction between "may

25  receive" and "will receive" a "semantic quibble."  *Benzon* held that the difference was not

26  material.

27          If anything, the inclusion of this statement in the prospectus
            (which, again, was not mandated by any current SEC regulation)
28          served to put prospective investors on notice that there was a
            possibility that brokers were being compensated more highly for

1

2

> the sale of certain class shares than others, such that investors could pursue that line of inquiry with their financial advisors if they were concerned about broker incentives.

3   *Id.* at 612 (emphasis in original).  This order respectfully disagrees with *Benzon*.  For the

4   reasons stated, this order finds that the distinction between a firm, already-extant kickback

5   arrangement and a mere possibility of additional compensation sufficiently alleges a material

6   omission, at least at the pleading stage.  The SEC's reasoning is more persuasive to the

7   undersigned than *Benzon*.  For example, again, in *Morgan Stanley DW*, the SEC found that none

8   of the information provided in prospectuses "adequately disclose[d] the preferred programs as

9   such, nor d[id] most provide sufficient facts about the preferred programs for investors to

10  appreciate the dimension of the conflicts of interest inherent in them" (Reese Decl. ¶ 2, Exh. A).

11  Put differently, the disclosures at issue only hinted at the possibility of a kickback scheme and

12  did not alert the investor to the full extent of the already thriving arrangement with its

13  concomitant conflicts of interest.

14      In *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050

15  (S.D.N.Y. June 25, 1998), the court held that the Dean Witter broker-dealer had no duty to

16  disclose that individual selling agents got more money when they sold proprietary products than

17  other products.  The court based this finding on the fact that plaintiffs could cite no caselaw on

18  their side and on the rationale that "[p]laintiffs should have been aware that sale of a Dean

19  Witter fund, as opposed to an outside fund, would mean greater compensation for the Dean

20  Witter companies."  The court also said that recognizing a duty to disclose such differential

21  compensation "would engender an almost impossible problem of defining the limits of such a

22  duty."  *Id.* at *9.

23      The instant case is factually distinguishable.  Plaintiff alleges that the broker-dealers

24  received additional compensation not only for selling propriety Wells Fargo shares but also for

25  selling the funds of certain other companies.  Buyers would have no reason to suspect a bias in

26  favor of such independent fund families.  Unlike the plaintiffs in *Castillo*, moreover, plaintiff

27  here cites authority on his side, namely the various SEC orders.  Again, the development of

28  disclosure standards by the SEC, as laid out in its orders, has eclipsed *Castillo*.

1    In *Press v. Quick & Reilly, Inc.*, 218 F.3d 121 (2d Cir. 2000), broker-dealers regularly

2    took uninvested money from clients' accounts and deposited them in money-market funds so

3    that the client would earn interest.  Investors were told that broker-dealers received payments

4    for "distribution assistance."  They were not told specifically, however, that certain money-

5    market fund companies paid the broker-dealers so that unallocated client money would be

6    invested in those funds.  The court held that broker-dealers had not breached their disclosure

7    duties.  It based this entirely on an SEC amicus brief that interpreted its rules and concluded that

8    the defendants' failure to disclose was not material because it would not provide much more

9    information than what already had been given.  *Id.* at 123–24, 130–32.  In contrast, the SEC

10   orders issued recently on arrangements like the ones at issue uniformly have found that

11   investors were not adequately informed about the scope of the conflicts of interest.  The SEC

12   brief in *Press* was limited to the "particular facts" of that case (Defs.' Req. for Judicial Notice,

13   Exh. 8 (Brief of SEC at 27–28, *Press*, *available at* 2000 WL 34447852).[2]

14                **B.    Scienter — 1934 Act.**

15         Count IV alleges violation of Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and Rule

16   10b-5, 17 C.F.R. 240.10b-5.  When damages are sought, as here, the complaint "shall, with

17   respect to each . . . omission . . . state with particularity facts giving rise to a strong inference

18   that the defendant acted with the required state of mind."  15 U.S.C. 78u-4(b)(2).  The state of

19   mind required to sustain an action under Section 10(b) and Rule 10b-5 is one that embraces an

20

21         [2] Federal Rule of Civil Procedure 9(b) requires that fraud be pleaded with particularity.  Movants argue
22   that the rule applies to Counts I, II and IV.  They argue that the complaint violates the rule because it does not
     have enough detail about why the omissions were material (Br. 19).  Rule 9(b) applies to Count IV, which
23   alleges violation of Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), and of SEC Rule 10b-5, 17 C.F.R. 240.10b-
     5, because those provisions are purely anti-fraud laws.  Counts I and II, however, allege violations of Section
24   12(a)(2) of the 1933 Act, 15 U.S.C. 77l(a)(2), for which a party can be responsible without committing fraud.
     *Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989).  If, however, the actual allegations sound in fraud, a claim
25   under the 1933 Act must also be pled with particularity.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,
     1103–04 (9th Cir. 2003).
26         To address the issue, this order need not decide whether Counts I and II sound in fraud.  Even if each
     count is evaluated under the Rule 9(b) standard, plaintiff's pleadings of materiality are specific enough to
27   withstand attack.  The complaint alleges the total amount of the payments, the percentages earned for sales of
     favored shares and the percentages earned when investors held shares for a full year.  The complaint also alleges
28   that the financial investment advisers who made the payments considered them significant, another detail that
     supports materiality.  Such detail is rich enough to withstand attacks based on Rule 9(b).

"intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193,

(1976), or which is "deliberately reckless," *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970,

974 (9th Cir. 1999).  Our Ninth Circuit has held that scienter is properly alleged when the

complaint alleges both false statements and the defendants' close involvement in the

preparation of those statements.  *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1022–24 (9th

Cir. 2005).

Movants say that the complaint does not raise an inference that they acted with scienter.

They argue that when they made the omissions, caselaw and relevant legal authority indicated

that revenue-sharing was lawful and that broker-dealers could rely on general prospectus

disclosure.  They claim that, therefore, "[t]he only reasonable inference here is that defendants

. . . were following the law as they understood it to be at the time" (Br. 22).  The complaint,

however, alleges a persistent and deliberate scheme to use half truths to conceal a thriving

system of kickbacks and its concomitant conflicts of interest.  If defendants wish to rely on

advice of counsel, that would be a matter for an affirmative defense.  It cannot, however,

destroy the inference of deliberate half truths alleged in the complaint.

Movants also attack portions of paragraphs 56 and 62, claiming that they make similar

allegations to those rejected by *Castillo* for not satisfying the heightened pleading requirements

of Rule 9(b) (*id.* at 22–23).  Paragraph 56 alleges that H.D. Vest's payback program caused

investors to be "misguided into mutual funds that were not suitable for them and had inferior

performance to other funds [sic]."  The relevant portion of paragraph 62 alleges that the broker-

dealers "focused on maximizing Defendants' profit to the detriment of investors . . . ."

These paragraphs are not, however, the only allegations in the complaint that raise an

inference of scienter.  Defendants obviously knew of the actual compensation arrangements.

The NASD findings against H.D. Vest and Wells Fargo Investments (incorporated into the

complaint) delineated specific programs designed to promote sales of certain funds' shares and

Wells Fargo Investments' system of ranking preferred funds.  The fact that defendants had the

incentive programs in place indicates that they believed these programs would drive sales.  In

light of this conscious strategy, the failure to disclose the full extent of the payback programs

14

1  raises a strong inference of scienter.  Buttressing this conclusion is plaintiff's allegation that the

2  directors of the Wells Fargo Funds Trust knew about the already-in-place arrangements but left

3  in place watered-down disclosures (Compl. ¶¶ 34, 39–55, 164).  These allegations are

4  analogous to those found sufficient in *Daou* and therefore satisfy the pleading requirements.[3]

5                    **C.    Reliance and Standing — 1934 Act.**

6           Movants argue that plaintiff does not have standing to bring his claims under the 1933

7  Act because he does not allege that he had any dealings with any defendant, or that he bought or

8  sold shares based on any defendant's recommendation (Br. 20).  Section 12(a)(2) makes sellers

9  and offerors of securities potentially liable only "to the person purchasing such security from

10 him [*i.e.*, from the seller or offeror]."  15 U.S.C. 779(a)(2).  For a plaintiff to have standing,

11 therefore, he or she "must have purchased the security directly from the issuer of the

12 prospectus."  *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999).

13          Contrary to movants' contention, plaintiff does allege that the broker-dealers sold him at

14 least one share of the relevant funds:  "The Broker/Dealer Defendants were the sellers, or the

15 successors in interest to the sellers, within the meaning of the Securities Act, for one or more of

16 the Shelf Space Fund shares sold to Plaintiff . . ." (Compl. ¶ 176).  Plaintiff therefore has

17 asserted standing to bring Count I.  Plaintiff just barely alleges standing to assert Count II.  The

18 complaint alleges that "[e]ach of the Distributor Defendants [Wells Fargo Funds Distributor and

19 Stephens] and the Registrant [Wells Fargo Funds Trust], was the seller, or the successor in

20 interest to the seller, within the meaning of the Securities Act, for one or more of the respective

21 Wells Fargo Fund shares sold to members of the Purchasers Subclass . . ." (Compl. ¶ 145).[4]

22 This allegation could be true even if none of the three defendants ever sold or offered a share to

23 plaintiff.  The allegation is broad enough, however, to include claims that each of the three

24 defendants sold one of more shares to plaintiff.  The Court therefore cannot conclude that "it

---

26      [3] Not all defendants may have had such an intent or recklessness.  Movants, however, do not make
defendant-specific challenges to the scienter allegations.  The Court declines to do so for them.

28      [4] The paragraphs in Count II are misnumbered.  They duplicate numbers used earlier and do not follow
those paragraph numbers used in Count I, which immediately precedes Count II.  The paragraph 145 referred to
here appears on page sixty-one.

United States District Court
For the Northern District of California

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46.  Plaintiff ought, however, to clarify this in any future complaint or in discovery.

Movants argue that plaintiff fails to allege that he relied upon the misrepresentations in deciding to buy mutual-fund shares.  They assert that the complaint "fails to identify what misstatements were made to Plaintiff, personally, and what facts about his investments were misrepresented. . . .  [It also] fails to allege how he came to make his investment decisions, or how that process was impacted by any misrepresentations" (Br. 24–25).

The prospectus stated that "the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser in the selection of broker-dealers to execute the Fund's portfolio transactions" (Compl. ¶ 84).  Plaintiff alleges that this statement was misleading because it was unaccompanied by any statement disclosing the actual quid pro quo agreement to compensate the broker-dealer defendants for encouraging sale and purchase of shares in preferred funds.  He characterizes this conduct as both an "omission[]" and as a "misrepresentation[]" (Compl. ¶¶ 193, 195).  Plaintiff argues that, given the factual context, reliance is presumed and he need not make additional allegations to make out a claim.

"Proof of reliance normally is adduced to demonstrate the causal connection between a defendant's wrongdoing and a plaintiff's loss.  Proof of reliance has not been required where unnecessary to establish causation." *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982).  Allegations of reliance are not required when the plaintiff alleges a material omission.  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972).  As the Supreme Court put it:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Ibid.*  In the instant case, we have just such a failure to disclose.  Defendants argue that the rule of *Affiliated Ute Citizens of Utah* applies solely when the complaint alleges *only* omissions and

1    does not allege any misrepresentations (Reply Br. 14).  Movants' argument conflicts with the

2    express command of the Supreme Court in *Affiliated Ute Citizens of Utah*, which held that

3    "positive proof of reliance is not a prerequisite" when the case involves "*primarily* a failure to

4    disclose," not *exclusively* a failure to disclose.  406 U.S. at 153 (emphasis added).[5]  This order

5    holds that plaintiff need not make independent allegations of reliance because he adequately

6    pleads causation by accusing defendants of material omissions resulting in half truths.  In any

7    case, plaintiff does allege transactional reliance, albeit in the alternative, in paragraph 95, which

8    states that

9            relying directly or indirectly on the false and misleading
             statements made by Defendants, or upon the integrity of the market
10           in which the securities trade, and/or on the absence of material
             adverse information that was known to or recklessly disregarded
11           by Defendants but not disclosed in public statements by
             Defendants during the Class Period, Plaintiff and the other
12           members of the Class acquired the shares or interest in the Shelf
             Space Funds during the Class Period at distorted prices and were
13           damaged thereby.

14   (Compl. ¶ 95).  Paragraph 194 is almost exactly the same; the only change is the replacement of

15   "members of the Class" with "members of the Purchasers Subclass."

16                  **D.        Loss Causation and Damages — 1934 Act.**

17          Movants allege that plaintiff fails to allege a cognizable theory of how defendants'

18   omissions and misleading statements caused him a loss.  They note that his allegation that the

19   price of shares were "distorted" (Compl. ¶ 95) is merely another way of alleging that the price

20   was artificially inflated when he bought them (Br. 23).  They argue that mere price inflation at

21   the time of sale to plaintiff is insufficient to state loss causation, citing *Dura Pharmaceuticals,*

22   *Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Furthermore, mutual-fund shares prices are based

23   solely on the value of the underlying assets.  17 C.F.R. 270.22c-1.  Compensation paid to

24   broker-dealers is not reflected in the value of the underlying assets.  Defendants therefore argue

25   that no diminution in the price of mutual-fund shares can ever be attributed to a failure to

26   disclose shelf-space arrangements.  Defendants also argue that plaintiff's loss-causation claims

27

28          [5] Because this order finds that plaintiff is not required to allege reliance, it does not address plaintiff's
     alternative argument that he may rely upon a fraud-on-the-market presumption of reliance.

1    are too speculative when he claims that, if he had not been deceived by defendants'

2    misrepresentation, he would have bought shares in different funds that potentially could have

3    made him more money (Br. 23–24).

4         None of these arguments categorically defeats plaintiff's loss-causation theory.  The

5    secret paybacks to the broker-dealers came out of the mutual funds' assets.  Without any such

6    secret diversion, the net assets of the fund would have been greater, thus saving investors

7    money and increasing their net return on their investment.  Extra payments to broker-dealers

8    might not have been a problem if investors had gotten something in return, such as better

9    investment research.  But all the kickbacks did was bring in more investors.  The additional

10   investors did nothing to benefit *existing* investors, such as plaintiff.  By footing the bill for the

11   undisclosed diversions, investors were unwittingly paying extra but getting nothing in return

12   (Opp. 21–23).

13        Defendants counter this theory by asserting that the program was financed by the funds'

14   investment advisers, not the investors.  The investment advisers got their fees from the funds,

15   however, so the cost was ultimately borne by investors holding the funds' shares.

16        Defendants also say that the *amount* of all fees paid to investment advisers was fully

17   disclosed even if the particular uses to which those fees were put were not revealed.  Defendants

18   contend that, since plaintiff bought shares with knowledge of the amount of the fees, he cannot

19   now claim that he suffered a cognizable loss from them.  Plaintiff is not, however, alleging a

20   failure to disclose the overall amount of all fees.  Instead, he claims that defendants deceived

21   him into thinking the fees were for worthwhile investment advice or something else of value to

22   shareholders when, in fact, these fees were merely a cover for funneling kickbacks to broker-

23   dealers.  For the present, the only issue is whether the complaint states a cognizable theory of

24   loss causation.  Plaintiff's theory is plausible enough at the Rule 12 stage.

25         Defendants claim that plaintiff has failed to make a proper damages allegation.  They

26   argue that although the complaint asserts that plaintiff purchased relevant funds, it does not

27   allege that he sold them.  Defendants also note that the complaint does not demand rescission or

28

18

allege that plaintiff tendered his shares to the relevant seller or offeror (Br. 20–21).[6]  In fact, the

complaint *does* assert that plaintiff sold shares, making him potentially eligible to recover

damages.  Exhibit B to the complaint lists, on its final page, the sales of thousands of shares by

plaintiff and his wife, Jeannette Siemers.

Finally, the Court is aware that the measure of damages may be problematic in a case

like this.  It is conceivable that this question will not be amenable to class treatment.  It is

conceivable that these claims on a class-wide basis are subject only to injunctive relief.  It also

is conceivable that there may be a double-recovery conflict between plaintiff's direct claims and

his derivative Investment Company Act claims, which seek damages on behalf of the Wells

Fargo Funds Trust.  Those issues, however, are for another day.  For now, at least, the

individual plaintiff has stated a claim.

### E.    Statutes of Limitations — 1933 and 1934 Acts.

Defendants argue that some of plaintiff's allegations fall outside the statute of

limitations periods.  The original complaint was filed November 4, 2005, and alleges claims for

actions from June 30, 2000, to June 8, 2005 (Compl. ¶ 1).  No plaintiff can maintain an action

for violation of Section 12(a)(2) more than three years after the sale at issue.  15 U.S.C. 77m.

All Section 12(a)(2) claims based on sales occurring before November 4, 2002, are therefore

barred.  This does not, however, require dismissal of any claim because some of the allegations

relate to sales within the limitations period.  No plaintiff can bring an action under Section

10(b) of the 1934 Act or under Section 10b-5 more than five years after the violation.  28

U.S.C. 1658(b)(2).  It is therefore impermissible for plaintiff to pursue claims under these

provisions that arose before November 4, 2000.  Again, this does not require dismissal of Count

IV because some of the violations are alleged to have occurred after that date.

United States District Court

For the Northern District of California

---

[6] Section 12(a)(2) allows successful plaintiffs to recover "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  15 U.S.C. 77l(a)(2).  If a plaintiff no longer holds a security, he or she can seek damages.  If the person still holds the security, he or she must tender the security and then seek rescission of the sale, recovering the amount paid, plus interest and less any income received.

**United States District Court**

For the Northern District of California

1     **2.     MOTION TO DISMISS — COUNTS III, V.**

2         Count III alleges that Wells Fargo & Co. is liable under Section 15 of the 1933 Act, 15

3     U.S.C. 77o, because it controlled the other defendants charged with violations of Section

4     12(a)(2) (Compl. ¶¶ 181).  Count V alleges that Wells Fargo & Co. is liable for violations of

5     Section 20(a) of the 1934 Act, 15 U.S.C. 77t, because it controlled the other defendants charged

6     with violations of Section 10(b) and Rule 10b-5 (Compl. ¶ 200).  Section 15 states:  "Every

7     person who . . . controls any person liable under sections 77k or 77l of this title, shall also be

8     liable jointly and severally with and to the same extent as such controlled person . . . ."  15

9     U.S.C. 77o.  Section 20(a) is identical, except that the underlying violations by the controlled

10    person must be of the 1934 Act, not the 1933 Act.  Although Section 15 and Section 20(a) are

11    separate bases of liability, the Ninth Circuit has held that the control-person analysis is

12    identical.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990).  To "prove a

13    prima facie case under Section 20(a) [and Section 15], [a] plaintiff must prove:  (1) a primary

14    violation of federal securities laws . . . and (2) that the defendant exercised actual power or

15    control over the primary violator."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.

16    2000).  This order has found that plaintiff adequately alleged primary violations.  The only issue

17    therefore is whether plaintiff adequately alleges that defendant exercised actual power or

18    control.

19        The complaint alleges that Wells Fargo & Co. "is the ultimate parent of all Defendants."

20    H.D. Vest is alleged to be "an affiliated non-bank subsidiary of Wells Fargo & Company."

21    Wells Fargo Funds Management is an "indirect, wholly-owned subsidiary of Wells Fargo &

22    Company."  Wells Fargo & Co. is alleged to be a control-person of the other defendants by

23    virtue of its position of operational control, operational management, ownership and/or "direct

24    and supervisorial involvement" in their operations.  Plaintiff claims it had

25              power to influence and control and did influence and control, directly or
              indirectly, the decision-making and actions of the Broker/Dealer Defendants,
26            the Investment Adviser Defendants, Distributor Defendants and the Registrant
              Defendant, including the content and dissemination of the various statements
27            which Plaintiff contends are false and misleading. Control Person Defendant
              had the ability to prevent the issuance of the statements alleged to be

28

20

1    false and misleading or could have caused such statements to be corrected.

2    (Compl. ¶¶ 16, 18, 20, 183, 200–201).

3        Defendant claims that the complaint sounds in fraud and that, therefore, Rule 9(b)

4    requires the allegations of control to be stated with particularity (Br. 4).  Rule 9(b), however,

5    requires only that "the circumstances constituting fraud . . . shall be stated with particularity."

6    The control exerted by Wells Fargo & Co. is not a circumstance that constitutes fraud.  Plaintiff

7    is only required to assert fraud with particularity as to the primary violations.  At the control-

8    person level, liability exists irrespective of the control person's scienter.  *Hollinger*, 914 F.2d at

9    1575 ("[W]e hold that a plaintiff is not required to show 'culpable participation' to establish

10   that a broker-dealer was a controlling person . . . .  The statute does not place such a burden on

11   the plaintiff.").

12       Defendant cites several orders to the contrary.  *Howard v. Hui*, No. C 92-3742 (CRB),

13   2001 WL 1159780, at *4 (N.D. Cal. Sept. 24, 2001), held that "a plaintiff must plead the

14   circumstances of the control relationship with sufficient particularity to satisfy rule 9(b)."  The

15   court supported its conclusion by citing *In re GlenFed, Inc. Securities Litigation*, 60 F.3d at

16   592–94.  That Ninth Circuit decision, however, did not require that all allegations of control be

17   set forth with particularity.  Instead, it held that plaintiffs could not rely on a theory of group-

18   published information to hold outside directors liable for misleading statements issued by the

19   corporation unless the plaintiffs pleaded the outside directors' involvement in the day-to-day

20   operations of the corporation with particularity.  In that decision, whether or not the directors

21   were involved in day-to-day operations was a circumstance determinative of whether or not

22   they committed fraud in the issuance of the statements.  *Ibid.*  That holding of *GlenFed* does not

23   apply to the situation in the instant case, where liability is not dependent upon showing that the

24   control person engaged in fraud.  To the extent *Howard* held that, in cases such as the one at

25   bar, control must be alleged with particularity, this order respectfully disagrees.

26       Defendant also cite *In re Splash Technology Holdings, Inc. Securities Litigation*, No.

27   C 99-00109 SBA, 2000 WL 1727405, at *15 (N.D. Cal. Sept. 29, 2000), which stated that "[i]n

28   order to adequately plead the second element of a control person liability claim, the complaint

United States District Court
For the Northern District of California

1  must plead the circumstances of the control relationship with particularity." *Splash Technology*

2  *Holdings* cited to another district court order in support of that proposition.  That underlying

3  order, *In re Oak Technology Securities Litigation*,  No. 96-20552 SW, 1997 WL 448168, *15

4  (N.D. Cal. Aug. 1, 1997), asserted the same proposition without citing to any authority.  To the

5  extent that *Splash Technology Holdings* held that, in cases such as the one at bar, control must

6  be alleged with particularity, this order respectfully disagrees.  In addition, it should be noted

7  that the claim in *Splash Technology Holdings* foundered, at least in part, on the fact that the

8  supposed control person never held more than a 20 percent interest in the underlying entity.

9  2000 WL 1727405, at *16.  No similarly weak position of control has been alleged by plaintiff

10  here.

11  **3.      MOTION TO DISMISS — COUNT VI.**

12  The investment adviser and distributor defendants move to dismiss Count VI, which

13  accuses them of breaching fiduciary duties to the Wells Fargo Funds Trust by charging

14  excessive fees and expenses in violation of Section 36(b) of the Investment Company Act of

15  1940, 15 U.S.C. 80a-35(b).  Plaintiff brings the claim for a subclass including "all persons or

16  entities who held shares or like interests of any of the Wells Fargo Funds at any time during the

17  Class Period" for the benefit of the Wells Fargo Funds (Compl. ¶¶ 170, 204).

18  Section 36(b) attempts to protect investors from some of the inevitable conflicts of

19  interest confronting investment advisers as they work for mutual funds.  Such funds are

20  nominally independent entities with their own boards of directors, the majority of which must

21  be unaffiliated with the investment adviser.  The advisers, however, typically create, run, staff

22  and make all investment decisions for the fund.  When an investor buys shares in a mutual fund,

23  it is often on the basis of the reputed acumen of the investment advisers in choosing money-

24  making investments.  These facts collectively make it difficult for vigorous arm's-length

25  bargaining to occur in the negotiation of payment by mutual funds for investment advisers'

26  services.

27  Section 36(b) therefore imposes a fiduciary duty on investment advisers:

28  > [T]he investment adviser of a registered investment company shall
   > be deemed to have a fiduciary duty with respect to the receipt of

22

United States District Court

For the Northern District of California

> compensation for services, or of payments of a material nature,
> paid by such registered investment company, or by the security
> holders thereof, to such investment adviser or any affiliated person
> of such investment adviser.

15 U.S.C. 80a-35(b).  The Act does not set forth more detailed contours of the fiduciary duty.

Anyone who holds a security in the mutual fund can bring an action for breach of the duty:

> An action may be brought . . . by a security holder of such
> registered investment company on behalf of such company, against
> such investment adviser, or any affiliated person of such
> investment adviser . . . for breach of fiduciary duty in respect of
> such compensation or payments paid by such registered investment
> company or by the security holders thereof to such investment
> adviser or person.

*Ibid.*  Such actions may only be brought against recipients of the compensation or payments.

Courts cannot award damages except for those suffered during the one-year period immediately

prior to plaintiff bringing the lawsuit.  15 U.S.C. 80a-35(b)(3).

The Supreme Court and Ninth Circuit have not set forth standards for pleading Section

36(b) violations.  The most-cited Section 36(b) decision is *Gartenberg v. Merrill Lynch Asset*

*Management*, 694 F.2d 923 (2d Cir. 1982), upon which both plaintiff and defendants rely here.[7]

*Gartenberg* affirmed a decision to dismiss a Section 36(b) action after a trial.  It therefore did

not expressly address pleading standards.  It did, however, set standards by which to assess

whether the fiduciary duty was breached as a result of excessive fees:

> [T]he test is essentially whether the fee schedule represents a
> charge within the range of what would have been negotiated at
> arm's-length in the light of all the surrounding circumstances. . . .
>
> To be guilty of a violation of § 36(b) . . . the adviser-manager must
> charge a fee that is so disproportionately large that it bears no
> reasonable relationship to the services rendered and could not have
> been the product of arm's-length bargaining. . . .
>
> [R]ates charged by other adviser-managers to other similar funds
> are . . . a factor to be taken into account. . . .
>
> Other factors . . . include the adviser-manager's cost in providing
> the service, the nature and quality of the service, the extent to
> which the manager-adviser realizes economies of scale as the fund
> grows larger, and the volume of orders which must be processed
> by the manager. . . .  [T]he expertise of the independent trustees of

---

[7] It has never been cited by the Ninth Circuit.  Of the 86 federal courts that had cited *Gartenberg* in
decisions reported on Westlaw as of July 7, 2006, 48 were within the Second Circuit.

23

the fund, whether they are fully informed about all facts bearing on the adviser-manager's service and fee, and the extent of care and conscientiousness with which they perform their duties are important factors . . . .

*Id.* at 929–30.

### A.      Plaintiff's Allegations.

Plaintiff alleges that the investment advisers and distributors breached their fiduciary duty in several ways.  The payback program is a key basis for the allegations of breach of duty, but not the only one.

*First*, as the funds' assets grew, the investment advisers, sub-advisers and fund distributors were able to achieve economies of scale.  For example, research costs are fixed even as assets increase.  The investment advisers, sub-advisers and fund distributors did not, however, often pass these cost savings along to the fund by way of a decrease in fee percentages.  Plaintiff supports this claim by (1) citing reports of a mutual-fund analyst that criticized failures to lower costs for a Wells Fargo mutual fund despite increases in assets, (2) by reciting statistics showing that expense ratios increased for certain relevant funds and classes of shares within funds despite increasing assets, (3) by noting the lack of "fee breakpoints" for one fund and the fact that other funds did not adopt breakpoints until August 1, 2004, and (4) by noting that the sub-adviser's breakpoints came at lower asset levels than those of the investment adviser, so that the adviser saved money as assets grew but did not pass the savings on to the fund (Compl. ¶¶ 96, 98–99, 111–129).[8]

*Second*, Wells Fargo Funds expense ratios were higher than those for similar funds (Compl. ¶¶ 117, 135–142).

*Third*, some funds did not perform well, meaning that any fee increases were not justified by better earnings (Compl. ¶¶ 130–134).

---

[8] A fee breakpoint is a particular level of fund assets that, when reached, triggers a decline in the percentage used to calculate fees charged to investors.  For example, when a fund gathers $500 million in assets, its fees might decline from 0.65 percent to 0.60 percent of assets (Compl. ¶¶ 119, 125).

*Fourth*, the investment advisers caused the funds to pay higher-than-usual commissions to financial consultants in return for "services" for which the investment adviser and sub-adviser were already compensated to perform themselves (Compl. ¶ 100).

*Fifth*, fund directors did not get enough information to evaluate the distribution fees paid to the distributors. Furthermore, these directors disregarded increases in expense ratios and the other defendants' failure to reduce their fees, thus failing to ensure that economies of scale were passed on to the funds (Compl. ¶ 101).

*Sixth*, the investment adviser and sub-adviser increased or maintained their fees (despite economies of scale) in order to recoup the costs of direct payments to broker-dealers and of guaranteed business given to them. This practice, the shelf-space program, provided no corresponding benefit to the fund and its investors (Compl. ¶¶ 143–151).

### B.    Movants' Arguments.

#### (*i*)    *Revenue Sharing.*

Movants claim that plaintiff's allegations fail to state a claim for violation of Section 36(b) (Br. 6–9). They argue that Section 36(b) governs only the "negotiation and enforcement of payment arrangements" from the fund to the investment adviser. They contend that this language bars only excessively large fees but not inappropriate uses of fees. Movants therefore contend that the payments they allegedly made to broker-dealers to market the funds more aggressively than other funds do not support a claim that they breached a fiduciary duty. In essence, they claim that if the total amount of fees is reasonable payment for the services rendered, it does not matter how the fees were spent. Movants cite *In re Oppenheimer Funds Fee Litigation*, 426 F. Supp. 2d 157, (S.D.N.Y. 2006). In *Oppenheimer*, plaintiff alleged in a single paragraph that the defendants had violated Section 36(b). The court granted defendants' motion to dismiss the claim, explaining:

> [T]he only theory of excessiveness alleged in that paragraph posits an unusual meaning of that word ["excessive"]: specifically, plaintiffs contend that increases in advisory fees that are added, not for the purpose of benefitting the Funds, but in order (as alleged) to create a slush fund to bribe brokers for the benefit of the Adviser Defendants and their affiliates, are "excessive" *per se*. But § 36(b) creates no such *per se* rule. Rather . . . the test is basically an economic one, *i.e.*, that the fees charged must be materially

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

> disproportionate to the services rendered. Plaintiffs' failure to
> make any specific factual allegations as to why the added amounts
> render the advisory fees, as an economic matter, disproportionate
> to the services rendered is fatal to the claim set forth in paragraph
> 220 . . . .

*Id.* at 158–59.

Defendants also contend that plaintiff's allegations of excessive fees more generally, as opposed to simply revenue-sharing, are insufficient to state a claim under Section 36(b) (Br. 9–18). In doing so, they claim that "[t]o state a section 36(b) claim for excessive fees, a plaintiff must satisfy the stringent standard enunciated by the Second Circuit in *Gartenberg*" and fault plaintiff for failing "to plead with particularity that economies of scale were realized at all" (Br. 10, 13).

These arguments misconstrue *Gartenberg*. It did not purport to determine how "to state a claim" (*i.e.*, set pleading standards), much less assert a *heightened* pleading standard. Furthermore, *Gartenberg* did not claim that its list of relevant factors was exclusive of any others. Nor must a plaintiff plead facts relative to *all* the *Gartenberg* factors in order to withstand a motion to dismiss. *Wicks v. Putnam Inv. Mgmt., LLC*, Civ. No. 04-10988-GAO, 2005 U.S. Dist. LEXIS 4892, at *13 (D. Mass. Mar. 28, 2005).

*Gartenberg* also addressed only claims of a breach of fiduciary duty due to excessive fees. It is possible that there are other actionable breaches of fiduciary duty "with respect to the [adviser's] receipt of compensation for services, or of payments of a material nature [to the adviser]," 15 U.S.C. 80a-35(b). For instance, if an investment adviser were unlawfully operating its business but did not disclose that fact to the fund, it might be liable for charging for its services, even if those services were performed competently and for a reasonable cost. Fiduciary duties often include duties of candor and fair dealing. *See, e.g.*, *de la Fuente v. F.D.I.C.*, 332 F.3d 1208, 1222 (9th Cir. 2003) (finding that fiduciary had a duty of candor).

Defendants' contentions about revenue-sharing fail. If the investment advisers and distributors were funding kickbacks by increasing fees to the funds or by keeping the fees steady when they otherwise would have declined, they may have breached their duty if the

United States District Court

For the Northern District of California

1   funds did not benefit from the kickback scheme.  A fiduciary duty requires, at the least, that

2   movants not charge the fund extra without providing additional value.

3                   *(ii)*      **Gartenberg *Factor:  The Nature and Quality of Services.***

4           Movants also run through the list of *Gartenberg* factors alleged by plaintiff and criticize

5   each one.  Movants claim that below-average performance of a mutual fund does not support a

6   claim.  The only support for this proposition is *Migdal v. Rowe Price-Fleming International,*

7   *Inc.*, 248 F.3d 321 (4th Cir. 2001), but that decision held only that "allegations of

8   underperformance *alone* are insufficient . . . ."  *Id.* at 327 (emphasis added).  Movants' suggestion

9   that underperformance in some of the funds can never, as a matter of law, support a Section

10  36(b) claim is unsupported in caselaw.  *See, e.g.*, *Gartenberg v. Merrill Lynch Asset Mgmt.,*

11  *Inc.*, 573 F. Supp. 1293, 1316 (S.D.N.Y. 1983) (holding that investment performance of a fund

12  was a factor that could be considered in determining if Section 36(b) was violated).  A claim

13  therefore might be stated if a plaintiff alleges that an investment adviser charged full fare to a

14  fund yet lost all of its money.  Whether the underperformance in this particular action was

15  serious enough to suggest a breach of fiduciary duty is a question to be resolved on the

16  evidentiary record.  Furthermore, the fact that plaintiff alleges underperformance for only *some*

17  of the funds is not fatal to the claim, since he only need prove breach of fiduciary duty to one of

18  the funds to prevail.

19                  *(iii)*     **Gartenberg *Factor:  Economies of Scale.***

20          Movants claim that plaintiff has failed "to plead with any particularity that economies of

21  scale were realized at all" (Br. 13).  As stated, plaintiff need not plead with particularity.

22  Nevertheless, even under the liberal pleading standards of Rule of Civil Procedure 8(a)(2),

23  plaintiff must plead enough facts to put defendants on notice of the claims against them and the

24  basis for those claims.  Movants note that, although plaintiff alleges that they enjoyed

25  economies of scale, he does not allege how *much* the investment adviser's costs per unit fell.

26  They cite *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990), which

27  stated, "[p]laintiffs in prior cases have argued in substance that since a fund increased

28  dramatically in size, economies in scale must have been realized.  The courts reject that

27

United States District Court

For the Northern District of California

1    argument." In *Kalish* and the decisions to which it cited, the issue was whether economies of

2    scale had been *proven* after trial, not whether they had been *pleaded* properly. *Id.* at 1238–39.

3        In the instant case, plaintiff cites studies showing that funds in general enjoy lower

4    expense ratios as assets increase. Plaintiff also makes reference to the expense ratios of several

5    Wells Fargo funds (Compl. ¶¶ 112, 114–117). Although these expense ratios include costs

6    beyond the advisory and distribution fees paid to the investment adviser and distributors, it is

7    reasonable to infer that if expense ratios and assets increase in tandem, a failure of the

8    investment adviser and distributors to pass on economies of scale may be the cause, as alleged.

9        Finally, although defendants demand specific facts as to their expense ratios, there is no

10   suggestion in the record that such information is public. It would be unfair to require more

11   before discovery.

12                    ***(iv)*      Gartenberg *Factor:  Economies of Scale — Time Period.***

13       Movants note that some of the facts plaintiff cites relate to expenses and fees charged

14   more than one year before the initiation of this civil action (Br. 14–15). Plaintiff can only

15   recover for damages suffered in the twelve-month period immediately preceding filing of the

16   initial complaint. This does not necessarily render the allegations irrelevant. For instance,

17   whether or not economies of scale are being passed along might be inferred by comparing

18   expense ratios at a fund's inception to the ratios at the time the complaint was filed. An

19   increase in the ratio despite an increase in assets could indicate that, for the twelve months

20   immediately prior to filing of the complaint, the fees were excessive.

21                    ***(v)*      Gartenberg *Factor:  Economies of Scale — Breakpoints.***

22       Movants do not address plaintiff's allegations that the breakpoints for the funds were

23   illusory.[9] They claim that the difference in breakpoints between the investment adviser and the

24   sub-adviser are irrelevant because (1) the breakpoints ought to be different because the

25   investment adviser and sub-adviser perform different services and (2) sub-adviser fees are paid

26   by the investment adviser, not the fund (Br. 15). It is reasonable, however, to infer that a lower

27   _____

28       [9] Again, a fee breakpoint is a particular level of fund assets that, when reached, triggers a decline in the percentage used to calculate fees charged to investors. For example, when a fund gathers $500 million in assets, its fees might decline from 0.65 percent to 0.60 percent of assets (Compl. ¶¶ 119, 125).

28

1    breakpoint for the sub-adviser than for the investment adviser may indicate that the investment

2    adviser's costs are dropping as assets increase without any commensurate decrease in fees paid

3    by the funds.

4                    *(vi)*      **Gartenberg** *Factor:  Comparing Fee Ratios.*

5            Defendants criticize plaintiff for using higher-than-average expense ratios for certain

6    Wells Fargo funds as a proxy for excessive advisory and distribution fees.  It is true that the

7    expense ratios include all expenses, not just the advisory and distribution fees at issue here.

8    Increases in expense ratios are nevertheless plausible indicators that advisory and distribution

9    fees were higher than industry averages.  Defendants also claim that plaintiff is comparing

10   Wells Fargo funds' fees to "a hypothetical benchmark fund that does not exist" (Br. 16).  In

11   fact, plaintiff compares five Wells Fargo funds to the 2004 industry averages for same-sized

12   funds pursuing the same types of investments (*e.g.*, small-company equities or equities in high-

13   growth companies).  These statistics were compiled by the University of Chicago Center for

14   Research in Securities Prices (Compl. ¶ 117 & nn. 10–12).  Such statistical comparisons to

15   relevant industry-wide averages are relevant to whether the five funds have higher expense

16   ratios than other funds and, by inference, excessive advisory and distribution fees.

17                   *(vii)*     **Gartenberg** *Factor:  Competency of Funds' Directors.*

18           Plaintiff claims that the funds' directors failed to supervise the investment advisers

19   adequately, giving the investment advisers and distributors the opportunity to seek and accept

20   excessive fees, including those portions used to fund kickbacks to broker-dealers.  Plaintiff does

21   not base this allegation on any facts about *how* the directors conducted the affairs of the fund,

22   nor on their professional qualifications.  Instead, it is based on the results they achieved.  These

23   results are merely the other allegations about excessive fees reframed in terms of the directors'

24   failure instead of the investment adviser's breach.  In other words, plaintiff is trying to bootstrap

25   some *Gartenberg* factors to cover the factor related to the directors.  This allegation therefore

26   fails to state any new facts that support the claim.  Plaintiff also alleges that the directors failed

27   to inform themselves adequately before making fee decisions.  Such conclusory allegations are

28   insufficient to support a claim.  Plaintiff also alleges that the directors are unlikely to have done

a thorough job because they were directors for *all* Wells Fargo funds.  If the number of funds were high enough, that inference might be reasonable.  But plaintiff fails to allege in the complaint how many Wells Fargo funds existed.  His opposition brief claims that there are more than ninety.  Allegations in a brief, however, cannot rectify any insufficiency in the complaint.  Movants' arguments on this point are well taken

### C.     Standing.

Defendants argue that plaintiff cannot maintain the claim because he does not have standing to bring it.  Actions against investment advisers for breach of fiduciary duty in accepting excessive fees and payments may be brought only by the SEC and "security holder[s] of such registered investment company on behalf of such company."  15 U.S.C. 80a-35(b).  Defendants argue that plaintiff does not have standing because he has not alleged that he is a security holder of Wells Fargo Funds Trust.  Defendants are correct.

Plaintiff alleges in the complaint that he bought and sold shares of Wells Fargo funds. *He does not allege, however, that he held any securities in the Wells Fargo Funds at the time he filed this action or now.*  His only response to this aspect of the motion was to state, in his opposition, that he "currently holds shares of a Wells Fargo Fund" and to file the Siemers declaration (Opp. 20).  Defendants' objection to the Siemers declaration was sustained, so it cannot be considered (Order Sustaining Defs.' Objections to Pl.'s Dec. 6).  Plaintiff's statement in the opposition brief is outside the pleadings and therefore cannot make up for the failing of the complaint.  This deficiency in the complaint, however, presumably can be repaired by amendment.  In the meantime, the motion must be granted for lack of standing.

### D.     Conclusion.

Plaintiff has alleged a variety of detailed facts that support the Section 36(b) claim.  If he can prove those allegations, he will have demonstrated that the investment advisers and distributors were passing to the funds the cost of self-serving kickbacks, that they did not provide adequate services because they failed to achieve even average returns on investments, that they failed to pass on economies of scale and that they charged more than investment advisers to similar funds.  Plaintiff, however, has failed to allege that he owned any of the

United States District Court

For the Northern District of California

relevant securities on the day the suit began.  Absent such an allegation of standing, plaintiff can prove no set of facts that would prove a breach of duty under *Gartenberg*.  Count VI therefore must be dismissed.  If plaintiff alleges standing, however, he might well state a claim. *See generally*, *Strigliabotti v. Franklin Res., Inc.*, No. C 04-883 SI, 2005 WL 645529, *4 (N.D. Cal. Mar. 7, 2005).

### 4.    MOTION TO DISMISS — COUNT VII.

Count VII alleges that Wells Fargo & Co. violated Section 48(a) of the Investment Company Act, 15 U.S.C. 80a-47, which makes it "unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do [under the Investment Company Act of 1940]."  15 U.S.C. 80a-47(a).  Defendant argues that Count VII must be dismissed because Section 48(a) does not provide a private right of action.  The Ninth Circuit and Supreme Court have not ruled on this issue.  The Second Circuit found in one action that the plaintiff could pursue actions under Section 48(a), but due in part to factual circumstances not present here and state laws not applicable here.  *Strougo v. Bassini*, 282 F.3d 162, 176–77 (2d Cir. 2002).  It found in another factual context not present here that the plaintiff *did not* have a private right of action under Section 48(a).  *Reeves v. Continental Equities Corp. of Am.*, 912 F.2d 37, 42 (2d Cir. 1990).

Given the lack of clear guidance by any court of appeals or the Supreme Court, this order must examine whether an implied private right of action exists under Section 48(a).  To do so, the Court uses the test set forth in *Cort v. Ash*, 422 U.S. 66, 78 (1975), and modified by later decisions.  *Cort v. Ash* held that there is a four-factor test to determine whether a right of action exists:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant.  First, is the plaintiff one of the class for whose especial benefit the statute was enacted — that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

be inappropriate to infer a cause of action based solely on federal law?

*Ibid.* (internal citations omitted). *Cort* was modified by *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76 (1979) (internal citations omitted), in which the court held that *Cort*

> did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create . . . a private cause of action. Indeed, the first three factors discussed in *Cort* — the language and focus of the statute, its legislative history, and its purpose — are ones traditionally relied upon in determining legislative intent.

### A.    Class Intended to Benefit from Statute.

The Investment Company Act of 1940 was enacted pursuant to a policy designed to protect investors. 15 U.S.C. 80a-1(b). In the instant action, the substantive allegations of wrongdoing under the Act are that the investment advisers and the distributors breached their duties to the Trust by charging certain fees but offering nothing of value in return. These substantive allegations are pursued in Count VI under Section 36(b) of the Act, 15 U.S.C. 80a-35(b). The Count VII allegations are a sort of control-person liability dependent upon the same wrongful conduct. This order therefore looks to Section 36(b) for evidence of the class of persons intended to be benefitted. That subsection provides a private right of action for the benefit of registered investment companies, *i.e.*, the mutual funds themselves. The ultimate beneficiary of this right of action, however, is the security holders of such fund, to whom the statute gives the right to bring claims under that subsection. It is significant that the subsection does not provide any cause of action to the funds themselves. This fact emphasizes that it was the investors who Congress intended to be the ultimate beneficiaries, not simply the funds themselves. This is emphasized further by the fact that security holders can bring suit even if the board of the fund approved the compensation that allegedly breached the investment adviser's fiduciary duty. For all these reasons, the Act itself makes clear that the "class for whose especial benefit the statute was enacted," *Cort*, 422 U.S. at 78, was the investors. Plaintiff alleges that he invested in the funds at issue. He is therefore within that class. The first *Cort* factor therefore is in his favor.

**B.      Legislative Intent to Create a Remedy or to Deny One.**

Section 36(b) provides that "[n]o such action [under Section 36(b)] shall be brought or maintained against any person other than the recipient of such compensation or payments . . . ." 15 U.S.C. 80a-35(b)(3).  This indicates that Congress did not intend to create liability for anyone except the persons who receive fees garnered in breach of fiduciary duty.  It is logical to extend that principle to cover Section 48(a), so that control persons are not liable unless they receive some compensation as a result of the breach of fiduciary duty.  If this requirement were not imputed to Section 48(a), it would mean that Congress imposed liability upon an *indirectly* responsible party who gained nothing while imposing no such liability upon a *directly* responsible party who also gained nothing.  In the complaint, plaintiff does not allege that Wells Fargo & Co. ever received any of the fees at issue.  In fact, he alleges that the proceeds of these fees went to the broker-dealers.  Although he alleges that these broker-dealers are controlled by Wells Fargo & Co., that does not mean that the fees ultimately flowed to the parent corporation.  In a situation such as the one alleged by plaintiff, therefore, the apparent intent of Congress was to deny him a remedy against a control person who is not alleged to have received any of the ill-gotten fees.

This indication is so strong as to be determinative of Congress's intent, irrespective of the last two *Cort* factors, which are consistency with the purposes of the legislation, and whether the cause of action is traditionally relegated to state law.  No matter how consistent with the Act's purposes, recognition of a private right of action here would conflict with Congress's explicit intent to impose liability only upon those who received excessive fees.  Given the centrality of congressional intent in the *Cort* inquiry, even the complete absence of state involvement in this area of regulation would not tip the balance in favor of recognizing an implied right on the facts of this case.  For these reasons, this order concludes that plaintiff has not alleged facts that would warrant recognition of an implied right of action under Section 48(a).  Count VII must therefore be dismissed.

Plaintiff cites to *In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation*, 848 F. Supp. 527, 545 (D. Del. 1994),

which held that plaintiff could maintain a claim under Section 48(a).  The Court finds *ML-Lee*

unpersuasive.  It neither employed the *Cort* test nor considered the congressional intent to limit

liability to those who actually received excessive fees, as set forth in 15 U.S.C. 80a-35(b)(3).

Plaintiff also cites *In re Dreyfus Mutual Funds Fee Litigation*, 428 F. Supp. 2d 342, 356 (W.D.

Pa. 2005), which allowed a Section 48(a) claim to go forward.  That court, however, did not

engage in any analysis of whether Section 48(a) contained an implied right of action.  It

therefore lacks persuasive power on that point.  The same lacuna saps vitality from plaintiff's

citation to *SEC v. American Board of Trade, Inc.*, 593 F. Supp. 335, 341 (S.D.N.Y. 1984).

### CONCLUSION

The motions to dismiss Counts I–V are **DENIED**.  The motions to dismiss Counts VI and

VII are **GRANTED**.  Plaintiff is **GRANTED LEAVE TO AMEND** the complaint again.  It must be

filed and served by **AUGUST 31, 2006**.  The instant order disposes of three motions to dismiss,

all filed at the same time and targeting the same complaint.  Any motion to dismiss the new

complaint must be filed within 14 calendar days after filing of an amended complaint and will

be heard on a 35-day track.  If defendants wish to file another motion to dismiss (if and when

plaintiff amends the complaint), they must put all their arguments into one motion.  Any new

motion may not re-raise pleading issues resolved against defendants by this order.


**IT IS SO ORDERED.**


Dated:  August 14, 2006.                                         _____
                                                                 WILLIAM ALSUP
                                                                 UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California