1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RONALD SIEMERS, individually and on behalf
of all others similarly situated,

        Plaintiff,

    v.

WELLS FARGO & CO.,WELLS FARGO
FUNDS MANAGEMENT, LLC, WELLS
CAPITAL MANAGEMENT, INC., H.D. VEST
INVESTMENT SERVICES, WELLS FARGO
INVESTMENTS, LLC, STEPHENS, INC., and
WELLS FARGO FUNDS TRUST,

        Defendants.

                               /

No. C 05-04518 WHA

**ORDER IDENTIFYING
CLAIMS TO PROCEED
AND DISMISSING ALL
OTHER CLAIMS AND
GRANTING MOTION
TO AMEND IN PART**

**INTRODUCTION**

      This action follows a series of enforcement orders by the Securities and Exchange

Commission restricting the practice of "revenue sharing." This refers to agreements by

sponsors of mutual funds to pay brokerage firms incentive payments in exchange for their

ongoing sales of the fund to the investing public. These payments are over and above the sales

load normally received by brokers. One problem with revenue sharing is that brokers are

incentivized to steer their customers into the subject funds while pretending to give unbiased

professional advice. Another problem is the sponsors' temptation to use the investors' common

fund to pay for such promotional campaigns, a practice of rare value to existing investors,

although of considerable value to the sponsors (due to enlargement of the fee base).

An overarching problem has been the secrecy with which such schemes have been implemented, leaving investors uninformed of the practice. This case presents the issue of the extent to which the Commission's crackdown on revenue sharing can be extended to private securities class actions.

**STATEMENT**

Beginning in 2003, the Commission imposed cease-and-desist orders and sanctions against several prominent investment advisers and brokerage firms in the mutual fund trade. The Commission found that the investment advisers had flourishing revenue-sharing programs in place — without disclosure to prospective investors. Payments were referred to as "hard dollars," *i.e.*, cash, or as "soft dollars," *i.e.*, cash equivalents. One form of soft dollars was "directed brokerage." This was the funneling of the lucrative brokerage business of the fund portfolio to a favored broker as a reward for ongoing sales. The Commission found that such schemes should have been disclosed. The size and scope of the schemes, moreover, created a conflict of interest. In order to meet their own revenue-sharing outlays, the advisers were subject to temptation to siphon away investors' money in the form of various fees, including advisory fees. This conflict should have been disclosed, the Commission held. It had not been adequately described by the watered-down language in the prospectus. The Commission entered sanctions against those investment advisers. *Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release No. 2,224/Inv. Co. Act of 1940 Release No. 26,409 (Mar. 31, 2004); *see also OppenheimerFunds, Inc.*, Exch. Act Release No. 52,420/Inv. Advisers Act of 1940 Release No. 2,427/Inv. Co. Act of 1940 Release No. 27,065 (Sept. 14, 2005); *Putnam Inv. Mgmt., LLC*, Inv. Advisers Act of 1940 Release No. 2,370/Inv. Co. Act of 1940 Release No. 26,788 (Mar. 23, 2005); *Franklin Advisers, Inc. & Franklin/Templeton Distribs., Inc.*, Exch. Act Release No. 50,841/Inv. Advisers Act of 1940 Release No. 2,337/Inv. Co. Act of 1940 Release No. 26,692 (Dec. 13, 2004); *Deutsche Inv. Mgmt. Ams.*, Exch. Act Release No. 54529/Inv. Advisers Act of 1940 Release No. 27,505 (Sept. 28, 2006).[1]

---

[1] Following the Commission's orders, several courts have dealt with other mutual fund revenue-sharing claims similar to that alleged in the instant case. The approaches of those courts have differed and the results have varied. Some courts have dismissed claims arising under the 1934 Act entirely because the plaintiffs had

United States District Court

For the Northern District of California

Brokers who had accepted such rewards were also sanctioned. At the broker level, the revenue-sharing agreements created a different conflict of interest. Supposedly neutral professional investment advice was, in truth, biased in favor of the subject funds but without disclosure of the conflict. The brokers had relied on the fund prospectuses to disclose revenue sharing. The Commission, however, held the prospectuses were insufficient disclosure. As it held in the *Morgan Stanley DW* case: "None adequately disclose[d] the preferred programs as such, nor [did] most provide sufficient facts about the preferred programs for investors to appreciate the dimension of the conflicts of interest inherent in them." *Morgan Stanley DW, Inc.*, Exch. Act Release No. 48,789/Sec. Act Release 8,339 at ¶ 25 (Nov. 17, 2003); *see also Am. Express Fin. Advisors, Inc.*, Sec. Act Release No. 8,637/Exch. Act Release No. 52,861 (Dec. 1, 2005); *Citigroup Global Markets, Inc.*, Sec. Act. Release No. 8,557/Exch. Act. Release 51,415 (Mar. 23, 2005); *Edward D. Jones & Co.*, Sec. Act Release No. 8,520/Exch. Act Release No. 50,910 (Dec. 22, 2004). The Commission held in all the cases that the brokers' failure to adequately disclose the conflict of interest while recommending the funds was improper.

Although none of the cease-and-desist orders was against any defendant herein, the NASD announced fines against defendants Wells Fargo Investments, LLC, and H.D. Vest Investment Services, two defendants herein, among a total of fifteen firms, on June 8, 2005. This action followed in November 2005. Most defendants are Wells Fargo entities.

---

failed to adequately plead certain essential elements. *See, e.g., In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006) ("The Court finds that Plaintiffs fail to satisfy a fundamental element common to all the federal securities claims asserted — loss causation — and, accordingly, all of Plaintiffs' securities claims must be dismissed."); *In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006) ("I conclude that current law and SEC regulations impose no duty on the defendants that the funds' offering prospectuses disclose more than they did. Furthermore, plaintiffs allege no material omission, from the offering prospectuses or otherwise.") (citation omitted); *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138at *9 (S.D.N.Y. Apr. 18, 2006) ("Plaintiffs plead neither cognizable losses, nor loss causation."). Other courts have dismissed claims based on the 1940 Act. *See, e.g., In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567 (NRB), 2006 WL 126772 at *10 (S.D.N.Y. Jan. 17, 2006) ("[P]laintiffs have at most alleged that the advisory and Rule 12b-1 fees were used for improper purposes . . . . [S]uch allegations do not suffice to state a claim under Section 36(b)."); *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 259 (S.D.N.Y. 2006) ("Plaintiffs have not sufficiently alleged excessive investment advisory fees under Section 36(b)."). Still other courts have allowed 1940 Act claims. *See, e.g., Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 116 (D. Mass. 2006) ("For present purposes, the plaintiffs' pleading of [the Section 36(b)] claim is sufficient to survive a motion to dismiss."). To the extent the reasoning of this order differs from other decisions, it does so with due respect. To date, the state of the law on revenue-sharing violations is unsettled. The rulings made herein are on the basis of the record and pleadings in this case.

In February 2006, Ronald Siemers was selected as the lead plaintiff. Plaintiff Siemers filed a first amended consolidated class action complaint three months later. The complaint asserted claims against defendants under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940.

At all material times, Wells Fargo & Co. was the corporate parent of the other Wells Fargo companies. It was a diversified financial-services company providing banking, insurance, investments, mortgage and consumer-finance services. Wells Fargo Funds Trust was the registrant of all Wells Fargo funds. The Wells Fargo funds were organized in several portfolios or series under Wells Fargo Funds Trust. Wells Fargo Funds Distributor, LLC, and Stephens Inc. were distributors for the Wells Fargo funds. In addition to serving as principal underwriters for the funds, they performed marketing and other services for Wells Fargo Funds Trust. Along with the investment adviser defendants, they are alleged to have "allocated revenue net of certain expenses" to Wells Fargo Investments. Wells Fargo Funds Management, LLC, was the investment adviser for the Wells Fargo funds. Both Wells Fargo Funds Management and its "sub-adviser," Wells Capital Management, Incorporated, were responsible for the day-to-day management of the funds. The investment adviser defendants allegedly entered into revenue-sharing agreements with the broker defendants and with other broker-dealers not affiliated with Wells Fargo. Wells Fargo Investments, LLC, and H.D. Vest Investment Services, LLC, were brokerage firms. H.D. Vest was acquired by Wells Fargo in 2001. These brokers entered into various revenue-sharing arrangements to promote the Wells Fargo funds as well as other third-party funds not affiliated with Wells Fargo. The broker defendants allegedly provided increased visibility of the preferred funds with which it had such arrangements (Compl. ¶¶ 20–32, 51).

Two rounds of motions to dismiss preceded this motion. On August 14, 2006, an order declined to dismiss the first amended complaint. The order held that plaintiff had, for pleading purposes, sufficiently pled allegations to support Counts I through IV, at least as against the Rule 12 motion under consideration. Those counts alleged violations of Section 12(a)(2) of the 1933 Act, 15 U.S.C. 77l(a)(2); Section 15 of the 1933 Act, 15 U.S.C. 77o; Section 10(b) of the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   1934 Act, 15 U.S.C. 78j(b); SEC Rule 10b-5, 17 C.F.R. 240.10b-5; and Section 20(a) of the

2   1934 Act, 15 U.S.C. 78t.  The August 14 order dismissed Count VI for lack of standing.

3   That count alleged a violation of Section 36(b) of the 1940 Act, 15 U.S.C. 80a-35(b).  It was

4   dismissed because plaintiff had not alleged that he held or continued to hold any securities in

5   any Wells Fargo fund at the time the action was filed.  The August 14 order also dismissed

6   Count VII, which alleged a violation of Section 48(a) of the 1940 Act, 15 U.S.C. 80a-47,

7   holding that there was no implied right of action under Section 48(a).

8        The August 14 order held that the consolidated complaint stated a Section 10(b) claim in

9   alleging that a broker recommended the purchase of a fund for whom the broker was receiving

10  hidden compensation in the form of revenue sharing.  Until immediately before the instant

11  order, however, no plaintiff had come forward to properly plead that he or she ever was the

12  victim of such a recommendation.

13       After leave to amend, the second consolidated amended complaint differed from the

14  first complaint only insofar as it:  (1) shortened the class period to conform with the August 14

15  order's holding with respect to the statute of limitations; (2) added language to make clear that

16  plaintiff held shares of the Wells Fargo funds as of the filing of this action, and continues to

17  hold shares, thereby purporting to establish standing to bring a claim under Section 36(b);

18  and (3) eliminated Count VII of the first amended complaint.  Again, defendants moved to

19  dismiss.  Specifically, defendants sought to:  dismiss all claims against broker-dealer defendant

20  H.D. Vest for lack of Article III standing; dismiss the claim under Section 36(b) of the 1940 Act

21  as to Wells Fargo funds not owned by plaintiff; dismiss Count VI as to distributor Stephens;

22  and dismiss the claim under Section 10(b) of the 1934 Act as to six defendants for failure to

23  adequately plead Section 10(b) liability for each of them.  While the motion was pending,

24  the case management order issued on September 28, 2006, and lifted the stay of discovery.

25       An order dated October 24, 2006, ruled on defendants' second motion to dismiss.

26  *First*, the order dismissed all of plaintiff's claims against defendant H.D. Vest for lack of

27  Article III standing.  Plaintiff had failed to allege that he had held an account with H.D. Vest

28  or had relied on any statements by an H.D. Vest consultant.  *Second*, the order dismissed

5

**United States District Court**
For the Northern District of California

1    plaintiff's claims under Section 10(b) of the 1934 Act as to H.D. Vest, Wells Fargo Funds

2    Management, Wells Capital Management, Wells Fargo Funds Distributor and Stephens,

3    for failure to allege that those defendants had substantially participated in the preparation of any

4    misleading statements or that they had the requisite scienter under Section 10(b). *Third*, the

5    order dismissed plaintiff's claims under Section 36(b) of the 1940 Act as to those Wells Fargo

6    funds not owned by plaintiff. Because he had not owned those funds, he had no standing to sue

7    as to those funds. Defendants' motion was otherwise denied.

8            The October 24 order allowed plaintiff to move for leave to amend the complaint.

9    To cure the standing defects with respect to H.D. Vest and the Wells Fargo funds in the

10   Section 36(b) claim, counsel was allowed to propose other named plaintiffs so long as they

11   were acquired in a manner consistent with counsel's professional obligations. Plaintiff was

12   also allowed to seek to amend the complaint to cure the pleading defects of Count IV,

13   a Section 10(b) claim. The October 24 order directed that any arguments that would be part of

14   any dismissal motion should be included in defendants' opposition to plaintiff's motion (Oct. 24

15   Order at 20–21).

16           Plaintiff timely filed a motion for leave to amend the complaint and concurrently filed a

17   proposed third amended complaint. This is the immediately pending motion. To cure his first

18   standing problem — the standing defect with respect to H.D. Vest — plaintiff now seeks to add

19   Joyce Kulasxa, Alan Robbins, and Guinn Eiland as named plaintiffs. Those plaintiffs are

20   alleged to have dealt with H.D. Vest in purchasing shelf-space funds. Plaintiff also seeks to add

21   Forrest McKenna and the McDaniel Family Trust as named plaintiffs. Prior to the hearing on

22   this motion, it was unclear whether any of those proposed plaintiffs could cure plaintiff's other

23   standing defect on his claim under Section 36(b) for Wells Fargo funds he does not own. In a

24   filing made at the Court's request, plaintiff's counsel revealed that Siemers only held and

25   continues to hold one Wells Fargo fund — Wells Fargo Small Cap Growth Fund.

26           Following a hearing on the pending motion, four supplements were requested to clarify

27   specific issues. The first request focused primarily on the alleged misrepresentations by brokers

28   to investors. The Court requested clarification on, among other things, what recommendations

6

United States District Court

For the Northern District of California

had been made to Siemers and other proposed plaintiffs and the extent to which the proposed complaint alleged that the brokers knew of an improper source of the payments. The second request centered on the prospectuses. It sought clarification as to how the prospectuses had misrepresented the benefits in return for investment adviser fees. The third request asked for clarification of issues related to directed brokerage and whether the brokers were fiduciaries. The fourth request asked for clarification on the liability of underwriters and distributors under the securities acts. Counsel were also asked to clear up the specific allegations that had been made about the amount of hard dollars channeled through the Wells Fargo arrangements. A tentative order was supplied to counsel with an order to show cause why it should not be finalized. After another round of briefing and reply, this order — the final order in a prolonged process — now issues.

**ANALYSIS**

This action began with an emphasis on brokers steering their clients into certain mutual funds via supposedly unbiased recommendations without disclosing to their clients that the brokers were receiving secret compensation for making the recommendations. Two difficulties have since developed. One was that no plaintiff alleged having received any such recommendation, much less having relied on it. The other was and remains the fact that whether an express recommendation was made (and relied on) would vary from individual investor to individual investor. Many purchases, for example, might have been made on-line or without any advice from any broker. This variable might well frustrate class treatment under Rule 23, a question ventilated in the supplemental briefing.

On the first point, when plaintiff's counsel were reminded by the Court that no investor alleged receiving and relying on their brokers' advice, counsel submitted yet further proposals (beyond even the pending proposed amendment). The new material would have added — identically for each proposed plaintiff — that he or she "purchased the Shelf Space Funds . . . based upon the advice of his [Wells Fargo Investments or H.D. Vest] brokers and relied upon that advice in determining to purchase the Shelf Space Funds." This vague conclusion would have been insufficient. It would not have specified the fraudulent statement

with sufficient particularity under Rule 9(b).  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–50 (9th Cir. 1994) (en banc); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987).  After being told of these deficiencies, counsel finally filed yet another proposal that, at least in this regard, is satisfactory as to plaintiff Siemers and proposed plaintiff Forrest McKenna and as to the Wells Fargo funds.

In search of a theory amenable to class certification, however, plaintiff's emphasis has shifted.  Now the emphasis is on the prospectus and the statement of additional information (SAI).  A prospectus was eventually sent to all members of the alleged class.  An SAI was available to all members upon request.  Showcasing these documents and any misleading statements therein casts this case more like the typical securities class action.  The theme now is that these documents concealed a scheme to misappropriate investors' money and to divert it to brokers as kickbacks to reward ongoing sales of the fund.

A parallel development in this litigation has been the explosion of the number of prospectuses and SAIs that would be in play were the action to be expanded as counsel proposes.  Five new plaintiffs would be added.  At least 93 different mutual funds would be under scrutiny, drawn from 23 separate mutual fund sponsors.  They range from the Wells Fargo funds originally at issue to 22 third-party and unrelated complexes such as Putnam, Oppenheimer and Massachusetts Financial Services.  Each of the funds would have had at least one and possibly more prospectuses during the alleged class period, not to mention SAIs of equivalent number.  The proposed pleading is massive.  It has 225 paragraphs.  It has thick appendices.  Its many different interlocking and moving parts take many hours to digest and must be read and re-read to catch nuances and to appreciate calculated ambiguities. To complicate matters, several proposed revisions have been offered during the many installments of briefing on this motion.

This order seeks to chart a course for this lawsuit.  In doing so, this order must re-plough some of the ground covered in the two prior orders.  Rather than addressing only standing, it is necessary to establish the basic governing framework to keep this action from spiraling out of control.

8

United States District Court
For the Northern District of California

1.   **REVENUE SHARING AND THE EXTENT TO WHICH
IT WAS LAWFUL DURING THE ALLEGED CLASS PERIOD.**

Mutual funds sometimes market themselves directly to the public, skipping the middle man.  Today, however, most funds market themselves through established brokerage houses.  About seventy percent of all sales are through brokers (or other intermediaries).  A sales load is imposed to cover commissions for brokers.  Our case, however, involves payments to brokers over and above the traditional sales load.  These extra payments are known as "revenue sharing."[2]

Twenty-five years ago, the industry sold about one thousand different mutual funds.  By 1990, with a takeoff in equity funds, the number had tripled.  The number has now tripled again to nine thousand.  The competition for new investor dollars is intense.

One new route to reach potential customers arose in 1992 with the opening of Schwab's OneSource.  This was a so-called "fund supermarket."  Investors could buy funds, both load and no-load, without paying a brokerage sales commission.  Some other discount firms followed suit.  Using their own customer base as leverage, these firms charged mutual funds a leverage fee for "shelf space" in the "fund supermarket."  Mainstream brokers also began to charge fund families for "shelf space."  Revenue sharing was underway.

In a letter to the Investment Company Institute in 1998, the Division of Investment Management of the Securities and Exchange Commission set forth guidelines for investment advisers to follow in financing payments to brokerage houses to be part of a fund supermarket.  The letter recognized that one of the risks in such arrangements was the temptation to use fund assets for financing distribution, as will be detailed in a moment.  Nonetheless, the letter assumed that the practice would continue and gave guidance to investment advisers as to how to legitimately finance such ongoing distribution.  Significantly, the letter also stated a belief that

---

[2] Mutual funds are more precisely designated as "management investment companies."  These are corporations or trusts with shares, with directors and officers, and investment advisers.  An "open-end" company is the most familiar version.  Such a company issues shares that are redeemable by the company, meaning the holder may on demand receive approximately his proportionate share of the issuer's net assets or its cash equivalent.  (That is one reason ongoing promotion is important to mutual funds — to compensate for redemptions.)  Closed-end companies do not have redeemable securities but trade on the open market.  Investment companies have been around for a century or more.  They have been subject to regulation by the Securities and Exchange Commission since at least the 1940 Act, 15 U.S.C. 80a-1 *et seq.*

sponsors of fund supermarkets did *not* solicit their customers to buy shares of any particular fund. Nor did they, the letter stated, make recommendations about individual funds, at least the letter so assumed. In this regard, NASD Rule 2830(k) has at all material times prohibited any broker from directly or indirectly favoring or disfavoring the sale of any fund based on the basis of brokerage commissions. Inv. Co. Inst., SEC No-Action Letter, 1998 SEC No-Act. Lexis 976 (Oct. 30, 1998).

If the no-action letter's assumptions were correct even in 1998, things certainly deteriorated by 2004. Revenue sharing skyrocketed. Brokers steered their customers into favored funds. They were rewarded by sponsors with "hard" and "soft" dollars. In 2004, the Commission stated:

> . . . Selling broker-dealers appear to have significant leverage over funds because the number of distribution channels is limited, and fund complexes compete to seek a prominent position in them. This leverage permits selling brokers to demand additional payments from fund advisers from their own assets ("revenue sharing") or through the direction of fund brokerage. These payments can purchase prominence (or better "shelf space") in an increasingly crowded fund marketplace.
>
> In many cases, meeting the increasing compensation demands of selling brokers has caused funds' distribution-related fees (*i.e.*, sales loads and rule 12b-1 fees) to reach the National Association of Securities Dealers ("NASD") limits (or "caps") on such fees (which we describe below). Fund advisers often use brokerage commissions to generate additional revenue to finance distribution. Brokers have, in turn, based their demands for greater compensation from funds on the apparent availability of these supplemental revenues. As a result, funds have allocated, over time, an increasing share of their brokerage commissions to support distribution.

Prohibition on Use of Brokerage Commissions to Finance Distribution: Proposed Rule, 69 Fed. Reg. 9726 (Mar. 1, 2004) (footnotes omitted).

The accumulation of cease-and-desist orders by the Commission against well-known brokerage houses testifies to the scope of ensuing violations of Rule 2830(k) by brokers. Many of the sanctions were at the fund level as well, notably against prominent sponsors of mutual funds.

*                *                *

10

A sponsor of a mutual fund, of course, has every right to publicize and to solicit new investors into its fund. Just as a new venture has the right to seek out start-up capital based on little more than a business plan, a mutual fund sponsor may seek out investors on little more than reputation and a plan. The solicitations must not be misleading in any material way. That said, the immediate point is that there is nothing wrong with self-promotion, even in the mutual fund business.

To carry out such self-promotion, a sponsor of a mutual fund may lawfully pay brokerage houses sales commissions and fees for certain services. To pay for ongoing distribution of new shares, the sponsor must ordinarily use its *own* money. But once it earns fees, they become the property of the sponsor. That money can be used as the sponsor wishes — for compensation, vacations, charity — or, if it elects, solicitations to attract further investors into the same (or other) funds. How a sponsor uses its *own* money is up to it.

Except to the limited extent allowed by statute and regulation, what a sponsor *cannot* do is to cause the mutual fund itself to pay for ongoing distribution. The reason is simple. After the agreed-on fees and sales load are taken out, the investors' money is supposed to remain in the common fund to be invested in accordance with the stated strategy, subtracting only for agreed-on periodic management and advisory fees. The common fund belongs to the investors. It is not a cash register for the fiduciaries to use as they wish. Existing investors have only a slight interest in having new investors join in. While new investments increase the fund size, the ownership percentage for the existing investors is correspondingly diluted, a wash for the existing investors. Growth inures primarily, if not exclusively, to the benefit of the sponsor and its stake in ever-larger management and advisory fees. The bigger the fund, the bigger will be the fees, almost always a percentage of the total assets under management. To diminish the common fund by causing it to finance an ongoing search for new money would, therefore, be a violation of the sponsor's fiduciary duties to the old money.[3]

*          *          *

---

[3] One possible benefit to existing investors from growth of the fund is economies of scale, which in theory can lead to a per-share reduction of overhead, including advisory fees.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Revenue sharing was lawful within limits during the period in question — and is still

2   lawful today, albeit within stricter limits.  It is worthwhile to review the various ways that fund

3   sponsors could have, during the class period, legitimately used even fund assets, not to mention

4   their own money, to finance ongoing distribution.  This bears on scienter, *i.e.*, whether a broker

5   would necessarily have been on notice that a fund sponsor had exceeded its limitations in using

6   fund assets to promote distribution.  It also bears on disclosure duties at the sponsor level.[4]

7   **A.      Rule 12b-1 Fees.**

8   A skeptic might say that the imagination of mutual fund sponsors has not slept in

9   inventing ways to use shareholder money rather their own to finance the ongoing distribution

10   of new shares.  Section 12(b) of the Investment Company Act of 1940, 15 U.S.C. 80a-12,

11   outlawed open-ended companies from acting as their own broker-dealers.  *See, e.g.*, A. Jaretzki,

12   *The Investment Company Act of 1940*, 26 Wash. U. L.Q. 303, 324–25 (1941) (cited with

13   approval by SEC at 53 Fed. Reg. 23,258, 23,260 (June 21, 1988)).  By 1980, however,

14   the industry prevailed on the Commission to make an important exception — what are known

15   as "rule 12b-1 plans," so called because they derive from Section 12(b) of the 1940 Act

16   authorization for such plans.  45 Fed. Reg. 73,898 (Nov. 7, 1980).

17   At all times relevant herein, the rule authorized written plans approved annually by the

18   board of directors of a fund, including — pointedly — by a majority of financially independent

19   directors.  They were required to find that the fees and ongoing distribution would benefit old

20   and new shareholders.  The rule was intended, in part, to address the potential conflicts of

21   interest between a fund and its investment adviser regarding distribution expenses.  Funds were

22   required to disclose in their prospectuses all fees to be paid pursuant to rule 12b-1 plans and to

23   disclose certain information about those fees when describing their distribution arrangements

24   (and such fees appear to have been disclosed in the Wells Fargo prospectuses).  Yet more

25   rule 12b-1 data was required to be supplied in the SAI.  Copies of the plans were to be exhibits

26   to the registration statements.  Consequently, at all material times, rule 12b-1 contemplated that

27

28   _____

[4] "Revenue sharing" is sometimes used to refer only to payments made from sources other than the fund.  This order uses the term more broadly, as it is also sometimes used, to refer to any payments to brokerage firms (beyond the normal sales load) to finance ongoing distribution.

United States District Court

For the Northern District of California

1   fees for ongoing distribution might be deducted directly out of the corpus of the fund on an

2   ongoing basis within the plan limits.  17 C.F.R. 270.12b-1 (2004).  These fees became

3   commonplace in the mid-1990s.[5]

4       Revenue sharing is now the second-largest distribution expense (after compensation for a

5   fund's sales force).  Rich Blake, "How High Can Costs Go?" *Institutional Investor* 56, 62

6   (May 2001) (cited with approval by SEC at 69 Fed. Reg. 9726 n.4 (Mar. 1, 2004)).

    The magnitude of revenue sharing, in turn, has generated even greater pressure to find ways to

7   finance it.  At least four further avenues have arisen.

8

9                   **B.      Disguised Fees.**

10      One avenue has been the indirect use of fund assets for distribution disguised as

11  investment adviser fees.  The Commission has specifically *disapproved* including in such fees

12  any allowance for distribution.  Payment of Asset-Based Sales Loads By Registered Open-End

13  Management Investment Companies, Inv. Co. Act Release No. 16,431, 53 Fed. Reg. 23,258,

14  23,272 n.129 (June 21, 1988).  An investment adviser may, as stated, spend its *own* money,

15  including profits from the advisory contract, for ongoing distribution.  It cannot, however,

16  use the fees (or any part thereof) as a mere "conduit" (the Commission's word) for financing

17  distribution.  *Id.* at 23,271 (middle column).  One danger is, as stated in the testimony of

18  Paul Roye, Director of the SEC Division of Investment Management, that as the magnitude of

19  the revenue-sharing payments escalate, as they have in recent years, "the manager may be

20  tempted to ask for an increase in its fees from the fund."  Testimony of Paul F. Roye on the

21  Mutual Funds Integrity and Fee Transparency Act of 2003 (HR 2420), before the Subcommittee

22  on Capital Markets, Insurance, and Government Sponsored Enterprises of the House Committee

23  on Financial Services at page 13 (June 18, 2003).

24

25

26

27

28
    [5] The United States General Accounting Office's report on revenue sharing stated that "Rule 12b-1 pleas were envisioned as temporary measures to be used during periods of declining assets."  GAO, *Mutual Funds Greater Transparency Needed in Disclosures to Investors* 30 (June 2003).

United States District Court

For the Northern District of California

### C.    Directed Brokerage.

Another avenue has been the use of "directed brokerage." This was the practice of rewarding brokers in proportion to their ongoing sales of the fund by directing to a brokerage house the lucrative business of conducting transactions for the fund's underlying portfolio. For example, if the adviser decided to invest the fund portfolio in a certain stock or bond, the adviser would direct the transaction to a broker to reward the broker for having promoted distribution of new shares in the mutual fund. The broker would then earn a handsome commission. This was particularly pernicious when another broker would have been willing to charge a lower commission. The commission, including the surcharge, was charged against the common fund, *i.e.*, borne by the shareholders, but the benefit — growing the fund — inured almost exclusively to the adviser (due to the larger fee base). Despite the conflict of interest in such matters, a 1981 amendment allowed fund advisers to follow a disclosed policy "of considering sales of their shares as a factor in the selection of broker-dealers to execute portfolio transactions, subject to best execution." 46 Fed. Reg. 16,012 (Mar. 10, 1981).[6]

Such "directed brokerage" then became a key way to deliver "soft dollars" to brokers, cash payments being "hard dollars." The industry used this avenue to expand revenue-sharing programs. The practice escalated until the recent crackdown by the Commission. In addition to the enforcement orders referenced above, the Commission recently amended rule 12b-1 to ban the practice of compensating a broker-dealer for promoting or selling fund shares by directing brokerage transactions to that broker. 69 Fed. Reg. 54,727, 54,730 (Sept. 9, 2004). This change, effective October 14, 2004, occurred in the middle of the class period alleged herein.

In proposing this rule, the Commission stated:

> We believe that the way brokerage has been used to pay for distribution involves unmanageable conflicts of interest that may harm funds and fund shareholders. The intense competition we observe among fund advisers to secure a prominent position in the selling brokers' distribution systems ("shelf space") creates powerful incentives for fund advisers to direct brokerage based on distribution considerations rather than quality and price

---

[6] The broker's duty of best execution is the duty to use reasonable diligence to execute promptly in the appropriate market and to obtain the best price. *See* NASD Rule 2320(a); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 269 (3d Cir. 1998) (en banc).

considerations. These incentives may adversely affect decisions about how and where to effect portfolio securities transactions, and thus affect the quality of portfolio transactions. Pressures to generate brokerage commissions may also lead to an increase in portfolio turnover rates, which may drive up fund costs and harm performance. At a minimum, this practice disadvantages funds that, because of investment considerations, do not actively trade their portfolios.

69 Fed. Reg. 9726, 9729 (Mar. 1, 2004) (footnotes omitted).

In addition, effective February 14, 2005, the Commission approved an amendment to NASD Rule 2830(k). The amendment now prohibits an NASD member from selling shares of or acting as an underwriter for any mutual fund if he or she knows, or has reason to know, that the mutual fund or its sponsor has directed brokerage arrangements in place intended to promote the sale of its shares. 69 Fed. Reg. 77,286 (Dec. 27, 2004); NASD, Notice to Members 05-04, Investment Company Directed Brokerage Arrangements (Jan. 2005).

### D.    Brokerage and Research Services.

A related avenue has been payment from the fund for "brokerage and research services" by paying higher commissions on portfolio transactions than another broker would charge. A 1975 amendment to the 1934 Act established a safe harbor for such "soft dollars" paid to a broker by a fiduciary of a fund "if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member, broker, or dealer, viewed in terms of either that particular transaction or his overall responsibilities with respect to the accounts as to which he exercises investment discretion." 15 U.S.C. 78bb(e)(1). The danger, of course, has been that sponsors will disguise as payments for "brokerage and research services" what are in truth rewards for distribution.

The Commission has issued three releases on the point. The first was issued in 1975. It stated that safe harbor did not protect "products and services which are readily and customarily available and offered to the general public on a commercial basis." Examples of excluded items were: "newspapers, magazines and periodicals, directories, computer facilities and software, government publications, electronic calculators, quotation equipment, office equipment, airline tickets, office furniture and business supplies." 41 Fed. Reg. 13,678 (Mar. 31, 1976). The second release was issued in 1986. It broadened the interpretation of "brokerage and

15

United States District Court

For the Northern District of California

1   research services."  It construed that term to include "lawful and appropriate assistance to the

2   money manager in the performance of his investment decision-making responsibilities."  51 Fed.

3   Reg. 16,004 (Apr. 30, 1986).  Following issuance of the 1986 report, it was determined that fund

4   managers were using such soft dollars to pay for a variety of things, including membership dues,

5   professional licensing fees, office rent, carpeting, and even entertainment and travel expenses.

6   In 1998, the Office of Compliance Inspections Examinations conducted examinations and issued

7   a report expressing concerns about the nature of products and services that were being treated as

8   "research."  In 2006, the Commission issued another interpretive release making clear that

9   "research" was restricted to advice, analyses, and reports that have substantive, intellectual or

10  informational content.  Essentially, money managers can use soft dollars to obtain traditional

11  company research reports, market research, market data, and trade analyses.  71 Fed. Reg.

12  41,978, 41,982–84 (July 24, 2006).  Again, the danger has been that such brokerage will be

13  thrown to the firms that deliver the most new customers — with the "research" being of only

14  quaint interest.

15              **E.      Non-Distribution Services.**

16          The final avenue has been the use of fund assets to pay a broker for services determined

17  to be "non-distribution" services.  This has included administrative expenses.  For example, if a

18  customer invests directly in a fund, the fund typically would pay its own service provider for

19  administrative services for the investor (such as account set-up and maintenance; shareholder

20  assistance, transaction processing and settlement; preparation and distribution of account

21  statements and transaction confirmations; and payment of redemptions).  If a customer has all his

22  or her accounts at a brokerage house, however, then the latter typically provides the services.

23  The investment is held in the name of the brokerage house.  A fund can (but need not) pay an

24  administrative fee to the brokerage firm to offset such expenses.

25                              *          *          *

26          Even now, revenue sharing is not unlawful *per se*.  So long as the revenue comes from

27  allowed sources, a brokerage firm can receive such payments.  Directed brokerage, however,

28  is no longer an allowed avenue for rewarding brokers.  Rule 2830 continues to bar any broker

United States District Court

For the Northern District of California

from recommending a mutual fund based on receipt of such directed brokerage.  With the foregoing summary of the revenue-sharing regulatory landscape in mind, this order now turns to the Section 10 disclosure issues.[7]

### 2.    SPONSOR LIABILITY UNDER SECTION 10 FOR INADEQUATE DISCLOSURE OF REVENUE SHARING.

Given the legitimate ways in which fund assets may be used for financing ongoing distribution, a Section 10 challenge to revenue sharing must allege, among other things, (i) that the sponsors had an undisclosed and continuing practice of misappropriating money out of the common fund in material amounts, and/or (ii) that the size and scope of the revenue sharing, even if within limits, had grown so large as to generate a conflict of interest at the adviser level requiring disclosure.  To solicit investments without disclosing such important ongoing hazards would be deceptive — just as it would be deceptive to market a fund without disclosing an ongoing embezzlement or other diversion scheme.  *SEC v. Zandford*, 535 U.S. 813, 822–24 (2002).

With respect to the Wells Fargo fund sponsors, the proposed pleading alleges both hazards.  The best Section 10 argument for plaintiffs goes as follows:  The sponsors allegedly extracted excessive advisory and other fees which were, to the extent of the excess, mere conduits for financing ongoing distribution (Compl. ¶¶ 9, 33, 50, 102, 103, 156, 161).[8]  These sham fees were imposed to satisfy continuing revenue-sharing obligations to brokers.  The sham fees contributed to the high fee structure described in the proposed complaint (Compl. ¶¶ 113–178).  Given the high fee structure and given the fixed obligations to brokers already in place, at least a component of the high fee structure was dedicated to satisfying revenue-sharing obligations rather than the ostensible reasons.  Discovery has revealed that the

---

[7] For an excellent survey of the development of revenue sharing, see Bibb L. Strench & Katy Mobedshahi, *Regulators Take A Hard Look at Mutual Fund Revenue Sharing Arrangements*, 11 Investment Law. 1 (May 2004).

[8] The Wells Fargo funds sponsors claim they paid in hard dollars and did not utilize directed brokerage in dealing with its affiliated brokers.  Although the proposed pleading is laced with references to directed brokerage, those allegations involve third-party funds with brokerage directed to defendant brokers. The proposed pleading, moreover, does not allege that any defendant accepted directed brokerage from any source whatsoever after the Commission banned it.

**United States District Court**
For the Northern District of California

1    Wells Fargo sponsors paid at least $18 million annually to Wells Fargo Investments, all of which

2    was directly or indirectly drawn from the Wells Fargo complex of funds.[9]  Beyond this,

3    additional payments were continuously made to unaffiliated brokerage firms like A.G. Edwards

4    and others.  The overall magnitude is hard to know at this stage.  At the very least, the payments

5    were intended to be material enough to incentivize many brokers in many firms and were likely

6    to have been, for all Wells Fargo funds combined, more than $100 million over a five-year

7    period.  Not all of it was allocable to a single fund, of course, and some of it *was* disclosed

8    (the rule 12b-1 fees, for example).  But the total magnitude of the program and its impact on the

9    individual funds was not revealed.  If investors in all Wells Fargo funds had been warned that

10   over five years $100 million would be spent on matters of *no* benefit to them and of benefit only

11   to the sponsors, many would have passed with thanks.  Invoking the Commission's

12   cease-and-desist rationale, plaintiff concludes that investors should have been warned as to the

13   overall magnitude of the program, all of which had ultimately to be borne, directly or indirectly,

14   by the shareholders.

15          As the Commission has also stated in analogous circumstances, shareholders should also

16   have been warned of the ongoing sponsor conflict of interest created by the persistent need to

17   find sources to meet the large revenue-sharing payments.  For example, in its order against the

18   investment adviser in the *Deutsche Investment* case, the Commission stated:

19              DIMA and DAMI, as fiduciaries, [both investment advisers] had a
                duty to communicate actual and potential conflicts of interest to
20              the Fund Boards and material information that would expose the
                conflicts of interest they faced relating to the use of directed
21              brokerage.  These conflicts included the use of Fund assets to
                reduce SDI's revenue sharing obligations and the possibility that
22              Respondents would benefit if the marketing the distribution
                arrangements led to an increase in assets under management.
23              During the relevant time period, DIMA and DAMI did not
                effectively communicate with the Fund Boards regarding the
24              directed brokerage practice.

25              DIMA and DAMI were primarily responsible for ensuring that the
                disclosures made in the Funds' prospectuses and SAIs accurately
26              described how DIMA and DAMI chose broker-dealers for Fund
                portfolio transactions.  Specifically, Item 16(c) of the Form N-1A

27

28          ────────────────────
            [9] The amended complaint to be filed must include this allegation.  With particularity, it must also quote
        from *each* misleading passage in each prospectus and each SAI for each Wells Fargo fund challenged herein.

United States District Court

For the Northern District of California

> requires a description in the SAI of "how the Fund will select brokers to effect securities transactions for the Fund" and requires that "[i]f the Fund will consider the receipt of products or services other than brokerage or research services in selecting brokers, [the Fund should] specify those products or services." Nonetheless, DIMA and DAMI failed to effectively communicate to the Fund Boards or to shareholders that SDI used fund brokerage commissions to satisfy its revenue sharing agreements. The failure to communicate these facts was a material omission that should have been disclosed to avoid misleading the Fund Boards and shareholders.
>
> When Respondents directed Fund brokerage commissions to satisfy the revenue sharing obligations, they did not ensure that these commissions came from those Funds that were promoted by the broker-dealers in connection with the revenue sharing agreements. Moreover, during the relevant period, Respondents did not apply for and the Commission did not grant an exemption from the statutory provisions that prohibit such joint enterprises or arrangements.

Order at 5 (footnote omitted).

With respect to scienter, a deliberate scheme was allegedly in place to siphon away investors' money for unauthorized purposes. Given the competitiveness among funds for investor dollars, the sponsors had a strong incentive to hide the subject of revenue sharing, a subject that would logically reveal to potential customers that *they* would ultimately have to bear its burden. Using watered-down disclosures in the prospectuses was a way to gloss over the true price of admission to investors and the magnitude of the conflict of interest. The arrangements, moreover, were not reduced to writing and were shrouded in secrecy. By using vague disclosures, the sponsors intended to suppress the fact that the common fund was being diverted for secret compensation to brokers to hype the funds, at least according to the allegations.

It seems true, as defendants state, that all fees were disclosed and no fees — sham or otherwise — were removed from the common fund beyond the total disclosed. But investors were not warned of the size and scope of the established revenue-sharing arrangements and the fact, as alleged, that excessive fees were being authorized in the first place to pay for the revenue-sharing program rather than for the ostensible reasons. Based on the ostensible reasons, investors would have expected some benefit from the fees whereas, as alleged, to the extent of the excess, there was no benefit. Nor were they warned of the adviser's conflict of interest.

**United States District Court**
For the Northern District of California

1    Instead, the sponsors left in place understated disclosures of the type the Commission has held

2    were inadequate.[10]

3         In a similar way, defendants repeat over and again that they prepared their prospectuses

4    and SAIs in strict accordance with Form N-1A.  They also say that the disclosures made were in

5    line with language approved by the Commission, albeit from an earlier era.  That argument was

6    rejected by the Commission in its cease-and-desist orders.  The vague disclosures — written in

7    plain Greek — concealed thriving revenue-sharing schemes.  The muscularity of the programs

8    had grown so large that language adopted in the earlier era concealed the truth, or so it is alleged.

9

10        Defendants insist that nothing was misrepresented about the funds' underlying portfolios.

11   Revenue sharing, they say, had no impact on the net asset value (of the portfolio) used daily to

12   value the mutual fund shares.  The loss, however, was the alleged pilfering of the common fund.

13   Had there been no misuse, the common fund would have been all the greater with all the more

14   for investment.  The situation is analogous to *Zandford*.  The Supreme Court held that a broker

15   who accepts payment for securities that he never intends to deliver or who sells securities with

16   an intent to misappropriate the proceeds violates Section 10 even though no misrepresentation is

17   made concerning the subject stock.  So too here.  The subject companies in the portfolio was not

18   the issue.  The issue was the hidden price of admission, the alleged ongoing subtractions from

19   the common fund.[11]

20        Defendants are correct that the recent cease-and-desist orders all involved directed

21   brokerage.  Here, by contrast, there is no claim, at least no clear-cut claim, that Wells Fargo

22   directed brokerage to anyone.  Without doubt, directed brokerage was an animating factor in the

23   enforcement actions.  But it was not the only factor.  The orders also involved "hard" dollars.

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

25        [10] Contrary to defendants, the proposed pleading adequately pleads the excessiveness of the fees.
     There is no requirement that the *Gartenberg* factors be pled and no decision so holds.  That decision came after
26   a full trial and was not a pleading case; moreover, it involved Section 36(b), not the 1933 and 1934 Acts.
     *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982).

27        [11] And see *Wharf (Holdings), Ltd. v. United International Holdings, Inc.*, 532 U.S. 588, 595–96 (2001).
     In *Wharf*, the Supreme Court held that selling an option for securities while secretly intending not to permit its
28   exercise was a material misrepresentation.  By analogy, selling securities while secretly intending to siphon
     away some of the investors' money for unauthorized purposes was also a material misrepresentation.

As importantly, the Commission's rationale translates fully to a hard-dollars-only situation. "The intense competition we observe," the Commission has stated, "among fund advisers to secure a prominent position in the selling brokers' distribution systems ('shelf space') creates powerful incentives for fund advisers to direct brokerages based on distribution considerations rather than quality and price considerations." 69 Fed. Reg. at 9729. Although directed brokerage involved soft dollars, the same "powerful incentives" apply with equal force to hard dollars. Hard dollars come from fees. The same "powerful incentives" that drove advisers to pay in soft dollars can also drive them to pay in hard dollars and, in turn, to raise fees to generate the hard dollars. As in the cease-and-desist cases, the Wells Fargo revenue-sharing programs had allegedly grown to such a magnitude that defendants resorted to taking excessive fees to pay for ongoing distribution and faced a material conflict of interest due to the magnitude of the program and the ever-present need to find ways to finance it.

Turning to the issue of loss causation, the Supreme Court has recently invalidated our circuit's standard for pleading loss causation in Section 10 actions. Before, the Ninth Circuit had held that it was enough to plead that the investment was actually worth less at the moment of purchase than the market had been led to believe due to the false statement. The Supreme Court, however, observed that a plaintiff investor might hold onto the stock for a long time and many intervening events might affect the value of the stock. One measure of loss causation approved by the Supreme Court was the familiar story of a plummet in the share price after the truth became known. That, however, was only one way to plead loss causation, not the only way. The Supreme Court stated that "ordinary pleading rules are not meant to impose a great burden upon a plaintiff" and that "it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Here, plaintiffs have provided such an indication. They allege that the loss was, at a minimum, the dollars siphoned out of the corpus for undisclosed purposes of no benefit to investors. Every dollar lifted out of the corpus reduced the net assets of the fund and reduced its ability to earn income. Defendants are correct that there was no drop in share value after the

United States District Court

For the Northern District of California

1    truth was revealed.  That is because the underlying portfolio and its net asset value was the same

2    just before and just after.  Dressed up as fees, cash was being misappropriated from the common

3    fund.  The fees were not used for their ostensible purposes but were diverted to support ongoing

4    distribution.  The true price of admission to the fund was greater than was represented.  At least

5    that is the allegation.  It is sufficient at this stage.

6          With respect to transaction causation, the proposed pleading adequately alleges that

7    plaintiffs would not have purchased the funds but for the concealment of the scheme.  This is

8    adequate at the pleading stage.  *In re Daou Sys.*, 411 F.3d 1006, 1025–26 (9th Cir. 2005).

9          Finally, with respect to the issue of reliance, we are concerned here with half-truths.

10   The sale of mutual fund shares carries with it an implied representation that all fees, even high

11   fees, are used only for the authorized purposes and that there are no material conflicts of interest

12   beyond those disclosed.  Prospective investors ordinarily so presume.  They ordinarily presume

13   that mutual fund fees, even if high, will be used for authorized purposes and will not be

14   charades.  When the implied representations are false, as here alleged, then reliance is presumed.

15   *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 192–94 (2d Cir. 1998); *see also Affiliated*

16   *Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972).

17         The foregoing analysis is based on a liberal construction of the proposed new pleading

18   and also on a number of supplements thereto — as well as asides and factoids within various

19   plaintiffs' briefs.  Patchwork best describes the state of the proposed pleading.  Before a final

20   decision on whether to allow a Section 10 claim, this order requires that the proposed pleading

21   be revised to set forth plaintiffs' best case as to all elements, taking nothing for granted.[12]

22   For example, it should, as to each of the five Wells Fargo funds, set forth with specificity

23   every alleged misrepresentation and half-truth, set forth the best case on materiality, and

24   set forth the best case as to scienter by the sponsors, among all other Section 10 elements.

25   Abbreviated motion practice shall then be allowed.

26

27

28
          [12] This latter caveat is necessary because counsel are fond of blaming the Court for their shortfalls, arguing reliance upon some comment by the Court to excuse problems in their pleadings.

In summary, subject to the vetting of a *revised* proposed complaint, a Section 10 claim against the sponsor — Wells Fargo Funds Management (the adviser) and Wells Fargo Funds Trust (the registrant) may proceed.[13]

### 3. BROKER LIABILITY UNDER SECTION 10 FOR NONDISCLOSURE OF REVENUE SHARING.

#### A. Broker Liability for Nondisclosure at the Sponsor Level.

Plaintiffs' best theory for requiring the broker defendants to answer is that they caused misleading prospectuses to be used in connection with the sale of the subject mutual funds. If the prospectus was misleading in a material way, then the action more closely resembles the typical Section 10 class action. The alleged key omissions were that the sponsor of the fund was sneaking money out of the fund to finance distribution beyond the limits allowed by law and/or that the size and scope of the sponsors' revenue-sharing obligations had developed into a conflict of interest.

As alleged, it would be materially deceptive for a sponsor of a fund to compete for investor dollars without disclosing an established practice of misappropriating investors' money. That disclosure obligation would be at the *sponsor* level, however. Whether that disclosure obligation would extend to the *broker* level would depend, among other things, on what the *broker* knew or should plainly have known. In the chain of distribution, the sponsor is at the top. The investor is at the bottom. The broker, if one is involved, is in the middle. Brokers are not privy to all inside information within a fund. Even brokers with revenue-sharing arrangements are not privy to all such information. Brokers are not, therefore, automatically on notice of every wrong committed inside a fund.

From the above summary of the regulatory landscape, one important conclusion is that during most of the alleged class period, a mutual fund and its adviser could have lawfully, within the limits described above, used hard and soft dollars to reward brokerage firms for distribution.

---

[13] At the pleading stage, all well-pled allegations are presumed true for purposes of dismissal motions. The reason that this order uses phrases like "sham," "pilfer" and "misappropriate" is that they capture the essence of the allegations. Contrary to plaintiff (Br. 1), however, in no way has the Court "recognized" that defendant "engaged in a nefarious practice." All that the Court has recognized are the allegations. For all the Court knows, defendants have behaved honorably.

United States District Court
For the Northern District of California

A broker would not necessarily have known that any soft or hard dollars were outside limits. A broker would ordinarily have been reasonable in assuming the payments were within limits. Even a brazen violation at the sponsor level would not have been visible to the broker merely on account of receipt of soft or hard dollars. This bears on scienter.

Significantly, prior to the recent rule changes, directed brokerage was allowed at both the broker level and the sponsor level. Even if an individual broker violated Rule 2830, it would not have followed that the brokerage firm was necessarily alerted to any directed brokerage being outside the sponsor's limits.

The Commission's order against Massachusetts Financial Services Company is a mainstay liberally quoted in the proposed pleading. Contrary to plaintiff, however, it did *not* hold that the bilateral revenue-sharing agreements were unlawful. Rather, the order held that the MFS agreements had not been adequately disclosed. Reciting in the prospectus that MFS might consider sales of shares of the funds as a factor in the selection of brokers to execute portfolio transactions was held to be insufficient disclosure. Critical was the fact that MFS had entered into such arrangements with *approximately one hundred* brokers. In two instances, MFS even had written revenue-sharing agreements.

The size and scope of the program meant that MFS shareholders were at greater risk of bearing extra costs of ongoing distribution than they were being told. There were one hundred such arrangements. The vast scope of the MFS revenue-sharing program was what rendered it material.

Our proposed complaint alleges that Wells Fargo Investments was *one* such broker promoting MFS (Compl. ¶ 89). We may take for granted on this pleading that Wells Fargo Investments was well aware of its own revenue-sharing arrangement with MFS. But, if so, there is nothing in the complaint to indicate that Wells Fargo Investments was aware of the vast scope of MFS' larger network of revenue-sharing arrangements. Only the MFS sponsors and possibly its distributors would ordinarily have had such inside information. Therefore, we must ask the question whether Wells Fargo Investments was on fair notice of the flaw in the MFS prospectus, the flaw being so much larger than the failure to disclose the MFS-Wells Fargo

United States District Court

For the Northern District of California

24

United States District Court

For the Northern District of California

1    arrangement.  Wells Fargo Investments could have reasonably believed that its own arrangement

2    with MFS, by itself, was all within the then-accepted limits of directed commissions.

3    Taking into account all inferences, including those unfavorable to plaintiff, *Gompper v. VISX,*

4    *Inc.*, 298 F.3d 893, 896–97 (9th Cir. 2002), the proposed complaint simply does not set forth

5    facts and circumstances from which we can reasonably draw a strong inference of scienter as to

6    Wells Fargo Investment's knowledge of any larger MFS scheme.  *Simpson v. AOL Time Warner,*

7    *Inc.*, 452 F.3d 1040, 1053 (9th Cir. 2006) (no liability for participating in legitimate transactions

8    that became deceptive only when distorted by the willful or intentional fraud of another party).

9    The same is true for Wells Fargo Investments as to all the other funds.

10              Anticipating this problem, the proposed pleading (at paragraphs 92–93) invokes two

11   different enforcement orders in which the Commission faulted a brokerage firm for relying on a

12   fund prospectus to disclose the brokerage firm's *own* conflict of interest under Rule 2830.

13   That principle is not in doubt.  Wells Fargo Investments, for example, could not have discharged

14   its *own* disclosure duties to its *own* clients by relying on any flawed fund prospectus.

15   *Citigroup Global Markets, Inc.*, Inv. Advisers Act of 1940 Release No. 8557 (Mar. 23, 2005);

16   *Edward D. Jones & Co.*, Inv. Advisers Act of 1940 Release No. 8520 (Dec. 22, 2004).  The two

17   orders, however, did not address our immediate problem of the extent of *broker* knowledge of

18   inside information at the *sponsor* level.  The complaint does not permit the inference that

19   Wells Fargo Investments was aware of the magnitude of the funds' larger revenue-sharing

20   program.

21                      **B.      Broker Liability for Nondisclosure at the Broker Level.**

22              The August 2006 order held that brokers who steer investors into a fund without

23   disclosing any secret compensation for doing so violate Section 10.  The August 2006 order

24   (at page 19), however, reserved the issue whether a proper damage measure could be fashioned.

25   Any damages would have to flow from the inadequate disclosure of the broker's conflict, not

26   from anything the sponsors did wrong.  The measure of damages posited by plaintiff's counsel is

27

28

United States District Court

For the Northern District of California

1   draconian — complete restitution of the commissions and revenue-sharing monies that the

2   brokers received (Br. 13–14):

> In this action against the Broker/Dealer Defendants, Plaintiff
> seeks restitution of the commissions and revenue sharing monies
> that the Broker-Dealer Defendants received, not the total paid by
> the sponsors.  The Broker/Dealer Defendants should refund these
> monies to Plaintiff (and class members) whether or not they knew
> of the other misconduct in which the Shelf Space Funds engaged
> with brokerages not affiliated with Wells Fargo (*e.g.*, Edward
> Jones; Amerprise; etc.).  All that Plaintiff seeks here is that the
> Broker/Dealer Defendants be held responsible for their own
> conduct regarding revenue sharing which was not adequately
> disclosed to Plaintiff and other class members.

9       This proposed measure of damage is unfit for duty.  It seeks a monumental windfall.

10  It would bear no connection to any actual damages suffered by any investor by reason of any

11  broker's failure to disclose its conflict of interest.  For all we know from the proposed complaint,

12  for example, the various funds bought by Mr. Siemers turned out fine.  No caselaw or authority

13  of any kind is cited for plaintiff's audacious damage theory.  Consequently, the Section 10

14  theory is fatally flawed.  Moreover, any proper damages measure for the nondisclosure of the

15  broker conflict would be hopelessly mired in individual issues and would not lend itself to class

16  treatment.  The Section 10(b) action by plaintiff Siemers against the broker defendants is now

17  **DISMISSED WITH PREJUDICE**.  Further leave to amend will not be granted.

18          **4.      SECTION 10 LIABILITY FOR DISTRIBUTOR DEFENDANTS.**

19      The October 24 order held that the second amended complaint had not adequately alleged

20  liability against five defendants under Section 10 of the 1934 Act and Rule 10b-5.  Those five

21  defendants were Stephens, Wells Fargo Funds Distributor, Wells Fargo Funds Management,

22  Wells Capital Management, and Wells Fargo & Co.  Specifically, the order held that the second

23  amended complaint had not alleged "substantial participation or intricate involvement in the

24  preparation of fraudulent statements" by those five defendants.  In other words, the complaint

25  had not established that they were "speakers" for Section 10 purposes.  Finally, the complaint

26  had not alleged sufficient facts to give rise to a strong inference of scienter by those defendants

27  (Oct. 24 Order at 14–18).

28

United States District Court

For the Northern District of California

1    Plaintiff seeks to amend the complaint to cure pleading deficiencies related to his

2    allegations under Section 10.  The proposed third amended complaint revises the allegations

3    against Wells Fargo Funds Management, Wells Fargo Funds Distributor and Stephens.

4    Wells Fargo & Company and Wells Capital Management are no longer included in Count IV.

5    Defendants do not challenge the sufficiency of the proposed amendments as to

6    investment adviser Wells Fargo Funds Management.  Defendants' various submissions focus

7    solely on whether the proposed third amended complaint sufficiently alleges liability by the

8    distributor defendants — Wells Fargo Funds Distributor and Stephens.

9    Most of the complaint's allegations regarding the distributor defendants refer to their

10   receipt of excessive 12b-1 distribution fees (Compl. ¶¶ 63 n.3, 105, 106, 109, 112, 114, 122,

11   153).  One representative passage alleges:  "During the relevant time-frame, compensation and

12   fees paid to the Investment Adviser and Distributor Defendants rose dramatically even though

13   the services provided by these Defendants remained the same, and no additional benefits were

14   provided to the Funds or their investors in return for the additional fees.  As a result, the advisory

15   and distribution fees were excessive" (Compl. ¶ 105).  The complaint plainly alleges several

16   times in this manner that the rule 12b-1 fees paid to the distributors were excessive.  But nothing

17   in the complaint demonstrates that the distributors *knew* that the allegedly excessive fees were

18   the result of improper revenue sharing.  Indeed, the complaint plainly admits that the distributors

19   properly received those fees under the funds' rule 12b-1 plans for financing distribution

20   (Compl. ¶ 114).

21   The complaint states in one place that "the Investment Adviser Defendants and the

22   Distributor Defendants allocated revenue net of certain expenses to the various Wells Fargo &

23   Company affiliates, including WF Investments, based on WF Investments' sales of Wells Fargo

24   Proprietary Funds" (Compl. ¶ 51).  There is no further discussion of the distributors' role in

25   financing the revenue-sharing scheme.  There are thus insufficient allegations in the complaint to

26   support a strong inference that the distributors had the requisite scienter to support Section 10

27   liability.  As with the brokers, the mere receipt of 12b-1 fees by the distributors is not an

28

1    indication of any knowledge of wrongdoing at the sponsor level.  The proposed complaint fails

2    to adequately plead the distributors' scienter.

3        In addition, there are insufficient allegations to support primary liability by the distributor

4    defendants.  Plaintiff suggests that because they were underwriters for the funds, the distributors

5    are *per se* liable under Section 10.  This order disagrees.  The Ninth Circuit has held that

6    "substantial participation or intricate involvement in the preparation of fraudulent statements is

7    grounds for primary liability even though that participation might not lead to the actor's actual

8    making of the statements."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000)

9    (citing *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 628–29 & n. 3 (9th Cir. 1994)).

10   "It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose

11   and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must

12   have had a deceptive purpose and effect."  *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040,

13   1048 (9th Cir. 2006).  "[I]f a defendant's conduct or role in an illegitimate transaction has the

14   principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme

15   to defraud, then the defendant is using or employing a deceptive practice within the meaning of

16   § 10(b)."  *Id.* at 1050.

17       Counsel are wrong to contend that the distributors — as underwriters — are *per se* liable

18   as primary violators under Section 10.  It is true that underwriters may be liable for material false

19   statements made in a registration statement under Section 11 of the 1933 Act.  *See* 15 U.S.C.

20   77k(a).  But counsel provide no support for the theory that the duty of an underwriter under

21   Section 11 of the 1933 Act necessarily translates into liability under Section 10 of the 1934 Act.

22   Those two provisions are separate.  Merely alleging that a defendant is an underwriter is

23   insufficient to establish, for Section 10 purposes, that "the defendant's *own conduct* contributing

24   to the transaction or overall scheme . . . had a deceptive purpose and effect."  *Simpson*, 452 F.3d

25   at 1048.  Stated another way, the mere fact that a defendant is an underwriter does not obviate

26   the requirement that a plaintiff plead facts that satisfy the "substantial participation or intricate

27   involvement" standard established by the Ninth Circuit for Section 10 claims.

28

28

**United States District Court**
For the Northern District of California

1    In response to the second request for further briefing, plaintiff made additional pleading

2    allegations as to defendant Stephens.  In that submission, plaintiff alleged that Stephens provided

3    comments and edits to Wells Fargo Funds Management prior to dissemination of the

4    prospectuses to the public.  Two senior vice presidents of Stephens reviewed the Wells Fargo

5    Funds Prospectuses for accuracy.  The allegations did not change with respect to Wells Fargo

6    Funds Distributor (Doc. No. 203 Exh. A at ¶¶ 30A–30B, 95A–95B).

7    The revised allegations with respect to Stephens fall short of demonstrating

8    "substantial participation or intricate involvement in the preparation of fraudulent statements."

9    The allegations suggest that Stephens participated in the creation of the prospectuses.  But there

10   is no allegation of *substantial* or *intricate* involvement.  As importantly, there are no allegations

11   that the passages of the prospectuses reviewed by Stephens' executives were the passages that

12   were misleading.  Whether the Stephens executives reviewed passages dealing with revenue

13   sharing is also not specified.  There are thus insufficient allegations to establish Section 10

14   liability against Stephens.

15   Accordingly, only the proposed amendments relating to defendant Wells Fargo Funds

16   Management's liability under Section 10 will be allowed.  Otherwise, plaintiff has failed to

17   allege that the distributors had the requisite scienter or that they were intricately involved in the

18   preparation of misleading statements.  Further leave to amend will not be granted.  This means

19   that further amendments relating to Stephens will not be allowed.

20       **5.      SECTION 12 OF THE 1933 ACT.**

21   All Wells Fargo defendants sued under Section 12, taking into account the latest

22   installment to the proposed pleading, are adequately alleged to be "sellers" by the proposed

23   pleading.  The only serious issue is whether a broker can be a "seller."  Given the robust

24   allegations of steering recommendations by the broker defendants, they would ordinarily and

25   easily be classified as "sellers" within the meaning of *Pinter v. Dahl*, 486 U.S. 622 (1988).

26   The whole point of the revenue-sharing regime was to integrate an active team of brokers as part

27   of a continuous syndication of the securities, ever soliciting new dollars.  *Pinter* extended the

28   "seller" group beyond those in the strict chain of title to include any person "who *successfully*

**United States District Court**
For the Northern District of California

1   solicits the purchase," among other requirements.  *Id.* at 647 (emphasis added); *accord*

2   *Harelson v. Miller Fin. Corp.*, 854 F.2d 1141, 1142 (9th Cir. 1988) (Willie Loman-type

3   defendant was "the 'but for cause' of the sale"); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d

4   531, 538 (9th Cir. 1989) (defendants recommended the units and were a substantial and

5   motivating force in the sales to plaintiffs); *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F. Supp.

6   713, 723 (S.D.N.Y. 1990).  Here, it is now adequately alleged that Wells Fargo Investments

7   solicited plaintiff Siemers and proposed plaintiff McKenna to invest in the five Wells Fargo

8   funds in question.  Wells Fargo Investments will be held (along with the other Wells Fargo

9   defendants and Stephens) to answer the Section 12 claim.  (H.D. Vest will be dealt with

10  separately below.)

11          **6.      IS SECTION 36 AN EXCLUSIVE REMEDY
                      PRECLUDING 1933 AND 1934 ACT LIABILITY?**

12          Another defense argument is that any claim ultimately based on excessive fees can only

13  be maintained as a derivative action under Section 36 of the 1940 Act rather than as a direct

14  action under the 1933 and 1934 Acts.  This argument is rejected.  The decisions cited for this

15  proposition do not so hold.  Those decisions merely held that Section 36 claims to recover

16  excessive fees from an investment adviser belong to the company as a whole (and are thus

17  derivative) rather than to shareholders individually (in which case they would be "direct"

18  claims).  Contrary to the defense memorandum, the cited holdings did *not* even discuss whether

19  Section 10 or Section 12 claims could be predicated on the fact scenario involving excessive

20  fees.[14]  Simply put, if a Section 10 or Section 12 claim is otherwise made out, there is nothing in

21  Section 36(b) to suggest that such viable claims evaporate merely because excessive fees can

22  also drive a Section 36(b) claim.

23          **7.      THE SECTION 36 CLAIM.**

24          The August 14 order held that the complaint alleged sufficient facts in Count VI to

25  allege a violation of Section 36(b) of the 1940 Act.  Plaintiff, however, had failed to allege

26

27          [14] *See In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 616, 625–26 (D.N.J. 2005); *In re*

28  *Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 597 (S.D.N.Y. 2006); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 462–64 (D.N.J. 2005); *In re Alliance Bernstein Mut. Fund Excessive Fee Litig.*, No. 04-4885, 2005 WL 2677753 at *3 (S.D.N.Y. Oct. 19, 2005).

United States District Court

For the Northern District of California

that he owned any of the relevant securities on the day the suit began, a requirement. Plaintiff subsequently amended his complaint to allege that he "held the shares of the Wells Fargo Funds as reflected in attachment B [to the Second Amended Complaint] at the time this action was originally filed and has continued, and continues, to hold these shares of the Wells Fargo Funds." Attachment B to the second amended complaint, however, only alleged that plaintiff had owned three out of ninety funds offered by Wells Fargo. Accordingly, the October 24 order held that plaintiff could only maintain a claim under Section 36(b) as to the three Wells Fargo funds he owned. He could not sue on behalf of the 87 Wells Fargo funds that he did not own.

Plaintiff was allowed to seek leave to add plaintiffs who owned other Wells Fargo funds. After plaintiff filed the instant motion and identified several proposed named plaintiffs, it was not clear which proposed plaintiffs would cure the standing problems with respect to the individual funds in Count VI. For Section 36(b) standing purposes, it is important that the fund be continuously owned during the pendency of the action. *See* 15 U.S.C. 80a-35(b) (permitting suit only by "security holder[s] of such registered investment company on behalf of such company"). The Court requested that lead counsel file a supplemental statement indicating which funds were alleged in Count VI, which proposed plaintiffs owned those funds, and when those funds were held.

In response, counsel conceded that out of all the proposed named plaintiffs, *only* lead-plaintiff Siemers held and continues to hold any Wells Fargo funds. Counsel also admitted that Siemers continues to hold only *one* Wells Fargo fund: Wells Fargo Small Cap Growth Fund. Thus, counsel conceded that "Count VI alleges a violation of Section 36(b) of the Investment Company Act of 1940 by the following Wells Fargo fund: Wells Fargo Small Cap Growth Fund." Moreover "[n]o one other than Mr. Siemers alleges claims in the proposed Third Amended Complaint under Count VI for violation of Section 36(b) of the Investment Company Act" (Docket No. 187 at 2).

Accordingly, Count VI may only proceed against Wells Fargo Small Cap Growth Fund, the only Wells Fargo Fund Siemers held and continues to hold. At oral argument, plaintiff's

**United States District Court**
For the Northern District of California

1   counsel requested that plaintiff be allowed to amend Count VI to specify that the scope of

2   Count VI will be limited to Wells Fargo Small Cap Growth Fund.  Defendants agreed to that

3   request.

4        **8.      LIMITING THIS ACTION TO WELLS FARGO FUNDS.**

5        Under Rule 20(a), this order further holds that this action will proceed only as to claims

6   involving a Wells Fargo fund.  All proposed plaintiffs whose claims involve only third-party

7   funds such as Oppenheimer, MFS, Putnam and so on will *not* be joined.  This is an independent

8   ground for decision.

9        The reason is that the two different sets of claims do not arise "out of the same

10  transaction, occurrence, or series of transactions or occurrences" within the meaning of

11  Rule 20(a).  Each fund adviser had its own brand of revenue sharing with its unique set of

12  purported board approvals and with its own network of distributors and brokers.  Each fund

13  adviser had its own prospectuses and SAIs.  Each fund had its own investors.  It would be

14  necessary in each instance to understand the particular revenue-sharing program, how it was

15  justified to each fund board, the parameters of each rule 12b-1 plan, how the revenue sharing

16  exceeded (if at all) the regulatory limits, how it was described in the prospectus and SAI, and

17  what the rationales for disclosure and the extent of reasonable care were.  All that the various

18  revenue-sharing stories would have in common would be that one of our broker defendants

19  touched the chain of distribution.  That is too attenuated to qualify as the same transaction or

20  occurrence.  At least, the various Wells Fargo funds had in common the same cast of characters

21  and an integrated program of revenue sharing.  We must remember that the proposed additional

22  plaintiffs are just that — proposed new parties.  They have no right to joinder.  The liberal rules

23  of amendment do not extend to joinder of new parties.

24       This means that Forrest McKenna may join as a plaintiff in Counts I through V but only

25  as to his claims against the Wells Fargo Advantage Large Company Growth Fund, the

26  Wells Fargo Advantage Total Return Bond Fund, and the Wells Fargo Advantage Small Cap

27  Growth Fund.  He may not assert claims involving non-Wells Fargo funds.  Plaintiff Siemers has

28  already asserted claims against the Wells Fargo Advantage Small Cap Growth Fund, the Wells

**United States District Court**
For the Northern District of California

1  Fargo Montgomery Emerging Markets Focus Fund, and the Wells Fargo Diversified Equity

2  Fund.  Under Rule 21 (last sentence), all of Siemers' claims involving non-Wells Fargo funds

3  are hereby **SEVERED AND STAYED** pending resolution of the main event against Wells Fargo.

4  All other proposed new plaintiffs will not be joined.  Their claims do not involve Wells Fargo

5  funds.

6  This also means that H.D. Vest must be and is hereby **DISMISSED** from this action, there

7  being no plaintiff with standing to sue H.D. Vest as to any Wells Fargo fund.  In addition, no

8  viable claim has been stated against any broker herein under Section 10, as explained already.

9  Therefore, the Section 10 claim against H.D. Vest would, at all events, have to be **DISMISSED** for

10  this independent reason.

11  To clarify, however, the relevant scope of Wells Fargo funds payments to brokers goes

12  beyond payments to its own affiliates and extends to payments to any and all brokers.

13  The fundamental issue is whether the Wells Fargo fund sponsors were, directly or indirectly,

14  siphoning away investors' money to pay for ongoing distribution.  If Wells Fargo paid money to

15  non-affiliated brokers to be on their "platform," then that was also money for ongoing

16  distribution.  Investors in Wells Fargo funds would have as much right to complain about

17  diversions to the non-affiliated brokers as to the affiliated brokers.  Therefore, the limitation of

18  this action to Wells Fargo funds does not limit our discovery gaze to alleged diversions only to

19  Wells Fargo affiliates.

20  **CONCLUSION**

21  This action will proceed as to five representative Wells Fargo funds, as to the only two

22  representatives having purchased such funds, and as to the "sellers" involved in promoting those

23  funds.  The funds in suit are Wells Fargo Advantage Small Cap Growth Fund, Wells Fargo

24  Montgomery Emerging Market Focus Fund, Wells Fargo Diversified Equity Fund, Wells Fargo

25  Advantage Large Company Growth, and Wells Fargo Advantage Total Return Bond Fund.

26  The viable plaintiffs are Ronald Siemers and Forrest McKenna.  Mr. McKenna may join as a

27  plaintiff but only on Counts I through V.  His other claims involving nonproprietary funds will

28

not be allowed (and he is free to assert them elsewhere).  Since they had no Wells Fargo funds, the other proposed plaintiffs may not join — and their claims may be asserted elsewhere.

The following claims will proceed as to the following defendants:

| | |
|---|---|
| Count I (§ 12(a)(2)) | Wells Fargo Investments |
| Count II (§ 12(a)(2)) | Wells Fargo Funds Trust; Wells Fargo Funds Distributor; Stephens |
| Count III (§ 15) | Wells Fargo & Co. |
| Count IV (§ 10) | Wells Fargo Funds Management; Wells Fargo Funds Trust |
| Count V (§ 20(a)) | Wells Fargo & Co. |
| Count VI (§ 36(b)) | Wells Fargo Funds Management; Wells Fargo Investments; Wells Capital Management; Stephens |

All other claims by Siemers involving Wells Fargo funds are **DISMISSED WITH PREJUDICE**.  All other claims by Siemers involving non-Wells Fargo funds are **SEVERED AND STAYED**.  H.D. Vest is **DISMISSED WITHOUT PREJUDICE** as a defendant.  (This is without prejudice because no plaintiff with standing to sue H.D. Vest has ever been joined as a party; therefore, no H.D. Vest claim has ever been adjudicated.)  Except to the extent stated herein, all pending pleading motions are **DENIED**.  To the extent of any inconsistency, this order supersedes the August 14 and October 24 orders.

By **MARCH 21, 2007**, plaintiffs' counsel shall file a revised third amended complaint identical to the existing proposal except that it must conform strictly to the rulings herein, deleting such parties and claims as necessary to conform (all appellate rights preserved as to such deletions).  The severed claims (by Siemers) shall be ignored and deleted for now.  The new pleading must identify the five individual Wells Fargo funds and the specific circumstances of their purchases by Siemers and McKenna, pleading with as much particularity as possible the

**United States District Court**
For the Northern District of California

specific facts pertaining to the individual Wells Fargo funds. Without limitation, this must include the alleged misleading passages in each prospectus used for the five funds. With respect to Count IV, counsel shall allege with particularity their best case on scienter and materiality concerning the defendants still in that count. It should be long on facts and short on gasconades. The Section 10 claim against the brokers shall be deleted (all appellate rights preserved).

The new pleading must also include facts common to all ninety-plus Wells Fargo funds on which plaintiffs rely to establish their claims. These will do double duty. They will relate to the elements of the claims, such as scienter and materiality. They will also relate to the suitability of class treatment, including the possibility that all ninety-plus Wells Fargo funds will be at issue. Whether plaintiffs will be allowed to represent all investors in all ninety-plus Wells Fargo funds under Rule 23 will be reserved for the class-certification stage. So too with the supposed conflict of interest by counsel for lead plaintiff.

With reluctance, the Court will allow a further Rule 12 motion. The reason is that we have not yet seen the final and revised proposed pleading. It is important that the revised pleading meet PSLRA and Rule 9(b) standards. Any such motion, however, shall be directed solely to Count IV (the Section 10(b) claim), even then, solely as to issues of scienter and materiality. Each side (defense filing together) shall have a total of fifteen pages (all in our now-familiar format) of which movants may reserve up to five pages for reply. The motion shall be filed on **MARCH 28, 2007**, the opposition on **APRIL 4**, the reply on **APRIL 6, EACH BY NOON**. By **APRIL 13, 2007**, defendant shall answer (except to the extent of a partial dismissal). The class-certification motion shall be filed on **APRIL 19** to be heard on a 35-day track. The case schedule otherwise remains unchanged.

   **IT IS SO ORDERED.**

Dated:  March 9, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE