**GUTRIDE SAFIER LLP**
Michael R. Reese (Cal. State Bar No. 206773)
Kim E. Richman (admitted *pro hac vice*)
230 Park Avenue, Suite 963
New York, New York 10169
Telephone:    (212) 579-4625
Facsimile: (212) 253-4272

        - and -

**GUTRIDE SAFIER LLP**
Adam J. Gutride (Cal. State Bar No.181466)
Seth A. Safier (Cal. State Bar No. 197427)
Kate J. Stoia (Cal. State Bar No. 183471)
835 Douglass Street
San Francisco, California 94114
Telephone:  (415) 271-6469
Facsimile:  (415) 449-6469

*Court Appointed Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD SIEMERS and FORREST MCKENNA, Individually And On Behalf Of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>        vs.<br><br>WELLS FARGO & COMPANY, WELLS FARGO INVESTMENTS, LLC, WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS CAPITAL MANAGEMENT INC., STEPHENS INC., WELLS FARGO FUNDS DISTRIBUTOR, LLC, and WELLS FARGO FUNDS TRUST,<br><br>                              Defendants. | Case No. 05-04518 WHA<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATION OF THE INVESTMENT COMPANY ACT**<br><br>**JURY TRIAL DEMANDED** |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATION OF THE INVESTMENT COMPANY ACT   — Case No.:  05-cv-4518 (WHA)

Lead Plaintiff Ronald Siemers and plaintiff  Forrest McKenna (collectively "Plaintiffs")
by and through their counsel, allege the following based upon the investigation of counsel, which
included a review of United States Securities and Exchange Commission ("SEC") filings, as well
as other regulatory filings, reports, and advisories, press releases, and media reports about Wells
Fargo & Company and its related entities also named herein as defendants (collectively
"Defendants" or "Wells Fargo").  Plaintiffs believe that substantial additional evidentiary support
will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This Third Amended Complaint is designed to comply with the Order Identifying
Claims To Proceed And Dismissing All Other Claims And Granting Motion To Amend In Part,
dated March 9, 2007 ("Order Identifying Claims", Dkt. 248).  Consistent with that Order,
Plaintiffs do not here restate claims that have been severed and stayed.  Nevertheless, Plaintiffs
preserve such claims and will replead them when authorized by the Court.  Plaintiffs also do not
restate claims that have been dismissed or state claims as to which leave to amend was not
granted but reserve their rights with respect to all such claims.

2.      This is a federal class action arising out of Defendants' failure to disclose their
unlawful and deceitful course of conduct that was designed to improperly enrich Defendants to
the detriment of Plaintiffs and other members of the Class.  This claim is brought by Plaintiffs
against Wells Fargo on behalf of a Class (defined below) consisting of all persons or entities who
purchased one or more of the Wells Fargo Funds, from November 4, 2000 through June 8, 2005,
inclusive (the "Class Period").

3.      Defendant Investment Advisers and Distributors to the Wells Fargo Funds (as
defined below) created undisclosed material conflicts of interest with members of the Class, by
entering into revenue-sharing agreements with brokerages and selling agents who sold the Wells
Fargo Funds, including without limitation Defendant Wells Fargo Investments.  The Investment
Advisers and Distributors financed these arrangements by illegally charging excessive and
improper fees to the Wells Fargo Funds and their investors that should have been invested in the
underlying portfolio.  Defendants did not disclose to investors, at the time of purchase, their pre-

existing and ongoing revenue sharing arrangements, but rather knowingly hid such information by way of material omissions and half-truths in the prospectuses and other offering documents.

4.     Defendant Wells Fargo Investments solicited investments in the Wells Fargo Funds and recommended such investments to its clients, without disclosing that it was a recipient of such kickbacks.  The NASD has fined and censured Wells Fargo Investments millions of dollars for its conduct accepting such kickbacks, which included its role in this scheme. Likewise, the NASD and SEC have fined and censured broker-dealers such as American Express for failure to disclose the kickbacks paid to the broker-dealers by the Wells Fargo Defendants.

5.     Defendants' sales practices created a material insurmountable conflict of interest between themselves and their clients by using investor assets to provide monetary incentives to broker/dealers to sell Wells Fargo Funds, sales of which increased Defendants' overall profits, but improperly diminished investors' returns.  Defendants failed to disclose its kickback scheme, knowing that if the truth were revealed, no reasonable investor would invest in the Wells Fargo Funds. This conflict of interest created by Defendants' failure to disclose these incentives violates federal securities laws. Furthermore, Plaintiffs and other members of the Class paid fees and commissions that they would not have paid otherwise had the kickback scheme been disclosed, and, as result, received lower returns from their investments.

6.     In engaging in this conduct, the Broker/Dealer, Investment Advisers, Distributors, and Control Person Defendants violated the Securities Act of 1933.  In addition, the Investment Advisor, Distributors, and Control Person Defendants violated the Securities Exchange Act of 1934.  Furthermore, the Investment Advisers, Investment Subadviser and Distributors violated the Investment Company Act of 1940 with respect to the Wells Fargo Advantage Small Cap Growth Fund.

7.     The truth was finally disclosed in part on June 8, 2005, the end of the Class Period, when the NASD fined and censured Wells Fargo Investments for its involvement in this insidious scheme that betrayed the trust of its clients.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

2

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; Section 22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v; and Sections 36(b) and 48(a) of the Investment Company Act ("ICA"), 15 U.S.C. §§ 80a-33(b), 80a-35(a), 80a-35(b), 80a-43 and 80a-47(a); and 28 U.S.C. §§ 1331, 1337 and 1367(a).

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391.  Substantial acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information, occurred within this District.  Defendant Wells Fargo is headquartered in San Francisco.

10.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

11.     Court appointed Lead Plaintiff Ronald Siemers, a client of Wells Fargo Investments, purchased shares of the Wells Fargo Funds during the Class Period and was thereby damaged.  The Wells Fargo Funds acquired by Mr. Siemers are included in Mr. Siemers certification attached hereto as Exhibit A.  Mr. Siemers held the shares of the Wells Fargo Advantage Small Cap Growth Fund as reflected in attachment A at the time this action was originally filed and has continued, and continues, to hold these shares of the Wells Fargo Advantage Small Cap Growth Fund.

12.     Forrest McKenna, a client of Wells Fargo Investments, purchased shares of the Wells Fargo Funds during the Class Period and was thereby damaged.  The Wells Fargo Funds acquired by Mr. McKenna are included in Mr. McKenna's certification attached hereto as Exhibit B.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

3

**The Parent Company**

13.     Wells Fargo & Company is the ultimate parent of all Defendants named in this Complaint other than Stephens, Inc. and is incorporated in Delaware.  Wells Fargo & Company is a diversified financial services company providing banking, insurance, investments, mortgage and consumer finance services.  Through its subsidiaries, Wells Fargo & Company also markets, sponsors, and provides investment advisory, distribution, and administrative services to mutual funds, including the Wells Fargo Funds.  Defendant Wells Fargo & Company is headquartered at 420 Montgomery Street, San Francisco, California 94104.  It was the ultimate beneficiary of the secret plan and scheme to drive new investors into the Wells Fargo Funds through the kickback scheme alleged herein.  Defendant Wells Fargo & Company is herein referred to as the "Control Person Defendant."

**The Broker/Dealer**

14.     Defendant Wells Fargo Investments, LLC ("WF Investments") is a broker/dealer. WF Investments received kickback payments from the Investment Adviser Defendants during the Class Period that pushed clients into purchasing the Wells Fargo Funds in exchange for financial gain.  The firm's address is 420 Montgomery St., San Francisco, California 94104.

15.     Defendants WF Investments will be referred to herein as the "Broker/Dealer Defendant."

**The Investment Advisers**

16.     Defendant Wells Fargo Funds Management, LLC ("the Fund Management Defendant" or "WFFM") is a Delaware corporation registered as an investment adviser under the Investment Advisers Act.  Its offices are located at 525 Market St., San Francisco, California 94105.  It is an indirect, wholly-owned subsidiary of Wells Fargo & Company.  Prior to March 1, 2001, the Fund Management Defendant existed as a division or department of Wells Fargo Bank, N.A., rather than as a separate legal entity, but at all times it has acted in the capacities described herein.  For example, in the prospectuses dated February 1, 2001, the Fund Management Defendant stated that it had been created in "early 2001" but referenced its existence as a fund

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

4

manager (under the ownership of Wells Fargo & Company) prior to that date, stating, "As of September 30, 2000, Funds Management and its affiliates managed over $514 billion in assets."

17.     The Investment Adviser is responsible for implementing the investment policies and guidelines for the Wells Fargo Funds and for supervising the sub-adviser responsible for their day-to-day management, including the placing of orders for the purchase and sale of portfolio securities.  In return, the Investment Adviser receives fees calculated as percentage of net assets under management.

18.     As of June 30, 2004, the Investment Adviser managed over $75 billion in Wells Fargo Funds mutual fund assets.  In breach of their fiduciary duties, the Investment Adviser Defendants (as defined below) provided self-serving information to the Funds' Board of Trustees and created a secret plan with broker/dealers to promote the Wells Fargo Funds which resulted in the Funds' investors footing the bill.

**Investment Sub-Adviser**

19.     Defendant Wells Capital Management Inc. ("Wells Capital Management") is an affiliate of Funds Management, a sub-adviser for each of the Funds, and is responsible for the day-to-day investment management activities of the Funds.  Wells Capital Management is compensated by the Investment Advisers for its services as adviser.  It is located at 525 Market St., San Francisco, California 94105.

20.     Defendant Wells Capital Management is also referred to herein as the "Investment Sub-Adviser."

**The Distributors**

21.     Wells Fargo Funds Distributor, LLC is the distributor of all Wells Fargo Funds. Wells Fargo Distributor is located at 525 Market Street, San Francisco, California 94105 and is an affiliate of the Fund Management Defendant.  According to the Wells Fargo Funds prospectuses: "Wells Fargo Funds Distributor, LLC serves as the principal underwriter distributing securities of the Funds on a continuous basis" during the Class Period. *see* April 11, 2005 prospectuses for Wells Fargo Advantage Small Cap Growth Fund.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

5

22.     Defendant Stephens Inc. served as the Distributor of the Wells Fargo Funds until July 26, 2004.  Stephens Inc. is located at 111 Center Street, Little Rock, Arkansas 72201. According to the Wells Fargo Funds prospectuses**:** "Stephens served as the principal underwriter distributing securities….on a continuous basis" during portions of the Class Period.  *See* April 11, 2005 prospectuses for Wells Fargo Advantage Small Cap Growth Fund.

23.     Defendant Stephen Inc. and Wells Fargo Funds Distributor, LLC., will be collectively referred to as the "Distributor Defendants".

**The Registrant**

24.     Defendant Wells Fargo Funds Trust is the Registrant of all the Wells Fargo Funds for the purposes of filing financials with the SEC, under which the Wells Fargo Funds are organized as several portfolios/series.  Defendant Wells Fargo Funds Trust is an open-ended management company incorporated in Delaware and is registered with the SEC under the Investment Company Act.  Wells Fargo Funds Trust has its principal executive offices at 525 Market Street, San Francisco, California  94105.  Defendant Wells Fargo Funds Trust is herein referred to as the "Registrant Defendant."

## SUBSTANTIVE ALLEGATIONS

**Background**

25.     Wells Fargo provides banking, insurance, investments, mortgage and consumer finance services to more than 23 million customers through an international network of over 6,160 financial services offices, the internet and other distribution channels.  Wells Fargo has $435 billion in assets and over 150,000 employees.  Wells Fargo calls its financial consultants "team members" and states on its website that the "team members" will "provide sound financial advice for customers … and create new wealth for them."  WellsFargo.com, Vision and Values: What is Wells Fargo, http://www.wellsfargo.com/ invest_relations/vision_values/4.

26.      Investors often turn to financial consultants for guidance on savings and retirement vehicles that will maximize the growth of their assets.  Brokers, such as those at Wells Fargo Investments, refer to themselves as financial consultants. Wells Fargo states on its website that among its core values are that its employees "[v]alue and reward open, honest, two-way

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

6

communication…[a]void any actual or perceived conflict of interest…[and] [c]omply with the letter and the spirit of the law."  WellsFargo.com, Vision and Values: What Are Our Values, http://www.wellsfargo.com/invest_relations/vision_values/11.  Indeed, the "Wells Fargo Team Members Code of Ethics and Business Conduct" states that team members must avoid conflicts of interest or the appearance of conflicts of interest, and also notes that it is unlawful for team members to accept anything of value from any person intending to be influenced or rewarded in connection with any business or transaction of Wells Fargo.  WellsFargo.com, Wells Fargo Team Members Code of Ethics and Business Conduct, June 1, 2004, at 6, http://www.wellsfargo.com/ pages/about/corporate/ethics/team_member_code_of_ethics_2004.pdf.  These internally-published prohibitions on conflicts of interest are, of course, in addition to the matrix of market regulations governing broker/dealers and mutual fund companies that prohibit such conduct.

27.     However, Defendants' mutual funds sales practices clearly contradict their statements made to investors.  Undisclosed conflict of interests were rampant in the relationships between Defendants and mutual fund investors who are members of the Class.

28.     The kickbacks paid by the Wells Fargo Funds were in the form of "revenue sharing."  Revenue sharing occurs when a mutual fund's investment adviser or its affiliate makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that fund over other funds.  Revenue sharing arrangements are problematic because they reduce the assets of the funds for a purpose that is not disclosed to investors.  In addition, broker/dealers cannot uphold their fiduciary responsibilities when they choose to include or exclude a fund based on the fund's participation in a revenue sharing arrangement rather than based on the benefit to the investor without informing the investor.  The SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds."  69 Fed. Reg. 6438, 6441 n.21 (Feb.10, 2004)

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

7

29.     According to Wells Fargo documents, payments from the Wells Fargo Funds were based upon the amount of assets of the Wells Fargo Fund held under management, as well as on the amount of sales of the Wells Fargo Funds.

### PLAINTIFFS' PURCHASES

30.     Plaintiff Ronald Siemers purchased the Wells Fargo Funds at issue based upon the recommendations of his WFI brokers/financial consultants.  Mr. Siemers made the following purchases based upon the following recommendations by his WFI brokers/financial consultants during the Class Period:

a.     On or about January 1, 2000, John Ingwalson ("Ingwalson"), Mr. Siemers' WFI broker/financial consultant at the time, had a face-to-face meeting with Siemers that took place at Ingwalson's WFI offices located in St. Paul, Minnesota.  During that meeting, Ingwalson recommended to Mr. Siemers how Siemers should invest Siemers' annual bonus he had just received.  Ingwalson recommended to Siemers that Siemers make purchases of Wells Fargo Diversified Equity Fund (NVDAX) and continue to do so on a monthly basis.  Based upon that recommendation, Mr. Siemers made monthly purchases of Wells Fargo Diversified Equity Fund (NVDAX) on a monthly basis throughout the Class Period as reflected in Exhibit A attached hereto.

b.     On or about February 20, 2004, Steve Sullivan ("Sullivan"), Mr. Siemers' WFI broker/financial consultant at the time, had a face-to-face meeting with Mr. Seimers that took place at Sullivan's WFI offices in St. Paul, Minnesota. During that meeting, Sullivan recommended to Mr. Siemers that he purchase shares of the Wells Fargo Advantage Small Cap Growth Fund (MNSCX) and Wells Fargo TR Montgomery Emerging Markets Focus Fund (MFFAX).  Based upon that recommendation, Mr. Siemers purchased shares of Wells Fargo Advantage Small Cap Growth Fund (MNSCX) on February 20, 2004 and shares of Wells Fargo TR Montgomery Emerging Markets Focus Fund (MFFAX) on February 23, 2004 as reflected in Exhibit A attached hereto.

31.     Forrest McKenna ("McKenna") purchased the Wells Fargo Funds at issue based upon the recommendations of his WFI broker/financial consultant, Ty Sell ("Sell").  McKenna

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

8

made the following transactions in Wells Fargo Funds based upon the recommendations by Sell during the Class Period as follows:  On or about May 3, 2001, Sell had a telephone conversation from Sell's office in Flagstaff, Arizona with McKenna located in Bullhead City, Arizona during which Sell recommended to McKenna that McKenna buy shares of Wells Fargo Advantage Large Company Growth mutual fund and Wells Fargo Advantage Small Cap Growth mutual fund.  Based upon that recommendation, McKenna purchased, on May 3, 2001, 191.84 shares of Wells Fargo Advantage Large Company Growth mutual fund and 252.18 shares of Wells Fargo Advantage Small Cap Growth mutual fund as reflected in Exhibit B attached hereto.

### THE WELLS FARGO FUNDS' PROSPECTUSES, THEIR STATEMENTS OF ADDITIONAL INFORMATION AND DEFENDANTS' PUBLIC STATEMENTS WERE MATERIALLY FALSE AND MISLEADING REGARDING THE KICKBACK ARRANGEMENTS

32.    The kickback activities engaged in by Defendants as described herein created conflicts of interest with respect to the financial consultants' investment advice given to their clients and the management of their client accounts.  These conflicts of interest were not disclosed to Plaintiffs and the Class, and were actively concealed from investors.  Disclosure of these sales incentives and compensation structures were necessary for Wells Fargo's clients to make informed investment decisions.

33.    Wells Fargo disclosed information to its customers concerning mutual fund purchases primarily through supplying customers with the prospectuses and if requested, the statements of additional information ("SAIs") issued by the mutual funds.

34.    A mutual fund's prospectus and its SAIs are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.  See Plain English Disclosure, SEC Release Nos. 33-7497, 34-39593 (Oct. 1, 1998) (to be codified at 17 C.F.R. pts. 228, 229, 230, 239 and 274).

35.    Prior to investing in any of the Wells Fargo Funds, Plaintiffs and each member of the Class were entitled to receive the appropriate prospectuses.  The SAI is not distributed to

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

9

investors, but is available to them on request.  The prospectuses and SAIs were deceptive and misleading as they failed to disclose Defendants' practice of steering investors into Wells Fargo Funds.

36.    Each of the Wells Fargo Funds prospectuses and their SAIs issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them.  As seen below, each of the prospectuses and their SAIs contained the same materially false and misleading statements and omissions regarding revenue sharing.

37.    Wells Fargo issued prospectuses annually for its Wells Fargo Funds.  These prospectuses were written by the Investment Adviser Defendant.  Accordingly to sworn deposition testimony in the above-captioned matter by a Wells Fargo Funds Management, LLC F.R.C.P. 30(b)(6) corporate representative (Karla Rabusch – President of Defendant Wells Fargo Funds Management, LLC during the Class Period) –the prospectuses were created using a common template such that the language contained in the various prospectuses was consistent.  Moreover, during the Class Period, the Investment Adviser Defendant often issued a single annual prospectus that pertained to a number of different Wells Fargo Funds.

**Exemplar Prospectus:  February 1, 2000 Prospectus**

38.    On or about February 1, 2000 Wells Fargo issued a single prospectus  that covered the following Wells Fargo Funds: Wells Fargo Diversified Equity Fund, Diversified Small Cap Fund, Equity Income Fund, Equity Index Fund, Equity Value Fund, Growth Fund, Growth Equity Fund, International Fund, International Equity Fund, Large Company Growth Fund, Small Cap Growth Fund, and Small Cap Opportunities Fund ("Feb. 1, 2000 Stock Fund Propspectus"). —The Feb. 1, 2000 Stock Fund Prospectus provided in relevant part as follows:

39.    First, the prospectus discussed the funds' "Fund—Objective— Principal Strategy" and stated:

> Diversified Equity Fund. Seeks long-term capital appreciation with moderate annual return volatility.  The Fund is a Gateway fund that invests in five different equity investment styles--an index style, an equity income style, a large company style, a diversified small cap style and an international style to minimize the volatility and risk of

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

10

investing in a single equity investment style. The Fund currently invests in 10 core portfolios.

* * *

Large Company Growth Fund. Seeks long-term capital appreciation. The Fund is a Gateway fund that invests in the common stock of large, high- quality domestic companies that have superior growth potential. We consider "large" companies to be those whose market capitalization is greater than the median of the Russell 1000 Index, which is considered a mid- to large- capitalization index.

Small Cap Growth Fund.  Seeks long-term capital appreciation.We invest in common stocks issued by companies whose market capitalization falls within the range of the Russell 2000 Index, which is considered a small capitalization index. We invest in the common stocks of domestic and foreign issuers we believe have above-average prospects for capital growth, or that may be involved in new or innovative products, services and processes.

40.     This discussion of the funds' objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

41.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

11

SHAREHOLDER FEES

<TABLE>
<CAPTION>

|  | All Funds | | |
| --- | --- | --- | --- |
|  | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the lower of the Net Asset Value ("NAV") at purchase or the NAV at redemption) | None/1/ | 5.00% | 1.00% |

</TABLE>

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)

<TABLE>
<CAPTION>

|  | Diversified Equity Fund | | | Diversified Small Cap Fund | |
| --- | --- | --- | --- | --- | --- |
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.86% | 0.86% | 0.86% | 0.99% | 0.99% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| Other Expenses/2/ | 0.73% | 0.73% | 1.40% | 0.87% | 0.96% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.59% | 2.34% | 3.01% | 1.86% | 2.70% |
| Fee Waivers/3/ | 0.59% | 0.59% | 1.26% | 0.46% | 0.55% |
| NET EXPENSES | 1.00% | 1.75% | 1.75% | 1.40% | 2.15% |

</TABLE>

<TABLE>
<CAPTION>

|  | Growth Equity Fund | | | International Fund | |
| --- | --- | --- | --- | --- | --- |
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 1.07% | 1.07% | 1.07% | 1.00% | 1.00% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| Other Expenses/2/ | 0.77% | 0.86% | 0.91% | 1.24% | 1.22% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.84% | 2.69% | 2.73% | 2.24% | 2.97% |
| Fee Waivers/3/ | 0.34% | 0.44% | 0.48% | 0.49% | 0.47% |
| NET EXPENSES | 1.50% | 2.25% | 2.25% | 1.75% | 2.50% |

</TABLE>

/1/  Class A shares that are purchased at NAV in amounts of $1,000,000 or more
     may be assessed a 1.00% CDSC if they are redeemed within one year from the
     date of purchase. See "A Choice of Share Classes" for further information.
     All other Class A shares will not have a CDSC.

22 Stock Funds Prospectus
<PAGE>

Summary of Expenses
-------------------

<TABLE>
<CAPTION>

|  | Equity Income Fund | | | Equity Index Fund | | Equity Value Fund | | | Growth Fund | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|  | 0.75% | 0.75% | 0.75% | 0.25% | 0.25% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
|  | 0.00% | 0.75% | 0.75% | 0.00% | 0.60% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
|  | 0.65% | 0.63% | 0.55% | 0.60% | 0.71% | 0.81% | 0.86% | 0.70% | 0.69% | 0.74% |
|  | 1.40% | 2.13% | 2.05% | 0.85% | 1.71% | 1.56% | 2.36% | 2.20% | 1.44% | 2.24% |
|  | 0.30% | 0.28% | 0.20% | 0.14% | 0.25% | 0.38% | 0.43% | 0.27% | 0.32% | 0.37% |
|  | 1.10% | 1.85% | 1.85% | 0.71% | 1.46% | 1.18% | 1.93% | 1.93% | 1.12% | 1.87% |

</TABLE>

<TABLE>
<CAPTION>

|  | International Equity Fund | | | Large Company Growth Fund | | | Small Cap Growth Fund | | | Small Cap Opportunities Fund | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|  | 1.00% | 1.00% | 1.00% | 0.75% | 0.75% | 0.75% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
|  | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.09% | 1.28% | 1.33% | 0.55% | 0.66% | 0.66% | 0.96% | 1.07% | 0.79% | 0.76% | 0.56% |
| 2.09% | 3.0_% | 3.3_% | | 1.6_% | | | | | | 2.11% |
| 0.34% | 0.53% | 0.58% | 0.10% | 0.41% | 0.41% | 0.57% | 0.68% | 0.40% | 0.26% | 0.06% |
| 1.75% | 2.50% | 2.50% | 1.20% | 1.75% | 1.75% | 1.29% | 2.04% | 2.04% | 1.40% | 2.15% |

</TABLE>

    /2/ Other expenses are based on estimated amounts for the current fiscal
        year and reflect the impact of fund mergers, if applicable, which
        occurred on November 6, 1999.
    /3/ Fee waivers are contractual and apply for one year from the closing date
        of the reorganization (two years for the Equity Income Fund). After this
        time, the Advisor, with Board approval, may reduce or eliminate such
        waivers.

                                        Stock Funds Prospectus 23

<PAGE>

42.     The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

43.     The prospectus next discusses "Organization and Management of the Funds" as follows:

> A number of different entities provide services to the Funds. This section shows how the Funds are organized, lists the entities that perform different services, and explains how these service providers are compensated. Further information is available in the Statement of Additional Information for the Funds.

> **About Wells Fargo Funds Trust**

> Wells Fargo Funds Trust (the "Trust") was organized as a Delaware business trust on March 10, 1999. The Board of Trustees of the Trust supervises each Fund's activities, monitors its contractual arrangements with various service providers and decides upon matters of general policy.

>                                    * * *

> The Board of Trustees of the Trust supervises the Funds' activities and approves the selection of various companies hired to manage the Funds' operation. The major service providers are described in the diagram below. Except for the advisors, which require shareholder vote to change, if the Board believes that it is in the best interest of the shareholders it may make a change in one of these companies.

>                                    * * *

> **The Investment Advisor**

> Wells Fargo Bank provides portfolio management and fundamental security analysis services as the advisor for the Funds. Wells Fargo Bank, founded in 1852, is the oldest bank in the western United States and is one of the largest banks in the United States. Wells Fargo Bank is a wholly owned subsidiary of Wells Fargo & Company, a national bank holding company. As of September 30, 1999, Wells Fargo Bank and its affiliates managed over $129 billion in assets. For providing these services, Wells Fargo Bank is entitled to receive fees as described in the "Summary of Expenses" section at the front of this Prospectus.

> The Growth Balanced Fund is a Gateway Fund that invests in various core portfolios. Wells Fargo Bank is entitled to receive an investment advisory fee of 0.25% of the Fund's average annual net assets for providing advisory services, including the determination of the asset allocations of the Fund's investments in various core portfolios. Wells Fargo Bank also acts as the Advisor to, and is entitled to receive a fee from, the core portfolios. The total amount of investment advisory fees paid to Wells Fargo Bank as a result of the Fund's investments varies depending on the Fund's allocation of assets among the various core portfolios.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

12

**Dormant Investment Advisory Arrangements**

Under the existing investment advisory contract for the Funds, Wells Fargo Bank has been retained as an investment advisor for Gateway Fund assets redeemed from a core portfolio and invested directly in a portfolio of securities. Wells Fargo Bank does not receive any compensation under this arrangement as long as a Gateway Fund invests substantially all of its assets in one or more core portfolios. If a Gateway Fund redeems assets from a core portfolio and invests them directly, Wells Fargo Bank receives an investment advisory fee from the Gateway Fund for the management of those assets.

**The Sub-Advisors**

Wells Capital Management Incorporated ("WCM"), a wholly owned subsidiary of Wells Fargo Bank, N.A., is the sub-advisor for the Equity Income, Equity Index, Equity Value, Growth, International Equity and Small Cap Growth Funds. In this capacity, it is responsible for the day-to-day investment management activities of these Funds. As of June 30, 1999, WCM provided advisory services for over $71 billion in assets.

Peregrine Capital Management, Inc. ("Peregrine"), a wholly owned subsidiary of Norwest Bank Minnesota, N.A., is the sub-advisor for the Large Company Growth Fund. Peregrine, which is located at LaSalle Plaza, 800 LaSalle Avenue, Suite 1850, Minneapolis, Minnesota 55402, is an investment advisor subsidiary of Norwest Bank Minnesota, N.A. Peregrine provides investment advisory services to corporate and public pension plans, profit sharing plans, savings investment plans and 401(k) plans. As of December 31, 1999, Peregrine managed approximately $8.1 billion in assets.

Schroder Investment Management North America, Inc. ("Schroder"), is the sub-advisor for the International Core Portfolio. Schroder, whose principal business address is 787 7/th/ Avenue, New York, NY 10019, is a registered investment adviser. Schroder provides investment management services to company retirement plans, foundations, endowments, trust companies and high net worth individuals. As of September 30, 1999, Schroder managed $ 36.1 billion in assets.

Smith Asset Management Group, LP ("Smith Group"), whose principal business address is 300 Crescent Court, Suite 750, Dallas, Texas 75201 is a registered investment adviser. Smith Group provides investment management services to company retirement plans, foundations, endowments, trust companies, and high net worth individuals using a disciplined equity style. As of December 31, 1999, the Smith Group managed over $1 billion in assets.

WCM, Peregrine, Schroders and Smith Group are each sub-advisors to certain of the core portfolios in which the Diversified Equity, Diversified Small Cap, and Growth Equity Funds invest.

**The Administrator**

Wells Fargo Bank provides the Funds with administration services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's Trustees and officers. Wells Fargo Bank also furnishes office space and certain facilities to conduct each Fund's business. For providing these services, Wells

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

13

Fargo Bank is entitled to receive a fee of 0.15% of the average annual net assets of each Fund.

**Shareholder Servicing Plan**

We have a shareholder servicing plan for each Fund class. We have agreements with various shareholder servicing agents to process purchase and redemption requests, to service shareholder accounts, and to provide other related services. For these services, each Fund pays 0.25% of its average net assets, except the Asset Allocation Fund which pays 0.10%.

**The Transfer Agent**

Boston Financial Data Services, Inc. ("BFDS") provides transfer agency and dividend disbursing services to the Funds. For providing these services, BFDS receives an annual fee, certain transaction-related fees, and is reimbursed for out-of-pocket expenses incurred on behalf of the Funds.

44.     The section discussing Organization and Management of the Funds is false and misleading in at least the following respects:  (1) It states that the fee paid to the Administrator is for "providing investment advisory services" when in fact a portion of that fee is not for such services at all, but rather used to market the funds by way of kickbacks to selling agents;  (2)it states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the amounts paid, including the kickbacks, were much larger:  (3) It states that the transfer agent receives fees for its services; in fact a portion of these fees were not for such services but were redirected to selling agents as kickbacks;  (4) It fails to disclose the existence of agreements with selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

45.     Finally, the prospectus discusses the "Distribution Plan" as follows:

**<u>Distribution Plan</u>**

We have adopted a Distribution Plan ("Plan") pursuant to Rule 12b-1 of the 1940 Act for the Class B and Class C shares of the Funds. The Plan authorizes the payment of all or part of the cost of preparing and distributing prospectuses and distribution-related services, including ongoing compensation to *selling agents*. The Plan also provides that, if and to the extent any shareholder servicing payments are recharacterized as payments

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

14

for distribution-related services, they are approved and payable under the Plan. The fees paid under this Plan are as follows:

| FUND | CLASS B | CLASS C |
|---|---|---|
| Diversified Equity | 0.75% | 0.75% |
| Equity Income | 0.75% | 0.75% |
| Equity Index | 0.75% | N/A |
| Growth Fund | 0.75% | N/A |
| Growth Equity | 0.75% | 0.75% |
| International Equity | 0.75% | 0.75% |
| Large Cap Appreciation | 0.75% | 0.75% |
| Large Cap Value | 0.75% | 0.75% |
| Large Company Growth | 0.75% | 0.75% |
| Montgomery Emerging Markets Focus | 0.75% | 0.75% |
| Montgomery Mid Cap Growth | 0.75% | 0.75% |
| Montgomery Small Cap | 0.75% | 0.75% |
| SIFE Specialized Financial Services | 0.75% | 0.75% |
| Small Cap Growth | 0.75% | 0.75% |
| Small Company Growth | 0.75% | 0.75% |
| Small Company Value | 0.75% | 0.75% |
| Specialized Health Sciences | 0.75% | 0.75% |
| Specialized Technology | 0.75% | 0.75% |

[In later prospectuses discussed *infra* in this Complaint, this chart was replaced with the simple sentence: "For these services, the Class B and Class C shares of the Funds pay 0.75% of their average daily net assets on an annual basis."]

These fees are paid out of the Funds' assets on an ongoing basis. Over time, these fees will increase the cost of your investment and may cost you more than paying other types of sales charges.

This passage was false and misleading in the following respects:  (1) by mentioning only Class B

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

15

and C shares, it implies that no ongoing fees were being paid for distribution-related services by Class A shareholders, when in fact all shareholders were footing the bill for such services through revenue sharing kickbacks; (2) it states that improperly paid shareholder servicing fees will be subject to the rule 12b-1 cap, when in fact they were not, because they were paid along with other revenue sharing kickbacks to the same selling agents, (3) Defendants did not comply with rule 12b-1 because they paid revenue sharing kickbacks without following the requirements of that rule for Board approval, findings of benefit to investors, and full investor disclosure.

**Additional Prospectuses**

**February 1, 2001 Prospectus**

46. The February 1, 2001 prospectus for the Wells Fargo Diversified Equity Fund, Diversified Small Cap Fund, Equity Income Fund, Equity Index Fund, Equity Value Fund, Growth Fund, Growth Equity Fund, International Fund, International Equity Fund, Large Company Growth Fund, Mid Cap Growth Fund, Small Cap Growth Fund, Small Cap Opportunities Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C—is substantially identical to the 2000 prospectus and is false and misleading for the same reasons. It provides in relevant part as follows:

47. First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." This section of the prospectus for the Diversified Equity Fund, Large Company Growth Fund and Small Cap Growth Fund is identical to the February 1, 2000 prospectus and is false and misleading for the reasons discussed above regarding this section.

48. Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

16

SHAREHOLDER FEES

|  | All Funds | | |
|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the lower of the Net Asset Value ("NAV") at purchase or the NAV at redemption) | None/1/ | 5.00% | 1.00% |

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)

|  | Diversified Equity Fund/4/ | | | Diversified Small Cap Fund | |
|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| Management Fees | 0.89% | 0.89% | 0.89% | 0.99% | 0.99% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| Other Expenses/2/ | 0.71% | 0.72% | 1.40% | 0.87% | 0.96% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.60% | 2.36% | 3.04% | 1.86% | 2.70% |
| Fee Waivers | -- | -- | -- | 0.46% | 0.55% |
| NET EXPENSES/3/ | -- | -- | -- | 1.40% | 2.15% |

|  | Growth Equity Fund | | | International Fund | |
|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| Management Fees | 1.09% | 1.09% | 1.09% | 1.00% | 1.00% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| Other Expenses/2/ | 0.73% | 0.86% | 0.91% | 1.09% | 1.22% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.82% | 2.70% | 2.75% | 2.09% | 2.97% |
| Fee Waivers | 0.32% | 0.45% | 0.50% | 0.34% | 0.47% |
| NET EXPENSES/3/ | 1.50% | 2.25% | 2.25% | 1.75% | 2.50% |

/1/ Class A shares that are purchased at NAV in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information. All other Class A shares will not have a CDSC.
/2/ Other expenses are based on estimated amounts for the current fiscal year.

24  Stock Funds Prospectus

<PAGE>

Summary of Expenses

|  | Equity Income Fund | | | Equity Index Fund | | Equity Value Fund | | | Growth Fund | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
|  | 0.75% | 0.75% | 0.75% | 0.25% | 0.25% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
|  | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
|  | 0.65% | 0.63% | 0.55% | 0.60% | 0.71% | 0.81% | 0.86% | 0.70% | 0.69% | 0.74% |
|  | 1.40% | 2.13% | 2.05% | 0.85% | 1.71% | 1.56% | 2.36% | 2.20% | 1.44% | 2.24% |
|  | 0.30% | 0.28% | 0.20% | 0.18% | 0.30% | 0.38% | 0.43% | 0.27% | 0.32% | 0.37% |
|  | 1.10% | 1.85% | 1.85% | 0.67% | 1.41% | 1.18% | 1.93% | 1.93% | 1.12% | 1.87% |

|  | International Equity Fund | | | Large Company Growth Fund | | | Mid Cap Growth Fund | | | Small Cap Growth Fund/4/ | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
|  | 1.00% | 1.00% | 1.00% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.90% | 0.90% | 0.90% |
|  | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
|  | 1.20% | 1.39% | 1.44% | 0.55% | 0.66% | 0.66% | 1.38% | 1.38% | 1.38% | 0.96% | 1.07% | 0.79% |
|  | 2.20% | 3.14% | 3.19% | 1.30% | 2.16% | 2.16% | 2.13% | 2.88% | 2.88% | 1.86% | 2.72% | 2.44% |
|  | 0.45% | 0.64% | 0.69% | 0.10% | 0.41% | 0.41% | 0.73% | 0.73% | 0.73% | -- | -- | -- |
|  | 1.75% | 2.50% | 2.50% | 1.20% | 1.75% | 1.75% | 1.40% | 2.15% | 2.15% | -- | -- | -- |

/3/ The advisor has committed through January 30, 2002 to waive fees and/or
    reimburse expenses to the extent necessary to maintain the Fund's net
    operating expense ratio shown.

/4/ The actual expenses incurred by these Funds may be lower than the total
    (gross) amounts shown above in certain instances as a result of fee waivers.
    Based on fee waiver arrangements for the upcoming year, actual expense
    ratios for the Funds and share classes indicated are not expected to exceed
    the following amounts: Diversified Equity Fund - Class A: 1.25%, Class B:
    2.00%, Class C: 2.00%; Small Cap Growth Funds - Class A: 1.40%, Class B:
    2.15%, Class C: 2.15%.

                              Stock Funds Prospectus 25

<PAGE>

Stock Funds                                          Summary of Expenses
--------------------------------------------------------------------------------

   ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)

| | Small Cap Opportunities Fund | | Specialized Health Sciences Fund | | | Specialized Technology Fund | | |
|---|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.90% | 0.90% | 0.95% | 0.95% | 0.95% | 1.05% | 1.05% | 1.05% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.76% | 0.56% | 0.87% | 0.87% | 0.87% | 0.96% | 0.96% | 0.96% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.66% | 2.21% | 1.82% | 2.57% | 2.57% | 2.01% | 2.76% | 2.76% |
| Fee Waivers | 0.26% | 0.06% | 0.17% | 0.17% | 0.17% | 0.26% | 0.26% | 0.26% |
| NET EXPENSES/3/ | 1.40% | 2.15% | 1.65% | 2.40% | 2.40% | 1.75% | 2.50% | 2.50% |

/2/ Other expenses are based on estimated amounts for the current fiscal year.

/3/ The advisor has committed through January 30, 2002 to waive fees and/or
    reimburse expenses to the extent necessary to maintain the Fund's net
    operating expense ratio shown.

26  Stock Funds Prospectus

49. The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

50. The prospectus next discusses "Organization and Management of the Funds", as follows:

A number of different entities provide services to the Funds. This section shows how the Funds are organized, lists the entities that perform different services, and explains how these service providers are compensated. Further information is available in the Statement of Additional Information for the Funds.

**About Wells Fargo Funds Trust**

Wells Fargo Funds Trust (the "Trust") was organized as a Delaware business trust on March 10, 1999. The Board of Trustees of the Trust supervises each Fund's activities, monitors its contractual arrangements with various service providers and decides upon matters of general policy.

\* \* \*

The Board of Trustees of the Trust supervises the Funds' activities and approves the selection of various companies hired to manage the Funds' operation. The major service providers are described in the diagram below. Except for the advisors, which generally require shareholder approval to change, if the Board believes that it is in the best interest of the shareholders it may change service providers.

\* \* \*

**The Investment Advisor**

Wells Fargo Funds Management, LLC ("Funds Management") is expected to assume the investment advisory responsibilities for each of the Funds on or about March 1, 2001. Funds Management, an indirect wholly owned subsidiary of Wells Fargo & Company, was created in early 2001 to succeed to the mutual fund advisory responsibilities of Wells Fargo Bank. Funds Management is an affiliate of Wells Fargo Bank. Wells Fargo Bank, which was founded in 1852, is the oldest bank in the western United States and is one of the largest banks in the United States. The Funds' advisor is responsible for developing the investment policies and guidelines for the Funds, and for supervising the sub-advisers who are responsible for the day-to-day portfolio management of the Funds. Because Funds management is not expected to assume the mutual funds advisory responsibilities of Wells Fargo Bank until on or about March 1, 2001, there will be a transition period whereby Wells Fargo Bank retains these responsibilities until Funds Management becomes operational. As of September 30, 2000, Funds Management and its affiliates managed over $514 billion in assets. For providing these services, Funds Management is entitled to receive fees as described in the "Summary of Expenses" section at the front of this Prospectus.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

17

The Diversified Equity and Growth Equity Funds are gateway funds that invest in various core portfolios. Funds Management is entitled to receive an annual investment advisory fee of 0.25% of each Fund's average daily net assets for providing services to each Fund, including the determination of the asset allocations of each Fund's investments in the various core portfolios. Funds Management also acts as the adviser to, and is entitled to receive a fee from, each core portfolio. The total amount of investment advisory fees paid to Funds Management as a result of a Fund's investments varies depending on the Fund's allocation of assets among the various core portfolios.

**Dormant Investment Advisory Arrangements**

Under the investment advisory contract for the Funds, Funds Management acts as investment adviser for gateway fund assets redeemed from a core portfolio and invested directly in a portfolio of securities. Funds Management does not receive any compensation under this agreement as long as a gateway fund invests substantially all of its assets in one or more core portfolios. If a Gateway fund redeems assets from a core portfolio and invests them directly, Funds Management receives an investment advisory fee from the Gateway fund for the management of those assets.

\* \* \*

**The Sub-Advisors**

Wells Capital Management Incorporated ("WCM"), an affiliate of Funds Management, is the sub-adviser for the Equity Income, Equity Index, Equity Value, Growth, International Equity, Small Cap Growth and Mid Cap Growth Funds. In this capacity, it is responsible for the day-to-day investment management activities of the Funds. WCM provides investment advisory services for registered mutual funds, company retirement plans, foundations, endowments, trust companies, and high net-worth individuals. As of December 31, 2000, WCM provided advisory services for over $87 billion in assets.

Peregrine Capital Management, Inc. ("Peregrine"), a wholly owned subsidiary of Wells Fargo Bank Minnesota, N.A., is the sub-advisor for the Large Company Growth Portfolio. Peregrine, which is located at LaSalle Plaza, 800 LaSalle Avenue, Suite 1850, Minneapolis, Minnesota 55402, provides investment advisory services to corporate and public pension plans, profit sharing plans, savings investment plans and 401(k) plans. As of December 31, 2000, Peregrine managed approximately $10.4 billion in assets.

Schroder Investment Management North America, Inc. ("Schroder"), is the sub-advisor for the International Core Portfolio. Schroder, whose principal business address is 787 7/th/ Avenue, New York, NY 10019, is a registered investment adviser. Schroder provides investment management services to company retirement plans, foundations, endowments, trust companies and high net worth individuals. As of December 31, 2000, Schroder, along with its other U.S. registered investment advisory affiliates managed approximately $41 billion in assets.

Smith Asset Management Group, LP ("Smith Group"), whose principal business address is 200 Crescent Court, Suite 850, Dallas, Texas 75201 is a registered investment adviser and the sub-advisor to the Small Cap Value Portfolio. Smith Group provides investment management services to company retirement plans, foundations, endowments, trust companies, and high net worth individuals using a

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

18

disciplined equity style. As of December 31, 2000, the Smith Group managed over $900 million in assets.

Dresdner RCM Global Investors LLC ("Dresdner"), an indirect wholly owned subsidiary of Dresdner Bank AG, is the sub-advisor for the Specialized Health Sciences and Specialized Technology Funds. Dresdner is responsible of the day-to-day investment management activities of the Funds. As of September 30, 2000, Dresdner and affiliates managed over $86 billion in assets.

WCM, Peregrine, Schroders and Smith Group are each sub-advisors to certain of the core portfolios in which the Diversified Equity, Diversified Small Cap, and Growth Equity Funds invest.

**The Administrator**

Funds Management  provides the Funds with administration services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's Trustees and officers. Funds Management  also furnishes office space and certain facilities to conduct each Fund's business. For providing these services, Funds Management  is entitled to receive a fee of 0.15% of the average daily net assets of each Fund.

**Shareholder Servicing Plan**

We have a shareholder servicing plan for each Fund. We have agreements with various shareholder servicing agents to process purchase and redemption requests, to service shareholder accounts, and to provide other related services. For these services, each Fund pays an annual fee of 0.25% of its average daily net assets.

**The Transfer Agent**

Boston Financial Data Services, Inc. ("BFDS") provides transfer agency and dividend disbursing services to the Funds. For providing these services, BFDS receives an annual fee, certain transaction-related fees, and is reimbursed for out-of-pocket expenses incurred on behalf of the Funds.

51.     The section discussing Organization and Management of the Funds is false and

misleading in at least the following respects:  (1) It states that the fee paid to the Administrator is

for "providing investment advisory services" when in fact a portion of that fee is not for such

services at all, but rather used to market the funds by way of kickbacks to selling agents;  (2)it

states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the

amounts paid, including the kickbacks, were much larger:  (3) It states that the transfer agent

receives fees for its services; in fact a portion of these fees were not for such services but were

redirected to selling agents as kickbacks;  (4) It fails to disclose the existence of agreements with

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

19

selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

52.    Finally, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

**February 1, 2002 Prospectus**

53.    The February 1, 2002 prospectus for the Wells Fargo Diversified Equity Fund, Equity Income Fund, Equity Index Fund, Equity Value Fund, Growth Fund, Growth Equity Fund, International Equity Fund, Large Cap Appreciation Fund, Large Company Growth Fund, Mid Cap Growth Fund, Small Cap Growth Fund, Small Company Value Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C-- is substantially identical to the 2000-2001 prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

54.    First, the prospectus discusses the funds' "Fund—Objective—Principal Strategies" as follows:

> Diversified Equity Fund. Seeks long-term capital appreciation with moderate annual return volatility.  The Fund is a gateway fund that invests in five different equity investment styles--index, equity income, large company, small cap, and international--to minimize the volatility and risk of investing in a single equity investment style. We currently invest in 11 core portfolios.
>
> * * *
>
> Large Company Growth Fund. Seeks long-term capital appreciation. The Fund is a gateway fund that invests in the common stocks of large U.S. companies that have superior growth potential. We invest principally in securities of companies with market capitalizations of $3 billion or more.
>
> * * *
>
> Small Cap Growth Fund.  Seeks long-term capital appreciation. In selecting portfolio investments, we focus on companies that we believe have above-average growth potential, or that may be involved in new or innovative products, services and processes. We invest principally in securities of companies with market capitalizations equal to or

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

20

lower than the company with the largest market capitalization in the Russell 2000 Index, a small capitalization range that is expected to change frequently.

55.     This discussion of the funds' objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

56.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

21

SHAREHOLDER FEES

<TABLE>
<CAPTION>

| | All Funds | | |
| --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the lower of the Net Asset Value ("NAV") at purchase or the NAV at redemption) | None/1/ | 5.00% | 1.00% |

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/2/

| | Diversified Equity Fund | | | Equity Income Fund | | |
| --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees | 0.89% | 0.89% | 0.89% | 0.75% | 0.75% | 0.75% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/3/ | 0.72% | 0.77% | 0.37% | 0.76% | 0.70% | 0.52% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.61% | 2.41% | 2.01% | 1.51% | 2.20% | 2.02% |
| Fee Waivers | 0.36% | 0.41% | 0.01% | 0.41% | 0.35% | 0.17% |
| NET EXPENSES/4/ | 1.25% | 2.00% | 2.00% | 1.10% | 1.85% | 1.85% |

| | Growth Equity Fund | | | International Equity Fund | | |
| --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees | 1.09% | 1.09% | 1.09% | 1.00% | 1.00% | 1.00% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/3/ | 0.84% | 0.81% | 0.48% | 0.81% | 0.95% | 0.75% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.93% | 2.65% | 2.32% | 1.81% | 2.70% | 2.50% |
| Fee Waivers | 0.43% | 0.40% | 0.07% | 0.06% | 0.20% | 0.00% |
| NET EXPENSES/4/ | 1.50% | 2.25% | 2.25% | 1.75% | 2.50% | 2.50% |

</TABLE>

/1/ Class A shares that are purchased at NAV in amounts of $1,000,000 or more
    may be assessed a 1.00% CDSC if they are redeemed within one year from the
    date of purchase. See "A Choice of Share Classes" for further information.
    All other Class A shares will not have a CDSC.
/2/ Expenses for gateway funds include expenses allocated from the core
    portfolio(s) in which each such Fund invests.
/3/ Other expenses may include expenses payable to affiliates of Wells Fargo
    Bank, N.A. Other expenses for the Large Cap Appreciation Fund have been
    adjusted as necessary from amounts incurred during the Fund's most recent
    fiscal year to reflect current fees and expenses.

24  Stock Funds Prospectus
<PAGE>

Summary of Expenses

| | Equity Index Fund | | Equity Value Fund | | | Growth Fund | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| | 0.25% | 0.25% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| | 0.63% | 0.63% | 0.95% | 0.92% | 1.20% | 0.78% | 0.73% |
| | 0.88% | 1.63% | 1.70% | 2.42% | 2.70% | 1.53% | 2.23% |
| | 0.21% | 0.22% | 0.52% | 0.49% | 0.77% | 0.41% | 0.36% |
| | 0.67% | 1.41% | 1.18% | 1.93% | 1.93% | 1.12% | 1.87% |

| | Large Cap Appreciation Fund | | | Large Company Growth Fund | | | Mid Cap Growth Fund | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| | 0.70% | 0.70% | 0.70% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 0.58% | 0.58% | 0.58% | 0.61% | 0.69% | 0.65% | 1.72% | 1.67% | 2.27% |
| | 1.28% | 2.03% | 2.03% | 1.36% | 2.19% | 2.15% | 2.47% | 3.17% | 3.77% |
| | 0.08% | 0.08% | 0.08% | 0.16% | 0.44% | 0.40% | 1.07% | 1.02% | 1.62% |
| | 1.20% | 1.95% | 1.95% | 1.20% | 1.75% | 1.75% | 1.40% | 2.15% | 2.15% |

/4/ The adviser has committed through January 31, 2003 to waive fees and/or
    reimburse expenses to the extent necessary to maintain the Fund's net
    operating expense ratio shown.

<PAGE>

Stock Funds

```
<TABLE>
<CAPTION>
```

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/1/

| | Small Cap Growth Fund | | | Small Company Value Fund | |
| --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| Other Expenses/2/ | 0.71% | 0.67% | 0.53% | 0.58% | 0.58% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.61% | 2.32% | 2.18% | 1.48% | 2.23% |
| Fee Waivers | 0.21% | 0.17% | 0.03% | 0.08% | 0.08% |
| NET EXPENSES/3/ | 1.40% | 2.15% | 2.15% | 1.40% | 2.15% |

```
</TABLE>
```

/1/ Expenses for gateway funds include expenses allocated from the core
    portfolio(s) in which each such Fund invests.
/2/ Other expenses may include expenses payable to affiliates of Wells Fargo
    Bank, N.A. Other expenses for the Small Company Value Fund are based on
    estimated amounts for the current fiscal year.
/3/ The adviser has committed through January 31, 2003 to waive fees and/or
    reimburse expenses to the extent necessary to maintain the Fund's net
    operating expense ratio shown.

57. The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

58. The prospectus next discusses "Organization and Management of the Funds" as follows:

A number of different entities provide services to the Funds. This section shows how the Funds are organized, lists the entities that perform different services, and explains how these service providers are compensated. Further information is available in the Statement of Additional Information for the Funds.

**About Wells Fargo Funds Trust**

The Trust was organized as a Delaware business trust on March 10, 1999. The Board of Trustees of the Trust supervises each Fund's activities, monitors its contractual arrangements with various service providers and decides upon matters of general policy.

* * *

The Board of Trustees of the Trust supervises the Funds' activities and approves the selection of various companies hired to manage the Funds' operation. The major service providers are described in the diagram below. Except for the advisors, which generally may be changed only with shareholder approval, if the Board believes that it is in the best interest of the shareholders it may change service providers.

* * *

**The Investment Advisor**

Funds Management serves as the investment adviser for each of the Funds. Funds Management, an indirect wholly owned subsidiary of Wells Fargo & Company, was created to succeed to the mutual fund advisory responsibilities of Wells Fargo Bank and is an affiliate of Wells Fargo Bank. Wells Fargo Bank, which was founded in 1852, is the oldest bank in the western United States and is one of the largest banks in the United States. The Funds' adviser is responsible for developing the investment policies and guidelines for the Funds, and for supervising the sub-advisers who are responsible for the day-to-day portfolio management of the Funds. As of September 30, 2001, Funds Management and its affiliates managed over $155 billion in assets. For providing these services, Funds Management is entitled to receive fees as described in the "Summary of Expenses" section at the front of this Prospectus.

The Diversified Equity and Growth Equity Funds are gateway funds that invest in various core portfolios. Funds Management is entitled to receive an annual investment advisory fee of 0.25% of each Fund's average daily net assets for providing services to each Fund, including the determination of the asset allocations of each Fund's investments in the various core portfolios. Funds Management also

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

22

acts as the adviser to, and is entitled to receive a fee from, each core portfolio. The total amount of investment advisory fees paid to Funds Management as a result of a Fund's investments varies depending on the Fund's allocation of assets among the various core portfolios.

**Dormant Investment Advisory Arrangements**

Under the investment advisory contract for the Funds, Funds Management acts as investment adviser for gateway fund assets redeemed from a core portfolio and invested directly in a portfolio of securities. Funds Management does not receive any compensation under this agreement as long as a gateway fund invests substantially all of its assets in one or more core portfolios. If a gateway fund redeems assets from a core portfolio and invests them directly, Funds Management receives an investment advisory fee from the gateway fund for the management of those assets.

* * *

**The Sub-Advisors**

Wells Capital Management Incorporated ("WCM"), an affiliate of Funds Management located at 525 Market Street, San Francisco, CA 94163, is the sub-adviser for the Equity Index, Equity Value, Growth, International Equity, Mid Cap Growth and Small Cap Growth Funds, and in this capacity is responsible for the day-to-day investment management activities of the Funds. WCM provides investment advisory services for registered mutual funds, company retirement plans, foundations, endowments, trust companies, and high net-worth individuals. As of September 30, 2001, WCM managed assets aggregating in excess of $99 billion.

* * *

Cadence Capital Management ("Cadence"), Peregrine Capital Management, Inc. ("Peregrine"), Smith Asset Management Group, LP ("Smith Group"), Schroder Investment Management North America Inc. ("Schroder") and WCM are each investment sub-advisers to certain Funds and to certain core portfolios in which the gateway funds invest and in this capacity are each responsible for the day-to-day investment management activities of the Funds and core portfolios.

* * *

Peregrine, a wholly owned subsidiary of Wells Fargo Bank Minnesota, N.A. located at LaSalle Plaza, 800 LaSalle Avenue, Suite 1850, Minneapolis, MN 55402, is the investment sub-adviser for the Large Company Growth, Small Company Growth and Small Company Value Portfolios. Peregrine provides investment advisory services to corporate and public pension plans, profit sharing plans, savings investment plans, 401(k) plans, foundations and endowments. As of September 30, 2001, Peregrine managed approximately $9.1 billion in assets.

* * *

WCM is the sub-adviser for the Equity Income, Index, International Equity and Small Cap Index Portfolios.

The sub-advisers are compensated for their services by Funds Management from the fees Funds Management receives for its services as adviser.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

23

**The Administrator**

Funds Management provides the Funds with administration services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's Trustees and officers. Funds Management also furnishes office space and certain facilities to conduct each Fund's business. For providing these services, Funds Management is entitled to receive a fee of 0.15% of the average daily net assets of each Fund.

**Shareholder Servicing Plan**

We have a shareholder servicing plan for each Fund. We have agreements with various shareholder servicing agents to process purchase and redemption requests, to service shareholder accounts, and to provide other related services. For these services, each Fund pays an annual fee of 0.25% of its average daily net assets.

**The Transfer Agent**

Boston Financial Data Services, Inc. ("BFDS") provides transfer agency and dividend disbursing services to the Funds. For providing these services, BFDS receives an annual fee, certain transaction-related fees, and is reimbursed for out-of-pocket expenses incurred on behalf of the Funds.

59.     The section discussing Organization and Management of the Funds is false and misleading in at least the following respects: (1) It states that the fee paid to the Administrator is for "providing investment advisory services" when in fact a portion of that fee is not for such services at all, but rather used to market the funds by way of kickbacks to selling agents; (2) it states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the amounts paid, including the kickbacks, were much larger: (3) It states that the transfer agent receives fees for its services; in fact a portion of these fees were not for such services but were redirected to selling agents as kickbacks; (4) It fails to disclose the existence of agreements with selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

24

60.   Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above for this section of the prospectus

61.   Finally, the Prospectus adds a brief statement about "additional payments" as follows:

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the Adviser, the Distributor, or their affiliates in connection with the sale of Fund shares.

This additional disclosure is false and misleading in the following respects.  First, the language was not placed anywhere near the applicable text regarding strategies, shareholder fees, or organization and management of the funds.  Instead, it appeared on a page near the end of the prospectus, without any heading, between sections labeled "You Can Buy Fund Shares" and "Minimum Investments."  The placement of the text seems deliberately designed to hide it from investors who might be looking for it. Second, the statement that selling agents "may" receive additional fees are materially misleading because in fact there already were set agreements to pay such fees, in specific amounts to specific firms.  Third, the statement does not disclose the amount of the additional fees, nor the fact that the "additional fees" were *greater than* the amount of fees for disclosed purposes such as shareholder servicing and 12b-1 fees, as set forth *infra*.  Fourth, the statement does not disclose that the source of the "additional payments" were fees charged to the investors by the funds, and then sent by the funds to the Investment Advisers and Distributors, or that the Investment Advisor's only source of income was fees earned from the funds.  Fifth, the statement does not disclose to whom the additional payments were being made, which made it impossible for investors to determine if the selling agents with whom they were dealing had a conflict of interest or were potentially biased. Sixth, the statement does not disclose that the payments were made in exchange for preferential marketing treatment by the selling agents.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

25

**February 1, 2003 Prospectus**

62.    The February 1, 2003 prospectus for the Wells Fargo Diversified Equity Fund, Equity Income Fund, Equity Index Fund, Equity Value Fund, Growth Fund, Growth Equity Fund, International Equity Fund, Large Cap Appreciation Fund, Large Company Growth Fund, Mid Cap Growth Fund, SIFE Specialized Financial Services Fund, Small Cap Growth Fund, Small Company Value Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C-- is substantially identical to the 2000-2002 prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

63.    First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies" as follows:

> Diversified Equity Fund. Seeks long-term capital appreciation with moderate annual return volatility.  The Fund is a gateway fund that invests in five different equity investment styles--index, equity income, large company, small cap, and international--to minimize the volatility and risk of investing in a single equity investment style. We currently invest in 9 master portfolios.

> * * *

> Large Company Growth Fund. Seeks long-term capital appreciation. The Fund is a gateway fund that invests in the common stocks of large U.S. companies that have superior growth potential. We invest principally in securities of companies with market capitalizations of $3 billion or more.

> * * *

> Small Cap Growth Fund.  Seeks long-term capital appreciation. We focus on companies that we believe have above-average growth potential, or that may be involved in new or innovative products, services and processes. We invest principally in securities of companies with market capitalizations equal to or lower than the company with the largest market capitalization in the Russell 2000 Index, a small capitalization range that is expected to change frequently.

64.    This discussion of the funds' objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

65.    Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

26

|  | CLASS A | CLASS B | CLASS C |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | 1.00% |
| Maximum deferred sales charge (load) (as a percentage of the lower of the Net Asset Value ("NAV") at purchase or the NAV at redemption) | None/1/ | 5.00% | 1.00% |

<CAPTION>

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/2/

|  | Diversified Equity Fund | | | Equity Income Fund | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.88% | 0.88% | 0.88% | 0.75% | 0.75% | 0.75% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/3/ | 0.70% | 0.76% | 0.50% | 0.61% | 0.68% | 0.62% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.58% | 2.39% | 2.13% | 1.36% | 2.18% | 2.12% |
| Fee Waivers | 0.33% | 0.39% | 0.13% | 0.26% | 0.33% | 0.27% |
| NET EXPENSES/4/ | 1.25% | 2.00% | 2.00% | 1.10% | 1.85% | 1.85% |

<CAPTION>

|  | Growth Equity Fund | | | International Equity Fund | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 1.05% | 1.05% | 1.05% | 1.00% | 1.00% | 1.00% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/3/ | 0.83% | 0.83% | 0.94% | 0.96% | 1.31% | 1.21% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.88% | 2.63% | 2.74% | 1.96% | 3.06% | 2.96% |
| Fee Waivers | 0.38% | 0.38% | 0.49% | 0.46% | 0.81% | 0.71% |
| NET EXPENSES/4/ | 1.50% | 2.25% | 2.25% | 1.50% | 2.25% | 2.25% |

</TABLE>

/1/ Class A shares that are purchased at NAV in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information. All other Class A shares will not have a CDSC.

/2/ Expenses for gateway funds include expenses allocated from the master portfolio(s) in which each such Fund invests.

/3/ Other expenses may include expenses payable to affiliates of Wells Fargo & Company.

28   Stock Funds Prospectus

<PAGE>

Summary of Expenses

<TABLE>
<CAPTION>

|  | Equity Index Fund | | Equity Value Fund | | | Growth Fund | |
|---|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| | 0.25% | 0.25% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% |
| | 0.74% | 0.97% | 1.14% | 1.24% | 1.23% | 0.95% | 1.19% |
| | 0.99% | 1.97% | 1.89% | 2.74% | 2.73% | 1.70% | 2.69% |
| | 0.32% | 0.56% | 0.79% | 0.89% | 0.88% | 0.45% | 0.69% |
| | 0.67% | 1.41% | 1.10% | 1.85% | 1.85% | 1.25% | 2.00% |

<CAPTION>

|  | Large Cap Appreciation Fund | | | Large Company Growth Fund | | | Mid Cap Growth Fund | | |
|---|---|---|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| | 0.70% | 0.70% | 0.70% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 5.78% | 7.00% | 6.92% | 0.70% | 0.96% | 0.78% | 2.27% | 2.71% | 3.53% |
| | 6.48% | 8.45% | 8.37% | 1.45% | 2.46% | 2.28% | 3.02% | 4.21% | 5.03% |
| | 5.23% | 6.45% | 6.37% | 0.25% | 0.51% | 0.33% | 1.57% | 2.01% | 2.83% |
| | 1.25% | 2.00% | 2.00% | 1.20% | 1.95% | 1.95% | 1.45% | 2.20% | 2.20% |

</TABLE>

/4/  Other expenses have been adjusted as necessary from amounts incurred during
     the Fund's most recent fiscal year to reflect current fees and expenses.
     Other expense for the Class C shares of the Small Company Value Fund are
     based on estimated amounts for the current fiscal year. The adviser has
     committed through January 31, 2004 to waive fees and/or reimburse expenses
     to the extent necessary to maintain the Fund's net operating expense ratio
     shown.

                              Stock Funds Prospectus    29

<PAGE>

Stock Funds
--------------------------------------------------------------------------------

<TABLE>
<CAPTION>
--------------------------------------------------------------------------------
  ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/1/
--------------------------------------------------------------------------------

| | SIFE Specialized Financial Services Fund | | | Small Cap Growth Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.95% | 0.95% | 0.95% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.51% | 0.78% | 1.04% | 0.84% | 1.39% | 1.01% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.46% | 2.48% | 2.74% | 1.74% | 3.04% | 2.66% |
| Fee Waivers | 0.11% | 0.38% | 0.64% | 0.29% | 0.84% | 0.46% |
| NET EXPENSES/3/ | 1.35% | 2.10% | 2.10% | 1.45% | 2.20% | 2.20% |

  </TABLE>

/1/  Expenses for gateway funds include expenses allocated from the master
     portfolio(s) in which each such Fund invests.

/2/  Other expenses may include expenses payable to affiliates of Wells Fargo &
     Company. Other expenses for the Class C shares of the Small Company Value
     Fund are based on estimated amounts for the current fiscal year.

/3/  The adviser has committed through January 31, 2004 to waive fees and/or
     reimburse expenses to the extent necessary to maintain the Fund's net
     operating expense ratio shown.

30   Stock Funds Prospectus

<PAGE>

                                                        Summary of Expenses
--------------------------------------------------------------------------------

<TABLE>
<CAPTION>
--------------------------------------------------------------------------------

| Small Company Value Fund | | | Specialized Health Sciences Fund | | | Specialized Technology Fund | | |
|---|---|---|---|---|---|---|---|---|
| CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 0.90% | 0.90% | 0.90% | 0.95% | 0.95% | 0.95% | 1.05% | 1.05% | 1.05% |
| 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| 1.42% | 1.81% | 1.25% | 0.97% | 1.17% | 1.33% | 1.42% | 1.66% | 1.36% |
| 2.32% | 3.46% | 2.90% | 1.92% | 2.87% | 3.03% | 2.47% | 3.46% | 3.16% |
| 0.87% | 1.26% | 0.70% | 0.27% | 0.47% | 0.63% | 0.72% | 0.96% | 0.66% |
| 1.45% | 2.20% | 2.20% | 1.65% | 2.40% | 2.40% | 1.75% | 2.50% | 2.50% |

</TABLE>

                              Stock Funds Prospectus    31

66. The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

67. The prospectus next discusses "Organization and Management of the Funds" as follows:

> A number of different entities provide services to the Funds. This section shows how the Funds are organized, lists the entities that perform different services, and explains how these service providers are compensated. Further information is available in the Statement of Additional Information for the Funds.
>
> **About Wells Fargo Funds Trust**
>
> The Trust was organized as a Delaware statutory trust on March 10, 1999. The Board of Trustees of the Trust supervises each Fund's activities, monitors its contractual arrangements with various service providers and decides upon matters of general policy.
>
> The Board supervises the Funds' activities and approves the selection of various companies hired to manage the Funds' operation. The major service providers are described in the diagram below. Except for the advisors, which generally may be changed only with shareholder approval, if the Board believes that it is in the best interest of the shareholders it may change service providers.
>
> * * *
>
> **The Investment Advisor**
>
> Funds Management serves as the investment adviser for each of the Funds. Funds Management, an indirect wholly owned subsidiary of Wells Fargo & Company, was created to succeed to the mutual fund advisory responsibilities of Wells Fargo Bank and is an affiliate of Wells Fargo Bank. Wells Fargo Bank, which was founded in 1852, is the oldest bank in the western United States and is one of the largest banks in the United States. The Funds' adviser is responsible for developing the investment policies and guidelines for the Funds, and for supervising the sub-advisers who are responsible for the day-to-day portfolio management of the Funds. As of September 30, 2002, Funds Management and its affiliates managed over $171 billion in assets. For providing these services, Funds Management is entitled to receive fees as shown in the table of Annual Fund Operating Expenses under "Management Fees" in the front of this Prospectus.
>
> The Diversified Equity and Growth Equity Funds are gateway funds that invest in various master portfolios. Funds Management is entitled to receive an annual investment advisory fee of 0.25% of each Fund's average daily net assets for providing services to each Fund, including the determination of the asset allocations of each Fund's investments in the various master portfolios. Funds Management also acts as the adviser to, and is entitled to receive a fee from, each master portfolio. The

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

27

total amount of investment advisory fees paid to Funds Management as a result of a Fund's investments varies depending on the Fund's allocation of assets among the various master portfolios.

**Dormant Investment Advisory Arrangements**

Under the investment advisory contract for the Equity Income, Large Cap Appreciation, Large Company Growth, and Small Company Value Funds, Funds Management does not receive any compensation from the Funds as long as the Funds continue to invest, as they do today, substantially all of their assets in a single master portfolio. If a Fund were to change its investment structure so that it begins to invest substantially all of its assets in two or more master portfolios, Funds Management would be entitled to receive an annual fee of 0.25% of the Fund's average daily net assets for providing investment advisory services to the Fund, including the determination of the asset allocations of the Fund's investments in the various master portfolios.

Under the investment advisory contract for all the gateway funds, Funds Management acts as investment adviser for gateway fund assets redeemed from a master portfolio and invested directly in a portfolio of securities. Funds Management does not receive any compensation under this agreement as long as a gateway fund invests substantially all of its assets in one or more master portfolios. If a gateway fund redeems assets from a master portfolio and invests them directly, Funds Management receives an investment advisory fee from the gateway fund for the management of those assets.

* * *

**The Sub-Advisors**

Wells Capital Management Incorporated ("Wells Capital Management "), an affiliate of Funds Management located at 525 Market Street, San Francisco, CA 94163, is the sub-adviser for the Equity Index, Equity Value, Growth, International Equity, Mid Cap Growth, SIFE Specialized Financial Services, and Small Cap Growth Funds, and in this capacity is responsible for the day-to-day investment management activities of the Funds. Wells Capital Management provides investment advisory services for registered mutual funds, company retirement plans, foundations, endowments, trust companies, and high net-worth individuals. As of September 30, 2002, Wells Capital Management managed assets aggregating in excess of $106 billion.

* * *

Cadence Capital Management ("Cadence"), Peregrine Capital Management, Inc. ("Peregrine"), Smith Asset Management Group, LP ("Smith Group"), Schroder Investment Management North America Inc. ("Schroder") and Wells Capital Management are each investment sub-advisers to certain Funds and to certain master portfolios in which the gateway funds invest and in this capacity are each responsible for the day- to-day investment management activities of the Funds and master portfolios.

* * *

Peregrine, a wholly owned subsidiary of Wells Fargo Bank Minnesota, N.A. located at LaSalle Plaza, 800 LaSalle Avenue, Suite 1850, Minneapolis, MN 55402, is the investment sub-adviser for the Large Company Growth, Small Company Growth and

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

28

Small Company Value Portfolios. Peregrine provides investment advisory services to corporate and public pension plans, profit sharing plans, savings investment plans, 401(k) plans, foundations and endowments. As of September 30, 2002, Peregrine managed approximately $8.6 billion in assets.

* * *

Wells Capital Management is the sub-adviser for the Equity Income, Index, International Equity, Small Cap Basic Value and Small Cap Index Portfolios.

The sub-advisers are compensated for their services by Funds Management from the fees Funds Management receives for its services as adviser.

**The Administrator**

Funds Management  provides the Funds with administration services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's Trustees and officers. Funds Management  also furnishes office space and certain facilities to conduct each Fund's business. For providing these services, Funds Management  is entitled to receive a fee of 0.15% of the average daily net assets of each Fund.

**Shareholder Servicing Plan**

We have a shareholder servicing plan for each Fund. We have agreements with various shareholder servicing agents to process purchase and redemption requests, to service shareholder accounts, and to provide other related services. For these services, each Fund pays an annual fee of 0.25% of its average daily net assets.

**The Transfer Agent**

Boston Financial Data Services, Inc. ("BFDS") provides transfer agency and dividend disbursing services to the Funds. For providing these services, BFDS receives an annual fee, certain transaction-related fees, and is reimbursed for out-of-pocket expenses incurred on behalf of the Funds.

68.     The section discussing Organization and Management of the Funds is false and misleading in at least the following respects: (1) It states that the fee paid to the Administrator is for "providing investment advisory services" when in fact a portion of that fee is not for such services at all, but rather used to market the funds by way of kickbacks to selling agents;  (2)it states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the amounts paid, including the kickbacks, were much larger:  (3) It states that the transfer agent receives fees for its services; in fact a portion of these fees were not for such services but were redirected to selling agents as kickbacks;  (4) It fails to disclose the existence of agreements with

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

29

selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

69.     Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above regarding this section of the Prospectus.

70.     Finally, the Prospectus adds a brief statement about "additional payments" which is identical to the February 1, 2002 Prospectus and is false and misleading for the same reasons discussed above regarding this section of the Prospectus .

**June 9, 2003 Prospectus**

71.     The June 9, 2003 prospectus for the Wells Fargo Diversified Equity Fund, Equity Income Fund, Equity Index Fund, Growth Fund, Growth Equity Fund, International Equity Fund, Large Cap Appreciation Fund, Large Company Growth Fund, Montgomery Emerging Markets Focus Fund, Montgomery Mid Cap Growth Fund, Montgomery Small Cap Fund, SIFE Specialized Financial Services Fund, Small Cap Growth Fund, Small Company Value Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C-- is substantially identical to the 2000-2002 and February 2003 prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

72.     First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Diversified Equity Fund, Large Company Growth Fund and Small Cap Growth Fund is identical to the February 1, 2003 prospectus.  The discussion of the Emerging Markets Focus Fund is as follows:

> Montgomery Emerging Markets Focus Fund,  Seeks long-term capital appreciation. We invest in a focused portfolio consisting of equity securities of 20 to 40 companies that are tied economically to emerging market countries.

73.     This discussion of the fund's objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

30

fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

74.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

31

SHAREHOLDER FEES

<TABLE>
<CAPTION>

| | All Funds except for the Montgomery Emerging Markets Focus Fund | | |
| --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | 1.00% |
| Maximum deferred sales charge (load) (as a percentage of the Net Asset Value ("NAV") at purchase) | None/1/ | 5.00% | 1.00% |
| Redemption Fee | None | None | None |

</TABLE>

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/2/

<TABLE>
<CAPTION>

| | Diversified Equity Fund | | | Equity Income Fund | | |
| --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.88% | 0.88% | 0.88% | 0.75% | 0.75% | 0.75% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.70% | 0.76% | 0.50% | 0.61% | 0.68% | 0.62% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.58% | 2.39% | 2.13% | 1.36% | 2.18% | 2.12% |
| Fee Waivers | 0.33% | 0.39% | 0.13% | 0.26% | 0.33% | 0.27% |
| NET EXPENSES/5/ | 1.25% | 2.00% | 2.00% | 1.10% | 1.85% | 1.85% |

</TABLE>

<TABLE>
<CAPTION>

| | International Equity Fund | | | Large Cap Appreciation Fund | | |
| --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 1.00% | 1.00% | 1.00% | 0.70% | 0.70% | 0.70% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.96% | 1.31% | 1.21% | 5.78% | 7.00% | 6.92% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.96% | 3.06% | 2.96% | 6.48% | 8.45% | 8.37% |
| Fee Waivers | 0.46% | 0.81% | 0.71% | 5.23% | 6.45% | 6.37% |
| NET EXPENSES/5/ | 1.50% | 2.25% | 2.25% | 1.25% | 2.00% | 2.00% |

</TABLE>

/1/  Class A shares that are purchased at NAV in amounts of $1,000,000 or more
     may be assessed a 1.00% CDSC if they are redeemed within one year from the
     date of purchase. See "A Choice of Share Classes" for further
     information. All other Class A shares will not have a CDSC.
/2/  Expenses for gateway funds include expenses allocated from the master
     portfolio(s) in which each such Fund invests.
/3/  Deducted from the net proceeds of shares redeemed (or exchanged) within
     three months after purchase. This fee by the is retained Fund.

30 Stock Funds Prospectus

<PAGE>

Summary of Expenses

<TABLE>
<CAPTION>

| | Montgomery Emerging Markets Focus Fund | | |
| --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | 1.00% |
| Maximum deferred sales charge (load) (as a percentage of the Net Asset Value ("NAV") at purchase) | None/1/ | 5.00% | 1.00% |
| Redemption Fee | 2.00%/3/ | None | None |

</TABLE>

<TABLE>
<CAPTION>

| | Equity Index Fund | | Growth Fund | | Growth Equity Fund | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | CLASS A | CLASS B | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.25% | 0.25% | 0.75% | 0.75% | 1.05% | 1.05% | 1.05% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.74% | 0.97% | 0.95% | 1.19% | 0.83% | 0.83% | 0.94% |

```
TOTAL ANNUAL FUND OPERATING EXPENSES   0.99%   1.97%   1.70%   2.69%   1.88%   2.63%   2.74%

Fee Waivers                            0.32%   .56%    .45%    .69%    .38%    .48%    .49%

NET EXPENSES/5/                        0.67%   1.41%   1.25%   2.00%   1.50%   2.25%   2.25%
```

|                                       | Large Company Growth Fund | | | Montgomery Emerging Markets Focus Fund | | | Montgomery Mid Cap Growth Fund | | |
|---------------------------------------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
|                                       | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees                       | 0.75%   | 0.75%   | 0.75%   | 1.10%   | 1.10%   | 1.10%   | 0.75%   | 0.75%   | 0.75%   |
| Distribution (12b-1) Fees             | 0.00%   | 0.75%   | 0.75%   | 0.00%   | 0.75%   | 0.75%   | 0.00%   | 0.75%   | 0.75%   |
| Other Expenses/4/                     | 0.70%   | 0.96%   | 0.78%   | 0.94%   | 0.94%   | 0.94%   | 0.75%   | 0.75%   | 0.75%   |
| TOTAL ANNUAL FUND OPERATING EXPENSES  | 1.45%   | 2.46%   | 2.28%   | 2.04%   | 2.79%   | 2.79%   | 1.50%   | 2.25%   | 2.25%   |
| Fee Waivers                           | 0.25%   | 0.51%   | 0.33%   | 0.14%   | 0.14%   | 0.14%   | 0.05%   | 0.05%   | 0.05%   |
| NET EXPENSES/5/                       | 1.20%   | 1.95%   | 1.95%   | 1.90%   | 2.65%   | 2.65%   | 1.45%   | 2.20%   | 2.20%   |

/4/  Other expenses may include expenses payable to affiliates of Wells Fargo &
     Company. Other expenses have been adjusted as necessary from amounts
     incurred during the Fund's most recent fiscal year to reflect current fees
     and expenses. Other expenses for the Montgomery Emerging Markets Focus and
     Montgomery Mid Cap Growth Funds are based on estimated amounts for the
     current fiscal year.
/5/  The adviser has committed through January 31, 2004 to waive fees and/or
     reimburse expenses to the extent necessary to maintain the Fund's net
     operating expense ratio shown.

                              Stock Funds Prospectus 31

<PAGE>

Stock Funds
--------------------------------------------------------------------------

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/1/
--------------------------------------------------------------------------

|                                       | Montgomery Small Cap Fund | | | SIFE Specialized Financial Services Fund | | |
|---------------------------------------|---------|---------|---------|---------|---------|---------|
|                                       | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees                       | 0.90%   | 0.90%   | 0.90%   | 0.95%   | 0.95%   | 0.95%   |
| Distribution (12b-1) Fees             | 0.00%   | 0.75%   | 0.75%   | 0.00%   | 0.75%   | 0.75%   |
| Other Expenses/2/                     | 0.80%   | 0.82%   | 0.82%   | 0.51%   | 0.78%   | 1.04%   |
| TOTAL ANNUAL FUND OPERATING EXPENSES  | 1.70%   | 2.47%   | 2.47%   | 1.46%   | 2.48%   | 2.74%   |
| Fee Waivers                           | 0.30%   | 0.32%   | 0.32%   | 0.11%   | 0.38%   | 0.64%   |
| NET EXPENSES/3/                       | 1.40%   | 2.15%   | 2.15%   | 1.35%   | 2.10%   | 2.10%   |

|                                       | Specialized Health Sciences Fund | | | Specialized Technology Fund | | |
|---------------------------------------|---------|---------|---------|---------|---------|---------|
|                                       | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees                       | 0.95%   | 0.95%   | 0.95%   | 1.05%   | 1.05%   | 1.05%   |
| Distribution (12b-1) Fees             | 0.00%   | 0.75%   | 0.75%   | 0.00%   | 0.75%   | 0.75%   |
| Other Expenses/2/                     | 0.97%   | 1.17%   | 1.33%   | 1.42%   | 1.66%   | 1.36%   |
| TOTAL ANNUAL FUND OPERATING EXPENSES  | 1.92%   | 2.87%   | 3.03%   | 2.47%   | 3.46%   | 3.16%   |
| Fee Waivers                           | 0.27%   | 0.47%   | 0.63%   | 0.72%   | 0.96%   | 0.66%   |
| NET EXPENSES/3/                       | 1.65%   | 2.40%   | 2.40%   | 1.75%   | 2.50%   | 2.50%   |

/1/  Expenses for gateway funds include expenses allocated from the master
     portfolio(s) in which each such Fund invests.
/2/  Other expenses may include expenses payable to affiliates of Wells Fargo &
     Company. Other expenses for the Montgomery Small Cap Fund and the Class C
     shares of the Small Company Value Fund are based on estimated amounts for
     the current fiscal year.
/3/  The adviser has committed through January 31, 2004 to waive fees and/or
     reimburse expenses to the extent necessary to maintain the Fund's, except
     the SIFE Specialized Financial Services Fund's, net operating expense ratio
     shown. For the SIFE Specialized Financial Services Fund, the adviser has
     committed through February 24, 2004 to waive fees and/or reimburse expenses
     to the extent necessary to maintain the Fund's net operating expense ratio
     shown.

32 Stock Funds Prospectus

<PAGE>

                              Summary of Expenses

<TABLE>
<CAPTION>

|  | Small Cap Growth Fund | | | Small Company Value Fund | | |
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.84% | 1.39% | 1.01% | 1.42% | 1.81% | 1.25% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.74% | 3.04% | 2.66% | 2.32% | 3.46% | 2.90% |
| Fee Waivers | 0.29% | 0.84% | 0.46% | 0.87% | 1.26% | 0.70% |
| NET EXPENSES/3/ | 1.45% | 2.20% | 2.20% | 1.45% | 2.20% | 2.20% |

</TABLE>

Stock Funds Prospectus 33

75.     The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

76.     The prospectus next discusses "Organization and Management of the Funds" as follows:

A number of different entities provide services to the Funds. This section shows how the Funds are organized, lists the entities that perform different services, and explains how these service providers are compensated. Further information is available in the Statement of Additional Information for the Funds.

**About Wells Fargo Funds Trust**

The Trust was organized as a Delaware statutory trust on March 10, 1999. The Board of Trustees of the Trust (the "Board") supervises each Fund's activities, monitors its contractual arrangements with various service providers and decides upon matters of general policy.

The Board supervises the Funds' activities and approves the selection of various companies hired to manage the Funds' operation. The major service providers are described in the diagram below. Except for the advisors, which generally may be changed only with shareholder approval, if the Board believes that it is in the best interest of the shareholders it may change service providers.

* * *

**The Investment Advisor**

Funds Management serves as the investment adviser for each of the Funds. Funds Management, an indirect wholly owned subsidiary of Wells Fargo & Company, was created to succeed to the mutual fund advisory responsibilities of Wells Fargo Bank and is an affiliate of Wells Fargo Bank. Wells Fargo Bank, which was founded in 1852, is the oldest bank in the western United States and is one of the largest banks in the United States. The Funds' adviser is responsible for developing the investment policies and guidelines for the Funds, and for supervising the sub-advisers who are responsible for the day-to-day portfolio management of the Funds. As of March 31, 2003, Funds Management and its affiliates managed over $183 billion in assets. For providing these services, Funds Management is entitled to receive fees as shown in the table of Annual Fund Operating Expenses under "Management Fees" in the front of this Prospectus.

The Diversified Equity and Growth Equity Funds are gateway funds that invest in various master portfolios. Funds Management is entitled to receive an annual investment advisory fee of 0.25% of each Fund's average daily net assets for providing services to each Fund, including the determination of the asset allocations

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

32

of each Fund's investments in the various master portfolios. Funds Management also acts as the adviser to, and is entitled to receive a fee from, each master portfolio. The total amount of investment advisory fees paid to Funds Management as a result of a Fund's investments varies depending on the Fund's allocation of assets among the various master portfolios.

**Dormant Investment Advisory Arrangements**

Under the investment advisory contract for the Equity Income, Large Cap Appreciation, Large Company Growth, and Small Company Value Funds, Funds Management does not receive any compensation from the Funds as long as the Funds continue to invest, as they do today, substantially all of their assets in a single master portfolio. If a Fund were to change its investment structure so that it begins to invest substantially all of its assets in two or more master portfolios, Funds Management would be entitled to receive an annual fee of 0.25% of the Fund's average daily net assets for providing investment advisory services to the Fund, including the determination of the asset allocations of the Fund's investments in the various master portfolios.

Under the investment advisory contract for all the gateway funds, Funds Management acts as investment adviser for gateway fund assets redeemed from a master portfolio and invested directly in a portfolio of securities. Funds Management does not receive any compensation under this agreement as long as a gateway fund invests substantially all of its assets in one or more master portfolios. If a gateway fund redeems assets from a master portfolio and invests them directly, Funds Management receives an investment advisory fee from the gateway fund for the management of those assets.

\* \* \*

**The Sub-Advisors**

Wells Capital Management Incorporated ("Wells Capital Management "), an affiliate of Funds Management located at 525 Market Street, San Francisco, CA 94163, is the sub-adviser for the Equity Index, Equity Value, Growth, International Equity, Mid Cap Growth, SIFE Specialized Financial Services, and Small Cap Growth Funds, and in this capacity is responsible for the day-to-day investment management activities of the Funds. Wells Capital Management provides investment advisory services for registered mutual funds, company retirement plans, foundations, endowments, trust companies, and high net-worth individuals. As of March 31, 2003, Wells Capital Management managed assets aggregating in excess of $114 billion.

\* \* \*

Cadence Capital Management ("Cadence"), Peregrine Capital Management, Inc. ("Peregrine"), Smith Asset Management Group, LP ("Smith Group"), Schroder Investment Management North America Inc. ("Schroder") and Wells Capital Management are each investment sub-advisers to certain Funds and to certain master portfolios in which the gateway funds invest and in this capacity are each responsible for the day- to-day investment management activities of the Funds and master portfolios.

\* \* \*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

33

Peregrine, a wholly owned subsidiary of Wells Fargo Bank Minnesota, N.A. located at LaSalle Plaza, 800 LaSalle Avenue, Suite 1850, Minneapolis, MN 55402, is the investment sub-adviser for the Large Company Growth, Small Company Growth and Small Company Value Portfolios. Peregrine provides investment advisory services to corporate and public pension plans, profit sharing plans, savings investment plans, 401(k) plans, foundations and endowments. As of March 31, 2003, Peregrine managed approximately $9.3 billion in assets.

* * *

Wells Capital Management is the sub-adviser for the Equity Income, Index, International Equity, Small Cap Basic Value and Small Cap Index Portfolios.

The sub-advisers are compensated for their services by Funds Management from the fees Funds Management receives for its services as adviser.

**The Administrator**

Funds Management  provides the Funds with administration services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's Trustees and officers. Funds Management  also furnishes office space and certain facilities to conduct each Fund's business.

**Shareholder Servicing Plan**

We have a shareholder servicing plan for each Fund. We have agreements with various shareholder servicing agents to process purchase and redemption requests, to service shareholder accounts, and to provide other related services. For these services, each Fund pays an annual fee of 0.25% of its average daily net assets.

**The Transfer Agent**

Boston Financial Data Services, Inc. ("BFDS") provides transfer agency and dividend disbursing services to the Funds. For providing these services, BFDS receives an annual fee, certain transaction-related fees, and is reimbursed for out-of-pocket expenses incurred on behalf of the Funds.

77.     The section discussing Organization and Management of the Funds is false and misleading in at least the following respects:  (1) It states that the fee paid to the Administrator is for "providing investment advisory services" when in fact a portion of that fee is not for such services at all, but rather used to market the funds by way of kickbacks to selling agents;  (2)it states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the amounts paid, including the kickbacks, were much larger:  (3) It states that the transfer agent receives fees for its services; in fact a portion of these fees were not for such services but were redirected to selling agents as kickbacks;  (4) It fails to disclose the existence of agreements with

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

34

selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

78.    Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above regarding this section of the Prospectus .

79.    Finally, the Prospectus adds a brief statement about "additional payments" which is identical to the February 1, 2002 prospectus and is false and misleading for the same reasons discussed above regarding this section of the prospectus .

**February 1, 2004 Prospectus**

80.    The February 1, 2004 prospectus for the Wells Fargo Diversified Equity Fund, Equity Income Fund, Equity Index Fund, Growth Fund, Growth Equity Fund, International Equity Fund, Large Cap Appreciation Fund, Large Company Growth Fund, Montgomery Emerging Markets Focus Fund, Montgomery Mid Cap Growth Fund, Montgomery Small Cap Fund, SIFE Specialized Financial Services Fund, Small Cap Growth Fund, Small Company Growth Fund, Small Company Value Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C-- is substantially identical to the 2000-2003 prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

81.    First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Large Company Growth Fund, Montgomery Emerging Markets Focus Fund and Small Cap Growth Fund is identical to the June 9, 2003 prospectus. The discussion of the Diversified Equity Fund is as follows:

> Diversified Equity Fund. Seeks long-term capital appreciation with moderate annual return volatility.  The Fund is a gateway fund that invests in five different equity investment styles—large cap blend, large cap value, large cap growth small cap, and international--to minimize the volatility and risk of investing in a single equity investment style. We currently invest in 14 master portfolios.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

35

82.     This discussion of the funds' objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

83.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

36

SHAREHOLDER FEES (FEES PAID DIRECTLY FROM YOUR INVESTMENT)

except for the Montgomery
Emerging Markets Focus Fund

| | CLASS A | CLASS B | CLASS C |
|---|---|---|---|
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the Net Asset Value ("NAV") at purchase) | None/1/ | 5.00% | 1.00% |
| Redemption Fee | None | None | None |

<TABLE>
<CAPTION>

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/2/

| | Diversified Equity Fund | | | Equity Income Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.88% | 0.88% | 0.88% | 0.75% | 0.75% | 0.75% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.66% | 0.68% | 0.65% | 0.58% | 0.63% | 0.57% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.54% | 2.31% | 2.28% | 1.33% | 2.13% | 2.07% |
| Fee Waivers | 0.29% | 0.31% | 0.28% | 0.23% | 0.28% | 0.22% |
| NET EXPENSES/5/ | 1.25% | 2.00% | 2.00% | 1.10% | 1.85% | 1.85% |

</TABLE>

<TABLE>
<CAPTION>

| | International Equity Fund | | | Large Cap Appreciation Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 1.00% | 1.00% | 1.00% | 0.70% | 0.70% | 0.70% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.76% | 1.07% | 0.95% | 1.75% | 1.66% | 2.51% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.76% | 2.82% | 2.70% | 2.45% | 3.11% | 3.96% |
| Fee Waivers | 0.26% | 0.57% | 0.45% | 1.20% | 1.11% | 1.96% |
| NET EXPENSES/5/ | 1.50% | 2.25% | 2.25% | 1.25% | 2.00% | 2.00% |

</TABLE>

/1/  Class A shares that are purchased at NAV in amounts of $1,000,000 or more
     may be assessed a 1.00% CDSC if they are redeemed within one year from the
     date of purchase. See "A Choice of Share Classes" for further information.
     All other Class A shares will not have a CDSC.

/2/  Expenses for gateway funds include expenses allocated from the master
     portfolio(s) in which each such Fund invests.

/3/  Deducted from the net proceeds of shares redeemed (or exchanged) within
     three months after purchase. This fee is retained by the Fund. Please see
     "Redemption Fee" on page 131 for further information.

<PAGE>

Summary of Expenses

SHAREHOLDER FEES (FEES PAID DIRECTLY FROM YOUR INVESTMENT)

Montgomery Emerging Markets
Focus Fund

| | CLASS A | CLASS B | CLASS C |
|---|---|---|---|
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the Net Asset Value ("NAV") at purchase) | None/1/ | 5.00% | 1.00% |
| Redemption Fee | 2.00%/3/ | None | None |

<TABLE>
<CAPTION>

ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/2/

| | Equity Index Fund | | Growth Fund | | Growth Equity Fund | | |
|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.15% | 0.15% | 0.75% | 0.75% | 1.05% | 1.05% | 1.05% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.78% | 0.88% | 0.81% | 0.98% | 0.77% | 0.79% | 0.88% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 0.93% | 1.78% | 1.56% | 2.48% | 1.82% | 2.59% | 2.68% |
| Fee Waivers | 0.29% | 0.39% | 0.31% | 0.48% | 0.32% | 0.34% | 0.43% |

```
NET EXPENSES/5/                    0.64%    1.39%    1.25%    2.00%    1.50%    2.25%    2.25%
```

</TABLE>

<TABLE>
<CAPTION>

|  | Large Cap Value Fund | | | Large Company Growth Fund | | | Montgomery Emerging Markets Focus Fund | | |
|---|---|---|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 1.10% | 1.10% | 1.10% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/4/ | 0.66% | 0.66% | 0.66% | 0.66% | 0.83% | 0.66% | 0.93% | 0.94% | 0.94% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.41% | 2.16% | 2.16% | 1.41% | 2.33% | 2.16% | 2.03% | 2.79% | 2.79% |
| Fee Waivers | 0.16% | 0.16% | 0.16% | 0.21% | 0.38% | 0.21% | 0.13% | 0.14% | 0.14% |
| NET EXPENSES/5/ | 1.25% | 2.00% | 2.00% | 1.20% | 1.95% | 1.95% | 1.90% | 2.65% | 2.65% |

</TABLE>

/4/  Other expenses may include expenses payable to affiliates of Wells Fargo &
     Company. Other expenses for the Equity Index Fund have been adjusted as
     necessary from amounts incurred during the Fund's most recent fiscal year
     to reflect current fees and expenses. Other expenses for the Large Cap
     Value Fund and Small Company Growth Fund are based on estimated amounts for
     the current fiscal year.

/5/  The adviser has committed through January 31, 2005 to waive fees and/or
     reimburse expenses to the extent necessary to maintain the Fund's net
     operating expense ratio shown.

                              Stock Funds Prospectus    31

<PAGE>

Stock Funds
--------------------------------------------------------------------------------


--------------------------------------------------------------------------------
ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/1/
--------------------------------------------------------------------------------

<TABLE>
<CAPTION>

|  | Montgomery Mid Cap Growth Fund | | | Montgomery Small Cap Fund | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.75% | 0.75% | 0.75% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.70% | 0.70% | 0.70% | 0.79% | 0.78% | 0.82% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.45% | 2.20% | 2.20% | 1.69% | 2.43% | 2.47% |
| Fee Waivers | 0.00% | 0.00% | 0.00% | 0.29% | 0.28% | 0.32% |
| NET EXPENSES/3/ | 1.45% | 2.20% | 2.20% | 1.40% | 2.15% | 2.15% |

</TABLE>

<TABLE>
<CAPTION>

|  | Small Company Value Fund | | | Specialized Health Sciences Fund | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Management Fees | 0.90% | 0.90% | 0.90% | 0.95% | 0.95% | 0.95% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.55% | 0.55% | 0.55% | 1.30% | 1.36% | 1.48% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.45% | 2.20% | 2.20% | 2.25% | 3.06% | 3.18% |
| Fee Waivers | 0.00% | 0.00% | 0.00% | 0.60% | 0.66% | 0.78% |
| NET EXPENSES/3/ | 1.45% | 2.20% | 2.20% | 1.65% | 2.40% | 2.40% |

</TABLE>

/1/  Expenses for gateway funds include expenses allocated from the master
     portfolio(s) in which each such Fund invests.
/2/  Other expenses may include expenses payable to affiliates of Wells Fargo &
     Company.
/3/  The adviser has committed through January 31, 2005 to waive fees and/or
     reimburse expenses to the extent necessary to maintain the Fund's net
     operating expense ratio shown.

32    Stock Funds Prospectus

<PAGE>

                              Summary of Expenses
--------------------------------------------------------------------------------


--------------------------------------------------------------------------------
ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)/1/
--------------------------------------------------------------------------------

<TABLE>

&lt;CAPTION&gt;

| | Specialized Financial Services Fund | | | Small Cap Fund | | | Small Company Growth Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Management Fees | 0.95% | 0.95% | 0.95% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.64% | 0.75% | 0.85% | 0.95% | 1.46% | 1.09% | 0.77% | 0.77% | 0.77% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.59% | 2.45% | 2.55% | 1.85% | 3.11% | 2.74% | 1.67% | 2.42% | 2.42% |
| Fee Waivers | 0.24% | 0.35% | 0.45% | 0.40% | 0.91% | 0.54% | 0.22% | 0.22% | 0.22% |
| NET EXPENSES/3/ | 1.35% | 2.10% | 2.10% | 1.45% | 2.20% | 2.20% | 1.45% | 2.20% | 2.20% |

&lt;/TABLE&gt;

| | Specialized Technology Fund | | |
|---|---|---|---|
| | CLASS A | CLASS B | CLASS C |
| Management Fees | 1.05% | 1.05% | 1.05% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% |
| Other Expenses/2/ | 0.93% | 1.28% | 1.11% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.98% | 3.08% | 2.91% |
| Fee Waivers | 0.23% | 0.58% | 0.41% |
| NET EXPENSES/3/ | 1.75% | 2.50% | 2.50% |

Stock Funds Prospectus    33

84.    The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

85.    The prospectus next discusses "Organization and Management of the Funds." This section is identical to the June 9, 2003 prospectus in all respects quoted above, except as follows.  (1) The assets under management by Wells Fargo Funds Management. Wells Capital Management, and Peregrine are updated as of September 30, 2003 as $72 billion, $116 billion, and $11.6 billion, respectively.  (2) Wells Capital Management is no longer listed as sub-advisor for the Small Cap Basic Value portfolio, (3) there is a new section called "Dormant Multi-Manager Structure:"

### Dormant Multi-Manager Structure

The Board has adopted a dormant "multi-manager" structure for the Large Cap Value Fund, Montgomery Emerging Markets Focus and Montgomery Small Cap Funds. Under this structure, a Fund and Funds Management would engage one or more sub-advisers to make day-to-day investment decisions for the Fund's assets. Funds Management would retain ultimate responsibility (subject to the oversight of the Board) for overseeing the sub-advisers and may, at times, recommend to the Board that the Fund: (i) change, add or terminate one or more sub-advisers; (ii) continue to retain a sub-adviser even though the sub-adviser's ownership or corporate structure has changed; or (iii) materially change a sub-advisory agreement with a sub-adviser.

Applicable law generally requires a Fund to obtain shareholder approval of most of these types of recommendations, even if the Board approves the proposed action. Under the dormant "multi-manager" structure approved by the Board, the Fund will seek exemptive relief, if necessary, from the SEC to permit Funds Management (subject to the Board's oversight and approval) to make decisions about the Fund's sub-advisory arrangements without obtaining shareholder approval. The Fund will continue to submit matters to shareholders for their approval to the extent required by applicable law.

86.    The section discussing Organization and Management of the Funds is false and misleading in at least the following respects: (1) It states that the fee paid to the Administrator is for "providing investment advisory services" when in fact a portion of that fee is not for such services at all, but rather used to market the funds by way of kickbacks to selling agents;  (2)it states that the Fund pays a set percentage of assets for "shareholder servicing" when in fact the amounts paid, including the kickbacks, were much larger:  (3) It states that the transfer agent

receives fees for its services; in fact a portion of these fees were not for such services but were redirected to selling agents as kickbacks;  (4) It fails to disclose the existence of agreements with selling agents by which a portion of fees paid by the funds were sent to those selling agents as kickbacks or to state the amount of the kickbacks; (5) It states that the Board supervises the activities of the Advisers when in fact it did not supervise or put a stop to revenue sharing practices; (6) It implies that the Board is an independent entity when in fact it acts as an arm of the Investment Advisor Defendant.

87.     Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above regarding this section of the Prospectus.

88.     Finally, the Prospectus adds a brief statement about "additional payments" which is slightly longer than the February 1, 2002 prospectus.  It provides as follows:

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the adviser, the distributor, or their affiliates in connection with the sale of Fund shares. These amounts may be fixed dollar amounts or a percentage of sales or both, and may be up-front or ongoing payments or both. Agents may agree to provide a marketing or servicing advantages to the Funds in return for the payments. Selling or shareholder servicing agents, in turn, may pay some or all of these amounts to their employees who recommend or sell Fund shares or make investment decisions on behalf of clients. Payments made with respect to the Funds may differ from those made with respect to other mutual funds available through the agent and could influence the agent's recommendations or decisions. Prospective investors should consult with their selling or shareholder servicing agent if they wish to request further information regarding these matters.

This additional disclosure is false and misleading in the nearly all the same respects as the shorter disclosure used between February 1, 2002 and January 31, 2004.  First, the language was not placed anywhere near the applicable text regarding strategies, shareholder fees, or organization and management of the funds.  Instead, it appeared on a page near the end of the prospectus, without any heading, between sections labeled "You Can Buy Fund Shares" and "Minimum Investments."  The placement of the text seems deliberately designed to hide it from investors who might be looking for it. Second, the statement that selling agents "may" receive additional fees are materially misleading because in fact there already were set agreements to pay

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

38

such fees, in specific amounts to specific firms.  Third, the statement does not disclose the amount of the additional fees, nor the fact that the "additional fees" were *greater than* the amount of fees for disclosed purposes such as shareholder servicing and 12b-1 fees., as set forth *infra*.  Fourth, the statement does not disclose that the source of the "additional payments" were fees charged to the investors by the funds, and then sent by the funds to the Investment Advisers and Distributors, or that the Investment Advisor's only source of income was fees earned from the funds.  Fifth, the statement does not disclose to whom the additional payments were being made, which made it impossible for investors to determine if the selling agents with whom they were dealing had a conflict of interest or were potentially biased.

**February 1, 2005 Prospectus**

89.     The February 1, 2005 prospectus for the Wells Fargo Diversified Equity Fund, Equity Income Fund, Equity Index Fund, Growth Fund, Growth Equity Fund, International Equity Fund, Large Cap Appreciation Fund, Large Cap Value Fund, Large Company Growth Fund, Montgomery Emerging Markets Focus Fund, Montgomery Mid Cap Growth Fund, Montgomery Small Cap Fund, SIFE Specialized Financial Services Fund, Small Cap Growth Fund, Small Company Growth Fund, Small Company Value Fund, Specialized Health Sciences Fund, and Specialized Technology Fund -- share classes A, B and C-- is substantially identical to the 2000-2004 prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

90.     First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Large Company Growth Fund, Montgomery Emerging Markets Focus Fund and Small Cap Growth Fund is identical to the February 1, 2004 prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

91.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table below:

| SHAREHOLDER FEES (fees paid directly from your investment) | | |
|---|---|---|
| | **All Funds** except for the Montgomery Emerging Markets Focus Fund | |
| | CLASS A | CLASS B | CLASS C |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

39

| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
|---|---|---|---|
| Maximum deferred sales charge (load) (as a percentage of the *Net Asset Value* ("*NAV*") at purchase) | None[1] | 5.00% | 1.00% |
| Redemption Fee | None | None | None |

**ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets)[3]**

| | Diversified Equity Fund | | | Equity Income[7] Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[4] | 0.83% | 0.83% | 0.83% | 0.69% | 0.69% | 0.69% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[5] | 0.54% | 0.54% | 0.54% | 0.49% | 0.49% | 0.49% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.37% | 2.12% | 2.12% | 1.18% | 1.93% | 1.93% |
| Fee Waivers | 0.12% | 0.12% | 0.12% | 0.08% | 0.08% | 0.08% |
| NET EXPENSES[6] | 1.25% | 2.00% | 2.00% | 1.10% | 1.85% | 1.85% |

| | International Equity Fund | | | Large Cap Appreciation Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[4] | 0.95% | 0.95% | 0.95% | 0.70% | 0.70% | 0.70% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[5] | 0.76% | 0.76% | 0.75% | 0.72% | 0.71% | 0.71% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.71% | 2.46% | 2.45% | 1.42% | 2.16% | 2.16% |
| Fee Waivers | 0.21% | 0.21% | 0.20% | 0.17% | 0.16% | 0.16% |
| NET EXPENSES[6] | 1.50% | 2.25% | 2.25% | 1.25% | 2.00% | 2.00% |

[1] Class A shares that are purchased at *NAV* in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information. All other Class A shares will not have a CDSC.

[2] Deducted from the net proceeds of shares redeemed (or exchanged) within three months after purchase. This fee is retained by the Fund. Please see "Redemption Fee" on page 131 for further information.

[3] Expenses for *gateway funds* include expenses allocated from the master portfolio(s) in which each such Fund invests.

[4] The Funds' investment adviser has implemented breakpoint schedules for the Funds' management fees and the master portfolios in which the *gateway funds* invest. The management fees charged to the Funds/master portfolios will decline as a Fund's assets grow and will continue to be based on a percentage of the Fund's/master portfolio's average daily net assets. The Equity Index Fund, Growth Fund, International Equity Fund and Montgomery Emerging Markets Focus Fund invest directly in a portfolio of securities. The breakpoint schedule for the Equity Index Fund is as follows: 0.10% for assets from $0 to $999 million, 0.075% for assets from $1 billion to $4.99 billion; 0.05% for assets $5 billion and higher. The breakpoint schedule for the Montgomery Emerging Market Focus Fund is as follows: 1.10% for assets from $0 to $499 million, 1.05% for assets from $500 million to $999 million; 1.00% for assets from $1 billion to $2.99 billion; 0.975% for assets from $3 billion to $4.99 billion; and 0.95% for assets $5 billion and higher. The breakpoint schedule for the Growth Fund is as follows: 0.75% for assets from $0 to $499 million, 0.70% for assets from $500 million to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. The breakpoint schedule for the International Equity Fund is as follows: 0.95% for assets from $0 to $499 million, 0.90% for assets from $500 million to $999 million; 0.85% for assets from $1 billion to $2.99 billion; 0.825% for assets from $3 billion to $4.99 billion; and 0.80% for assets $5 billion and higher.

| | Montgomery Emerging Markets Focus Fund | | |
|---|---|---|---|
| | CLASS A | CLASS B | CLASS C |
| | 5.75% | None | None |
| | None[1] | 5.00% | 1.00% |
| | 2.00%[2] | None | None |

| Equity Index | Growth | Growth Equity |
|---|---|---|

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

40

| | Fund | | Fund | | Fund | | |
|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS A | CLASS B | CLASS A | CLASS B | CLASS C |
| | 0.10% | 0.10% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% |
| | 0.00% | 0.75% | 0.00% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 0.72% | 0.72% | 0.68% | 0.68% | 0.60% | 0.59% | 0.59% |
| | 0.82% | 1.57% | 1.43% | 2.18% | 1.60% | 2.34% | 2.34% |
| | 0.18% | 0.18% | 0.18% | 0.18% | 0.10% | 0.09% | 0.09% |
| | 0.64% | 1.39% | 1.25% | 2.00% | 1.50% | 2.25% | 2.25% |

| | Large Cap Value Fund | | | Large Company[7] Growth Fund | | | Montgomery Emerging Markets Focus Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| | 0.75% | 0.75% | 0.75% | 0.67% | 0.67% | 0.67% | 1.10% | 1.10% | 1.10% |
| | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 10.15% | 9.70% | 9.61% | 0.61% | 0.61% | 0.61% | 0.91% | 0.92% | 0.92% |
| | 10.90% | 11.20% | 11.11% | 1.28% | 2.03% | 2.03% | 2.01% | 2.77% | 2.77% |
| | 9.65% | 9.20% | 9.11% | 0.08% | 0.08% | 0.08% | 0.11% | 0.12% | 0.12% |
| | 1.25% | 2.00% | 2.00% | 1.20% | 1.95% | 1.95% | 1.90% | 2.65% | 2.65% |

The Equity Income, Large Cap Appreciation, Large Cap Value and Large Company Growth Funds invest substantially all of their assets in one master portfolio. The Funds' investment adviser has implemented breakpoint schedules for the management fees of the master portfolios in which these Funds invest. The breakpoint schedule for the master portfolios in which the Equity Income, Large Cap Value and Large Company Growth Funds invest is as follows: 0.75% for assets from $0 to $499 million, 0.70% for assets from $500 million to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. The breakpoint schedule for the master portfolio in which the Large Cap Appreciation Fund invests is as follows: 0.70% for assets from $0 to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher.

The Diversified Equity Fund and Growth Equity Fund each invest substantially all of their assets in two or more master portfolios. Management fees for the Growth Balanced Fund and Moderate Balanced Fund are based on a blended rate of the advisory fees charged to the master portfolios in which the Funds invest.

[5] Other expenses may include expenses payable to affiliates of Wells Fargo & Company. Other expenses for the Equity Index Fund have been adjusted as necessary from amounts incurred during the Fund's most recent fiscal year to reflect current fees and expenses.

[6] The adviser has committed through January 31, 2006 to waive fees and/or reimburse expenses to the extent necessary to maintain the Fund's net operating expense ratio shown.

[7] For the Equity Income and Large Company Growth Funds, the adviser has committed through April 30, 2007 to waive fees and/or reimburse expenses to the extent necessary to maintain the Fund's net operating expense ratio as shown.

| | Montgomery Mid Cap[5] Growth Fund | | | Montgomery Small[5] Cap Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[2] | 0.75% | 0.75% | 0.75% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[3] | 0.75% | 0.76% | 0.76% | 0.79% | 0.83% | 0.83% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.50% | 2.26% | 2.26% | 1.69% | 2.48% | 2.48% |
| Fee Waivers | 0.10% | 0.11% | 0.11% | 0.29% | 0.33% | 0.33% |
| NET EXPENSES[4] | 1.40% | 2.15% | 2.15% | 1.40% | 2.15% | 2.15% |

| | Small Company Value Fund | | | Specialized Health Sciences Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[2] | 0.90% | 0.90% | 0.90% | 0.95% | 0.95% | 0.95% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[3] | 0.68% | 0.71% | 0.70% | 0.89% | 0.89% | 0.89% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.58% | 2.36% | 2.35% | 1.84% | 2.59% | 2.59% |
| Fee Waivers | 0.13% | 0.16% | 0.15% | 0.19% | 0.19% | 0.19% |
| NET EXPENSES[4] | 1.45% | 2.20% | 2.20% | 1.65% | 2.40% | 2.40% |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

41

[1]   Expenses for gateway funds include expenses allocated from the master portfolio(s) in which each such Fund invests.
[2]   The Funds' investment adviser has implemented breakpoint schedules for the Funds' management fees and the management fees of the master portfolios in which the gateway funds invest. The management fees charged to the Funds/master portfolios will decline as a Fund's/master portfolio's assets grow and will continue to be based on a percentage of the Fund's/master portfolio's average daily net assets. The Montgomery Mid Cap Growth Fund, Montgomery Small Cap Fund, SIFE Specialized Financial Services Fund, Specialized Health Sciences Fund and Specialized Technology Fund invest directly in a portfolio of securities. The breakpoint schedule for the Montgomery Mid Cap Growth Fund is as follows: 0.75% for assets from $0 to $499 million, 0.70% for assets from $500 million to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. The breakpoint schedule for the Montgomery Small Cap Fund is as follows: 0.90% for assets from $0 to $499 million, 0.85% for assets from $500 million to $999 million; 0.80% for assets from $1 billion to $2.99 billion; 0.775% for assets from $3 billion to $4.99 billion; and 0.75% for assets $5 billion and higher. The breakpoint schedule for the SIFE Specialized Financial Services Fund and Specialized Health Sciences Fund is as follows: 0.95% for assets from $0 to $499 million, 0.90% for assets from $500 million to $999 million; 0.85% for assets from $1 billion to $2.99 billion; 0.825% for assets from $3 billion to $4.99 billion; and 0.80% for assets $5 billion and higher. The breakpoint schedule for the Specialized Technology Funds is as follows: 1.05% for assets from $0 to $499 million, 1.00% for assets from $500 million to $999 million; 0.95% for assets from $1 billion to $2.99 billion; 0.925% for assets from $3 billion to $4.99 billion; and 0.90% for assets $5 billion and higher.
   The Small Company Growth and Small Company Value Funds each invest substantially all of their assets in one master portfolio. The breakpoint schedule for these Funds is as follows: 0.90% for assets from $0 to $499 million, 0.85% for assets from $500 million to $999 million; 0.80% for assets from $1 billion to $2.99 billion; 0.775% for assets from $3 billion to $4.99 billion; and 0.75% for assets $5 billion and higher.
[3]   Other expenses may include expenses payable to affiliates of Wells Fargo & Company.
[4]   The adviser has committed through January 31, 2006 to waive fees and/or reimburse expenses to the extent necessary to maintain the Fund's net operating expense ratio shown.
[5]   For the Montgomery Mid Cap Growth, Montgomery Small Cap Funds and Specialized Technology Funds, the adviser has committed through April 30, 2007 to waive fees and/or reimburse expenses to the extent necessary to maintain the Funds' net operating expense ratio as shown.

| | SIFE Specialized Financial Services Fund | | | Small Cap Growth Fund | | | Small Company Growth Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| | 0.95% | 0.95% | 0.95% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 0.65% | 0.65% | 0.65% | 0.68% | 0.68% | 0.68% | 0.65% | 0.64% | 0.62% |
| | 1.60% | 2.35% | 2.35% | 1.58% | 2.33% | 2.33% | 1.55% | 2.29% | 2.27% |
| | 0.25% | 0.25% | 0.25% | 0.13% | 0.13% | 0.13% | 0.10% | 0.09% | 0.07% |
| | 1.35% | 2.10% | 2.10% | 1.45% | 2.20% | 2.20% | 1.45% | 2.20% | 2.20% |

| | Specialized Technology Fund[5] | | |
|---|---|---|---|
| | CLASS A | CLASS B | CLASS C |
| | 1.05% | 1.05% | 1.05% |
| | 0.00% | 0.75% | 0.75% |
| | 0.75% | 0.75% | 0.74% |
| | 1.80% | 2.55% | 2.54% |
| | 0.05% | 0.05% | 0.04% |
| | 1.75% | 2.50% | 2.50% |

92.   The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

42

and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

93.     The prospectus next discusses "Organization and Management of the Funds." This section is identical to the February 1, 2004 prospectus in all quoted respects, except that the assets under management by Wells Fargo Funds Management. Wells Capital Management, and Peregrine are updated as of September 30, 2004 as $74 billion in mutual fund assets, $112 billion, and $12.4 billion, respectively.  This section of the prospectus is false and misleading for the same reasons set forth above.

94.     Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons set forth above for this section of the prospectus.

95.     Finally, the Prospectus discusses "additional payments" in identical language as the February 1, 2004 prospectus and is false and misleading for the same reasons set forth above for this section of the prospectus .

**April 11, 2005 Small and Mid Cap Stock Funds Prospectus**

96.     The April 11, 2005 prospectus for the Wells Fargo Advantage C&B Mid Cap Value Fund, Common Stock Fund, Mid Cap Growth Fund, Small Cap Growth Fund, and Small Cap Value Fund -- share classes A, B and C-- is substantially identical to the earlier prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

97.     First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Small Cap Growth Fund is as follows:

> Small Cap Growth Fund (formerly named the Montgomery Small Cap Fund).  Seeks long-term capital appreciation.  We invest principally in securities of small-capitalization companies, which are defined as those with market capitalizations equal to or lower than the company with the largest market capitalization in the Russell 2500TM Index at the time of purchase; and up to 30% of the Fund's assets in foreign securities. The company with the largest market capitalization in the Russell 2500TM Index was $9.5 billion, as of December 31, 2004, and is expected to change frequently. As a hedging strategy, the Fund may write put and call options.

98.     This discussion of the fund's objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

43

fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

99.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table below:

| SHAREHOLDER FEES (fees paid directly from your investments) | | | |
|---|---|---|---|
| | **All Funds** | | |
| | **CLASS A** | **CLASS B** | **CLASS C** |
| Maximum sales charge (load) imposed on purchases (as a percentage of the offering price) | **5.75%** | **None** | **None** |
| Maximum deferred sales charge (load) (as a percentage of the *Net Asset Value* ("*NAV*") at purchase) | **None**[1] | **5.00%** | **1.00%** |

| ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets) | | | | | | |
|---|---|---|---|---|---|---|
| | **C&B Mid Cap Value Fund** | | | **Common Stock Fund** | | |
| | **CLASS A** | **CLASS B** | **CLASS C** | **CLASS A** | **CLASS B** | **CLASS C** |
| Management Fees[2] | **0.74%** | **0.74%** | **0.74%** | **0.70%** | **0.70%** | **0.70%** |
| Distribution (12b-1) Fees | **0.00%** | **0.75%** | **0.75%** | **0.00%** | **0.75%** | **0.75%** |
| Other Expenses[3] | **0.67%** | **0.67%** | **0.67%** | **0.63%** | **0.63%** | **0.63%** |
| TOTAL ANNUAL FUND OPERATING EXPENSES | **1.41%** | **2.16%** | **2.16%** | **1.33%** | **2.08%** | **2.08%** |
| Fee Waivers | **0.01%** | **0.01%** | **0.01%** | **0.02%** | **0.02%** | **0.02%** |
| NET EXPENSES[4] | **1.40%** | **2.15%** | **2.15%** | **1.31%** | **2.06%** | **2.06%** |
| | **Mid Cap Growth Fund** | | | **Small Cap Growth Fund** | | |
| | **CLASS A** | **CLASS B** | **CLASS C** | **CLASS A** | **CLASS B** | **CLASS C** |
| Management Fees[2] | **0.75%** | **0.75%** | **0.75%** | **0.90%** | **0.90%** | **0.90%** |
| Distribution (12b-1) Fees | **0.00%** | **0.75%** | **0.75%** | **0.00%** | **0.75%** | **0.75%** |
| Other Expenses[3] | **0.75%** | **0.76%** | **0.76%** | **0.72%** | **0.72%** | **0.72%** |
| TOTAL ANNUAL FUND OPERATING EXPENSES | **1.50%** | **2.26%** | **2.26%** | **1.67%** | **2.37%** | **2.37%** |
| Fee Waivers | **0.10%** | **0.11%** | **0.11%** | **0.27%** | **0.22%** | **0.22%** |
| NET EXPENSES[4] | **1.40%** | **2.15%** | **2.15%** | **1.40%** | **2.15%** | **2.15%** |

[1]   Class A shares that are purchased at NAV in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information.

[2]   The Funds' investment adviser has implemented a breakpoint schedule for the Funds' management fees. The management fees charged to the Funds will decline as a Fund's assets grow and will continue to be based on a percentage of the Fund's average daily net assets. The breakpoint schedule for the C&B Mid Cap Value, Common Stock, and Mid Cap Growth Funds is as follows: 0.75% for assets from $0 to $499 million; 0.70% for assets from $500 million to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. The breakpoint schedule for the Small Cap Growth and Small Cap Value Funds is as follows: 0.90% for assets from $0 to $499 million; 0.85% for assets from $500 million to $999 million; 0.80% for assets from $1 billion to $2.99 billion; 0.775% for assets from $3 billion to $4.99 billion; and 0.75% for assets $5 billion and higher.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

44

| ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets) | | | |
|---|---|---|---|
| | Small Cap Value Fund | | |
| | CLASS A | CLASS B | CLASS C |
| Management Fees[2] | 0.83% | 0.83% | 0.83% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% |
| Other Expenses[3] | 0.63% | 0.63% | 0.63% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.46% | 2.21% | 2.21% |
| Fee Waivers | 0.02% | 0.02% | 0.02% |
| NET EXPENSES[4] | 1.44% | 2.19% | 2.19% |

[3]   Other expenses may include expenses payable to affiliates of Wells Fargo & Company. Other expenses for the C&B Mid Cap Value Fund, Common Stock Fund and Small Cap Value Fund are based on estimated amounts for the current fiscal year. Other expenses for the C&B Mid Cap Value Fund include various Fund start-up expenses, which will only be incurred in the first year of the Fund's operation. Without including these first year expenses, the Gross Operating Expense ratio for the Class A, Class B and Class C shares of the C&B Mid Cap Value Fund would be 1.38%, 2.13% and 2.13%, respectively.

[4]   For all the Funds, except the C&B Mid Cap Value Fund, the adviser has committed through April 30, 2007, to waive fees and/or reimburse expenses to the extent necessary to maintain each Fund's net operating expense ratio shown. For the C&B Mid Cap Value Fund, the adviser has committed through February 28, 2007, to waive fees and/or reimburse expenses to the extent necessary to maintain the Fund's net operating expense ratio shown. After this time, the net operating expense ratio may be increased only with the approval of the Board of Trustees.

100.    The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

101.    The prospectus next discusses "Organization and Management of the Funds." This section is identical to the quoted portions of the February 1, 2005 stock fund prospectus except that the dollar amounts of assets under management are updated and is false and misleading for the same reasons discussed above for this section of the prospectus.

102.    Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above for this section of the prospectus.

103.    Finally, the Prospectus discusses "additional payments" with a slightly longer passage than the February 1, 2004 prospectus, as follows:

> In addition to payments received from the Funds for distribution and shareholder servicing, the Adviser, the Funds' distributor or their affiliates, may pay out of their own assets, and at no cost to the Funds, significant amounts to selling or shareholder servicing agents in connection with the sale and distribution of shares of the Funds or for

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

45

services to the Funds and their shareholders.

In return for these payments, the Funds may receive certain marketing or servicing advantages including, without limitation, inclusion of the Funds on a selling agent's "preferred list"; providing "shelf space" for the placement of the funds on a list of mutual funds offered as investment options to its clients; granting access to a selling agent's registered representatives; providing assistance in training and educating the selling agent's registered representatives and furnishing marketing support and other related services. Additionally, the Funds and their shareholders may receive certain services including, but not limited to, establishing and maintaining accounts and records; answering inquiries regarding purchases, exchanges and redemptions; processing and verifying purchase, redemption and exchange transactions; furnishing account statements and confirmations of transactions; processing and mailing monthly statements, prospectuses, shareholder reports and other SEC-required communications, and providing services that might typically be provided by a Fund's transfer agent (e.g., the maintenance of omnibus or omnibus-like accounts, the use of the National Securities Clearing Corporation for the transmission of transaction information and the transmission of shareholder mailings).

Payments made by the Funds' Adviser, distributor or their affiliates, for the advantages and services described above, may be fixed dollar amounts, may be based on a percentage of sales and/or assets under management or a combination of the above, and may be up-front or ongoing payments or both. Such payments may be based on the number of customer accounts maintained by the selling or shareholder servicing agent, or based on a percentage of the value of shares sold to, or held by, customers of the selling or shareholder servicing agent, and may differ among selling and shareholder servicing agents.

In addition, representatives of the Funds' distributor visit selling agents on a regular basis to educate their registered representatives and to encourage the sale of Fund shares. The costs associated with such visits and any arrangement, such as sponsoring various contests and promotions to encourage the sale of Fund shares, may be paid for by the Adviser, the Funds' distributor or its affiliates, subject to applicable NASD regulations.

This additional disclosure is false and misleading in the nearly all the same respects as the shorter disclosures used between February 1, 2002 and April 10, 2005. First, the language was not placed anywhere near the applicable text regarding strategies, shareholder fees, or organization and management of the funds. Instead, it appeared on a page near the end of the prospectus, without any heading, in a section entitled "How to Open an Account." The placement of the text seems deliberately designed to hide it from investors who might be looking for it. Second, the statement that selling agents "may" receive additional fees is materially

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-4518 (WHA)

46

misleading because in fact there already were set agreements to pay such fees, in specific amounts to specific firms.  Third, the statement does not disclose the amount of the additional fees, nor the fact that the "additional fees" were *greater than* the amount of fees for disclosed purposes such as shareholder servicing and 12b-1 fees., as set forth *infra*.  Fourth, the statement does not disclose that the source of the "additional payments" were fees charged to the investors by the funds, and then sent by the funds to the Investment Advisers and Distributors, or that the Investment Advisor's only source of income was fees earned from the funds.  Instead it states falsely that the provision of these payments are at "no cost to the Funds."  Fifth, the statement does not disclose to whom the additional payments were being made, which made it impossible for investors to determine if the selling agents with whom they were dealing had a conflict of interest or were potentially biased.

**April 11, 2005 Equity Gateway Funds Prospectus**

104.    The April 11, 2005 prospectus for the Wells Fargo Advantage C&B Large Cap Value Fund, Diversified Equity Fund, Equity Income Fund, Equity Value Fund, Growth Equity Fund, Large Cap Appreciation Fund, Large Company Growth Fund, Small Company Growth Fund, and Small Company Value Fund -- share classes A, B and C-- is substantially identical to the other prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

105.    First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Large Company Growth Fund and Diversified Equity Fund are as follows:

> Diversified Equity Fund. Seeks long-term capital appreciation with moderate annual return volatility.  The Fund is a gateway fund that invests in five different equity investment styles—large cap blend, large cap value, large cap growth, small cap, and international--to minimize the volatility and risk of investing in a single equity investment style. We currently invest in 14 master portfolios.
>
> * * *
>
> Large Company Growth Fund. Seeks long-term capital appreciation. The Fund is a gateway fund that invests in the common stocks of large U.S. companies that we believe have superior growth potential. We invest principally in securities of companies with market capitalizations of $3 billion or more.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

47

106.    This discussion of the funds' objectives and principal strategies is false and misleading in that it does not disclose that an additional objective to increase investments in the fund by use of a strategy of paying revenue-sharing kickbacks of fund assets to selling agents to incentivize new investments.

107.    Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page:

[remainder of page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

48

# Equity Gateway Funds

These tables are intended to help you understand the various costs and expenses you will pay as a shareholder in a Fund. These tables do not reflect charges that may be imposed in connection with an account through which you hold Fund shares. A broker-dealer or financial institution maintaining the account through which you hold Fund shares may charge separate account, service or transaction fees on the purchase or sale of Fund shares that would be in addition to the fees and expenses shown here.

| SHAREHOLDER FEES (fees paid directly from your investment) | | | |
|---|---|---|---|
| | **All Funds** | | |
| | CLASS A | CLASS B | CLASS C |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the *Net Asset Value* ("*NAV*") at purchase) | None[1] | 5.00% | 1.00% |

| ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets)[2] | | | | | | |
|---|---|---|---|---|---|---|
| | **C&B Large Cap Value Fund** | | | **Diversified Equity Fund** | | |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[3] | 0.75% | 0.75% | 0.75% | 0.83% | 0.83% | 0.83% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[4] | 0.85% | 0.85% | 0.85% | 0.54% | 0.54% | 0.54% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.60% | 2.35% | 2.35% | 1.37% | 2.12% | 2.12% |
| Fee Waivers | 0.40% | 0.40% | 0.40% | 0.12% | 0.12% | 0.12% |
| NET EXPENSES[5] | 1.20% | 1.95% | 1.95% | 1.25% | 2.00% | 2.00% |
| | **Large Cap Appreciation Fund** | | | **Large Company Growth Fund** | | |
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[3] | 0.70% | 0.70% | 0.70% | 0.67% | 0.67% | 0.67% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[4] | 0.72% | 0.71% | 0.71% | 0.61% | 0.61% | 0.61% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.42% | 2.16% | 2.16% | 1.28% | 2.03% | 2.03% |
| Fee Waivers | 0.17% | 0.16% | 0.16% | 0.08% | 0.08% | 0.08% |
| NET EXPENSES[5] | 1.25% | 2.00% | 2.00% | 1.20% | 1.95% | 1.95% |

[1] Class A shares that are purchased at *NAV* in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information. All other Class A shares will not have a CDSC.

[2] Expenses for *gateway funds* include expenses allocated from the master portfolio(s) in which each such Fund invests.

[3] The Funds' investment adviser has implemented breakpoint schedules for the management fees of the master portfolios in which the Funds invest. The management fees charged to the master portfolios will decline as a master portfolio's assets grow and will continue to be based on a percentage of the master portfolio's average daily net assets. Each Fund, except for the Diversified Equity Fund and Growth Equity Fund, invests substantially all of its assets in one master portfolio. The breakpoint schedule for the C&B Large Cap Value, Equity Income, Equity Value, and Large Company Growth Funds is as follows: 0.75% for assets from $0 to $499 million; 0.70% for assets from $500 million to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. The breakpoint schedule for the Large Cap Appreciation Fund is as follows: 0.70% for assets from $0 to $999 million; 0.65% for assets from $1 billion to $2.99 billion; 0.625% for assets from $3 billion to $4.99 billion; and 0.60% for assets $5 billion and higher. Management fees for the Diversified Equity and Growth Equity Funds are based on a blended rate of the advisory fees charged to the master portfolios in which the Funds invest.

FMG 012437

## Summary of Expenses

| | Equity Income Fund | | | Equity Value Fund | | | Growth Equity Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| | 0.69% | 0.69% | 0.69% | 0.75% | 0.75% | 0.75% | 1.00% | 1.00% | 1.00% |
| | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| | 0.49% | 0.49% | 0.49% | 10.15% | 9.70% | 9.61% | 0.60% | 0.59% | 0.59% |
| | 1.18% | 1.93% | 1.93% | 10.90% | 11.20% | 11.11% | 1.60% | 2.34% | 2.34% |
| | 0.08% | 0.08% | 0.08% | 9.65% | 9.20% | 9.11% | 0.10% | 0.09% | 0.09% |
| | 1.10% | 1.85% | 1.85% | 1.25% | 2.00% | 2.00% | 1.50% | 2.25% | 2.25% |

[4] Other expenses may include expenses payable to affiliates of Wells Fargo & Company. Other expenses for the C&B Large Cap Value Fund are based on estimates for the current fiscal year and include various Fund start-up expenses which will only be incurred in the first year of the Fund's operation. Without including these first year expenses, the Gross Operating Expense Ratios for the Class A, Class B and Class C shares of the C&B Large Cap Value Fund are 1.52%, 2.27% and 2.27%, respectively.

[5] For the Diversified Equity Fund, Equity Value Fund, Growth Equity Fund and Large Cap Appreciation Fund, the adviser has committed through January 31, 2006 to waive fees and/or reimburse expenses to the extent necessary to maintain each Fund's net operating expense ratio shown. The adviser has committed through April 30, 2007 to waive fees and/or reimburse expenses to the extent necessary to maintain the net operating expense ratio shown for the Large Company Growth Fund and the Equity Income Fund. The adviser has committed through February 28, 2007 to waive fees and/or reimburse expenses to the extent necessary to maintain the net operating expense ratio shown for the C&B Large Cap Value Fund.

FMG 012438

# Equity Gateway Funds                    Summary of Expenses

**ANNUAL FUND OPERATING EXPENSES (EXPENSES THAT ARE DEDUCTED FROM FUND ASSETS)[1]**

| | Small Company Growth Fund | | | Small Company Value Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[2] | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[3] | 0.65% | 0.64% | 0.62% | 0.68% | 0.71% | 0.70% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.55% | 2.29% | 2.27% | 1.58% | 2.36% | 2.35% |
| Fee Waivers | 0.10% | 0.09% | 0.07% | 0.13% | 0.10% | 0.15% |
| NET EXPENSES[4] | 1.45% | 2.20% | 2.20% | 1.45% | 2.20% | 2.20% |

[1] Expenses for *gateway funds* include expenses allocated from the master portfolio(s) in which each such Fund invests.

[2] The Funds' investment adviser has implemented a breakpoint schedule for the management fees of the master portfolios in which the Funds invest. The management fees charged to the master portfolios will decline as a master portfolio's assets grow and will continue to be based on a percentage of the master portfolio's average daily net assets. The breakpoint schedule for the Small Company Growth and Small Company Value Funds is as follows: 0.90% for assets from $0 to $499 million; 0.85% for assets from $500 million to $999 million; 0.80% for assets from $1 billion to $2.99 billion; 0.775% for assets from $3 billion to $4.99 billion; and 0.75% for assets from $5 billion and higher.

[3] Other expenses may include expenses payable to affiliates of Wells Fargo & Company.

[4] The adviser has committed through January 31, 2006 to waive fees and/or reimburse expenses to the extent necessary to maintain the Fund's net operating expense ratio shown. After this time, the net operating expense ratio may be increased only with the approval of the Board of Trustees.

FMG 012439

108.     The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

109.     The prospectus next discusses "Organization and Management of the Funds." This section is identical to the April 11, 2005 Small and Mid Cap Stock Funds prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

110.     Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons set above for this section of the prospectus.

111.     Finally, the Prospectus discusses "additional payments" in language identical to the April 11, 2005 Small and Mid Cap Stock Funds prospectus and is false and misleading for the same reasons set above for this section of the prospectus.

**April 11, 2005 International Stock Funds Prospectus**

112.     The April 11, 2005 prospectus for the Wells Fargo Advantage Emerging Markets Focus Fund, International Core Fund, International Equity Fund, and International Value Fund -- share classes A, B and C-- is substantially identical to the other prospectuses and is false and misleading for the same reasons.  It provides in relevant part as follows:

113.     First, the prospectus discusses the funds' "Fund—Objective— Principal Strategies." The discussion of the Emerging Market Focus Fund is the same as in the February 1, 2005 prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

114.     Next, the prospectus discusses "Shareholder Fees" and "Annual Fund Operating Expenses" as set forth in the table on the following page:

[remainder of page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

49

# International Stock Funds            Summary of Expenses

These tables are intended to help you understand the various costs and expenses you will pay as a shareholder in a Fund. These tables do not reflect the charges that may be imposed in connection with an account through which you hold Fund shares. A broker-dealer or financial institution maintaining the account through which you hold Fund shares may charge separate account, service or transaction fees on the purchase or sale of Fund shares that would be in addition to the fees and expenses shown here.

## SHAREHOLDER FEES (fees paid directly from your investments)

|  | All Funds | | |
|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C |
| Maximum sales charge (load) imposed on purchases (as a percentage of offering price) | 5.75% | None | None |
| Maximum deferred sales charge (load) (as a percentage of the *Net Asset Value* ("*NAV*") at purchase) | None[2] | 5.00% | 1.00% |
| Redemption Fee[1] | 2.00% | 2.00% | 2.00% |

## ANNUAL FUND OPERATING EXPENSES (expenses that are deducted from fund assets)

|  | Emerging Markets Focus Fund | | | International Core Fund | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[3] | 1.10% | 1.10% | 1.10% | 0.95% | 0.95% | 0.95% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[4] | 0.91% | 0.92% | 0.92% | 6.82% | 6.82% | 6.82% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 2.01% | 2.77% | 2.77% | 7.77% | 8.52% | 8.52% |
| Fee Waivers | 0.11% | 0.12% | 0.12% | 6.27% | 6.27% | 6.27% |
| NET EXPENSES[5] | 1.90% | 2.65% | 2.65% | 1.50% | 2.25% | 2.25% |

|  | International Equity Fund | | | International Value Fund[6,7] | | |
|---|---|---|---|---|---|---|
|  | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| Management Fees[3] | 0.95% | 0.95% | 0.95% | 0.95% | 0.95% | 0.95% |
| Distribution (12b-1) Fees | 0.00% | 0.75% | 0.75% | 0.00% | 0.75% | 0.75% |
| Other Expenses[4] | 0.76% | 0.76% | 0.75% | 0.80% | 0.74% | 0.74% |
| TOTAL ANNUAL FUND OPERATING EXPENSES | 1.71% | 2.46% | 2.45% | 1.75% | 2.44% | 2.44% |
| Fee Waivers | 0.21% | 0.21% | 0.20% | 0.25% | 0.19% | 0.19% |
| NET EXPENSES[5] | 1.50% | 2.25% | 2.25% | 1.50% | 2.25% | 2.25% |

FMG 013297

[1] Deducted from the net proceeds of shares redeemed or exchanged within 30 days after purchase. This fee is retained by the Fund. Please see "Redemption Fees" on page 57 for further information.

[2] Class A shares that are purchased at NAV in amounts of $1,000,000 or more may be assessed a 1.00% CDSC if they are redeemed within one year from the date of purchase. See "A Choice of Share Classes" for further information.

[3] The Funds' investment adviser has implemented a breakpoint schedule for each Fund's management fees, except the International Value Fund's, and the master portfolio in which the International Value Fund invests. The management fees charged to the Funds/master portfolio's will decline as a Fund's/master portfolio's assets grow and will continue to be based on a percentage of the Fund's/master portfolio's average daily net assets. The breakpoint schedule for the Emerging Markets Focus Fund is as follows: 1.10% for assets from $0 to $499 million; 1.05% for assets from $500 million to $999 million; 1.00% for assets from $1 billion to $2.99 billion; 0.975% for assets from $3 billion to $4.99 billion; and 0.95% for assets $5 billion and higher. The breakpoint schedule for the International Core Fund, International Equity Fund and master portfolio in which the International Value Fund invests substantially all its assets is as follows: 0.95% for assets from $0 to $499 million; 0.90% for assets from $500 million to $999 million; 0.85% for assets from $1 billion to $2.99 billion; 0.825% for assets from $3 billion to $4.99 billion; and 0.80% for assets $5 billion and higher.

[4] Other expenses may include expenses payable to affiliates of Wells Fargo & Company. Other expenses for the International Core Fund and the Class B and Class C shares of the International Value Fund are based on estimates for the current fiscal year.

[5] For the Emerging Markets Focus Fund and International Equity Fund, the adviser has committed through January 31, 2006, to waive fees and/or reimburse expenses to the extent necessary to maintain each Fund's net operating expense ratio shown. For the International Core Fund and International Value Fund, the adviser has committed through April 30, 2007, to waive fees and/or reimburse expenses to the extent necessary to maintain each Fund's net operating expense ratio shown. After this time, the net operating expense ratio may be increased only with the approval of the Board of Trustees.

[6] Expenses for the International Value Fund include expenses allocated from the master portfolio in which the Fund invests.

[7] The Fund, with eleven months of operating history, has nominal assets due to it being distributed on a very limited basis (only to the following individuals who are residents of the state of California: current employees, directors, trustees and officers of Wells Fargo Advantage Funds, and Wells Fargo & Company; and the family members of same). Due to the expected expansion of the distribution of the Fund during its second year of operations, the Fund's Adviser has determined to treat the Fund as a New Fund and has made certain assumptions as to its anticipated asset size in calculating the annual fund operating expenses referenced above. If such assumptions were not made, the annual fund operating expenses would be as follows:

## EXAMPLE OF EXPENSES

These examples are intended to help you compare the cost of investing in a Fund with the cost of investing in other mutual funds. The examples assume a fixed rate of return, the reinvestment of all dividends, and that fund operating expenses remain the same. The fee waivers shown in the table of Annual Fund Operating Expenses are not reflected in the 3, 5 and 10 year examples. Your actual costs may be higher or lower than those shown.

**You would pay the following expenses on a $10,000 investment assuming a 5% annual return and that you redeem your shares at the end of each period.**

| | Emerging Markets Focus Fund | | | International Core Fund | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| 1 YEAR | $ 957 | $ 968 | $ 568 | $ 919 | $ 928 | $ 528 |
| 3 YEARS | $1,159 | $1,148 | $ 848 | $2,193 | $2,218 | $1,918 |
| 5 YEARS | $1,586 | $1,654 | $1,454 | $3,587 | $3,691 | $3,491 |
| 10 YEARS | $2,770 | $2,824 | $3,091 | $6,747 | $6,808 | $6,963 |

| | International Equity Fund | | | International Value Fund[1] | | |
|---|---|---|---|---|---|---|
| | CLASS A | CLASS B | CLASS C | CLASS A | CLASS B | CLASS C |
| 1 YEAR | $ 919 | $ 928 | $ 528 | $ 919 | $ 728 | $ 528 |
| 3 YEARS | $1,064 | $1,047 | $ 744 | $1,071 | $1,042 | $ 742 |
| 5 YEARS | $1,431 | $1,492 | $1,288 | $1,447 | $ — | $ — |
| 10 YEARS | $2,462 | $2,508 | $2,771 | $2,499 | $ — | $ — |

FMG 013298

115.    The table setting forth "Shareholder Fees" and "Annual Fund Operating Expenses" is false and misleading because it fails to state that portions of the "Annual Fund Operating Expenses" are in fact paid as kickbacks to selling agents as described in this complaint and because it implies that the only compensation to selling agents paid by shareholders' fees are the "sales charges."

116.    The prospectus next discusses "Organization and Management of the Funds." This section is identical to the April 11, 2005 Small and Mid Cap Stock Funds prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

117.    Next, the Prospectus discusses the Distribution Plan, in identical language set forth in the prior prospectuses and is false and misleading for the same reasons discussed above for this section of the prospectus.

118.    Finally, the Prospectus discusses "additional payments" in language identical to the April 11, 2005 Small and Mid Cap Stock Funds prospectus and is false and misleading for the same reasons discussed above for this section of the prospectus.

**The Statements Of Additional Information Were Materially Misleading**

119.    Each Prospectus for each Wells Fargo Fund makes reference to the Statement of Additional Information with the following (or substantially the following) language:

YOU MAY WISH TO REVIEW THE FOLLOWING DOCUMENTS:

STATEMENT OF ADDITIONAL INFORMATION supplements the disclosures made by this Prospectus. The Statement of Additional Information has been filed with the SEC and incorporated by reference into this Prospectus and is legally part of this Prospectus.

120.    The Statement of Additional Information for each of the funds was misleading in the same fashion.  For example, the Statement of Additional Information for the Disciplined Growth Fund, Diversified Equity Fund, Diversified Small Cap Fund, Equity Income Fund, Equity Index Fund, Equity Value Fund, Growth Fund, Growth Equity Fund, Index Fund, International Equity Fund, International Fund, Large Company Growth Fund, Small Cap Growth Fund, Small Cap Opportunities Fund, Small Cap Value Fund, Small Company Growth Fund,

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-4518 (WHA)

50

share classes A, B, C, O and Institutional, dated February 1, 2000, provides in relevant part as follows.

121.    First, the Statement of Additional Information states the following regarding the duties of the investment advisor:

> Investment Advisor.  Subject to the general supervision of the Board, Wells Fargo Bank provides investment advisory services to the Funds.  As investment advisor, Wells Fargo Bank furnishes investment guidance and policy direction in connection with the daily portfolio management of the Funds.  Wells Fargo Bank furnishes to the Trust's Board of Trustees periodic reports on the investment strategies and performance of each Fund.
>
> The Funds operate under three types of advisory arrangements:  (i) stand- alone Funds with an investment advisor and sub-advisor; (ii) gateway feeder Funds that invest in a single corresponding core portfolio of Wells Fargo Core Trust ("Core Trust") and have "dormant" advisory arrangements at the gateway level; and (iii) gateway blended Funds that invest in two or more core portfolios and have both active and dormant advisory arrangements at the gateway level.

This statement is false and misleading in at least the following respects, as further described in this Complaint:  ((1) the Board did not supervise the Investment Advisor, and (2) the Investment Advisor did not report to the Board on the existence or scope of the revenue sharing arrangements.

122.    Next the Statement of Additional Information discusses the compensation of the Investment Advisor.  This information is provided on the following page.

[Remainder of Page left intentionally blank]

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

51

As compensation for its advisory services for the following stand-alone
Funds, Wells Fargo Bank is entitled to receive a monthly fee at the annual rates
indicated below of each Fund's average daily net assets.

| Stand-Alone Funds | Annual Rate (as a percentage of net assets) |
| ----------------- | ------------------------------------------- |
| Equity Index | 0.25% |
| Equity Value | 0.75% |
| Growth | 0.75% |
| International Equity | 1.00% |
| Small Cap Growth | 0.90% |
| Small Cap Opportunities | 0.90% |

As described in the second category above, the gateway feeder Funds (the
"Gateway Funds") each invest 100% of their assets in a single respective core
portfolio of Core Trust.  Because the Gateway Funds invest all of their assets
in a single portfolio, no investment advisory

<center>26</center>

<PAGE>

services are currently provided at the gateway feeder Fund level. However, in
order to preserve flexibility to allow the Gateway Funds to either invest in
more than one core portfolio of Core Trust or to convert to a stand-alone Fund
with a direct advisory relationship, the following Funds have a "dormant"
advisory arrangement with Wells Fargo Bank. Under the dormant advisory
arrangement, Wells Fargo Bank will receive no advisory fees as long as the
Gateway Fund invest all (or substantially all) of its assets in one core
portfolio of Core Trust. In the event that the Gateway Fund converts into a
gateway blended Fund as described above, Wells Fargo Bank as advisor would be
entitled to receive a fee of 0.25% for asset allocation services. The dormant
advisory rate listed below mirrors the advisory fee charged by Wells Fargo Bank
to the Core Trust portfolio in which the Gateway Fund invests.

<TABLE>
<CAPTION>

| Gateway Feeder Fund | Active Advisory Fees | Dormant Asset Allocation Fees/*/ | Pass-through Advisory Fees/**/ |
| ------------------- | -------------------- | -------------------------------- | ------------------------------ |
| <S> | <C> | <C> | <C> |
| Disciplined Growth | 0.00% | 0.25% | 0.75% |
| Equity Income | 0.00% | 0.25% | 0.75% |
| Index | 0.00% | 0.25% | 0.15% |
| International | 0.00% | 0.25% | 1.00% |
| Large Company Growth | 0.00% | 0.25% | 0.75% |
| Small Cap Value | 0.00% | 0.25% | 0.90% |
| Small Company Growth | 0.00% | 0.25% | 0.90% |

</TABLE>
_____

/*/  Represents the proposed advisory fee payable to Wells Fargo Bank as Advisor
     if the Fund converts into a gateway blended Fund.

/**/ Represents the advisory fee payable to Wells Fargo Bank as advisor to the
     portfolio(s) of Core Trust in which the Fund invests. This would be the
     proposed advisory fee payable to Wells Fargo Bank as advisor if the Fund
     converts into a stand-alone Fund.

As described in the third category above, the following gateway blended
Funds invest their respective assets in two or more Funds of Core Trust.  For
these Funds, Wells Fargo Bank determines the core portfolios of Core Trust in
which each gateway blended Fund invests and the percentage allocation that each
gateway blended Fund would make to each core portfolio.  For these asset
allocation services, Wells Fargo Bank is entitled to receive a fee as indicated
in the chart below.  The gateway blended Funds also have the dormant advisory
arrangements described above with respect to the gateway feeder Funds.

<center>27</center>

<PAGE>

<TABLE>
<CAPTION>

| Gateway Blended Funds | Advisory Fees (Maximum Asset Allocation Fees) | Core Level Dormant Advisory Fees* |
| --------------------- | --------------------------------------------- | --------------------------------- |
| <S> | <C> | <C> |
| Diversified Equity | 0.25% | 0.72% |
| Diversified Small Cap | 0.25% | 0.87% |
| Growth Equity | 0.25% | 0.97% |

</TABLE>
_____

*  Because the gateway blended Funds invest in two or more Core Trust portfolios
   with varying advisory fees, the dormant advisory fees are based on a formula
   that reflects a blended rate.

As discussed in the "Historical Fund Information" section, the Funds were
created as part of the reorganization of the Stagecoach and Norwest Funds.
Therefore, the information shown below concerning the dollar amount of advisory
(and other) fees paid shows the dollar amount of fees paid to either Wells Fargo
Bank or NIM by the predecessor portfolio that is considered the surviving entity
for accounting purposes.

<center>FORMER STAGECOACH FUNDS</center>

For the periods indicated below, the following Funds paid to Wells Fargo
Bank the following advisory fees and Wells Fargo Bank waived the indicated
amounts:

<TABLE>
<CAPTION>

| Fund | Year-Ended 9/30/99 Fees Paid | Fees Waived |
| ---- | ---------------------------- | ----------- |
| <S> | <C> | <C> |
| Equity Index | $1,647,315 | $1,035,373 |

</TABLE>

```
      Equity Value                  $1,375,903        $1,320,099
      Growth                        $1,923,826        $1,841,878
      International Equity          $  451,818        $  463,880
      Small Cap Growth              $  53,957
```

</TABLE>

<TABLE>
<CAPTION>

| Fund | Six-Month Period-Ended 9/30/98 | | Year-Ended 3/31/98 | | Six-Month Period-Ended 3/31/97 | |
|---|---|---|---|---|---|---|
| | Fees Paid | Fees Waived | Fees Paid | Fees Waived | Fees Paid | Fees Waived |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Equity Index | $572,998 | $158,503 | $ 1,638,127 | $ 288,393 | $ 933,498* | $ 0* |
| Equity Value | $843,996 | $ 0 | $ 1,286,783 | $ 95,512 | $ 557,096 | $ 0 |
| Growth | $969,698 | $ 0 | $ 1,753,825 | $ 44,284 | $ 782,529 | $ 0 |
| International Equity** | $238,297 | $ 83,843 | $ 145,743 | $ 111,696 | N/A | N/A |
| Small Cap Growth | $288,703 | $ 10,004 | $ 169,949*** | $ 227,120*** | $ 89,707*** | $ 0*** |

</TABLE>

                                    28
<PAGE>
_____

*    For the period between April 29, 1996 and December 15, 1997, amounts
     represent advisory fees paid by the Master Portfolio on behalf of the Fund
     as described below.

 **  These amounts indicate fees paid since September 24, 1997, the commencement
     date.

*** These amounts reflect fees allocated from the Master Portfolio for the Fund
    as described below.

1  This information is false and misleading because the fees paid did not in fact go for advisory

2  services, but instead a portion were used to pay revenue sharing kickbacks.

3       123.   Next, the Statement of Additional Information discusses the Investment Sub-

4  Advisors.  It states that "As compensation for sub-advisory services ... [the Sub-Advisors]

5  entitled to receive the following fees" and then lists a fee table.  This information is false and

6  misleading because a portion of the fee paid was not for sub-advisory services but was

7  redistributed to selling agents, including Wells Fargo Investments and H.D. Vest, as revenue

8  sharing kickbacks.

9       124.   Next, the Statement of Additional Information discusses the Administrator.  It

10  provides as follows:

> Administrator.  The Trust has retained Wells Fargo Bank as Administrator on behalf
> of each Fund.  Under the Administration Agreement between Wells Fargo Bank and
> the Trust, Wells Fargo Bank shall provide as administration services, among other
> things:  (i) general supervision of the Funds' operations, including coordination of the
> services performed by each Fund's investment advisor, transfer agent, custodian,
> shareholder servicing agent(s), independent auditors and legal counsel, regulatory
> compliance, including the compilation of information for documents such as reports
> to, and filings with, the SEC and state securities commissions; and preparation of
> proxy statements and shareholder reports for each Fund; and (ii) general supervision
> relative to the compilation of data required for the preparation of periodic reports
> distributed to the Trust's officers and Board of Trustees.  Wells Fargo Bank also
> furnishes office space and certain facilities required for conducting the Funds'
> business together with ordinary clerical and bookkeeping services.  The
> Administrator is entitled to receive a fee of up to 0.15% of each Fund's average daily
> net assets on an annual basis.

19  This information is false and misleading because a portion of the fee paid was not for the

20  administrative services provided but instead but was redistributed to selling agents as revenue

21  sharing kickbacks.

22       125.   Next, the Statement of Additional Information discusses the Distributor.  It

23  provides as follows:

> Distributor.  Stephens Inc. ("Stephens," the "Distributor"), located at 111 Center
> Street, Little Rock, Arkansas 72201, serves as Distributor for the Funds. The Funds
> have adopted a distribution plan (a "Plan") under Section 12(b) of the 1940 Act and
> Rule 12b-1 thereunder (the "Rule") for their Class B and Class C shares. The Plan
> was adopted by the Trust's Board of Trustees, including a majority of the Trustees
> who were not "interested persons" (as defined in the 1940 Act) of the Funds and who
> had no direct or indirect financial interest in the operation of the Plan or in any
> agreement related to the Plan (the "Non-Interested Trustees").

> Under the Plan and pursuant to the related Distribution Agreement, the Class B and Class C shares of the Funds pay Stephens up to 0.75% of the average daily net assets attributable to each Class as compensation for distribution- related services or as reimbursement for distribution-related expenses.
>
> The actual fee payable to the Distributor by the above-indicated Funds and Classes is determined, within such limits, from time to time by mutual agreement between the Trust and the Distributor and will not exceed the maximum sales charges payable by mutual funds sold by members of the National Association of Securities Dealers, Inc. ("NASD") under the Conduct Rules of the NASD.  The Distributor may enter into selling agreements with one or more selling agents (which may include Wells Fargo Bank and its affiliates) under which such agents may receive compensation for distribution-related services from the Distributor, including, but not limited to, commissions or other payments to such agents based on the average daily net assets of Fund shares attributable to their customers.  The Distributor may retain any portion of the total distribution fee payable thereunder to compensate it for distribution-related services provided by it or to reimburse it for other distribution-related expenses.

This information is false and misleading because according to the deposition testimony in this matter of Stephen, Inc. corporate representative Richard Blank because:  (1) in fact, the revenue sharing payments were being made for purposes subject to rule 12b-1 purposes but without complying with the 12b-1 plan, (2) the revenue sharing payments were made for all shares, not just class B and class C shares, (3) some if not all of the monies paid under the 12b-1 plan did not in fact go to the Distributor, but instead was redirected to selling agents either in the form of direct payments or in the form of reimbursements for meals, entertainment and travel expenses, (4) the Distributor sold all the rights to the 12b-1 fees to a third party, so that it could finance up-front payments to the selling agents of anticipated future 12b-1 fees, (5) the Distributor already had entered into selling agreements with selling agents by which 12b-1 fees were to be redirected to selling agents at the time of this disclosure, (6) the Distributor used other monies it earned as recordkeeper for the funds to finance marketing activities that were supposed to be paid by the 12b-1 fees, because the Distributor had assigned its right to the 12b-1 fees to a third party so that it could make the up-front payments to selling agents.

126.    Next, the Statement of Additional Information discusses the rule 12b-1 plan as follows:

> General.  The Plan will continue in effect from year to year if such continuance is approved by a majority vote of both the Trustees of the Trust and the Non-Interested Trustees.  Any Distribution Agreement related to the Plan also must be approved by such vote of the Trustees and the Non-Interested Trustees.  Such Agreement will

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

53

terminate automatically if assigned, and may be terminated at any time, without payment of any penalty, by a vote of a majority of the outstanding voting securities of the relevant class of the Fund or by vote of a majority of the Non-Interested Trustees on not more than 60 days' written notice.  The Plan may not be amended to increase materially the amounts payable thereunder without the approval of a majority of the outstanding voting securities of the Fund, and no material amendment to the Plan may be made except by a majority of both the Trustees of the Trust and the Non-Interested Trustees.

The Plan requires that the Treasurer of Trust shall provide to the Trustees, and the Trustees shall review, at least quarterly, a written report of the amounts expended (and purposes therefor) under the Plan.  The Rule also requires that the selection and nomination of Trustees who are not "interested persons" of the Trust be made by such disinterested Trustees.

Wells Fargo Bank, an interested person (as that term is defined in Section 2(a)(19) of the 1940 Act) of the Trust, acts as a selling agent for the Funds' shares pursuant to selling agreements with Stephens authorized under the Plan. As a selling agent, Wells Fargo Bank has an indirect financial interest in the operation of the Plan.  The Board of Trustees has concluded that the Plan is reasonably likely to benefit the Funds and their shareholders because the Plan authorizes the relationships with selling agents, including Wells Fargo Bank, that have previously developed distribution channels and relationships with the retail customers that the Funds are designed to serve. These relationships and distribution channels are believed by the Board to provide potential for increased Fund assets and ultimately corresponding economic efficiencies (i.e., lower per-share transaction costs and fixed expenses) that are generated by increased assets under management.

These statements are false and misleading in that (1) the revenue sharing kickbacks, though subject to rule 12b-1, were not approved in the method stated, (2) the statements falsely imply that there were no payments from the funds for purposes subject to rule 12b-1 other than the payments pursuant to the 12b-1 plan, (3) the revenue sharing payments did not benefit the Funds and their shareholders but rather decreased the value of investors' assets for the benefit of Defendants, (4) no economic efficiencies that benefited investors were derived from the revenue sharing arrangements.

127.   Next, the Statement of Additional Information discusses the Shareholder Servicing Plan and Shareholder Servicing Agents.  It states:

Shareholder Servicing Agent.  The Funds have approved a Servicing Plan and have entered into related Shareholder Servicing Agreements with financial institutions, including Wells Fargo Bank.  Under the agreements, Shareholder Servicing Agents (including Wells Fargo Bank) agree to perform, as agents for their customers, administrative services, with respect to Fund shares, which include aggregating and transmitting shareholder orders for purchases, exchanges and redemptions; maintaining shareholder accounts and records; and providing such other related services as the Trust or a shareholder may reasonably request.  For providing shareholder services, a Servicing Agent is entitled to a fee from the applicable Fund

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

54

as indicated below on an annualized basis, of the average daily net assets of the class of shares owned of record or beneficially by the customers of the Servicing Agent during the period for which payment is being made.  The amounts payable under the Shareholder Servicing Plan and Agreements are shown below.  The Servicing Plan and related Shareholder Servicing Agreements were approved by the Trust's Board of Trustees and provide that a Fund shall not be obligated to make any payments under such Plan or related Agreements that exceed the maximum amounts payable under the Conduct Rules of the NASD.

```
Fund                                             Fee

Diversified Equity
  Class A                                        0.25%
  Class B                                        0.25%
  Class C                                        0.25%
  Institutional Class                             N/A

Large Company Growth
  Class A                                        0.25%
  Class B                                        0.25%
  Class C                                        0.25%
  Institutional Class                             N/A

Small Cap Growth
  Class A                                        0.25%
  Class B                                        0.25%
  Class C                                        0.25%
  Institutional Class                            0.10%
```

General.  The Servicing Plan will continue in effect from year to year if  such continuance is approved by a majority vote of the Trustees of the Trust, and the Non-Interested Trustees. Any form of Servicing Agreement related to the Servicing Plan also must be approved by such vote of the Trustees and the Non- Interested Trustees. Servicing Agreements may be terminated at any time, without payment of any penalty, by a vote of a majority of the Board of Trustees, including a majority of the Non-Interested Trustees. No material amendment to the Servicing Plan or related Servicing Agreements may be made except by a majority of both the Trustees of the Trust and the Non-Interested Trustees.

The Servicing Plan requires that the Administrator of the Trust shall provide to the Trustees, and the Trustees shall review, at least quarterly, a written report of the amounts expended (and purposes therefor) under the Servicing Plan.

This information is false and misleading because (1) Defendants made revenue sharing payments to shareholder servicing agents (aka selling agents) far in excess of the disclosed shareholder servicing fees, (2) Defendants failed to secure the vote of trustees or non-interested trustees to approve such payments, (3) Defendants failed to provide the trustees of written reports of such payments.

128.   Finally, the Statement of Additional Information discusses the Custodian, as follows:

> Custodian.  Norwest Bank Minnesota, N.A. ("Norwest Bank"), located at Norwest Center, 6th and Marquette, Minneapolis, Minnesota 55479, acts as custodian for each Fund except for the International Equity Fund for which Investors Bank & Trust Company ("IBT"), located at 200 Clarendon Street, Boston, Massachusetts 02116, acts as custodian. The custodian, among other things, maintains a custody account or accounts in the name of each Fund, receives and delivers all assets for each Fund upon purchase and upon sale or maturity, collects and receives all income and other payments and distributions on account of the assets of each Fund and pays all expenses of each Fund. For its services as custodian, Norwest Bank is entitled to receive 0.02% of the average daily net assets of each Fund except the Gateway Funds. The Gateways Funds are not charged a custody fee at the Gateway level, provided that they remain Gateway Funds and Norwest Bank receives custodial fees for the Core Trust Portfolios. With respect to the International Equity Fund, IBT is entitled to receive a domestic custody fee of 0.01% of the average daily net assets of the Fund and transaction fees and basis point fees depending on the county in which the foreign assets are held.

This information is false and misleading because, in fact, a portion of the fees paid to the custodian were not for "services as custodian" but instead were redistributed from the custodian to other Wells Fargo entities that acted as selling agents for the funds, as "profit sharing", a.k.a. revenue sharing kickbacks.  The recipients of these monies included Defendant Wells Fargo Investments, H.D. Vest, and First Allied Securities.

**All Wells Fargo Funds Prospectuses and Statements Of Additional Information Were Identically False And Misleading**

129.   Every prospectus for every Wells Fargo Fund issued during the class period contained identical or substantially identical statements in the false and misleading categories of the Prospectus discussed above, namely, the fund's "objective and principal strategies," the "Shareholder Fees," and the "Organization and Management of the Funds."  Each of the prospectuses also incorporated by reference a Statements of Additional information, which contained identical or substantially identical statements in the false and misleading categories of the Statement of Additional Information discussed above, namely, Duties of Investment Advisor, Compensation of Investment Advisor, Investment Sub Advisors, Administrator, Distributor, 12b-1 Plan, Shareholder Servicing Plan and Shareholder Servicing Agent, and Custodian.  These sections of each prospectus and statement of additional information for each Wells Fargo Fund were false and misleading during the entire class period in the same respects set forth above.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

56

130.    Wells Fargo Funds Management LLC corporate representative Karla Rabusch, President of Wells Fargo Funds Management, stated during deposition testimony in this matter that Wells Fargo Funds Management, LLC used a "common template" for *all* prospectuses "in order to be consistent" for any disclosures regarding the revenue sharing practices at issue here – disclosures that are alleged to be inadequate and in violation of the federal securities laws. Rabusch  further admitted to the SEC on February 29, 2004, during its investigation of Wells Fargo Funds Management, LLC that there had been only two versions of "disclosures" in the Wells Fargo Funds prospectuses regarding revenue sharing (dated February 1, 2002 and Feburary 1, 2004), and that these were identical for all prospectuses.  As stated in her lette response to the SEC:

> [REQUEST BY SEC]  *Provide copies of all disclosures to investors relating to revenue esharing or directed brokerage commissions, and identify the relevant portion of each disclosure, the date the disclosure was first published, and any changes made to the relevant portion of the disclosure since January 1, 2001.*

> [WELLS FARGO RESPONSE]  Starting with prospectuses dated February 1, 2002, the following disclosure regarding revenue sharing was included in the Funds' prospectuses:

>> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the Adviser, the Distributor, or their affiliates in connection with the sale of Fund shares.

> Starting with prospectuses dated February 1, 2004, the revenue share language described above was revised and now reads as follows:

>> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the adviser, the distributor, or their affiliates in connection with the sale of Fund shares. These amounts may be fixed dollar amounts or a percentage of sales or both, and may be up-front or ongoing payments or both. Agents may agree to provide a marketing or servicing advantages to the Funds in return for the payments. Selling or shareholder servicing agents, in turn, may pay some or all of these amounts to their employees who recommend or sell Fund shares or make investment decisions on behalf of clients. Payments made with respect to the Funds may differ from those made with respect to other mutual funds available through the agent and could influence the agent's recommendations or decisions. Prospective investors should consult with their selling or shareholder servicing agent if they wish to request further information regarding these matters.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

57

These statements were false and misleading in all the following respects.  First, the language was not placed anywhere near the applicable text regarding strategies, shareholder fees, or organization and management of the funds.  Instead, it appeared on a page near the end of the prospectus, without any heading, in a section entitled "How to Open an Account."  The placement of the text seems deliberately designed to hide it from investors who might be looking for it.  Second, the statement that selling agents "may" receive additional fees is materially misleading because in fact there already were set agreements to pay such fees, in specific amounts to specific firms.  These statements left the impression that the payment might or might not materialize when it was, in reality, already a done deal.  Third, the statement does not disclose the amount of the additional fees, nor the fact that the "additional fees" were *greater than* the amount of fees for disclosed purposes such as shareholder servicing and 12b-1 fees., as set forth *infra*.  Fourth, the statement does not disclose that the source of the "additional payments" were fees charged to the investors by the funds, and then sent by the funds to the Investment Advisers and Distributors, or that the Investment Advisor's only source of income was fees earned from the funds.  Instead it states falsely that the provision of these payments are at "no cost to the Funds."  Fifth, the statement does not disclose to whom the additional payments were being made, which made it impossible for investors to determine if the selling agents with whom they were dealing had a conflict of interest or were potentially biased.  Nor do these statements adequately disclose that the payments were for preferential marketing of the Wells Fargo Funds over other mutual funds and that those payments created inherent conflicts of interests.

**The Investment Adviser and Distributor Defendants Knew  of The Kickback Scheme**

131.   According to internal Wells Fargo documents as well as sworn testimony from corporate representatives of Defendant WFFM and Defendant Stephens, Inc, the Defendants had actual knowledge of the kickback scheme at issue here.

132.   Specifically, the kickback arrangements entered into by WFFM were negotiated by WFFM President Rabusch or her predecessor Mike Hogan ("Hogan").  These agreements were then memorialized in written form and signed by Rabusch or Hogan and were good for

1  periods of a year or longer. For example, in the revenue-sharing arrangement between WFFM

2  and ᴬ                     the revenue-sharing kickback arrangement was memorialized in a letter of

3  understanding date            signed by Hogan, among other Wells Fargo personnel, that

4  stated that '                        REDACTED

5                          ' This revenue-sharing kickback arrangement was subsequently re-

6  confirmed in letters of understanding between               and WFFM that were signed by

7  Rabusch on or about              REDACTED          The           greement came only

8  days before Wells Fargo Funds issued updated prospectuses on June 9, 2003, which made no

9  mention of the agreement or any other revenue sharing arrangements.

10       133.    Likewise, in a           revenue sharing letter of understanding with the

11              and Wells Fargo, signed by Rabusch, under the subject line "Revenue Share

12  Agreement", it states that                         REDACTED                           J

13                                                           ." In

14  other words, instead of using the Expense Ratio, which is the total amount of fees paid by

15  investors for supposed legitimate services such as portfolio management, Defendant WFFM was

16                                      REDACTED

17       134.    The kickback arrangements discussed above that misappropriated investors'

18  earnings as kickbacks to              REDACTED          are just a few of a number of

19  revenue sharing arrangements entered into between Wells Fargo and selling agents. According

20  to internal Wells Fargo documents, Defendants had kickback arrangements with, among others,

21  the following selling agents during the Class Period:

22  E

23  [

24  I                        REDACTED

25  /

26  N                                                                           st

27  (

28  F

---

1

2

3

4

5   REDACTED

6

7

8

9

10

11       135.    The internal Wells Fargo documents reflecting these arrangements also show that

12  revenue-sharing kickbacks were not just limited to improperly used investment adviser fees, but

13

14

15

16

17

18

19   REDACTED

20

21

22

23

24

25

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

60

REDACTED

61

1

2

3

4

5

6

7

8

9

REDACTED

10

11

12

13

14

15

16

17

18

19      Wells Fargo Funds . . . .

20

21      140.    Notably, several of the selling agents listed directly above already have been fined

22      and censured by the SEC and/or NASD for the kickback arrangements at issue here.  For

23      example, on December 1, 2005, the SEC announced the fine and censure of American Express

24      (now known as Ameriprise) because it "failed to adequately disclose millions of dollars in

25      revenue sharing payments that it received from a select group of mutual fund companies." *See*

26      December 1, 20005 press release, *American Express Financial Advisors (now know as*

27      *Ameriprise Financial Services, Inc.) to Pay $30 Million to Settle Revenue Sharing Charges* at

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL       62
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

http://www.sec.gov/news/press/2005-168.htm.  As explained in the SEC's Cease-and-Desist

Order brought against American Express:

### AEFA Did Not Adequately Disclose Its Revenue Sharing Programs To Its Customers

AEFA did not make adequate disclosures to its brokerage customers relating to its receipt of revenue sharing payments from the inception of the program through approximately August 2004. Instead, AEFA relied on incomplete disclosures in its brokerage application, in some of its brochures and in the prospectuses and Statements of Additional Information ("SAIs") of the mutual fund families that participated in the Preferred Provider and Select Group programs to disclose its revenue sharing practices. Although the mutual fund families' prospectuses and SAIs contained various disclosures concerning payments to broker-dealers distributing their funds, many of these documents did not adequately disclose the source and the amount of the revenue sharing payments to AEFA and the dimensions of the resulting conflicts of interest.

None of the disclosures made by the participating mutual fund families indicated that many of AEFA's financial advisors were given financial incentives of paying reduced or no ticket charges for the sale of Preferred, Strategic, Select and Associate fund families at AEFA or that those financial advisors did not receive similar incentives for the sales of fund families that did not pay revenue sharing.

Moreover, these disclosures did not disclose the conflict of interest created by AEFA's selection of mutual fund families for participation in its distribution system based in part on the financial incentives provided to AEFA, including in some cases, the receipt of payments for distribution of fund shares through "step-outs."

In the Matter of American Express Financial Advisors, Inc. (now known as Ameriprise

Financial Advisors, Inc.) Order Instituting Administrative and Cease-and-Desist

Proceedings, SEC File No. 3-12115 at 6 available at http://www.sec.gov/litigation/admin/33-

8637.pdf

141.    Although the SEC did not disclose the names of any of the mutual fund

companies involved in paying revenue-sharing kickbacks to American Express, the internal

Wells Fargo documents discussed above reveal that Well Fargo was one of the mutual fund

companies making such payments to American Express that were the subject of the SEC cease

and desist order based, in part, on inadequate disclosures in the prospectuses of the participants –

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

63

1  i.e. Wells Fargo.  Additionally, in a parallel action by the New Hampshire Bureau of Securities

2  Regulation ("New Hampshire Bureau") against American Express for the type of kickback

3  payments at issue here, the New Hampshire Bureau identified Wells Fargo as one of the mutual

4  fund companies making the revenue-sharing kickback payments to American Express.  *See State*

5  *of New Hampshire Department of State Bureau of Securities Regulation, Staff Petition for Relief*

6  *in the Matter of American Express Financial Advisors, Inc. INV04-122* at 5 available at

7  http://www.sos.nh.gov/securities/EnforceOrderINV04-122.pdf

8       142.    Likewise, as stated above, both Wells Fargo Investments and H.D. Vest were

9  fined and censured by the NASD for their receipt of revenue-sharing kickbacks from Defendant

10  WFFM, among others.

11       143.    In order to keep track of the revenue-sharing kickback payments at issue here,

18                              REDACTED

REDACTED

65

REDACTED

66

REDACTED

**The Amount Of Kickbacks Paid Was Material**

REDACTED

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

67

REDACTED

153.    Had it been disclosed to investors at the time the investments were made that ___ REDACTED    heir fees would not be used for the purposes stated disclosed to investors in the Prospectuses or Statements of Additional Information, no reasonable investor would have invested in the Wells Fargo Funds. Had it been disclosed that the amounts of shareholder servicing fees and 12b-1 fees described in the Prospectuses were total amount of payments to selling agents taken out of fees charged by the funds, no reasonable investor would have invested in the Wells Fargo Funds. Indeed, had he or she known the truth, no reasonable investor would have agreed to any of the amounts being paid to selling agents, including the shareholder servicing fees, 12b-1 fees, other fees, or the loads and contingent deferred sales charges imposed on them, which, in total, amounted to billions of dollars.

**Wells Fargo Treated the Funds as One Common Unit**

154.    The Defendants treated all of the Wells Fargo Funds as one unit. All Wells Fargo Funds shared the same Board of Directors and had the same investment adviser, Wells Fargo Funds Management, LLC.

155.    Moreover, because Wells Fargo Funds Management, LLC was the sole investment adviser for all the Wells Fargo Funds, Wells Fargo Funds Management, LLC entered into revenue-sharing kickback arrangement that affected all of the Wells Fargo Funds. For example, the revenue-sharing arrangement entered into between            and Wells Fargo, signed by Rabusch, was on behalf of all the Wells Fargo Funds.

REDACTED

REDACTED

expenses.

157.    The fact that the Wells Fargo Funds Defendants treated the Wells Fargo Funds as one entity is further reflected by the fact that a single entity, Wells Fargo Funds Management, LLC, was responsible for drafting and creating the Prospectuses for all the Funds.  Because the Wells Fargo Funds were treated as one entity, several Wells Fargo Funds would appear on the same Prospectus or Statement of Additional Information, sharing the same language.  In fact, the Prospectuses and/or Statements of Additional Information for the five funds owned by Siemers and McKenna are applicable to up to 38 different Wells Fargo Funds.

158.    As set forth above, the applicable language of the Prospectuses is substantially identical regardless of fund, throughout the Class Period.  During her deposition as a corporate representative in the above-captioned matter, Rabusch further testified that, beyond funds listed in the same prospectus, that Wells Fargo Funds Management, LLC used a "common template" for *all* prospectuses "in order to be consistent" for any disclosures regarding the revenue sharing practices at issue here – disclosures that are alleged to be inadequate and in violation of the federal securities laws.

159.    Furthermore, investors in one fund were permitted to transfer investments to any other fund without payment of a sales load.  Thus an investor in any Wells Fargo fund has an interest in the integrity of the entire fund complex.

**SEC Enforcement Actions Confirm The Insufficiency**

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

69

1   **Of Defendants' Disclosures.**

2
3   > The SEC has ruled in similar cases that such prospectus disclosures
    > are not adequate.  *See*  SEC Order Instituting Administrative and
    > Cease-And-Desist Proceedings, Making Findings, and Imposing
    > Remedial Sanctions, In the Matter of Massachusetts Financial
4   > Services Company, Mar. 31, 2004, *available at*
5   > http://www.sec.gov/litigation/admin/ia-2224.htm;

6   SEC Order Instituting Administrative And Cease-And-Desist Proceedings, Making Findings,

7   And Imposing Remedial Sanctions, In the Matter of Franklin Advisers, Inc. and

8   Franklin/Templeton Distributors, Inc., *available at* http://www.sec.gov/litigation/admin/34-

9   50841.htm (emphasis added).  *See also* SEC Order Instituting Administrative And Cease-And-

10  Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the Matter of

11  OppenheimerFunds, Inc. and OppenheimerFunds Distributor, Inc., Sept. 14, 2004, *available at*

12  http://www.sec.gov/litigation/ admin/34-52420.pdf; SEC Order Instituting Administrative And

13  Cease-And-Desist Proceedings, Making Findings, And Imposing Remedial Sanctions, In the

14  Matter of Putnam Investment Management, LLC, Mar. 23, 2005, *available at*

15  http://www.sec.gov/litigation/admin/ia-2370.pdf

16          160.    Additionally, the Broker/Dealer Defendant's reliance on the Wells Fargo Funds'

17  prospectuses and SAIs to disclose the revenue sharing arrangements was insufficient to make

18  investors aware of the costs and risks associated with these arrangements.  The SEC recently

19  brought administrative actions against broker-dealers for failing to adequately disclose their

20  revenue sharing relationships to investors by solely relying on Shelf-space Funds' prospectuses

21  and SAI.  As was explained in the SEC Administrative Cease-and-Desist Order brought against

22  Citigroup Global Corp ("CGMI"):

23      > CGMI relied on the participating funds' prospectuses and SAIs to satisfy
        > its disclosure obligations with regard to its revenue sharing
24      > program….[M]ost of the disclosures were generally vague and lacked
        > sufficient information to inform CGMI's customers of the nature and scope
25      > of CGMI's revenue sharing program.  For example, the prospectuses and
        > SAIs did not specifically disclose the magnitude of the revenue sharing
26      > payments that CGMI received from the fund complexes or that certain fund
        > complexes had greater access to, or increased visibility in, CGMI's retail
27      > network.  As a result, CGMI's customers were not provided with sufficient

28

information to appreciate the dimension of the conflict of interest the
revenue sharing program created.

In the Matter of Citigroup Global Markets, Inc., Order Instituting Administrative and Cease-and-Desist Proceedings, SEC Act Release No. 8557, March 23, 2005. Likewise, in an SEC action against Edward D. Jones, another broker-dealer, the SEC also came to the same conclusions, and noted that the:

> [P]referred families' prospectuses and SAIs fail to disclose adequate information about the source and the amount of revenue sharing payments to Edward Jones and the dimensions of the resulting potential conflicts of interest.  Although the Preferred Families' prospectuses and SAI's contained various disclosures concerning payments to broker-dealers distributing their funds, few of these disclosures adequately described Edward Jones' potential conflict of interest.

In the Matter of Edward D. Jones & Co., L.P., Order Instituting Administrative and Cease-and-Desist Proceedings, SEC Release No. 8520, December 22, 2004.

161.    Here, as in the SEC's actions against Edward Jones and Citigroup, the Broker/Dealer Defendant improperly relied on prospectuses and SAIs that failed to disclose the financial quid pro quo arrangements discussed above.  The Wells Fargo Fund prospectuses and SAIs also failed to disclose that participants in the Broker/Dealer's financial arrangements paid with a portion of advisory fees and other fees derived from the Wells Fargo Funds and their investors, in addition to the sales loads accompanying the initial purchase of shares.  The Broker/Dealer Defendant took no other steps to ensure that investors were made aware of the material scope of these arrangements, the nature of which was also not disclosed, leaving investors unaware that the payments made by Wells Fargo Funds to the Broker/Dealer Defendant were in exchange for the Broker/Dealer Defendant's "financial consultants" steering investors into the Wells Fargo Funds.  In fact, the additional fees were paid to sway the financial consultants into misrepresenting the value and performance of the Wells Fargo Funds. Defendants, therefore, misled investors into believing that the Wells Fargo Funds were given priority over other mutual funds due to their performance and the consultants' objective analyses of different mutual funds.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

71

**The Investment Adviser Defendant and Distributor Defendants Were Responsible for the False and Misleading Statements in the Wells Fargo Funds' Prospectuses and SAIs.**

162.     The Investment Adviser and Distributor Defendants each were responsible for the statements made in the Wells Fargo Funds Prospectuses and SAIs and had a duty to disclose all material information in the Prospectuses and SAIs.  In addition to the general anti-fraud provision of section 10(b) of the Securities Exchange Act of 1934, the federal securities laws impose specific duties on mutual fund investment advisers and distributors/underwriters to disclose all material information.  *See* Section 11(a)(5) of the Securities Act of 1933, 15 U.S.C. § 77k (stating that an underwriter is liable for any misleading material statements or omissions made in a registration statement); section 34(b) Investment Company Act of 1940; 15 U.S.C. § 80a-34(b)  (stating that an investment adviser involved in the preparation or filing of a registration statement is liable for any misleading material statements or omissions made therein). Additionally, the SEC also imposes disclosure requirements on mutual fund investment advisers and distributors through its rules and regulations, including, but not limited to, the requirements of Form N-1A.   Accordingly, when a mutual fund investment adviser or distributor fails to meet the disclosure requirements imposed by the federal securities laws and the SEC, the SEC has held mutual fund investment advisers and distributor liable under the federal securities laws for failure to disclose.

163.     The Wells Fargo Prospectuses and SAIs state that the Investment Adviser Defendant – Wells Fargo Funds Management, LLC – was directly involved in the preparation and dissemination of the false and misleading Prospectuses and SAIs.  For example, the Prospectus for Wells Fargo Advantage Large Cap Stock Funds states as follows:

**Organization and Management of the Funds**

**The Administrator**
Funds Management provides the [Wells Fargo] Funds with administrative services, including general supervision of each Fund's operation, coordination of the other services provided to each Fund, *compilation of information for reports to the SEC and the state securities commissions, preparation of proxy statements and shareholder reports, and general supervision of data compilation in connection with preparing periodic reports to the Trust's*

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

72

*Trustees and officers.*

Prospectus for Wells Fargo Advantage Large Cap Stock Funds including the Wells Fargo Advantage Capital Growth Fund, Wells Fargo Advantage Dividend Income Fund, Wells Fargo Advantage Growth Fund, Wells Fargo Advantage Growth and Income Fund, Wells Fargo Advantage Large Cap Growth Fund and Wells Fargo Advantage Value Fund effective December 1, 2005 (emphasis added).

164.   The Statements of Additional Information to the Wells Fargo Advantage Funds Prospectuses further underscore the significant involvement of the Investment Adviser Defendant:

**Administrator**

The [Wells Fargo Fund] Trust has retained Funds Management (the *"Administrator"*) as administrator on behalf of the Portfolios pursuant to an Administration Agreement. Under the Administration Agreement with the Trust, Funds Management provides, among other things: (i) general supervision of the Portfolios' operations, including communication, coordination and supervision services with regard to the Portfolios' transfer agent, custodian, fund accountant and other service organizations that render record-keeping or shareholder communication services; (ii) ***coordination of the preparation and filing of reports and other information materials regarding the Portfolios, including prospectuses, proxies and other shareholder communications***; (iii) ***development and implementation of procedures for monitoring compliance with regulatory requirements*** and compliance with the Portfolios' investment objectives, policies and restrictions; and (iv) any other administrative services reasonably necessary for the operation of the Portfolios other than those services that are provided by the Portfolios' transfer agent, custodian and fund accountant. Funds Management also furnishes office space and certain facilities required for conducting the Portfolios' business together with ordinary clerical and bookkeeping services.

Wells Fargo Growth Fund SAI effective October 21, 2003 (emphasis added)

165.   Likewise, during her testimony as a corporate representative in this matter, Rabusch testified that Defendant Wells Fargo Funds Management LLC created the Wells Fargo Funds Prospectuses and SAI's at issue here and that WFFM is "responsible for the disclosures in the prospectuses, the creation of them, getting them out timely – the information in them."

In situations identical to that presented here where a mutual fund investment adviser is responsible for "compilation of information for reports to the SEC" and engaged in providing "revenue-sharing" kickbacks, the SEC has held the investment adviser liable for violating the disclosure requirements of the federal securities laws and Form N-1A. See, e.g., *See*  SEC Order Instituting Administrative and Cease-And-Desist Proceedings,

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

73

Making Findings, and Imposing Remedial Sanctions, In the Matter of Massachusetts Financial Services Company, Mar. 31, 2004, *available at* http://www.sec.gov/litigation/admin/ia-2224.htm;

SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanction In the Matter of Hartford Investment Financial Services, LLC, HL Investment Advisors, LLC, and Hartford Securities Distribution Company, Inc. dated November 6, 2006, *available at* http://www.sec.gov/litigation/admin/2006/33-8750.pdf (emphasis added). *See also* SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanction In the Matter of Putnam Investment Management, LLC dated March 23, 2005, *available at* http://www.sec.gov/litigation/admin/ia-2370.pdf; SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings and Imposing Remedial Sanction In the Matter of Franklin Advisers, Inc. and Franklin/Templeton Distributors, Inc., dated  December 13, 2004 *available at* http://www.sec.gov.litigation/admin/34-50841.htm ("The shelf space arrangements also were not adequately disclosed to the FT Shareholders.  [Investment adviser] FA [Franklin Advisers, Inc.] was responsible for ensuring that the disclosures made in the funds' prospectuses and Statements of Additional Information ("SAIs") accurately described how [distributor/underwriter] FTDI chose the broker-dealers with which it worked.").

### THE KICKBACKS WERE FINANCED BY EXCESSIVE FEES CHARGED TO THE WELLS FARGO FUNDS

166.    During the relevant time-frame, compensation and fees paid to the Investment Adviser and Distributor Defendants rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds or their investors in return for the additional fees.  As a result, the advisory and distribution fees were excessive.

167.    A major reason for the dramatic increase in compensation to the Investment Adviser Defendants, Distributor Defendants and affiliates was the growth in the size of the Wells Fargo Funds, resulting from Defendants' use of Wells Fargo Fund assets to promote the sale of Wells Fargo Fund shares through participation in revenue sharing or "Shelf Space" programs.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

74

These payments resulted in the growth of the Wells Fargo Funds, which benefited the Investment Adviser and Distributor Defendants because it allowed their advisory and other asset-based fees to increase.  The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations.  Defendants engaged in such activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Wells Fargo Funds or their investors, or by additional benefits to the Wells Fargo Funds or their investors.

168.    Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the Wells Fargo Funds or their investors.  Instead, they utilized the economies of scale for their own benefit.

169.    The fee structure imposed by Defendants on the Wells Fargo Funds and their investors far exceeded the fees that would be paid as a result of arm's-length bargaining.  Fees for essentially the same services that were paid by similar funds not affiliated with Defendants were substantially less.

170.    In addition, Wells Fargo Fund assets were used to pay large amounts of what essentially were "Rule 12b-1" fees to the Distributor Defendants without any benefit accruing to the Wells Fargo Funds or their investors from those payments, without being limited to class B and class C shares, and without disclosure to investors.

171.    Furthermore, the Directors of the Wells Fargo Funds ("Directors") failed to satisfy their duty to independently and conscientiously evaluate the Funds' 12b-1 and advisory fee arrangements, a factor which strongly supports a finding of fee excessiveness.  The Directors were unable to perform their duties as the "watchdogs" of the Wells Fargo Funds because they failed to obtain enough information adequately to evaluate the Wells Fargo Funds' distribution fees as required by Rule 12b-1.  As a result of the Directors' failure to be adequately informed, they were unable to evaluate whether Defendants' use of Wells Fargo Fund assets for Shelf Space agreements was in the Wells Fargo Funds' and their investors' best interest and whether

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

75

the fees being charged were excessive.  Moreover, the increase in the Wells Fargo Funds' net assets, accompanied by an increase in the expense ratios and Defendants' failure to reduce their fees, were red flags which the Directors disregarded.  As a result, the Directors did not perform their duties as "watchdogs" of the Wells Fargo Funds because they failed to ensure that any economies of scale that were being realized from the increase in Wells Fargo Funds assets were passed to the Wells Fargo Funds and their investors.  The Directors' failure to satisfy their duties resulted in excessive fees being charged to the Wells Fargo Funds that were disproportionate to the services rendered and were not the product of arm's-length bargaining.

172.    The fees charged to a mutual fund and its investors should be the equivalent of fees that would have been negotiated within the bounds of arm's-length bargaining.  Directors are responsible for negotiating the fees charged to the fund on behalf of the investors who, individually, are unable to negotiate such fees.  At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to investors, in that such fees must be reasonably related to the services provided.

173.    Congress has underscored directors' duties by adopting Section 15(c) of the Investment Company Act, requiring directors to be adequately informed of the terms of any investment advisory contracts, and giving them the authority to demand documents and other information from investment advisers in order to make informed and independent decisions when evaluating such contracts.  See 15 U.S.C. § 80a-15(c).  However, as alleged below, the Directors were beholden to the Investment Adviser Defendants, failed to adequately inform themselves and disregarded red flags showing that the advisory and distribution fees were excessive.  Furthermore, the Directors failed to hold the Investment Adviser Defendants accountable for revenue sharing agreements entered into by them with various brokerage firms, or for other Shelf Space payments for which the Investment Adviser and Distributor Defendants charged the Funds, and therefore their investors, excessive fees and commissions.

**The Excessive Fees At Issue**

174.    **Investment Advisory Fees**:  Investment advisory fees are calculated as a percentage of assets under management.  As the fund assets increase, the dollar amount of such

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

76

fees parallels this growth.  Directors are charged with ensuring that such growth does not result in a windfall to advisers where commensurate services are not provided.  Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.*, choosing the securities in which a mutual fund should invest and conducting the operations required to support the management of the portfolio, and include the overhead and administrative costs involved in conducting the business of the investment adviser.

175.  **Rule 12b-1 Fees**:  SEC Rule 12b-1 permits a fund to pay "12b-1" distribution fees out of fund assets, but only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its investors.  Distribution fees are comprised of fees paid to the Distributor Defendants for marketing and selling fund shares, including compensation for advertising, the printing and mailing of prospectuses and sales literature to investors and payments to financial consultants and others who sell fund shares.  Like the investment advisory fees, 12b-1 fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

176.  **Service Fees And Administrative Fees**:  Service and administrative fees are paid to persons to respond to investor inquiries, furnish investors with information about their investments, and to provide other services required to enable the functioning of the fund.  These two types of fees may pay for similar expenses or may significantly overlap, as described more fully below.  Unlike distribution fees, a fund may pay shareholder service and administrative fees without adopting a 12b-1 plan.  Accordingly, such fees are often not visible to investors and are highly susceptible to manipulation by the Investment Advisers.  Like the investment advisory fees and the 12b-1 fees, the service and administrative fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

177.  **Transfer Agency Fees**:  Transfer agency fees are paid to an in-house, affiliated or independent third party to handle sales and redemptions of fund shares, maintain shareholder records, compute the net asset value (the "NAV") of the fund daily, and pay out dividends and capital gains.  Like the investment advisory fees, the 12b-1 fees and the administrative/service

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

77

fees, the transfer agency fees are calculated as a percentage of assets under management and the dollar amount of such fees increases with the size of the fund.

178.   These foregoing fees are the principal components of a funds "expense ratio," which is the ratio of total expenses to net assets.  The expense ratio determines the fund's efficiency and cost effectiveness, and consequently a lower number is desirable because it reflects higher total returns.

**Factors That Show The Fees Charged To The Wells Fargo Funds And Their Investors Were Not Reasonably Related To The Services Provided Them And Were Excessive**

179.   Courts recognize that certain factors indicate that fees are excessive.  In particular, the following factors bear on whether the investment adviser and its affiliates are charging excessive fees to a fund and its investors:

- the nature and quality of services being paid for by the fund and its investors;

- whether the investment advisory fees are reduced to reflect the "fall-out benefits" the advisers receive, which are those benefits other than the advisory fees that flow to the adviser and its affiliates as a result of the adviser's relationship with the fund;

- what fees other fund families or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- whether the funds' directors or trustees exercised a sufficient level of care and conscientiousness in approving the investment advisory and distribution agreements.

180.   These factors, when applied to the Wells Fargo Funds, demonstrate that the fees charged to the Wells Fargo Funds and their investors were not reasonably related to the services provided and were excessive.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

78

**The Economies Of Scale Were Not Passed On To Investors**

181.    While Defendants were profiting from the Funds' growth, they failed to pass the economies of scale generated from such growth to the Funds and their investors.  The legislative history of Section 36(b) recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted … that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), as reprinted in 1970 U.S. Code Cong. & Ad. News, at 4901-02.

182.    An investment adviser's profit is a function of revenue minus the costs of providing services.  Defendants' incremental costs of providing advisory services to the Wells Fargo Funds were nominal.  The additional fees received by Defendants were disproportionate given that the nature, quality and level of the services they provided remained the same.  On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur at both the fund complex and portfolio levels for various costs incurred.  For example, many of the costs, such as the costs of research for a particular investment, remain fixed regardless of the amount of assets in a given fund devoted to that investment.  As has been noted, the mutual fund industry is a business in which economies of scale are present and are statistically significant.  *See* Jim Saxton, Chairman, Joint Economic Committee of the United States Congress, *The Mutual Fund Industry: An Overview and Analysis* 19 (2002) (citing William Baumol, *The Economics of Mutual Fund Markets: Competition Versus Regulation* 186, 190 (Kluwer Academic 1990)), *available at* http://www.house.gov/jec/mutual2.pdf.

183.    The growth of assets under management by the Investment Adviser Defendants has generated substantial economies of scale which, to the great benefit of the Investment Adviser and Distributor Defendants, have not been passed on to the Funds and their investors

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

79

through lower fees. Instead, Defendants retained these economies of scale for themselves as a windfall and continued charging greatly increased expenses without providing additional, commensurate services.

184. In regard to Wells Fargo Advantage Asset Allocation, industry analyst Morningstar noted that "the fund's rising costs disappoint us. Despite having below-average fees for a front-load offering in this category, fees have steadily trended upward over the past decade." Lawrence Jones, *Morningstar's Take: We think This Fund's Aggressive Allocation Stance and Increasing Costs Limit Its Appeal*, Dec. 1, 2005, http://quicktake.morningstar.com (password required). Morningstar's conclusions are supported by the increase in assets under management between 2002 and 2005, when the Fund grew from $1.13 billion to $1.16 billion and the expense ratio simultaneously increased from 1.84% to 1.90%.[1]

185. Additionally, in regards to Wells Fargo Small Cap Value Fund, Morningstar analysts have observed that, "[t]he fund's asset growth could have provided shareholders with one benefit: a lower cost, had this fund's advisor lowered expenses significantly as assets grew. Unfortunately, it has not done so. Lower costs could provide the fund a better opportunity to replicate past successes with a less nimble offering." Lawrence Jones, *Morningstar's Take: Could Wells Fargo Advantage Small Cap Value Become a Victim of Its Own Success*, Feb. 27, 2006, http://quicktake.morningstar.com (password required). The increase in assets under management and the expense ratio demonstrates Morningstar's point.

186. Several other Wells Fargo Funds illustrate the same historical trends with their expense ratios:

- Between 2002 and 2005, Wells Fargo Advantage Growth Equity Fund increased in assets from $390,546,000 to $560,779,000, and the Class B expense ratio also increased from 2.22% to 2.25%;[2]

---

[1] Wells Fargo Asset Allocation Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Asset Allocation, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[2] Wells Fargo Growth Equity Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Growth Equity, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

80

- Wells Fargo Advantage Outlook 2020 Fund's assets also increased between 2000 and 2005, growing from $230,820,000 to $363,586,000, and its Class B expense ratio rose from 1.30% to 2.02% during the same period;[3]

- Wells Fargo Advantage Diversified Equity Fund increased in assets between 2002 and 2005, from $1.16 billion to $1.37 billion, while its expense ratio remained constant.[4]

- Wells Fargo Montgomery Emerging Markets Focus Funds grew between 2002 and 2005 from $23,020,221 to $237,387,000 and its Class B expense ratio increased from 2.31% to 2.65%.[5]

- Between 2004 and 2005, Wells Fargo Advantage Small Cap Growth Fund increased from $131,274,000 to $246,389,079, and the Fund's Class B expense ratio remained at 2.15%.[6]

- Between 2001 and 2005, Wells Fargo Advantage Large Company Growth Fund increased from $202,514,000 to $524,323,000 and the expense ratio remained constant.[7]

---

[3] Wells Fargo Outlook 2020 Fund, annual report for fiscal year ending Feb. 28, 2005 (Form N-CSR) (Apr. 27, 2005); Wells Fargo LifePath 2020 Fund, annual report for fiscal year ending Feb. 28, 2001 (Form N-30D) (May 10, 2001).

[4] Wells Fargo Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2003 (Form N-CSR) (Dec. 9, 2003); Wells Fargo Advantage Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec 7, 2005).

[5] Wells Fargo Montgomery Emerging Markets Focus Fund, annual report for fiscal year ended June 30, 2003 (Form N-CSR) (Sept. 8, 2003); Wells Fargo Montgomery Emerging Markets Focus Fund, annual report for fiscal year ended Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[6] Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ended Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004); Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ended Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[7] Wells Fargo Advantage Large Company Growth Fund, annual report for fiscal year ended Sept. 30, 2001 (Form N-CSR); Wells Fargo Advantage Large Company Growth Fund, annual report for fiscal year ended Sept. 30, 2005 (Form N-CSR).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

81

187.    Additionally, when looking at how much higher Wells Fargo Funds' expense ratios are than the expense ratios of similar sized funds that would experience the same economies of scale, it is clear that the economies of scale were not passed to investors.  As illustrated below, the Funds were, on average, 55 bps more expensive than other funds:

| Comparison of 2004 Fees on Wells Fargo Funds to CRSP[8] Value-Weighted[9] Benchmark of Same-Sized Funds[10] Retail Share Classes Only Differences in Terms of Basis Points | | |
|---|---|---|
| **Fund Name** | **S&P Objective** | **Expense Ratio bps Higher than Industry Average** |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 58 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 50 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 15 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 32 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 11 |
| **Arithmetic Average Across Share Classes** | | **55bps** |

188.    The above fund information is provided for illustrative purposes; the complained of conduct occurred across the Wells Fargo Funds.

189.    Wells Fargo Funds' historical trend of failing to pass economies of scale to investors resulted in a huge windfall for the Investments Adviser Defendants, all to the detriment of investors.  The fees were not reasonably related to the services provided to the Funds and therefore investors were paying excessive fees.

---

[8] The University of Chicago Center for Research in Securities Prices ("CRSP") Benchmark is the value weighted average (defined below) of all funds in the same-size quartile that had the same CRSP Strategic Objective Designation.

[9] The value weighted benchmark is calculated by obtaining the contemporaneous monthly asset valuation for each fund and the averages of the funds' expense ratios that have the same strategic objective.

[10] Same-sized funds refers to funds that have similar size of class shares.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

82

**The Illusory Breakpoints In The Funds' Advisory Agreements Illustrate That
The Economies of Scale Were Not Passed On To The Funds And Their Investors**

190.    A "fee breakpoint" has been explained as follows:

> Many funds employ a declining rate structure in which the
> percentage fee rate decreases in steps or at designated breakpoints
> as assets increase…. The declining rate schedule reflects the
> expectation that costs efficiencies or scale economies will be
> realized in the management and administration of the fund's
> portfolio and operations as the fund grows.

John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of
Interest*, 26 Iowa J. Corp. L. 609, 620 n.59 (2001).

191.    While some of the advisory contracts for the Funds include breakpoints, many of
these breakpoints were meaningless because, as a practical matter, they did not pass any of the
economies of scale to Fund investors.  For example, prior to August 1, 2004, Wells Fargo
Advantage Outlook 2020 Fund had no advisory fee breakpoints.  Additionally, when the Fund
finally adopted breakpoints on that date, the first breakpoint started at $500 million, even though
the Fund held $363,585,000 in assets.[11]

192.    Wells Fargo Advantage Asset Allocation Fund also lacked breakpoints until
August 1, 2004.  The breakpoints that were adopted were illusory because after the Fund grew to
$1 billion in assets, its structure required the Fund to swell to $3 billion in assets before any
economies of scale would be passed to the investor.  For example, as of September 30, 2004, the
Fund had $1.1 billion in assets under management, but it would need to grow by another $2
billion before any more breakpoints would impact the Fund and pass any economies of scale to
the investors.[12]

---

[11] Wells Fargo Outlook 2020 Fund, annual report for fiscal year ending Feb. 28, 2005 (Form N-
CSR) (Apr. 27, 2005).

[12] Wells Fargo Advantage Asset Allocation Fund, annual report for fiscal year ending Sept. 30,
2004 (Form N-CSR) (Dec. 3, 2004).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

83

193.   Funds such as the Wells Fargo Advantage Diversified Equity Fund have no advisory fee breakpoints and therefore fail to pass on any economies of scale.[13]

194.   Following this trend, prior to August 1, 2004, Wells Fargo Advantage Small Cap Growth Fund lacked advisory fee breakpoints.  Additionally, when the Fund finally adopted breakpoints, the first breakpoint started at $500 million, even though the Funds were only at $131,274,000.[14]

195.   Prior to August 1, 2004, Wells Fargo Advantage Montgomery Emerging Markets Focus Fund also had no advisory fee breakpoints.  Additionally, when the Fund finally adopted breakpoints, the first breakpoint started at $500 million, even though the Funds were only at $195,486,000.[15]

196.   Additionally, the Investment Advisers hired other companies, known as sub-advisers, to do the day-to-day stock or bond picking for their portfolios.  As New York Attorney General Eliot Spitzer noted when he testified in front of the Senate, typically when parties engage in arms'-length negotiations, the sub-adviser agrees to be compensated with a portion of the advisory fee governed by breakpoints that kick in as the fund grows larger.  Rachel McTague, Spitzer Says Advisers Overcharged Funds; Fund Boards Breached Duty to Shareholders, Securities Regulation & Law Report, Feb. 02, 2004, available at http://corplawcenter.bna.com/pic2/clb.nsf/id/BNAP-5VPRZJ?OpenDocument.  This "typical" arrangement stands in sharp contrast to the facts in the instant matter.  Despite the fact that the Advisers did negotiate lower breakpoint fees with the sub-advisers (that yield more profits for them as the funds grow), the advisers continued to charge shareholders their full fee for "management services," pocketing the difference.  The charts below illustrate this phenomenon:

---

[13] *See, e.g.,* Wells Fargo Advantage Diversified Equity Fund, annual report for fiscal year ending Sept. 30, 2005 (Form N-CSR) (Dec. 7, 2005).

[14] Wells Fargo Advantage Small Cap Growth Fund, annual report for fiscal year ending Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004).

[15] Wells Fargo Advantage Montgomery Emerging Markets Focus Fund, annual report for fiscal year ending Sept. 30, 2004 (Form N-CSR) (Dec. 3, 2004).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

84

## Wells Fargo Advantage Outlook 20/20 Advisory Fee Breakpoints

### from 7/1/2005 Prospectus

| Advisory Fees | Average Daily Net Assets | Fee % | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | | | *Average Daily Net Assets* | *Fee %* |
| after 8/1/2004 | 0 - 499 million | 0.65 | *0-100 million* | *0.25* |
| | 500 - 999 million | 0.60 | *100 - 200 million* | *0.20* |
| | 1 - 2.99 billion | 0.55 | *over 200 million* | *0.15* |
| | 3 - 4.99 billion | 0.525 | | |
| | over 4.99 billion | 0.50 | | |

197.   While the sub-adviser's fee breakpoints apply to the Wells Fargo Fund beginning at $100 million, and again at $200 million, the adviser's breakpoints do not kick in until the Fund's assets reach $500 million. Therefore, when the assets in Wells Fargo Advantage Outlook 2020 Fund grew between $100 and $200 million, the sub-advisers' breakpoint structure resulted in the Investment Adviser Defendants receiving an additional 5 bps without performing any additional work, and when the assets in Wells Fargo Advantage Outlook 2020 Fund grew between $200 and $500 million, the Investment Adviser Defendants received an additional 10bps without performing any additional work.

## Wells Fargo Advantage Asset Allocation Advisory Fee Breakpoints

### from 2/1/2005 Prospectus

| Advisory Fees | Average Daily Net Assets | Fee % | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | | | *Average Daily Net Assets* | *Fee %* |
| after 8/1/2004 | 0 - 499 million | 0.65 | *0-100 million* | *0.15* |
| | 500 - 999 million | 0.60 | *over 100 million* | *0.10* |
| | 1 - 2.99 billion | 0.55 | | |
| | 3 - 4.99 billion | 0.525 | | |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

85

| | | |
|---|---|---|
| | over 4.99 billion | 0.50 |
| prior to 8/1/2004 | n/a | 0.75 |

198.   Again, the sub-adviser's fee breakpoints apply to the Fund when its assets are over $100 million, but the adviser's breakpoints do not kick in until the Fund's assets reach $500 million.  Thus, when Wells Fargo Advantage Asset Allocation Fund 's assets increased from $100 to $500 million, the Investment Adviser Defendant received an additional 5 bps in fees without performing any additional work as a result of the sub-advisers' breakpoints.

### Wells Fargo Advantage Growth Fund Advisory Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | - |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **Effective 2/1/2006 (LCGF Prosp. dated 2/1/06)** | 0-499 million | 0.75 | *0-25 million* | *0.75* |
| | 500-999 million | 0.70 | *25-50 million* | *0.60* |
| | 1-2.99 billion | 0.65 | *50-275 million* | *0.50* |
| | 3-4.99 billion | 0.625 | *over 275 million* | *0.30* |
| | over 5 billion | 0.60 | | |
| | | | - | - |

199.   Again, the sub-adviser's fee breakpoints apply to the Fund at $25 million, $50 million, and $275 million, while the Adviser's breakpoints do not kick in until the Fund's assets reach $500 million.  Therefore, while the assets in Wells Fargo Advantage Growth Fund grew, the Investment Adviser Defendant was receiving up to an additional 45 bps without performing any additional work

### Wells Fargo Small Cap Fund Advisory Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **effective 8/1/2004** | 0-499 million | 0.90 | *0-200 million* | *0.25* |
| | 500-999 million | 0.85 | *over 200 million* | *0.2* |
| | 1-2.99 billion | 0.80 | | |
| | 3-4.99 billion | 0.775 | | |
| | over 4.99 billion | 0.75 | | |
| | | | | |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

86

## Wells Fargo Montgomery Emerging Market Focus Fund Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **effective 8/1/2004** | 0-499 million | 1.10 | *0-200 million* | *0.25* |
| | 500-999 million | 1.05 | *over 200 million* | *0.2* |
| | 1-2.99 billion | 1.00 | | |
| | 3-4.99 billion | .975 | | |
| | over 4.99 billion | 0.75 | | |
| | | | | |

## Wells Fargo Large Company Growth Fund Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **effective 8/1/2004** | 0-499 million | .75 | *0-200 million* | *0.25* |
| | 500-999 million | .70 | *over 200 million* | *0.2* |
| | 1-2.99 billion | .65 | | |
| | 3-4.99 billion | .625 | | |
| | over 4.99 billion | 0.6 | | |
| | | | | |

## Wells Fargo Advantage Small Cap Growth Fund Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |
| **effective 8/1/2004** | 0-499 million | .9 | *0-200 million* | *0.25* |
| | 500-999 million | .85 | *over 200 million* | *0.2* |
| | 1-2.99 billion | .8 | | |
| | 3-4.99 billion | .775 | | |
| | over 4.99 billion | 0.75 | | |
| | | | | |

## Wells Fargo Advantage Total Return Bond Fund Fee Breakpoints

| | | | *(under Sub-Adviser agrmt)* | |
|---|---|---|---|---|
| | **Average Daily Net Assets** | **Fee %** | *Average Daily Net Assets* | *Fee %* |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

| effective 8/1/2004 | 0-499 million | .45 | *0-200 million* | *0.25* |
|---|---|---|---|---|
| | 500-999 million | .4 | *over 200 million* | *0.2* |
| | 1-2.99 billion | .35 | | |
| | 3-4.99 billion | .325 | | |
| | over 4.99 billion | 0.3 | | |
| | | | | |

200.    Again, in each of the above funds, the sub-adviser's fee breakpoints apply to the Fund when its assets are under $200 million, but the adviser's breakpoints do not kick in until the Fund's assets reach $500 million.  Thus, when the assets grew from $200 to $500 million in the Small Cap Fund, Small Cap Growth Fund, Emerging Market Focus Funds, Total Return Bond Fund, or Large Company Growth Fund, the Investment Adviser Defendant received an additional 5 bps without performing any additional work:

201.    The above fund information is provided for illustrative purposes; the complained of conduct occurred across the Wells Fargo Funds.

202.    As demonstrated above, the advisory fee breakpoints' lack of impact on fees levied on the Funds and their clear contrast to the savings gleaned by the Investment Adviser Defendant from the sub-advisers' contract further illustrates that the economies of scale were not passed to the Funds' investors.

**The Nature and Quality of Services Does Not Justify The Excessive Fees**

203.    The nature of the advisory services provided to the Wells Fargo Funds did not justify the excessive expense ratios carried by the Funds.  Defendants cannot justify their high fees by arguing that their managers and analysts are of superior quality and provide superior performance.  The performance of these Funds was not up to par with other, similar funds in the industry, and thus could not justify the higher fees.

204.    According to the Lipper Research Center, Wells Fargo Diversified Equity Fund received an average score in terms of the total returns, a low score in terms of providing consistent returns, and a low score in terms of expenses.  Lipper.com, *Scorecard: Wells Fargo Funds Management LLC*, Feb. 28, 2006, http://www.lipperweb.com/research/fund.asp?fundno=40019707 (password required).

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

88

Additionally, according to Lipper's Leader Scorecard, while the return on Wells Fargo Diversified Equity over one year would be 14.76%, other funds in the multi-cap core category would have a 16.50%; the Fund's three year annualized performance was estimated to be at 18.81%, even though the multi-cap core funds had a 20.30% return; and the Funds five year performance was 4.52% whereas the multi-cap funds have an annual return of 5.90%. *Id.*

205.    In regard to Wells Fargo Advantage Asset Allocation Fund, analysts have noted that, "[w]ith high volatility and middle performance, we have yet to see this strategy add the value investors are paying for." Lawrence Jones, *Morningstar's Take: We Think This Fund's Aggressive Allocation Stance and Increasing Costs Limit Its Appeal*, Dec. 1, 2005, http://quicktake.morningstar.com (password required).

206.    When comparing Wells Fargo Advantage Emerging Markets Fund with comparable funds, it underperformed its benchmark peers with the same S&P objective by 14.73%. Wells Fargo Advantage Small Cap Growth Fund also significantly underperformed benchmark funds with the same S&P objective by 13.55%. Wells Fargo Advantage Outlook 20/20 Fund also underperformed its peer funds by 0.22%.

207.    Additionally, most of the Wells Fargo Funds' returns were highly correlated with the S&P 500 Index, indicating a level of performance that is consistent with the passive type of fund management characteristics of an index fund, rather than the purported active fund management for which the Investment Adviser Defendants are being paid. As illustrated below, the performance of Plaintiffs' Funds is highly correlated to the S&P 500 Index, ranging from a .59 to .98 correlation in returns.

| Correlation Between Monthly Returns on the Wells Fargo Funds (A Shares) and the S&P 500 Market Index - January 2004 through December 2005 | | |
|---|---|---|
| Ranked by Asset Size | | |
| Fund Name | Correlation Coefficient | Total Net Assets as of 12/04 |
| Wells Fargo Advantage Small Cap Value Fund | 0.73* | $601.1m |
| Wells Fargo Funds: Asset Allocation Fund | 0.97* | $915.5 m |
| Wells Fargo Funds: Diversified Equity | 0.98* | $112.5 m |
| Wells Fargo Funds: Growth Equity Fund | 0.94* | $21.7 m |
| Wells Fargo Funds: Outlook 2020 Fund | 0.96* | $153.4 m |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

89

| * denote statistical significance at the 1% level |
| --- |

208.    The above fund information is provided for illustrative purposes; the complained of conduct occurred across the Wells Fargo Funds.

**The Fees Charged To The Funds And Their Investors Were Excessive
Relative To Similar Funds Offered In The Industry**

209.    When examining the expense ratios of other fund families that provide the same types of funds as Wells Fargo, it is apparent that the Investment Adviser Defendants charged higher fees than other investment advisers who manage the same type of portfolio.  As noted by Morningstar, even while some of Wells Fargo's expense ratios have declined, "many still rank above their respective categories."  Morningstar.com, *Stewardship Grade: Wells Fargo Advantage Asset Allocation Fund*, Aug. 25, 2004, http://quicktake.morningstar.com (password required).

210.    Wells Fargo Advantage Diversified Equity Fund Class B charges a significantly higher expense ratio than the category average, charging 2% when the category average is 1.21%.  Yahoo! Finance Profile, Wells Fargo Advantage Diversified Eq B (NVDBX), Feb 28, 2006, http://finance.yahoo.com/q/pr?s=nvdbx.

211.    Similarly, Wells Fargo Advantage Asset Allocation Class B had a higher expense ratio than similar funds, with the Fund charging 1.90% when the category average was 1.22%. Yahoo! Finance Profile, Wells Fargo Advantage Asset Allocation B (SASBX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=sasbx.

212.    Wells Fargo Advantage Small Cap Value Fund Class B also carries an expense ratio that is significantly higher than the category average of its type of fund, charging 2.24% when the category average is 1.49%.  Yahoo! Finance Profile, Wells Fargo Advantage Small Cap Value B (SMVBX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=smvbx.

213.    Wells Fargo Advantage Outlook 2020 Class C Fund charged a higher expense ratio than the category average, charging 2.02% when the category average is .68%. Yahoo! Finance Profile, Wells Fargo Advantage Outlook 2020 C (WFLAX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=wflax.

214.   Wells Fargo Advantage Growth Equity Fund Class B share fees were also excessively high, carrying an expense ratio of 2.25% when the category average is 1.49%. Yahoo! Finance Profile, Wells Fargo Advantage Growth Equity B (NVEBX), Feb. 28, 2006, http://finance.yahoo.com/q/pr?s=nvebx.

215.   As also illustrated below, the Wells Fargo Funds had a trend of carrying higher expense ratios than comparable funds:

| Comparison of Wells Fargo Funds Fees to the CRSP Benchmark | | |
|---|---|---|
| Benchmark is the Equally-Weighted Average[16] of all Funds Existing During 2004 With the same CRSP S&P Objective as the Wells Fargo Funds | | |
| | | |
| All Share Classes Only | | |
| Differences in Terms of Basis Points | | |
| | | |
| Fund Name | S&P Objective | Expense Ratio - bps Higher than Industry Average |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 75 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 52 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 53 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 78 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 74 |
| Wells Fargo Funds: Outlook 2020 Fund | Asset Allocation USA Flexible | 58 |
| | | 69 |
| **Arithmetic Average Across Share Classes** | | **64bps** |

216.   The above fund information is provided for illustrative purposes; the complained of conduct occurred across the Wells Fargo Funds.

217.   The lower fees charged by similar funds is also demonstrative of how Wells Fargo Funds carry excessively high expense ratios.  Additionally, it illustrates that investors can

---

[16] Equally-weighted average means that all funds were given equal value when determining the average of their expense ratio.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

91

obtain the same services for lower fees from other funds and that Wells Fargo's fees are not reasonably related to the services they are providing investors.

**The Investment Adviser Defendants Placed The Expense Of**
**Revenue Sharing Payments On The Funds And Their Investors**

218.   The Investment Adviser and Distributor Defendants also charged excessive fees by charging the Well Fargo Funds and their investors for Defendants' revenue sharing expenses described above.

219.   Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold.  Smita Madhur, *Revenue-Sharing Boosts Mutual Fund Sales Tenfold*, Financial-Planning.com, Jan. 24, 2005, http://www.financial-planning.com/pubs/fpi/20050124101.html.  At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and potentially excessive fees levied upon shareholders.

220.   Defendants' payments to brokers increased the fees levied on the Funds and their investors because the Investment Adviser Defendants, in determining the amount they would charge for their advisory fees, accounted for the costs of the revenue sharing agreements for which they paid broker dealers and others, in order to ensure the recovery of their full profit after the revenue sharing payments were made.

**The Investment Advisory Fees Were Excessive Because They Were Not**
**Reasonably Related To The Services Provided To The Funds Or Their Investors**

221.   A recent report on revenue sharing by Cerulli Associates notes that advisory fees are the most significant source of revenue sharing.  Cerulli Associates, *Mutual Fund Revenue Sharing: Current Practices and Projected Implications* (2005).  The advisory fee can be inflated in order to finance the adviser's revenue sharing obligations and, as shown herein, the Investment Adviser Defendants did just this with respect to the Wells Fargo Funds.

222.   Investment advisory fees are meant to cover management of the invested funds, including management and administrative activities related to managing the fund's portfolios.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

92

Report of the SEC on the Public Policy Implications of Investment Company Growth, H.R. Rep. No. 89-2337 (1966).

223. The investment advisory fees implemented by the Investment Adviser Defendants for revenue sharing do not fit either of these categories. As explained in the NASD Letter of Acceptance, Waiver and Consent, "the investment adviser to the Wells Fargo Proprietary Funds allocated revenue net of certain expenses to various Wells Fargo & Company affiliates, on their sale of the Wells Fargo Funds proprietary mutual funds." H.D. Vest Investment Services, NASD Letter Of Acceptance Waiver and Consent (No. CE1050007); June 8, 2005 NASD Press Release, *supra* ¶57; *see also* WF Investments, LLC, NASD Letter of Acceptance, Waiver and Consent (No. CE1050006).

224. The SEC has expressed concern over these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds. Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities . . . Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees." Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, 69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (to be codified at 17 C.R.F. pts. 239, 240 and 274).

225. The nature of Defendants' revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts on behalf of the Wells Fargo Funds. As a result of such activities, the aggregate net assets—against which the management fees were charged on a percentage basis—increased, with a consequent increase in the dollar amount of the advisory fees. The Investment Adviser Defendants therefore received "something for nothing" from the Wells Fargo Funds and their investors because the fees were not the result of any

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

93

1   increase or improvement in the services being provided, and did not reflect any legitimate

2   increase in the cost of the services being provided to the advisers and their affiliates.

3   226.   In addition, the advisory fee payments made by the Funds and their investors that

4   were utilized for revenue sharing were charged in violation of Rule 12b-1.  Advisory fees paid to

5   an investment adviser with the intent of allocating a certain amount towards distribution

6   practices, such as revenue sharing, are regulated under Rule 12b-1 and Section 36(b).  As the

7   SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes

8   distribution related payments out of its own resources . . . 'if any allowance were made in the

9   investment adviser's fee to provide money to finance distribution.'"  Investment Company

10  Institute, 1998 SEC No-Act. LEXIS 976, at *16 (Oct. 30, 1998) (citing Payment of Asset-Based

11  Sales Loads By Registered Open-End Management Investment Companies, Investment

12  Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)) (emphasis added).

13  Defendants paid for part of these revenue sharing arrangements through advisory fees to

14  circumvent limits placed on such distribution payments by Rule 12b-1.

15  **Defendants Paid Massive Fees That Were Subject To Rule 12b-1 Fees But Provided No
    Benefit To The Wells Fargo Funds Or Their Investors In Return**

16

17  227.   As discussed above, Rule 12b-1, promulgated by the SEC pursuant to the

18  Investment Company Act, prohibits mutual funds from directly or indirectly distributing or

19  marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.

20  The Rule 12b-1 conditions are, amongst others, that payments for marketing must be made

21  pursuant to a written plan "describing all material aspects of the proposed financing of

22  distribution;" all agreements with any person relating to implementation of the plan must be in

23  writing; the plan must be approved by a vote of the majority of the board of directors; and the

24  board of directors must review, at least quarterly, "a written report of the amounts so expended

25  and the purposes for which such expenditures were made." 17 C.F.R. § 270.12b-1(b).

26  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to

27  any agreement with such company relating to such plan shall have a duty to furnish, such

28  information as may reasonably be necessary to an informed determination of whether such plan

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

94

should be implemented or continued." 17 C.F.R. § 270.12b-1(d).  The directors may continue the

plan "only if the directors who vote to approve such implementation or continuation conclude, in

the exercise of reasonable business judgment and in light of their fiduciary duties under state law

and sections 36(a) and (b) (15 U.S.C. § 80a-35(a) and (b)) of the Act that there is a reasonable

likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

As noted above, Rule 12b-1 fees are assessed as a percentage of assets under management and,

accordingly, grow proportionately with the size of the Funds.Here, the Wells Fargo Funds

Defendants violated rule 12b-1 by paying revenue sharing kickbacks that were for the same

purposes for which rule 12b-1 was designed, but without meeting the requirements of 12b-1 of

Board approval, proof of shareholder interests, and full disclosure.

228.    Additionally, even excluding the revenue sharing payments and looking only at

the fees that Wells Fargo states were paid pursuant to 12b-1 plans, the fees charged to Wells

Fargo Funds were higher than those charged to comparable funds.  As illustrated below, the

Funds on average, charged 12b-1 fees that were 32 bps higher than other funds:

| Comparison of Wells Fargo Funds Fees to the CRSP Benchmark | | |
|---|---|---|
| **Benchmark is the Equally-Weighted Average of all Funds Existing During 2004 With the same CRSP S&P Objective as the Wells Fargo Funds** | | |
| | | |
| **Retail Share Classes Only** | | |
| Differences in Terms of Basis Points | | |
| | | |
| **Fund Name** | **S&P Objective** | **12b-1 Fees - bps Higher than Industry Average** |
| Wells Fargo Advantage Small Cap Value Fund | Equity USA Small Co. | 59 |
| Wells Fargo Funds: Asset Allocation Fund | Asset Allocation USA Flexible | 19 |
| Wells Fargo Funds: Growth Equity Fund | Equity USA Growth | 27 |
| Wells Fargo Funds: Montgmry Emg Mkt Foc Fund | Equity Global Emerging Mkt. | 27 |
| Wells Fargo Funds: Montgmry Small Cap Fund | Equity USA Small Co. | 37 |
| Wells Fargo Funds: Outlook 2020 Fund | Asset Allocation USA Flexible | 34 |
| | | 19 |
| **Arithmetic Average Across Share Classes** | | **32bp** |

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

95

229.    The above fund information is provided for illustrative purposes; the complained of conduct occurred across the Wells Fargo Funds.

**The Directors' Failure To Act Independently And Conscientiously Resulted In Defendants Charging Excessive Fees To The Funds And Their Investors**

230.    Mutual funds are typically created and managed by investment advisers for a profit.  Investment advisers usually supervise a mutual funds' daily operations, and often select affiliated persons to serve on the board of directors.  As former SEC Commissioner Manuel Cohen remarked when referring to testimony by investment advisers:

> They also made the point that the investment advisor creates the fund, and operates it in effect as a business.  Many of them stated that "It is our fund, we run it, we manage it, we control it," and I don't think there is anything wrong with them saying it.  They were just admitting what is a fact of life.  The investment advisor does control the fund.

Freeman & Brown, Mutual Fund Advisory Fees, 26 Iowa J. Corp. L. at 615 n.24 (citing Statement of Manuel Cohen, Commissioner, SEC, Investment Company Act Amendments of 1976: Hearings on H.R. 9510, H.R. 9511 Before the Subcomm. on Commerce and Fin. of the Comm. on Interstate and Foreign Commerce (1967)).

231.    As a result of the investment adviser's control of the fund, the relationship between investment advisers and mutual funds contains many potential conflicts of interest.  This conflict arises because part of the fees the investment advisers charge, which reduce investors' returns, represents revenue and a source of profit to the investment adviser.  *See* GAO Report, *Mutual Fund Fees: Additional Disclosure Could Encourage Price Competition* 14, 82 ("GAO Report") (June 2000), *available at* http://www.gao.gov/new.items/gg00126.pdf.

232.    The Investment Company Act ("ICA") was enacted in response to concerns that mutual fund shareholders were not being adequately protected as a result of these conflicts of interest.  As a result, the Directors were made responsible for overseeing the investment advisers' activities.  GAO Report at 14.  More specifically, the Investment Company Act requires the presence of independent directors on the board of directors to review and approve the fees the funds and their investors are charged.  See 15 U.S.C. § 80a-10(a).  The board of directors is responsible for approving the investment advisory agreements, 12b-1 plans, and fees

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

96

1   paid to Investment Adviser Defendants.  In reviewing and approving the foregoing, the Directors

2   are required to act in the best interest of the investors.

3       233.    Acting in the investors' best interests requires the Directors to exercise due care in

4   approving the fees charged to those Funds that the Directors have the responsibility to oversee.

5   This is why the expertise of the independent Directors, whether they are fully informed about all

6   facts bearing on the adviser's fee, and the extent of care and conscientiousness with which they

7   perform their duties are among the most important factors to be examined in evaluating whether

8   the compensation fund advisers and distributors receive is reasonable under §36(b) of the ICA.

9   *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 930 (2d Cir. 1982).

10      234.    One of the ways to evaluate whether the Directors fulfilled their duties with

11  adequate care and conscientiousness is to determine whether they acted independently in

12  approving the Funds' fee arrangements or whether the Directors' actions were controlled by the

13  Funds' investment advisers.  In determining whether or not a Director is considered an

14  "interested person," the ICA states that "[a] natural person shall be presumed not to be a

15  controlled person."  15 U.S.C. § 80a-2(a)(9).  The term "interested person" is defined to include

16  "any affiliated person" of an investment company, investment adviser, or principal underwriter.

17  *Id.* at § 80a-2(a)(19)(A)(i); (B)(i).  "Affiliated person" is further defined as "any person directly

18  or indirectly controlling, controlled by, or under common control with, such other person."  *Id.* at

19  § 80a-2(a)(3)(C) (emphasis added).  Finally, the ICA defines "control" as "the power to exercise

20  a controlling influence over the management or policies of a company."  *Id.* at § 80a-2(a)(9)

21  (emphasis added).

22      235.    The presumption that a Director is not a "controlled person" under the ICA may

23  be rebutted by "evidence."  *Id.* at § 80a-2(a)(9).  Such evidence may include allegations that non-

24  employee directors followed a course of action suggested by the investment adviser which

25  prejudiced the Funds' shareholders.  If the Directors rubber-stamp follow suggestions of the

26  Investment Adviser Defendants, they cannot fulfill their statutory duties to act as "watchdogs"

27  for the Funds.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

97

236. The Directors who served on the Board of Directors of the Wells Fargo Funds during the relevant time period include: Robert C. Brown, J. Tucker Morse, Thomas S. Goho, Peter G. Gordon, Richard M. Leach, Timothy J. Penny and Donald C. Willeke.

237. All the Directors are on the boards of all the Wells Fargo Funds. However, the fee structures in place show that the Directors failed to earnestly considered the shareholders' interests when negotiating the various fees of the Wells Fargo Funds.

238. A wealth of evidence demonstrates that the purportedly "non-interested" Directors blindly followed the Investment Adviser Defendants' suggested courses of action by rubber-stamping fees and arrangements which prejudiced the Wells Fargo Funds' investors. This evidence also firmly establishes that, even if the Directors were considered "independent," they failed to fulfill their duties with the care and conscientiousness necessary to ensure that the fees paid to Defendants from Wells Fargo Fund and investor assets were reasonable and not excessive. Specifically, Directors failed to genuinely consider and recognize that the Wells Fargo Funds should be considered individually instead of as part of a fund family unit; that no economies of scale were passed to investors as the Wells Fargo Funds grew; that the fees were significantly more expensive than comparable funds; and that the advisory fees should be reduced to reflect the fall out benefits received by Defendants.

239. Directors breached their duties because their service on all the Wells Fargo Funds allowed them to treat the Wells Fargo Funds as a unit of the Wells Fargo Fund complex, instead of examining each fund individually and diligently. As industry analyst Morningstar notes, "there is just one board for all mutual funds in the Wells Fargo complex. That structure could make it more difficult for the board to focus on what is happening to each fund." Morningstar.com, *Stewardship Grade: Wells Fargo Advantage Asset Allocation Fund*, Aug. 24, 2004, http://www.quicktake.morningstar.com (password required). For example, the Wells Fargo Fund complex would enter in agreements on behalf of all the Funds, instead of Directors determining whether the administrative services and fees or shareholder services fees were appropriate for the individual Funds. For example, according to the transfer agency and service agreement dated August 10, 2004, the Wells Fargo Fund Trust, the registrant for all the Wells

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

98

Fargo mutual funds, entered into an arrangement with Boston Financial Data Services, evidenced

by the most recent annual agreement approved by the Wells Fargo Board of directors on May 18,

2004.  These transfer agency agreements included 'complex base fees' to be applied to all of the

Portfolios of Wells Fargo Funds Trust and Wells Fargo Variable Trust Portfolios.  Wells Fargo

Funds Trust, Transfer Agency & Service Agreement and Shareholder Servicing Plan, effective

Nov. 8, 1999 (Oct. 30, 2000), amended Mar. 1, 2003 (Exh. 99.B(H)(3)) (Aug. 30, 2003),

Schedule A amended Feb. 8, 2005 (EX-99.B(H)(3)) (Apr. 11, 2005).  Administrative agreements

were also entered into by the Board on behalf of the Wells Fargo Trust incurring fees for the

retail class shares of 0.33%, regardless of each individual Fund's needs.  Wells Fargo Funds

Trust, Administration Agreement, June 9, 2003 (Exh. 99.B(H)(1)) (Aug. 15, 2003), Appendix A

amended Aug. 10, 2004 (Exh. 99.B(H)(1)) (Apr. 11, 2005).

240.    The Directors knew that the cost of these revenue sharing and directed brokerage

payments should have been borne by the Defendants as their own out-of-pocket expenses, yet

did nothing to prevent the siphoning of these payments from Fund and investor assets or to

appropriately reduce the advisory fee.  The fact that the Directors did not even question the acts

or recommendations of the Defendants with respect to these programs (which only benefited

Defendants) demonstrates the Directors' failure to act as a "watchdog" of the Investment Adviser

Defendants.

241.    Another of these instances was the Directors' lack of action with respect to the fee

levels and structures in place for the Wells Fargo Funds.  Again, by failing to act to reduce the

Wells Fargo Funds' fees, the Directors neglected to represent the Wells Fargo Funds and their

investors with the degree of care and conscientiousness required of them.

242.    Another example of the Directors following a course of action set by the

Investment Adviser Defendants instead of acting in the investors' best interest is found in the

Directors' failure to implement fee structures that had meaningful—or even any—breakpoints

for certain Wells Fargo Funds, while adopting them in others.  The SEC has made clear that it is

the duty of the directors to carefully scrutinize the advisory and other fees to ensure that the

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

99

economies of scale are being passed to investors as Fund assets grow so that the increases in advisory and other fees are not a windfall to the investment advisers and their affiliates:

> If the fund or fund family is experiencing economies of scale, fund directors have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by, for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's fees, or that the adviser provide additional services under the advisory contract. If the fund or fund family is not experiencing economies of scale, then the directors may seek to determine from the adviser how the adviser might operate more efficiently in order to produce economies of scale as fund assets grow.

SEC, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000), *available at* http://www.sec.gov/news/studies/feestudy.htm.

243.   While Plaintiffs and other Wells Fargo investors have contributed to the growth of Fund assets, they received no benefits in return. The Directors continually allowed investor assets to be used for only the benefit of the Investment Adviser Defendants and their affiliates. As purportedly "independent" Directors, they had a duty to question the Investment Adviser Defendants' and their affiliates' practices, and to ensure that any economies of scale that were being realized from the increase in the Wells Fargo Funds' assets were being passed on to shareholders, the rightful recipients. The Directors ultimately failed to exercise the requisite care and conscientiousness in performing their statutory duties by approving a course of action suggested by the Investment Adviser Defendants that was of no benefit to the Wells Fargo Funds or their investors. The Directors' approval of such actions, which prejudiced the Wells Fargo Funds and their investors, further demonstrates that they were controlled by the Investment Adviser Defendants.

244.   Additionally, the Directors failed to ensure that the economies of scale were passed to the Wells Fargo Funds and their investors and that the Funds' expense ratios are reasonable in relation to comparable funds.

**Additional Scienter Allegations**

245.   As alleged herein, the Investment Adviser and Registrant Defendants acted with scienter in that they knew that the public statements issued or disseminated in the name of Wells

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

100

1  Fargo were materially false and misleading, knew that such statements would be issued or

2  disseminated to the investing public, and knowingly and substantially participated or acquiesced

3  in the issuance or dissemination of such statements as primary violations of the federal securities

4  laws.  As set forth elsewhere herein in detail, the Investment Adviser and Registrant Defendants,

5  by virtue of their knowledge of the true facts regarding the kickback scheme, culpably

6  participated in the fraudulent scheme alleged herein.  Defendants were highly motivated to allow

7  and facilitate the wrongful conduct alleged herein and participated in and/or had actual

8  knowledge of the fraudulent conduct alleged herein.

9  **The Sales Loads Paid By Class Members To Their Brokers Were Not Justified**

10         246.    Approximately 98% of mutual fund shareholders say their investments constitute

11  long-term savings and about 77% cite retirement savings as their primary financial goal.  David

12  J. Carter, *Mutual Fund Board and Shareholder Action,* 3 Vill. J. of Law & Inv. Mgmt. 1, 8

13  (2001).  Many investors purchase mutual funds through brokers such as Wells Fargo

14  Investments, ostensibly paying their financial consultant to guide their fund selection.  According

15  to a recent survey by the SEC, investors believed that anyone with a title other than a broker, for

16  example a "financial consultant" or "financial adviser," provided something more than a broker.

17  In addition, many assumed that investment advisers, financial consultants and financial advisers

18  all provided financial planning.  Cynthia A. Glassman, Speech by SEC Commissioner, SEC in

19  Transition: What We've Done and What's Ahead, June 15, 2005, *available at*

20  http://ftp.sec.gov/news/speech/spch061505cag.htm.

21         247.    When investors speak to financial consultants regarding the purchase of mutual

22  funds, financial consultants can help the investor by providing (a) assistance selecting funds that

23  are harder to find and evaluate; (b) access to funds with lower costs (excluding distribution

24  costs); and (c) access to funds with better performance.  Daniel Bergstresser et al., *Assessing the*

25  *Costs and Benefits of Brokers in the Mutual Fund Industry* (Jan. 16, 2006) (Working Paper

26  Series, Am. Fin. Assoc. 2006 Boston Meetings), *available at*

27  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=616981.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

101

248.     Investors can avoid the huge fees associated with the services of distribution professionals, such as financial consultants, by determining all the above-mentioned issues for themselves and purchasing mutual funds directly from a fund company.  Many investors choose, however, to pay the substantial fees and commissions to obtain financial guidance from financial consultants.  These commissions are often known as a "sales load" or "sales charge."  There are two general types of sales loads—a front-end sales load investors pay when they purchase fund shares and a back-end or deferred sales load investors pay when they redeem their shares.  12b-1 fees can also be used to compensate brokers in place of part of their sales load.[17]  Securities and Exchange Commission, Mutual Fund Fees and Expenses, http://www.sec.gov/ answers/mffees.htm (last visited Apr. 3, 2006).

249.     According to a recent study, in 2002, mutual fund investors paid as much as $3.6 billion in front-end loads, $2.8 billion in back-end loads and another $8.8 billion in 12b-1 fees, all  in addition to the $23.8 billion investors paid during that same year for investment management fees and other operational expenses.  Bergstresser et al., *Assessing the Costs, supra*. Thus, the effort to sell a mutual fund consumes material resources from the investors, often deducting around 5% from their total investments in a fund.  In 2002, the fees associated with funds sold through a broker were twice as large as the fees charged to investors who purchased funds directly from the mutual fund family.  *Id.*

250.     The payment of kickbacks as described herein places in issue the sales loads paid by members of the Class.  The disclosure of the sales load to be paid to the broker implies that the broker does not receive additional compensation for selling the fund.  Had Class Members known that their brokers were receiving the additional undisclosed kickbacks, they would have realized that they were not getting unbiased advice and decided not to invest in the Wells Fargo

---

[17] SEC Rule 12b-1 under the Investment Company Act permits a fund to pay "12b-1" distribution fees out of fund assets, but only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Directors properly find that there is a reasonable likelihood that the plan will benefit the fund and its investors.  Distribution fees are comprised of fees paid to the Distributor Defendants for marketing and selling fund shares, including compensation for advertising, the printing and mailing of prospectuses and sales literature to investors, and payments to brokers and others who sell fund shares.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

102

1   Funds, saving the sales loads.  At the very least, class members would have made their

2   investments directly with the Wells Fargo Funds rather than through a broker, which would have

3   not only saved the sales loads but prevented kickbacks from being deducted from their funds to

4   pay broker dealers.

5   **The Broker/Dealer Defendant Received Kickbacks From The Wells Fargo Funds.**

6   251.   Throughout the Class Period, the Broker/Dealer Defendant received undisclosed

7   kickbacks from the Wells Fargo Funds in exchange for steering investors into the Wells Fargo

8   Funds.  The Broker/Dealer Defendant received this kickback in the form of "profit sharing"

9   payments from the Funds Management Defendant.  These "profit sharing" payments were in fact

10  excessive fees paid by the Wells Fargo Funds to the Funds Management Defendant and/or the

11  other Investment Adviser Defendants, which in turn were redistributed to the Broker/Dealer

12  Defendant.  NASD Letter of Acceptance, Waiver and Consent against Wells Fargo Investments,

13  No. CE10500006.

14  252.   WF Investments received revenue from its affiliate, Funds Management, for

15  pushing Wells Fargo Funds based on customer assets held by the Wells Fargo Funds.  See Wells

16  Fargo Investments, LLC, An Investor Guide to Mutual Funds 6 (Dec. 2005), available at

17  http://a248.e.akamai.net/7/248/1856/f61e334331442a/www.wellsfargo.com/pdf/online_brokerag

18  e/mf_disc.pdf.  However, unlike non-proprietary funds, the Investment Adviser Defendants did

19  not pay a negotiated fee rate to participate in revenue sharing arrangements with Defendants WF

20  Investments.  Instead, the Investment Adviser Defendants and the Distributor Defendants

21  allocated revenue net of certain expenses to the various Wells Fargo & Company affiliates,

22  including WF Investments, based on WF Investments' sales of Wells Fargo Proprietary Funds.

23  Wells Fargo Investments, LLC, NASD Letter of Acceptance, Waiver and Consent (No.

24  CE1050006).  As a result, investors in the Wells Fargo Funds footed the bill for the financial

25  incentives given to Wells Fargo's brokerage firms as kickbacks

26  253.   Specifically, during the Class Period, WFI received the following amounts of

27  revenue/profit sharing kickback payments from the Wells Fargo Funds: 2000 (November and

28  December only) - $1,006,932;   2001 - $24,378,607; 2002 - $40,547,822; 2003 - $31,675,121;

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

1   2004 - $41,219,661; and 2005 (through June) - $23,958,166 for a total of **$162,786,309.**

2   Additionally, during this same time period, WFI received $123,972,137 in questionable and

3   excessive shareholder service fees that are also alleged to be disguised revenue sharing

4   payments.

5

6   **Plaintiffs And Other Members Of The Class Have Suffered Damages As A Result Of**
    **Defendants' Illegal And Improper Actions**

7

8          254.    As a result of Defendants' conduct alleged above, Plaintiffs and the other

9   members of the Class have suffered damages.  The damages suffered by Plaintiffs and the other

10  members of the Class were a foreseeable consequence of Defendants' omissions and conduct,

11  particularly in light of the fact that the net returns on the Wells Fargo Funds were diminished as a

12  result of the improper kickbacks paid to broker/dealers from the funds.  Plaintiffs and other

13  members of the Class would not have purchased the Wells Fargo Funds, and paid the related

14  commissions and fees associated with them, had they known of the illegal and improper

15  practices as alleged above.  By investing in the Wells Fargo Funds, Plaintiffs and other members

16  of the Class received a return on their investment that was substantially less than the return they

17  would have received had they invested the same dollars in a comparable fund.  Alternatively,

18  investors could have invested fewer dollars in a non-Wells Fargo Fund to obtain a rate of return

19  equal to or greater than that obtained at a higher price from the comparable Wells Fargo Fund.

20         255.    Additionally, Plaintiffs and other members of the Class were deceived into buying

21  shares of the Wells Fargo Funds at an artificially inflated value.  Plaintiffs and other members of

22  the Class accepted, as an integral aspect of purchasing shares of the Wells Fargo Funds, that they

23  would be required to pay fees and expenses against their ownership interests in the Wells Fargo

24  Funds, with the understanding that those charges were legitimate outlays for services that would

25  benefit the mutual fund and contribute positively to its value.  In truth, a significant portion of

26  those expenses was not being used to provide the services promised, but rather to increase the

27  sales of the funds to other investors and thus the profits of Wells Fargo.  As a result, the values of

28  the Wells Fargo Funds were less than they appeared to be to members of the Class.  Plaintiffs

1  and the other members of the Class have also suffered damages through commissions paid by

2  Plaintiffs and the other members of the Class for their purchase of shares of the Wells Fargo

3  Funds.  Had Plaintiffs and the other members of the Class known about the practices alleged

4  above, Plaintiffs and the other members of the Class would not have paid such commissions.

5  The damages sustained by Plaintiffs and the other members of the Class, as a result of the

6  commissions they paid for shares of the Wells Fargo Funds, were a foreseeable consequence of

7  Defendants' failure to disclose.

8          256.    Additionally, as a result of the dissemination of the materially false and

9  misleading information and failure to disclose material facts, as set forth above, the market prices

10  of the Wells Fargo Funds were distorted during the Class Period such that they did not reflect the

11  risks and costs of the continuing course of conduct alleged herein.  In ignorance of the fact that

12  market prices of the shares were distorted, and relying directly or indirectly on the false and

13  misleading statements made by Defendants, or upon the integrity of the market in which the

14  securities trade, and/or on the absence of material adverse information that was known to or

15  recklessly disregarded by Defendants but not disclosed in public statements by Defendants

16  during the Class Period, Plaintiffs and the other members of the Class acquired the shares or

17  interest in the Wells Fargo Funds during the Class Period at distorted prices and were damaged

18  thereby.

19                          **THE TRUTH BEGINS TO BE DISCLOSED**

20          257.    On June 8, 2005, the NASD censured and fined the Broker/Dealer Defendant.  As

21  detailed in the NASD's press release, the:

22                  NASD found that the [Broker/Dealer Defendants], most of which
                    sold funds offered by hundreds of different mutual fund
23                  complexes, operated "preferred partner" or "shelf space" programs
                    that provided certain benefits to a relatively small number of
24                  mutual fund complexes in return for directed brokerage.  The
                    benefits to mutual fund complexes of these quid pro quo
25                  arrangement included, in various cases, higher visibility on the
                    firms' internal web sites, increased access to the firms' sales
26                  forces, participation in "top producer" or training meetings, and
                    promotion of their funds on a broader basis than was available for
27                  other funds

28

---

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

Press Release, NASD, NASD Charges 15 Firms With Directed Brokerage Violations, Imposes

Fines Totaling More Than $34 Million (June 8, 2005), *available at* http://www.nasd.com/web/

idcplg?IdcService=SS_GET_PAGE&ssDocName=NASDW_014340 ("June 8, 2005 NASD

Press Release").

    258.    Then, in December 2005, Wells Fargo Investments issued document entitled:

"**WELLS FARGO INVESTMENTS, LLC POTENTIAL CONFLICTS OF INTEREST**

**DISCLOSURE STATEMENT"** was publicly circulated.  In this document, Wells Fargo

Investments disclosed that:

- Wells Fargo Investments had entered into financial arrangements with a limited number of mutual fund companies (*i.e.* the Shelf Space Funds) that Wells Fargo Investments referred to as "Platform Participants";
- among these funds were the Wells Fargo Funds
- in addition to payments received from third-party mutual fund families, Wells Fargo Investments received revenue from Wells Fargo Funds Management, LLC
- as a result of these payments, these limited number of mutual funds "receive enhanced access to Wells Fargo's Investments' sales force" [i.e. "financial consultants"] and meet with said "financial consultants" in training events, conference calls and private meetings; and
- "the above-referenced payments and compensation arrangements are *in addition to the sales charges and fees that are disclosed in the fee tables, prospectuses and statements of additional information*."  (emphasis added).

In other words, in this document, Wells Fargo Investments admitted that it received the

payments from the Wells Fargo Funds that are at issue in this Complaint, that said payments

created "Potential Conflicts of Interests" and that, finally, such payments were not disclosed in

either the Wells Fargo Funds' prospectuses or statements of additional information.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

106

259.     The filing of the Complaint in this case in November 2005, and the publication of notice of the Complaint pursuant to the Private Securities Litigation Reform Act, as well as the subsequent press releases regarding decisions rendered by this Court, created additional public awareness of Defendants' wrongdoing.

260.     Nevertheless, the entire truth has still not been revealed.  Defendants have not yet publicly announced either the recipients of their revenue sharing payments or the amount paid.  Even in this case, there is still a "data gap" so that Defendants have yet to disclose the full extent of their revenue sharing payments.

## CLASS ACTION ALLEGATIONS

261.     Plaintiffs bring this action (excepts for Counts I and VI) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities who purchased shares or like interests in any of the Wells Fargo Funds between November 4, 2000 and June 8, 2005, inclusive and who were damaged thereby.  Excluded from the class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest (the "Class").

262.     Plaintiffs bring Count I of this action on behalf of only some members of the Class, namely those persons who purchased their shares or like interests in the Wells Fargo Funds from Defendant Wells Fargo Investments (the "Subclass").

263.     Plaintiffs do not assert any class action claims under Count VI.

264.     The members of the Class and the Subclass are so numerous that joinder of all members is impracticable.  While the exact number of the members of the Class and the Subclass is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members.  Record owners and other members of the Class and the Subclass may be identified from records maintained by the Wells Fargo and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  Plaintiffs' claims are typical of the claims of the members of the Class and the Subclass as all members of the Class and the Subclass are similarly

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

107

affected by Defendants' wrongful conduct in violation of federal securities laws that is complained of herein. Plaintiffs are adequate representatives of the members of the C\ass and the Subclass in that they are informed about the general nature of the claims asserted herein, have hired and will supervise competent counsel, and will remain informed about the prosecution of this suit.

265.    Common questions of law and fact exist as to all members of the Class and the Subclass, which predominate over any questions solely affecting individual members of the Class or the Subclass.  Among the questions of law and fact common to the Class and the Subclass are:

a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein; and

b.    To what extent the members of the Class and the Subclass have sustained damages and the proper measure of such damages.

266.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class and the Subclass may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class and the Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

108

## SECURITIES ACT CLAIMS

## COUNT I

### ON BEHALF OF THE PURCHASERS SUBCLASS AGAINST THE BROKER/DEALER DEFENDANT FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

267.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

268.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Plaintiffs and other members of the Subclass against the Broker/Dealer Defendant for failure to disclose sales practices that created an insurmountable conflict of interest.

269.     The Broker/Dealer Defendant was the seller, or the successor in interest to the sellers, within the meaning of the Securities Act, of the Wells Fargo Fund shares sold to Plaintiffs and other members of the Subclass because they either:  (a) transferred title of shares of the Wells Fargo Funds to members of the Subclass; (b) transferred title to shares of the Wells Fargo Funds to the Wells Fargo Funds distributors that in turn sold shares of the Wells Fargo Funds as agents for the Wells Fargo Funds; and/or (c) solicited the purchase of shares of the Wells Fargo Funds by members of the Subclass.

270.     During its sale of the Wells Fargo Funds to members of the Subclass, the Broker/Dealer Defendant failed to disclose the kickback payments and other improper inducements alleged herein that it received.  These inducements created an insurmountable conflict of interest.  Wells Fargo also caused to be issued to members of the Subclass the Prospectuses that failed to disclose that fees and commissions from the Wells Fargo Funds would be used to pay brokers for directing investors into the Wells Fargo Funds.

271.     As set forth herein, when they became effective, all Wells Fargo Funds' Prospectuses were misleading as they omitted the following material facts:

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

109

1         a.     that the Wells Fargo Funds' had a quid pro quo financial arrangement with

2   brokers whereby the brokers received payments from the Wells Fargo Funds in exchange for

3   pushing the Wells Fargo Funds on their clients

4         b.     that the Wells Fargo Funds' investment advisers authorized the payment

5   for these financial arrangements from Wells Fargo investors assets which were hidden as

6   exorbitant advisory and distribution fees, even though no services were rendered by the

7   Investment Advisers and Distributors in exchange for those fees;

8   REDACTED c.     that the Wells Fargo Funds' investment advisers would and did pay over

9   $ __ million to Wells Fargo Investments out of fund assets; and

10         d.     that the Wells Fargo Funds Rule 12b-1 plans were not in compliance with

11   Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the

12   Investment Company Act because, among other reasons, the plans were not properly evaluated

13   by the Wells Fargo Funds' Directors and there was not a reasonable likelihood that the plans

14   would benefit the company and its shareholders;

15         e.     that by paying brokers to steer their clients to the Wells Fargo Funds, the

16   Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties,

17   and profiting from the brokers' improper conduct;

18         f.     that any economies of scale achieved by marketing the Wells Fargo Funds

19   to new investors were not passed on to the Wells Fargo Funds investors; on the contrary, as the

20   Wells Fargo Funds grew, fees charged to the Wells Fargo Funds investors continued to increase;

21         g.     that Defendants improperly used soft dollars and excessive commissions,

22   paid from the Funds assets, to pay for overhead expenses the cost of which should have been

23   borne by the Company and the Investment Adviser Defendants and not the Wells Fargo Funds

24   investors; and

25         h.     that the Directors failed to monitor and supervise the Investment Adviser

26   Defendants and that, as a consequence, the Investment Adviser Defendants were able to

27   systematically skim millions of dollars from the Wells Fargo Funds and their investors.

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.: 05-cv-4518 (WHA)

110

1         i.     that by accepting payment from the Wells Fargo Funds (through the

2 Investment Advisers and Distributors) to push the Wells Fargo Funds onto their clients, the

3 Broker/Dealer Defendant had a conflict of interest material to investors.

4         272.    At the time they purchased the Wells Fargo Funds shares traceable to the

5 defective Prospectuses, members of the Subclass were without knowledge of the facts

6 concerning the material omissions alleged herein and could not reasonably have possessed such

7 knowledge.  This claim was brought within the applicable statute of limitations.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

111

## COUNT II

### ON BEHALF OF THE CLASS AGAINST THE REGISTRANT AND DISTRIBUTOR DEFENDANTS FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

273.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

274.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against the Distributor Defendants and Registrant.

275.    Each of the Distributor Defendants and the Registrant, was the seller, or the successor in interest to the seller, within the meaning of the Securities Act, for one or more of the respective Wells Fargo Fund shares sold to members of the Class because they either: (a) transferred title to members of the Class of the Wells Fargo Funds; (b) transferred title to shares of the Wells Fargo Funds to the Wells Fargo Funds Distributors that in turn sold shares of the Wells Fargo Funds as agents for the Wells Fargo Funds; and/or (c) solicited the purchase of shares of the Wells Fargo Funds by members of the Class.

276.    Each of the Registrant Defendant and Distributor Defendants issued, caused to be issued and participated in the issuance of its respective misleading Prospectus that omitted material facts and is statutorily liable under Section 12.

277.    Prior to purchasing shares of the Wells Fargo Funds, members of the Class were provided with a Wells Fargo Fund Prospectus.  Members of the Class purchased shares of the Wells Fargo Funds traceable to a misleading Prospectus and were damaged thereby.

278.    As set forth herein, when they became effective, the Prospectuses were materially false and misleading as they omitted the following material facts:

        a.    that the Wells Fargo Funds' had a quid pro quo financial arrangement with brokers whereby the brokers received payments from the Wells Fargo Funds in exchange for pushing the Wells Fargo Funds on their clients

        b.    that the Wells Fargo Funds' investment advisers authorized the payment for these financial arrangements from Wells Fargo investors assets which were hidden as

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

112

1  exorbitant advisory and distribution fees, even though no services were rendered by the

2  Investment Advisers and Distributors in exchange for those fees;

3  REDACTED  c.     that the Wells Fargo Funds' investment advisers would and did pay over

4  —     million to Wells Fargo Investments out of fund assets; and

5         d.     that the Wells Fargo Funds Rule 12b-1 plans were not in compliance with

6  Rule 12b-1, and that payments made as described herein were in violation of Section 12 of the

7  Investment Company Act because, among other reasons, the plans were not properly evaluated

8  by the Wells Fargo Funds' Directors and there was not a reasonable likelihood that the payments

9  would benefit the company and its shareholders;

10        e.     that by paying brokers to steer their clients to the Wells Fargo Funds, the

11  Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties,

12  and profiting from the brokers' improper conduct;

13        f.     that any economies of scale achieved by marketing the Wells Fargo Funds

14  to new investors were not passed on to the Wells Fargo Funds investors; on the contrary, as the

15  Wells Fargo Funds grew, fees charged to the Wells Fargo Funds investors continued to increase;

16        g.     that Defendants improperly used soft dollars and excessive commissions,

17  paid from the Funds assets, to pay for overhead expenses the cost of which should have been

18  borne by the Company and the Investment Adviser Defendants and not the Wells Fargo Funds

19  investors; and

20        h.     that the Directors failed to monitor and supervise the Investment Adviser

21  Defendants and that, as a consequence, the Investment Adviser Defendants were able to

22  systematically skim millions of dollars from the Wells Fargo Funds and their investors.

23     279.    Members of the Class have sustained damages due to these violations.

24     280.    At the time they purchased the Wells Fargo Funds shares traceable to the

25  defective Prospectuses, members of the Class were without knowledge of the facts concerning

26  the material omissions alleged herein and could not reasonably have possessed such knowledge.

27  This claim was brought within the applicable statute of limitations.

28

**COUNT III**

**ON BEHALF OF THE CLASS AGAINST THE CONTROL PERSON DEFENDANT FOR
VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT**

281.   Plaintiffs repeat and re-allege each and every allegation contained above, except that for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

282.   This claim is brought pursuant to Section 15 of the Securities Act against the Control Person Defendant as control persons of the Broker/Dealer Defendant, the Registrant Defendants, and the Distributor Defendants.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misleading information complained about herein is the collective action of the Control Person Defendant.

283.   The Broker/Dealer Defendant, the Distributor Defendants, and the Registrant Defendants are liable under Section 12(a)(2) of the Securities Act as set forth herein.

284.   The Control Person Defendant was a "control person" of the Broker/Dealer Defendants and the Distributor and Registrant Defendants within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or ownership.  At the time that members of the Class purchased shares of one or more of the Wells Fargo Funds, by virtue of its position of control and authority over the Broker/Dealer, Distributor, and Registrant Defendants, the Control Person Defendant directly and indirectly, had the power and authority, and exercised the same, to cause the Broker/Dealer, Distributor, and Registrant Defendants to engage in the wrongful conduct complained of herein.

285.   Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the Control Person Defendant is liable to members of the Class to the same extent as the Broker/Dealer, Distributor and Registrant Defendants are for their primary violations of Section 12(a)(2) of the Securities Act.

286.   By virtue of the foregoing, members of the Class are entitled to damages against the Control Person Defendant.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

114

**EXCHANGE ACT CLAIMS**
**FRAUD-ON-THE-MARKET ALLEGATIONS**

287.   At all relevant times, the market for the Wells Fargo Funds was efficient for, *inter alia*, the following reasons:

a.   The Wells Fargo Funds met the requirements for listing, and were listed and actively traded through a highly efficient and automated market;

b.   Regulated entitles, periodic public reports concerning the Wells Fargo Funds were regularly filed with the SEC;

c.   Persons associated with the Wells Fargo Funds regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   The Wells Fargo Funds were followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

288.   As a result of the foregoing, the market for the Wells Fargo Funds promptly digested current information regarding the Wells Fargo Funds from all publicly available sources and reflected such information in the respective value for the Wells Fargo Funds as well as the market trend and demand for the shares of the Wells Fargo Funds.  Investors who purchased or otherwise acquired shares or interests in the Wells Fargo Funds relied on the integrity of the market for such securities.  Under the circumstances, all purchasers of the Wells Fargo Funds during the Class Period suffered similar injury through their purchase or acquisition of the Wells Fargo Funds at a value that did not reflect the risks and costs of the continuing course of conduct alleged herein, and a presumption of reliance applies.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

115

## COUNT IV

**ON BEHALF OF THE CLASS AGAINST THE INVESTMENT ADVISOR AND REGISTRANT DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER**

289.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

290.    During the Class Period, the Investment Adviser and Registrant Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other Class members, as alleged herein and caused Plaintiffs and other members of the Class to purchase Wells Fargo Funds at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, the Investment Adviser and Registrant Defendants took the actions set forth herein.

291.    The Investment Adviser and Registrant Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Wells Fargo Funds, including Plaintiffs and other members of the Class, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

292.    The Investment Adviser and Registrant Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Wells Fargo Funds' operations, as specified herein.

293.    The Investment Adviser and Registrant Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

116

1  unlawfully manipulate and profit from excessive fees and/or commissions paid to them as a

2  result of its undisclosed kickback arrangement described above and thereby engaged in

3  transactions, practices and a course of conduct which operated as a fraud and deceit upon

4  Plaintiffs and members of the Class.

5      294.   The Investment Adviser and Registrant Defendants had actual knowledge of the

6  misrepresentations and omissions of material facts set forth herein, or acted with reckless

7  disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

8  facts were available to them.  The Investment Adviser and Registrant Defendants' material

9  misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and

10  effect of concealing the truth.

11      295.   As a result of the dissemination of the materially false and misleading information

12  and failure to disclose material facts, as set forth above, the market prices of the Wells Fargo

13  Funds were distorted during the Class Period such that they did not reflect the risks and costs of

14  the continuing course of conduct alleged herein.  In ignorance of the fact that market prices of

15  the shares were distorted, and relying directly or indirectly on the false and misleading

16  statements made by the Investment Adviser and Registrant Defendants, or upon the integrity of

17  the market in which the securities trade, and/or on the absence of material adverse information

18  that was known to or recklessly disregarded by Defendants but not disclosed in public statements

19  by the Investment Adviser and Registrant Defendants during the Class Period, Plaintiffs and the

20  other members of the Class acquired the shares or interest in the Wells Fargo Funds during the

21  Class Period at distorted prices and were damaged thereby.

22      296.   At the time of said misrepresentations and omissions, Plaintiffs and other

23  members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

24  and other members of the Class known the truth concerning the Wells Fargo Funds' operations,

25  which Defendants did not disclose, Plaintiffs and other members of the Class would not have

26  purchased or otherwise acquired their shares, or, if they had acquired such shares during the

27  Class Period, they would not have done so at the distorted prices which they paid; would not

28

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

117

have paid the commissions or fees paid as a result of their acquisition of the Wells Fargo Funds; and would not have paid the fees and costs associated with ownership of the Wells Fargo Funds.

297.    By virtue of the foregoing, the Investment Adviser and Registrant Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

298.    As a direct and proximate result of the wrongful conduct by the Investment Adviser and Registrant Defendants, Plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of Wells Fargo Funds during the Class Period.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL
SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

118

**COUNT V**
**ON BEHALF OF THE CLASS AGAINST THE CONTROL PERSON DEFENDANT FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT**

299.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

300.   This claim is brought pursuant to Section 20(a) of the Exchange Act against the Control Person Defendant.

301.   The Control Person Defendant acted as a controlling person of the Investment Adviser and Registrant Defendants within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the Investment Adviser and Registrant Defendants' respective businesses and systematic involvement in the fraudulent scheme alleged herein, the Control Person Defendant  had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of the Investment Adviser and Registrant Defendants, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Control Person Defendant had the ability to prevent the issuance of the statements alleged to be false and misleading or could have caused such statements to be corrected.

302.   In particular, the Control Person Defendant had direct and supervisory involvement in the operations of the Investment Adviser and Registrant Defendants and, therefore, is presumed to have had the power to control or influence the particular transaction giving rise to the securities violations as alleged herein, and to have exercised same.

303.   As set forth above, the Investment Adviser and Registrant Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its positions as a controlling person, the Control Person Defendant is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Investment Adviser and Registrant Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Wells Fargo Funds securities during the Class Period.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

119

1

## COUNT VI

2

**BY PLAINTIFF RONALD SIEMERS FOR THE BENEFIT OF THE WELLS FARGO SMALL CAP GROWTH FUNDS AGAINST THE INVESTMENT ADVISER, SUBADVISER AND DISTRIBUTORDEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT**

3

4

5      304.     Plaintiffs repeat and reallege each and every allegation contained above and

6    otherwise incorporates the allegations contained above.

7      305.     This Count is brought by Ronald Siemers, derivatively, on behalf of and for the

8    benefit of the Wells Fargo Advantage Small Cap Growth Fund, against the Distributor

9    Defendants, the Investment Adviser Defendants, and the Investment Sub-Adviser Defendant, for

10   breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

11     306.     The Distributor, Investment Adviser and Investment Sub-Adviser Defendants had

12   a fiduciary duty to Wells Fargo Advantage Small Cap Growth Fund with respect to the receipt of

13   compensation for services and of payments of a material nature made by and to the Distributor,

14   Investment Adviser and Investment Sub-Adviser Defendants.

15     307.     The Distributor, Investment Adviser and Investment Sub-Adviser Defendants

16   violated Section 36(b) by charging excessive Rule 12b-1 marketing fees and advisory fees.

17   These Defendants caused the Wells Fargo Advantage Small Cap Growth Fund and their

18   investors to pay inflated commissions (including soft dollar payments) and recouped from the

19   Wells Fargo Advantage Small Cap Growth Fund and their investors, through management and

20   other fees, the cost of any revenue sharing payments purportedly made from adviser or

21   distributor assets.  These Defendants also charged excessive advisory fees under section 36(b)

22   because they improperly inflated management fees and shifted expenses from the Investment

23   Advisers to the Funds and their investors without a corresponding reduction in their management

24   fees to reflect that shift in expense; failed to pass along economies of scale; imposed an usually

25   large fee schedule; and charged for active management of the Wells Fargo Advantage Small Cap

26   Growth Fund, when, in fact, the Funds were passively managed.

27     308.     By reason of the conduct described above, the Distributor, Investment Adviser

28   and Investment Sub-Adviser Defendants violated Section 36(b) of the Investment Company Act.

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

120

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

      (a)    Determining that this action is a proper class action and certifying the Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

      (b)    Awarding compensatory damages in favor of Plaintiffs and the Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws set forth above, in an amount to be proven at trial, including interest thereon;

      (c)    Awarding the Wells Fargo Advantage Small Cap Growth Fund the return of the excessive fees pursuant to the Investment Company Act claim;

      (d)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (e)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:   March 21, 2007

                     **GUTRIDESAFIER LLP**
                     By: /s/ Adam J. Gutride_____
                     Adam J. Gutride (Cal. State Bar No. 181446)
                     Seth A. Safier (Cal. State Bar No. 197427)
                     Kate J. Stoia (Cal. State Bar No. 183471)
                     835 Douglass Street
                     San Francisco, California 94114
                     Telephone:  (415) 271-6469
                     Facsimile:   (415) 449-6469

                     - and -

                     **GUTRIDE SAFIER LLP**
                     Michael R. Reese (Cal. State Bar No. 206773)
                     Kim E. Richman (admitted *pro hac vice*)
                     230 Park Avenue, Suite 963
                     New York, New York  10169
                     Telephone:(212) 579-4625
                     Facsimile: (212) 253-4272

                     ***Court Appointed Lead Counsel***

THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR THE VIOLATION OF THE FEDERAL SECURITIES LAWS AND FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT
Case No.:  05-cv-4518 (WHA)

121