**GUTRIDE SAFIER LLP**
Michael R. Reese (Cal. State Bar No. 206773)
Kim E. Richman (admitted *pro hac vice*)
230 Park Avenue, Suite 963
New York, New York 10169
Telephone:   (212) 579-4625
Facsimile:   (212) 253-4272

- and -

**GUTRIDE SAFIER LLP**
Adam J. Gutride (Cal. State Bar No.181466)
Seth A. Safier (Cal. State Bar No. 197427)
Kate J. Stoia (Cal. State Bar No. 183471)
835 Douglass Street
San Francisco, California 94114
Telephone: (415) 271-6469
Facsimile:  (415) 449-6469

*Court Appointed Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD SIEMERS and FORREST MCKENNA, Individually And On Behalf Of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>     vs.<br><br>WELLS FARGO & COMPANY, WELLS FARGO INVESTMENTS, LLC, WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS CAPITAL MANAGEMENT INC., STEPHENS INC., WELLS FARGO FUNDS DISTRIBUTOR, LLC, and WELLS FARGO FUNDS TRUST,<br><br>                              Defendants. | Case No. 05-04518 WHA<br><br>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT IV OF PLAINTIFF'S THIRD AMENDED CONSOLIDATED COMPLAINT<br><br>Ctrm:  9, 19th Floor<br>Judge:  Honorable William H. Alsup |

# TABLE OF CONTENTS

I.  INTRODUCTION..............................................................................................................1

II. ARGUMENT....................................................................................................................2

    A.    **The Complaint Adequately Pleads Materiality.**............................................2

        1.    **Defendants Ignore 62 Pages Of New Allegations.** ................................2

        2.    **Defendants Ignore Previous Rulings by the Court Regarding Materiality.** ...................................................................................................4

        3.    **The Only "Authority" For The Four-Part "Test" Of Materiality That Defendants Advocate Is Their Own Imagination.** ..........................5

        4.    **Even If The Four-Part Test Existed, The Complaint Would Pass It.**...................................................................................................................8

        5.    **There Is Even More Evidence Of Materiality Now Than There Was When The Third Amended Complaint Was Filed Two Weeks Ago.** ....................................................................................................9

        6.    **No Distinction Should Be Drawn In The Section 10(b) Claim Between Different Share Classes** ..................................................11

    B.    **The Total Return Bond Fund Remains In The Case At Least Until A Decision On Class Certification.**................................................................13

    C.    **Plaintiffs Have Pled Scienter Against Defendant Wells Fargo Funds Trust.** ...............................................................................................................13

III. CONCLUSION .............................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Fecht v. The Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995) ............................................................ 5

*Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) .......................................... 6

*Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982) ............................................ 2

*In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812 2003 U.S. Dist. LEXIS 6962
 (S.D.N.Y. Apr. 25, 2003) ............................................................................................................. 6, 7

*In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...................................................... 5

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding
 Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) ..................................................................................... 4

*Siemers v. Wells Fargo et al.*, 2006 U.S. Dist. LEXIS 60858, *17-18 (N.D. Cal. Aug. 14,
 2006) (*citing Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)) ...................................... 4

## I. INTRODUCTION

In its Order Identifying Claims To Proceed dated March 9, 2007 (Dkt. 248) ("March 9th Order"), the Court instructed Plaintiffs, in filing the Third Amended Complaint ("Complaint"), to cite the misleading portions of the Wells Fargo Prospectuses for the mutual funds Plaintiffs had purchased and to state their "best case concerning scienter and materiality." (March 9th Order at 35). Plaintiffs not only complied with this directive, but detailed in *62 new pages of allegations* in the Complaint of specific facts as to what Defendants knew, the exact amount of kickbacks at issue, how Defendants failed to disclose the kickbacks in the prospectuses, and why the missing information was material.

Defendants' most recent motion to dismiss reads, however, as if the March 9th Order had not been issued and as if not a single one of Plaintiffs' new allegations had been made. First, in their argument regarding materiality, Defendants entirely ignore the new allegations and discuss only the (old) portion of the Complaint relating to excessive fees that pertained to Plaintiff's claim pursuant to section 36(b) of the Investment Company Act. Defendants then try to graft onto section 10(b) of the Securities Exchange Act of 1934 the requirements for an "excessive fees" case under section 36(b) of the Investment Company Act, a tactic the Court expressly rejected in the March 9th Order. Second, in their argument about scienter on the part of Wells Fargo Funds Trust, Defendants entirely ignore the voluminous new facts regarding the conduct of Mike Hogan and Karla Rabusch who negotiated the revenue sharing arrangements. They do not dispute that these allegations are sufficient to show scienter on the part of Wells Fargo Funds Management, but they nevertheless challenge the claim against Wells Fargo Funds Trust, even though Hogan and Rabusch each was acting in the dual capacity as President of Wells Fargo Funds Management and president of the board of Wells Fargo Fund Trust. Finally, in their argument that Plaintiffs have "abandoned" claims of liability regarding the Total Return Bond Fund, they ignore multiple paragraphs of the Complaint alleging that Defendants' misstatements and omissions for that fund were identical to those for the other funds. The motion to dismiss should be denied in its entirety.

## II. ARGUMENT

### A. The Complaint Adequately Pleads Materiality.

#### 1. Defendants Ignore 62 Pages Of New Allegations.

Defendants focus their section 10(b) argument not on the portion of the complaint that directly relates to that claim, but on the portion of the complaint that addresses the "excessive fees" charged by the funds. Defendants argue that the Complaint does not establish a claim for "excessive fees" under section 36(b) of the Investment Company Act of 1940, and therefore does not establish materiality under section 10(b) of the Securities Exchange Act of 1934. Admitting that they have no direct authority, Defendants instead rely on *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2d Cir. 1982) and cases that follow it. (Motion at 4-9). Defendants ignore the fact that this Court **expressly rejected this argument in its March 9th Order** when it ruled that "[c]ontrary to defendants, the proposed pleading adequately pleads the excessiveness of the fees. There is no requirement that the *Gartenberg* factors be pled and no decision so holds. That decision came after a full trial and was not a pleading case; moreover, it involved Section 36(b), not the 1933 and 1934 Acts." (March 9th Order at 20 n.10).

Plaintiffs did not change the "excessive fees" portion of the complaint (other than limiting the claim under the Investment Company Act to the Small Cap Growth Fund). Instead, in the half of the Complaint that Defendants ignore, Plaintiffs included detailed allegations about materiality. After quoting the relevant language from each of the Wells Fargo Prospectuses, Plaintiffs explained why each quote was materially misleading and inconsistent with Defendants' actual conduct. (Complaint ¶¶ 44, 45, 51, 59, 61, 68, 77, 85, 86, 88, 121, 125-127). For example, Plaintiffs explained that the fees being paid as undisclosed kickbacks to selling agents during the Class period totaled nearly [REDACTED] million, and that the money was coming directly from investor assets. (Complaint ¶¶ 5, 61, 139, 150-53). Plaintiffs also explained that the amount of undisclosed kickbacks was [REDACTED] fees that Defendants paid pursuant to the disclosed 12b-1 plans. (Complaint ¶ 150). Plaintiffs noted that, if it would be material for investors to know about 12b-1 arrangements—which even Defendants do not dispute—it is certainly material to know about th[e] [REDACTED] of fees being paid pursuant to undisclosed arrangements. (*Id.*).

1   Contrary to Defendants' contention (Motion at 3), Plaintiffs also expressly set forth for
2   every fund owned by Plaintiffs the amount of fees being paid as a percentage of net assets.
3   (Complaint ¶¶ 31, 48, 56, 65, 74, 83, 91, 99, 107, 114). Plaintiffs also alleged that REDACTED of these
4   fees, if not more, was regularly being paid as kickbacks. For example, the arrangement with
5   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯. (Complaint ¶ 132).
6   This means that on a fund with a 1.00% expense ratio, ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ is
7   points) of those fees paid by its investors.
8   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯. (Complaint ¶ 133). This would mean on a fund with a
9   1.00% expense ratio that ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ of the fees paid by
10  its investors, for undisclosed purposes.

REDACTED

24  revenue-sharing arrangements been disclosed. (Complaint ¶¶ 5, 255-256, 297).
25      Defendants apparently hope these allegations will disappear if they close their eyes tightly
26  enough. These detailed allegations, however, cannot be ignored and they fully satisfy Plaintiffs'
27  obligation to plead materiality.
28

2. **Defendants Ignore Previous Rulings by the Court Regarding Materiality.**

Beyond ignoring the allegations of the Complaint, Defendants also ignore previous rulings by the Court in this case regarding materiality. For example, Defendants challenged the pleading of materiality in their very first motion to dismiss. The Court responded as follows:

> The next issue is whether the omissions were material. An omission is only material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). The alleged omissions here were material under the Basic standard. A reasonable investor is more likely to view the broker-dealer's recommendations with skepticism if he or she knows for sure that the broker-dealer's objectivity has already been compromised, as opposed to the mere possibility that the broker-dealer's objectivity might (or might not) be compromised. If a reasonable investor knows the broker-dealer has a payback agreement to showcase a particular fund, the investor is likely to take a harder look at the recommendation.
>
> The very nature of the program suggests that the failure to disclose it was material. The investment advisers who compensated the broker-dealers obviously believed that the payments led to increased sales of their funds. If the investment advisers believed that the payments were enough to drive sales, then it is reasonable now for us to infer the same. If the payments were enough to drive sales, disclosure of them would have been material to an investor considering a broker's advice to buy those shares.

*Siemers v. Wells Fargo et al.*, 2006 U.S. Dist. LEXIS 60858, *17-18 (N.D. Cal. Aug. 14, 2006).

In the March 9th Order, the Court again addressed materiality, writing:

> At the very least, the payments were intended to be material enough to incentivize many brokers in many firms and were likely to have been, for all Wells Fargo funds combined, more than $100 million over a five-year period. Not all of it was allocable to a single fund, of course, and some of it was disclosed (the rule 12b-1 fees, for example). But the total magnitude of the program and its impact on the individual funds was not revealed. If investors in all Wells Fargo funds had been warned that over five years $100 million would be spent on matters of no benefit to them and of benefit only to the sponsors, many would have passed with thanks.

(March 9th Order at 10.) REDACTED

Now that the Complaint pleads that the actual total is not $100 million but (Complaint ¶¶ 150-51), the materiality prong is certainly met. As the Ninth Circuit observed in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003), "materiality depends on the significance the reasonable investor would

place on the withheld or misrepresented information." Here, it is reasonable to assume that, as alleged, investors would not have acquired the funds in the first place, let alone pay the mutual funds fees that financed the kickback scheme had they known the truth.

*In re WorldCom Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003), is on point. There, plaintiffs sued the analyst Jack Grubman and Salomon Smith Barney ("SSB") for failing to disclose that recommendations to purchase WorldCom stock made by Grubman and other SSB analysts were tainted by conflicts of interest due to *quid pro quo* arrangements between WorldCom and the defendants. In denying defendants' motion to dismiss, the court held that:

> [I]nvestors were misled by material misrepresentations and omissions by Jack Grubman and SSB in SSB's analyst reports and by SSB in WorldCom's Registration Statements. The SSB Defendants' analyst reports and the Registration Statements issued in connection with the 2000 and 2001 Offerings were false and misleading not only because they misrepresented WorldCom's financial condition, but also because they failed to disclose key information regarding the nature and extent of an illicit quid pro quo arrangement that existed between the SSB Defendants and WorldCom.

*Id*. at 404. (emphasis added).

Here too, Plaintiff and the other class members would have wanted to know the true use of the fees they were paying that reduced the return on their investments. Moreover, "[w]hether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him and these assessments are peculiarly ones for the trier of fact.'" *Fecht v. The Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995).

### 3. The Only "Authority" For The Four-Part "Test" Of Materiality That Defendants Advocate Is Their Own Imagination.

Because neither the Complaint nor the Court's previous rulings help them, Defendants next turn to their own imagination, with a liberal sprinkling of inapposite case law. Defendants argue that it is "established by authorities" that Plaintiffs must plead with particularity four elements to establish materiality:

> (1) the total amount or percentage of overall fees as well as advisory fees paid; (2) the "extent of the excess"—the portion of the overall fees as well as the advisory fees that are alleged to be excessive such that they are conduits for revenue sharing payments; (3) the effect of the purportedly excess fees on share

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT IV OF PLAINTIFF'S THIRD AMENDED CONSOLIDATED COMPLAINT  Case No.: 05-cv-04518 (WHA)

5

> value and the value of Plaintiffs' holdings; and (4) the basis for the allegations that the overall fees and advisory fees are excessive and the amount by which these fees are excessive.

(Motion at 3). Defendants are ambiguous, however, about exactly which "authorities" they are talking about, or how those authorities "establish" the four-part test. In the following ten pages, they cite only two cases arising under section 10(b): *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) and *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812 2003 U.S. Dist. LEXIS 6962 (S.D.N.Y. Apr. 25, 2003), neither of which enunciates any portion of such a test. All of the other cases they cite relate not to pleading requirements under section 10(b), but requirements of proof under section 36(b) of the Investment Company Act.

With respect to the section 36(b) cases cited by Defendants, the Court has already ruled that they are inapposite. March 9th Order at 20 n.10. ("Contrary to defendants, the proposed pleading adequately pleads the excessiveness of the fees. There is no requirement that the *Gartenberg* factors be pled and no decision so holds. That decision came after a full trial and was not a pleading case; moreover, it involved Section 36(b), not the 1933 and 1934 Acts.") The Court was correct, because section 36(b) has ***nothing to do with adequacy or materiality of disclosures in connection with the sale of securities***. In a section 36(b) action, the investor need not even contend that his investment was procured by fraud. The requirements of proof under that section exist so that there will be standards by which the Court can determine, in a derivative action, whether an investment adviser breached its fiduciary duty. Section 36(b) provides no protection for ***past investors*** who were defrauded into making an investment. Indeed, it need not involve the investor's decision to invest, or the disclosures that induced that investment. It is not the case that the pleading standards for a section 36(b) claim are "more lenient" or "relaxed" than the standards under section 10(b) (Motion at 11); rather the two statutes have different pleading standards for different circumstances.

Nor are the section 10(b) cases on point. In *Feinman*, the Plaintiffs alleged that brokerage firms were charging transaction fees for securities transactions that were higher than their actual handling costs and that the difference (which defendants retained for themselves) should have been separately disclosed as commissions. *Feinman*, 84 F.3d at 540. The court concluded that the conduct was not material, because "there was no plausible way that [investors] could suffer

financially from the consequences of the alleged undisclosed…violations." *Id.* at 541. The court also concluded that if overcharges were occurring, they would be remedied by "competition among the firms in labeling and pricing of their services, not resort to the securities fraud provisions." *Id.* Here, by contrast, the financial harm suffered by investors is more than plausible; as this Court recently explained, "[h]ad there been no misuse, the common fund would have been all the greater with all the more for investment." (March 9th Order at 20). Furthermore, the kickbacks interfere with competition because brokers are not evaluating funds based on comparative performance and costs but rather based on their own undisclosed interests.

In *Allied Capital*, the plaintiffs bought shares of common stock of a company that invested in illiquid securities, among other investments. *Allied Capital*, 2003 U.S. Dist. LEXIS 6962, at *3. The plaintiff alleged that the defendant improperly valued several of its illiquid investments under the "fair value" test. *Id.* at *5-6. When questions about the valuation were publicly raised, the share price fell by 10%, but rebounded within a month, even while the rest of the stock market was falling. *Id.* at *6-7. The court concluded that the plaintiffs had failed to plead fraud in several respects, and also failed to plead materiality. *Id.* at *10-16. With respect to materiality, it held that:

> Because plaintiffs have not alleged the amounts by which Allied allegedly overvalued the questioned investments, plaintiffs have not pleaded any facts that would permit a rational jury to conclude that a reasonable investor would have viewed the overvaluation as significant….Allied fully disclosed that it determined the value of each investment using accounting that attempted to take into account various market factors, as well as the illiquidity of the securities -- a process that any reasonable investor would understand was somewhat subjective, involved judgment calls, and, given the lack of a market, would not yield exact, verifiable results. In light of these disclosures, no reasonable investor could consider the fact that a small proportion of Allied's holdings might have valuations that were debatable (which is all that the Complaint alleges) to be material.

*Id.* at *16.  REDACTED

Here, by contrast, the Complaint details exactly how much is at issue – ₁

Moreover, Defendants here did not "fully disclose" anything about the revenue sharing arrangements. The Complaint details, at length, how the partial disclosures it did make were false and misleading in numerous respects, including (1) that a significant portion of the fees supposedly earmarked for "advisory services" were actually used to market the funds by way of kickbacks to

selling agents; (2) whereas the prospectuses stated that revenue-sharing arrangements "may" be negotiated, there already were pre-existing agreements to pay particular percentages of sales and assets under management as kickbacks; (3) the amounts actually paid to selling agents exceeded the disclosed amounts authorized to be paid under shareholder servicing and 12b-1 plans and were for all share classes, not just B and C shares; (4) the Wells Fargo Funds Trust Board did not independently review the activities as stated but rather rubber-stamped decisions of Wells Fargo Funds Management; (5) the payments came not from "profits" of Wells Fargo Funds Management but from fees charged to the investors by the funds; and, (6) the revenue sharing payments did not benefit the Funds and their shareholders but rather decreased the value of investors' assets for the benefit of Defendants. (Complaint ¶¶ 44, 45, 51, 59, 61, 68, 77. 85, 86, 88, 121, 125-127). As the Court put it succinctly in the March 9th Order: "[t]he vague disclosures—written in plain Greek—concealed thriving revenue-sharing schemes." (March 9th Order at 20). The Complaint also pleads that had investors known t~~...~~ of dollars earmarked for advisory services was actually being paid as kickbacks that earned investors no benefit, they would not have invested. (Complaint ¶¶ 5, 255-256, 297).

Not only is the four-part test unsupported by the "established authorities," but at least one part of it—prong three—directly contradicts a prior ruling of this Court. The third prong of the test would require Plaintiffs to plead with particularity "the effect of the purportedly excess fees on share value and the value of Plaintiffs' holdings." Defendants previously made the identical pleading argument, but instead of calling it "materiality," they called it "loss causation." The Court responded that Defendants had overstated the pleading requirement:

> [Plaintiffs] allege that the loss was, at a minimum, the dollars siphoned out of the corpus for undisclosed purposes of no benefit to investors. Every dollar lifted out of the corpus reduced the net assets of the fund and reduced its ability to earn income. Defendants are correct that there was no drop in share value after the truth was revealed. That is because the underlying portfolio and its net asset value was the same just before and just after. Dressed up as fees, cash was being misappropriated from the common fund. The fees were not used for their ostensible purposes but were diverted to support ongoing distribution. The true price of admission to the fund was greater than was represented. At least that is the allegation. It is sufficient at this stage.

(March 9th Order at 21-22).

### 4. Even If The Four-Part Test Existed, The Complaint Would Pass It.

Even were the four-factored test enunciated by Defendants applicable to the section 10(b) claim, which it is not, the Complaint would satisfy every factor. First, the Complaint does state "the total amount or percentage of overall as well as advisory fees paid." In particular, Plaintiffs plead the fee structure for each of the funds in each year of the Class Period, showing the overall fees and advisory fees for each fund. (Complaint ¶¶ 31, 48, 56, 65, 74, 83, 91, 99, 107, 114).

Second, the Complaint also states "the 'extent of the excess'—the portion of the overall fees as well as the advisory fees that are alleged to be excessive such that they are conduits for revenue sharing payments." In particular, it alleges that [REDACTED] of these fees were overpaid during the Class Period, because instead of being used for services to benefit investors, they went to selling agents as kickbacks. It further alleges how the [REDACTED] in fees was broken down among "shareholder servicing," "networking," "revenue sharing," "profit sharing," "undifferentiated," and "other." (Complaint ¶¶ 150-51). And it gives examples of specific revenue sharing arrangements, by basis points being charged to the funds on sales and assets under management, and attaches a multi-page chart of revenue-sharing arrangements. (Complaint ¶¶ 130-133, 135, 138-39, Ex. C).

Third, the Complaint explains "the effect of the purportedly excess fees on share value and the value of Plaintiffs' holdings"—at least to the extent applicable for a case regarding mutual funds. As the Court explained in its March 9th Order, the effect of the conduct at issue is not a drop in the particular share value, but a reduction of the common fund being invested for the benefit of investors. (March 9th Order at 21-22). "Had there been no misuse, the common fund would have been all the greater with all the more for investment." (March 9th Order at 20). This concept is repeated in the Complaint. (Complaint ¶¶ 5, 255).

Fourth and finally, the Complaint provides "the basis for the allegations that the overall fees and advisory fees are excessive and the amount by which these fees are excessive." It alleges that the entire amount paid as kickbacks is "excessive," because the kickbacks not only provide no benefit to investors but also deplete their investments and reduces capital appreciation over time. (Complaint ¶ 5, 225, 255). It explains that, although kickbacks drive sales, and thus increase the fee income of Defendants, they have no positive effect on share price. (Complaint ¶ 226). It alleges,

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT IV OF PLAINTIFF'S THIRD AMENDED CONSOLIDATED COMPLAINT Case No.: 05-cv-04518 (WHA)

9

1  finally, that had the kickbacks been disclosed, Plaintiffs and other investors would not have made
2  the investments. (Complaint ¶¶ 5, 255-256, 297).

### 5. There Is Even More Evidence Of Materiality Now Than There Was When The Third Amended Complaint Was Filed Two Weeks Ago.

In the two weeks since the Complaint was filed, Plaintiffs have discovered even more information regarding materiality. The Court had ordered Defendants to produce this information by March 12, presumably so that it could be included in the Complaint due March 21. (Order Granting Plaintiff's Motion to Compel Discovery, February 26, 2007 (Dkt. 239) ("February 26 Order")). Claiming that they were unable to compile the information in time, Defendants delayed production until March 26, while refusing to stipulate to an extension on filing the Complaint to March 28. The new information increases the total fees at issue from around $ [REDACTED] to more than [REDACTED] ("March 26th Amount"). While reducing the amount paid for 12b-1 fees and shareholder servicing fees, it also increases the total paid as profit sharing, revenue sharing, undifferentiated and "other" fees from [REDACTED]. The new total of [REDACTED] is comprised of [REDACTED]. The number of broker/dealers receiving payments has increased from [REDACTED] received payments [REDACTED] a purpose not disclosed in the Wells Fargo Prospectuses.

Without acknowledging t[he information] identified in the Complaint (or the [information] more recently identified), Defendants argue that there need to be specific allegations about the amount of fees charged to each fund owned by Plaintiffs. Again, no authority makes this a requirement of section 10(b). The requirement is particularly inappropriate in this case, where there are allegations that the revenue sharing arrangements were negotiated at a level applicable to all funds by a single adviser, that the same arrangements applied to all funds, that fees paid by all funds were commingled, and that Defendants inserted the same misleading language in every prospectus through a "common template" which was intentionally used "in order to be consistent" across all

funds. (Complaint ¶¶ 155-160).

Even were there an obligation to show exactly how much was withdrawn from each fund owned by Plaintiffs, Plaintiffs could now satisfy it. The February 26 Order directed Defendants that, by March 12, "if there is a way to allocate the amounts to the Wells Fargo funds at issue, please do this as well." When Defendants belatedly complied on March 26th, they admitted that of the [REDACTED] aid to selling agents by all 90-odd Wells Fargo Funds, more than [REDACTED] ) was paid by the four funds owned by Plaintiffs. The March 26th information further shows tha[REDACTED]. The totals by fund are set forth on the following page.

If the Court believes it necessary, Plaintiffs can file an Amendment to the Third Amended Complaint that reiterates the facts stated in this section and includes the chart on the following page, to supplement paragraphs 150-51 of the Complaint. Plaintiffs do not, however, think that such a pleading is required. The Complaint already contains detailed allegations about the claims. As discovery proceeds, new information will continue to be unearthed that supports those claims, but certainly there is enough in the Complaint now to require Defendants to answer.

### 6. No Distinction Should Be Drawn In The Section 10(b) Claim Between Different Share Classes.

Defendants offer yet one more unsupported theory on the 10(b) claim: that it is not enough for Plaintiffs to make allegations regarding the specific mutual funds they owned, unless those allegations specifically pertain to "Class A" shares, the class owned by Mr. Siemers. Not only did the Court not require such specificity in the March 9th Order, but Defendants offer neither legal authority nor logic to justify their requirement. The Complaint shows that for purposes of the section 10(b) claim, all share classes were identical. There was only one prospectus for share classes A, B and C in each fund; indeed, that prospectus covered not just a single fund but numerous funds. (Complaint ¶¶ 38, 53, 62, 71, 80, 89, 96, 104, 112, 120). The revenue sharing arrangements were paid without reference to share class. (Complaint ¶¶ 45, 125-126, 132-139,

Fees Paid To Selling Agents By Wells Fargo Funds Owned By Plaintiffs, November 4, 2000 to June 8, 2005:

REDACTED

150).  While the revenue sharing kickbacks were for purposes that should have been governed by the 12b-1 plans, they were illegally paid for A shares in addition to B and C shares, and on all classes in amounts greater than approved under the plans.  (Complaint ¶¶ 45, 125-126).  In any event, the Complaint does set out the fee tables for each share class A, B and C.  (Complaint ¶¶ 31, 48, 56, 65, 74, 83, 91, 99, 107, 114).

### B. The Total Return Bond Fund Remains In The Case At Least Until A Decision On Class Certification.

Defendant next argues that Plaintiffs have "abandoned" all claims regarding the Total Return Bond Fund.  The argument again shows that Defendants misunderstand the Complaint and the Court's March 9 Order.  In the March 9 Order, the Court directed Plaintiffs to make specific allegations about the funds into which they were steered, and the prospectuses for those funds. Plaintiffs did not include specific allegations about the Total Return Bond Fund, because Mr. McKenna owned and sold it only when it was managed by Montgomery Asset Management, before it became a Wells Fargo mutual fund under the control of Defendant Wells Fargo Funds Management LLC.  Plaintiffs did, however, make allegations that *all* Wells Fargo funds—which includes the Total Return Bond Fund after its acquisition by Wells Fargo—had identically misleading statements in their prospectuses during the Class Period.  Accordingly, the claims regarding the Total Return Bond Fund are in the same category as the claims regarding all other Wells Fargo funds not specifically owned by Plaintiffs.  Unlike the Tentative Order, which would have dismissed those claims  (Dkt. 240 at 30), the March 9th Order leaves the claims in the case and defers until class certification the question of whether Plaintiffs can represent investors in all the funds.  (March 9th Order at 35).

### C. Plaintiffs Have Pled Scienter Against Defendant Wells Fargo Funds Trust.

Finally, without attacking the pleading of scienter against Wells Fargo Funds Management, Defendants argue that there is insufficient pleading of scienter against Wells Fargo Funds Trust. They contend that there are no allegations that the Wells Fargo Funds Trust Board knew of the revenue sharing arrangements that were misrepresented in the prospectuses.  Conveniently, Defendants fail to inform the Court that at all relevant times, as stated in the Statements of

Additional Information incorporated by reference in the Complaint, the president of Wells Fargo Funds Management was simultaneously the President of the Board of Directors of Wells Fargo Funds Trust. From the beginning of the Class Period until 2002, this person was Mike Hogan, and from 2003 through the end of the Class Period (and later), it was Karla Rabusch.

k

REDACTED

30). The Complaint further alleges that the Wells Fargo Funds Trust Board "rubber-stamped" actions of Wells Fargo Funds Management, and that it operated as an arm of Wells Fargo Funds Management rather than as an independent entity. (Complaint ¶¶ 44, 51, 59, 68, 77, 86, 121, 172, 174, 239).

Should the Court think it necessary, Plaintiffs will file an "Amendment to Third Amended Complaint" that adds the following sentence to paragraph 237 of the Complaint: "At the same time that Hogan (and later Rabusch) was president of Wells Fargo Funds Management and engaging in the acts described in the Complaint, Hogan (and later Rabusch) was also president of the Board of Directors (a.k.a. Board of Trustees) of Wells Fargo Funds Trust."

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court deny Defendants' motion to dismiss in its entirety and, if the Court deems it necessary, permit filing of an Amendment to the Third Amended Complaint containing the additional facts set forth in sections II(A)(5) and II(C) of this brief.

Dated:  April 4, 2007               Respectfully Submitted,

**GUTRIDE SAFIER LLP**

By:     /s/ Adam Gutride
        Adam J. Gutride (Cal. State Bar No.181466)
        Seth A. Safier (Cal. State Bar No. 197427)
        Kate J. Stoia (Cal. State Bar No. 183471)
        835 Douglass Street
        San Francisco, California 94114
        Telephone:  (415) 271-6469
        Facsimile:   (415) 449-6469

                - and -

**GUTRIDE SAFIER LLP**
Michael R. Reese (Cal. State Bar No. 206773)
Kim E. Richman (admitted *pro hac vice*)
230 Park Avenue, Suite 963
New York, New York  10169
Telephone:    (212) 579-4625
Facsimile:    (212) 253-4272

*Court Appointed Lead Counsel*