United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RONALD SIEMERS, individually and on behalf of all others similarly situated,

    Plaintiff,

  v.

WELLS FARGO & CO., WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS CAPITAL MANAGEMENT, INC., H.D. VEST INVESTMENT SERVICES, WELLS FARGO INVESTMENTS, LLC, STEPHENS, INC., and WELLS FARGO FUNDS TRUST,

    Defendants.

No. C 05-04518 WHA

**ORDER DENYING MOTION TO DISMISS THIRD AMENDED COMPLAINT**

## STATEMENT

This order is a sequel to one entitled Order Identifying Claims to Proceed and Dismissing All Other Claims and Granting Motion to Amend in Part, filed on March 9, 2007. The full procedural history of this action is set forth there and is recounted here only in brief. *See Siemers v. Wells Fargo & Co.*, No. C 05-4518 WHA, 2007 WL 760750 at *1 (N.D. Cal. Mar. 9, 2007).

This private securities action arose out of a series of cease-and-desist orders and sanctions issued by the Securities and Exchange Commission against investment advisers and brokerage firms based on revenue sharing. The orders were directed against two classes of firms: mutual fund sponsors and brokers.

Although no action was brought by the Commission against the sponsors of the Wells Fargo funds, the Commission did issue cease-and-desist orders against several other prominent fund sponsors, including OppenheimerFunds, Deutsche Investment Management, Putnam Investment Management, Franklin Advisers, and Massachusetts Financial Services. Based on revenue sharing, the NASD did fine Wells Fargo-affiliated brokers H.D. Vest and Wells Fargo Investments. Discovery in this case has shown that the Wells Fargo defendants disclosed to the investigators less than one third of the revenue sharing actually paid.

The March 2007 order described in detail the history and development of revenue sharing in the mutual fund industry. The order narrowed the claims to proceed in this case, limiting this action to the five Wells Fargo funds purchased during the class period by lead-plaintiff Ronald Siemers and named-plaintiff Forrest McKenna. The remaining Section 10 defendants are Wells Fargo Funds Management and Wells Fargo Funds Trust.

Plaintiffs' counsel were directed to file a third amended complaint. The new pleading was to conform to the rulings in the order, allege specific facts concerning the individual Wells Fargo funds, and set forth plaintiffs' best case with respect to materiality and scienter.

Having already considered the Rule 12 motions in various iterations, the Court limited the scope of the now-pending motion to the issues of scienter and materiality for plaintiffs' Section 10(b) claim.

The new complaint now addresses in much greater detail the alleged misrepresentations and revenue sharing by the Wells Fargo funds, the only funds remaining in this case. The complaint quotes extensively from several Wells Fargo prospectuses where earlier pleadings had not. The following facts must be presumed true for purposes of the instant motion to dismiss.

\* \* \*

As stated, this action is based on allegations of revenue sharing. The complaint describes:

> Revenue sharing occurs when a mutual fund's investment adviser or its affiliate makes cash payments to a broker/dealer in exchange for the broker/dealer pushing shares of that fund over other funds. Revenue sharing arrangements are problematic

2

> because they reduce the assets of the funds for a purpose that is not disclosed to investors. In addition, broker/dealers cannot uphold their fiduciary responsibilities when they choose to include or exclude a fund based on the fund's participation in a revenue sharing arrangement rather than based on the benefit to the investor without informing the investor. The SEC has stated that "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds."

69 Fed. Reg. 6438, 6441 n.21 (Feb. 10, 2004) (Compl. ¶ 28).

Generally, revenue sharing is funded by two types of payments, "hard" dollars and "soft" dollars. The complaint rests mainly on the allegation that Wells Fargo fund sponsors paid "hard" dollars — in the form of cash payments — to brokers in exchange for steering their clients into Wells Fargo funds.[1]

The Wells Fargo fund sponsors financed these arrangements by charging excessive fees to the Wells Fargo funds and their investors. The sponsors did not disclose to investors the ongoing revenue-sharing arrangements. Instead, they hid the arrangements by material omissions and half-truths in the prospectuses and SAIs. The magnitude of the revenue-sharing obligation was huge — approximately $372 million to 472 brokers over five years — and reached proportions that created a conflict of interest for the sponsors, namely that in order to find sources of cash to make the payments, the sponsors would have to inflate artificially the fees charged to the common fund even though this was against the interest of the common fund (Compl. ¶ 150; Opp. 10).

The general allegations regarding the structure of the scheme have not changed. Earlier versions of the complaint, however, were unclear as to the misrepresentations by the Wells Fargo fund sponsor defendants, having relied primarily on prospectuses distributed by non-Wells Fargo entities. Plaintiffs have now revised the complaint to plead facts relating to misrepresentations regarding the size, scope, and existence of revenue-sharing payments by

---

[1] Defendants have represented that *after* December 13, 2004, they did not engage in directed brokerage, a form of soft dollars (Docket No. 202 at 8), and have noted that an earlier pleading did not allege that broker-dealers "asked for" directed brokerage (*id.* at 7). Whether or not discovery will reveal that Wells Fargo provided directed brokerage to any broker-dealer is unclear. This order presumes that cash was the only specie in the Wells Fargo revenue-sharing program.

3

Wells Fargo fund sponsors. They further cite to specific memoranda establishing the existence of the revenue-sharing agreements between the sponsors and brokers.

\* \* \*

As to the Wells Fargo fund sponsors, the conduct alleged by plaintiffs here against the Wells Fargo funds matches the pattern of conduct disapproved of by the Commission in its cease-and-desist orders. A series of "letters of understanding" referenced and quoted in the complaint establish the sponsors' involvement in the kickback scheme. Those letters memorialized the agreements between Wells Fargo fund sponsors and brokers. They set forth the formulas for calculating the payments the sponsors owed to the brokers as well as payment schedules. The agreements were negotiated and signed by successive presidents of Wells Fargo Fund Management. In all, it is alleged that agreements were confirmed with as many as 472 broker firms during the class period (Compl. ¶¶ 132–34; Opp. 10).

Plaintiffs further allege that the revenue-sharing agreements were being funded by excessive fees charged to investors. For example, an October 2004 letter of understanding between Wells Fargo Funds Management and ING Advisor Network indicates that part of the "administrative" fee, which was supposed to go to Wells Fargo Bank, as the "Administrator," was actually being diverted to ING. In the letter, under the topic heading "Payment Terms," the following is indicated: "For 2004, you have agreed to pay the ING Broker-Dealers the following: (i) 10 Basis Points on Gross Sales Mutual Funds; and (ii) 10 Basis Points on Assets (Adjusted Quarterly); or (iii) $300,000 minimum administrative fee." This improper use of administrative fees — and their possible excessiveness — did not go unnoticed by the Commission when it investigated the revenue-sharing practices. In a letter from the Commission to Wells Fargo Funds Management in May 2005, Tom Stickley of the Commission wrote that nothing Wells Fargo had produced during his investigation demonstrated the need for the Wells Fargo funds' high fee rate. Indeed, he suspected the administrative fee was "masking" revenue sharing. The letter is quoted in full later in this order (Compl. ¶¶ 135, 138).

Wells Fargo Funds Management kept track of the revenue-sharing payments on a master list. The list was continually updated to reflect the brokers with whom Wells Fargo had

4

revenue-sharing arrangements, the contact and phone number of the selling agents, the selling agents' bank account numbers in which to route the money, the amount of revenue-sharing payments due to the broker (reflected as an amount of basis points), the date payments began for each broker, and whether or not invoices would be sent to Wells Fargo by the brokers (Compl. ¶ 143, Exh. C).

For revenue-sharing purposes, all the individual Wells Fargo funds were treated as a single unit. Wells Fargo Funds Management drafted and created the prospectuses and SAIs for the funds. Moreover, the fees paid by the Wells Fargo funds were treated as a common unit, placed into a single bank account, and commingled. One Wells Fargo Fund Management executive explained in an email: "Wells Fargo Funds Management being only one entity has one account where its advisory fees and administrative fees are contained. After all expenses are paid from that account, the remaining legitimate profit is used to pay entities like Charles Schwab" (Compl. ¶¶ 154–57).

The sponsors closely monitored the brokers to ensure that the brokers were pushing the Wells Fargo funds. The complaint quotes several Wells Fargo internal emails and emails between the sponsors and brokers praising the benefits of the kickback scheme. One email from a senior vice president of Wells Fargo Funds Management to a CEO of broker H.D. Vest Investments states:

> We believe more and more that the single greatest influence we can collectively have on your [H.D. Vest] advisors is through your sales desk. We also believe we have to get them more and more engaged in [Wells Fargo Funds]. We believe if we can own their minds, hearts, and pocket books, we can exceed our sales plan with you. We are convinced that the recent spike in sales is directly traced to your sales desk having a contest and earning incentives.

(Compl. ¶¶ 145–49).

\*   \*   \*

The complaint focuses on four main types of fees that sponsors could legitimately charge investors but that wound up being inflated artificially to finance the revenue-sharing scheme. The four types of fees were investment-advisory fees, rule 12b-1 fees, service and administrative fees, and transfer-agency fees. All of those fees were calculated as a percentage

5

1 of assets under management and the amount of such fees increased with the size of the funds
2 (Compl. ¶¶ 174–77).

3 Each of the relevant prospectuses disclosed that a certain amount of fees would be
4 charged for certain services that would ostensibly benefit the funds' shareholders.
5 Investment-advisory fees would be used to fund Wells Fargo Funds Management's
6 "determination of the asset allocations of each Fund's investments in the various core
7 portfolios." Wells Fargo Funds Management was also entitled to fees to finance
8 "administration services, including general supervision of each Fund's operation, coordination
9 of the other services provided to each Fund, compilation of information for reports to the SEC
10 and the state securities commissions, preparation of proxy statements and shareholder reports,
11 and general supervision of data compilation in connection with preparing periodic reports to the
12 Trust's Trustees and officers." Additionally, each fund had a "shareholder servicing plan,"
13 which were agreements with "shareholder servicing agents" to "process purchase and
14 redemption requests, to service shareholder accounts, and to provide other related services."
15 Finally, there were transfer-agent fees that went to a separate firm, Boston Financial Data
16 Services, which provided "transfer agency and dividend disbursing services to the Funds."
17 A percentage of all of these fees, disclosed to investors in the prospectuses, was deducted
18 directly from the funds' assets (Compl. ¶¶ 48, 50).

19 The funds also adopted a distribution plan pursuant to rule 12b-1 to pay for the costs of
20 preparing and distributing prospectuses and distribution-related services. This even included
21 ongoing compensation to brokers, referred to in the prospectuses as "selling agents." Like the
22 other fees, the fees charged pursuant to the 12b-1 distribution plan were deducted directly from
23 fund assets. Furthermore, the 12b-1 distribution plans indicated that only Class B and Class C
24 shareholders would have to bear those fees (Compl. ¶ 45). As will be shown, the prospectuses
25 left the distinct impression that the distribution plan covered the ongoing costs of distribution.
26 Little did investors know that the rule 12b-1 fees were only the tip of the iceberg and that
27 investors were paying, through inflated fees, vastly greater sums for distribution.
28

Starting in February 2002, the Wells Fargo fund prospectuses began making oblique references to "additional payments" the funds "may" make. The language of those "disclosures," however, was similar to the language expressly criticized by the Commission in the actions against the fund sponsors.[2] The February 2002 prospectus made the following brief statement about "additional payments":

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the Adviser, the Distributor, or their affiliates in connection with the sale of Fund shares.

(Compl. ¶ 61, 130). That language was repeated in the prospectuses until February 2004, when the following expanded language was used:

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the adviser, the distributor, or their affiliates in connection with the sale of Fund shares. These amounts may be fixed dollar amounts or a percentage of sales or both, and may be up-front or ongoing payments or both. Agents may agree to provide a marketing or servicing advantages to the Funds in return for the payments. Selling or shareholder servicing agents, in turn, may pay some or all of these amounts to their employees who recommend or sell Fund shares or make investment decisions on behalf of clients. Payments made with respect to the Funds may differ from those made with respect to other mutual funds available through the agent and could influence the agent's recommendations or decisions. Prospective investors should consult with their selling or shareholder servicing agent if they wish to request further information regarding these matters.

(Compl. ¶ 88, 130). Finally, the language was enlarged yet again in the prospectus issued on April 11, 2005 (Compl. ¶ 103). To save space, it will be quoted in full below.

These "disclosure" statements were located near the end of the prospectuses in sections unrelated to fund strategies, shareholder fees, or fund management. These statements did not disclose that the source of the additional payments were fees charged to the investors.

---

[2] *Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release No. 2,224/Inv. Co. Act of 1940 Release No. 26,409 (Mar. 31, 2004); *see also OppenheimerFunds, Inc.*, Exch. Act Release No. 52,420/Inv. Advisers Act of 1940 Release No. 2,427/Inv. Co. Act of 1940 Release No. 27,065 (Sept. 14, 2005); *Putnam Inv. Mgmt., LLC*, Inv. Advisers Act of 1940 Release No. 2,370/Inv. Co. Act of 1940 Release No. 26,788 (Mar. 23, 2005); *Franklin Advisers, Inc. & Franklin/Templeton Distribs., Inc.*, Exch. Act Release No. 50,841/Inv. Advisers Act of 1940 Release No. 2,337/Inv. Co. Act of 1940 Release No. 26,692 (Dec. 13, 2004); *Deutsche Inv. Mgmt. Ams.*, Exch. Act Release No. 54529/Inv. Advisers Act of 1940 Release No. 27,505 (Sept. 28, 2006).

7

The last version falsely claimed that the payments were at "no cost to the Funds" since the funds were being charged inflated fees to pay for the additional payments. Furthermore, the statements did not disclose to whom the additional payments were being made (Compl. ¶ 130).

The "disclosure" statements stated that fees "may" be paid for distribution and shareholder servicing in connection with a broker's sale of funds. Merely revealing the *possibility* of such an arrangement was held by the Commission to be insufficient disclosure of agreements that were already in existence. For example, in the cease-and-desist order against Massachusetts Financial Services, the Commission stated:

> From at least January 1, 2000 to November 7, 2003, MFS Funds' SAIs disclosed that MFS may consider sales of shares of the funds as a factor in the selection of broker-dealers to execute the MFS Funds' portfolio transactions. The SAIs did not make the distinction, however, between directing commissions in "consideration of fund sales" and satisfying negotiated arrangements for specific amounts with brokerage commissions. The SAIs did not adequately disclose to shareholders that MFS had entered into bilateral arrangements in which it agreed to allocate specific negotiated amounts of fund brokerage commissions, subject to best execution, to broker-dealers for "shelf space" or heightened visibility within their distribution systems.

*Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release No. 2,224/Inv. Co. Act of 1940 Release No. 26,409 at ¶ 24 (Mar. 31, 2004).

One of the principal wrongs alleged here was that the fees were not being used in full for their ostensible purposes. Rather, the funds' investors were being charged excessive fees to fund hidden revenue-sharing agreements. Thus, the prospectuses misled shareholders by stating that the fees were being used for disclosed purposes when, instead, they were being used to market the funds by way of kickbacks to brokers. The prospectuses were further misleading because they failed to disclose the existence of the revenue-sharing agreements (Compl. ¶ 44). With respect to the 12b-1 distribution plan, the prospectuses were misleading because, rather than limiting the distribution-related payments to Class B and Class C shareholders, the sponsors used the assets of all shareholders, including Class A shareholders, to pay for distribution services by secretly funding the revenue-sharing arrangements. In addition, the rule 12b-1 cap was not honored because fees in excess of the cap were being used to fund the

8

hidden revenue-sharing scheme (Compl. ¶ 45). These allegations repeat with respect to the ten prospectuses cited and quoted in the complaint.

According to the complaint, approximately $372 million of the fees paid by the Wells Fargo funds were transferred to brokers. Of that, only $14 million was paid as "legitimate" 12b-1 fees. The rest of the fees were made up of the $130 million in "shareholder servicing" fees, $1 million in networking fees, $9 million in "undifferentiated" fees, $130 million in "revenue sharing" fees, $82 million in "profit sharing" fees, and $6 million in "other" fees. It is alleged that only the $14 million in 12b-1 fees to brokers were legitimate and disclosed for their actual purposes. The remaining amounts were used to fund revenue sharing and were either disclosed but excessive, or not disclosed for their true use at all (Compl. ¶ 150; Opp. 16).

This was allegedly material because if reasonable investors had been informed that hundreds of millions of dollars of their money were not being used for the purposes stated in the prospectuses and SAIs, the investors would not have been interested in the Wells Fargo funds. Of course, investors accepted that they would have to pay fees and expenses. But it was presumed that those fees would be used for their disclosed purposes to benefit the mutual fund as a whole. Instead, a significant portion of those expenses was not being used to provide the services promised but used to increase the sales of the funds to other investors. This benefitted the fund sponsors by increasing their fees while investors' money were being siphoned away to fund revenue sharing (Compl. ¶ 153).

**ANALYSIS**

A vast system of Wells Fargo revenue sharing was in place to steer investors into the ever-larger ranks of Wells Fargo funds. Over the period from 2001 to 2005, $372 million in cash was paid to at least 472 brokers. This was more than twenty times the rule 12b-1 fees, which were disclosed as the fees for ongoing distribution (Compl. ¶ 150; Opp. 10). The $372 million in payments provided no benefit to investors. They were used for Wells Fargo's benefit — to induce brokers to steer their customers into the Wells Fargo funds and thereby enlarge Wells Fargo's fee base. Nonetheless, directly or indirectly, all or much of

9

1  the $372 million was taken out of the common fund owned by investors rather than from
2  Wells Fargo's own sources, or so it is alleged.

3  The full extent — as well as the very existence — of the Wells Fargo revenue-sharing
4  regime were material facts. They would have been significant in the total mix of information
5  for making an investment decision. There are several reasons. One reason was given by the
6  Commission in its cease-and-desist orders — the magnitude and cost of the program had grown
7  so large that the Wells Fargo fiduciaries were caught in a conflict of interest (Compl. ¶¶ 3, 5,
8  28, 224, 231). In order to find sources of cash to satisfy brokers demanding the alleged
9  kickbacks, the fiduciaries had to choose between using their own money (as their fiduciary duty
10 required) versus inflating their fees charged to investors (in violation of their fiduciary duty)
11 (Compl. ¶ 224). Short of dipping into their own money, in fact, the common fund was the *only*
12 available source of funds of this scope. The large magnitude of the fiduciaries' persisted need
13 to pay 472 brokers on a continuing basis was material, for it would have informed and defined
14 the conflict problem. Investors would have wanted to know that this conflict of interest would
15 be hanging over their investments. This would be true even if, in the actual event, the
16 fiduciaries never stepped over the line. The existence and size of the conflict was a material
17 fact. *See, e.g.*, *Putnam Inv. Mgmt.*, LLC, Inv. Advisers Act of 1940 Release No. 2,370 at ¶¶ 3–4,
18 24–26; *OppenheimerFunds, Inc.*, Exch. Act Release No. 52,420/Inv. Advisers Act of 1940
19 Release No. 2,427 at ¶¶ 3–6.

20 The complaint goes further, however, and alleges that the fiduciaries in fact did succumb
21 to temptation and siphon away investors' money by inflating their fees to finance ongoing
22 distribution (Compl. ¶¶ 3, 132–34). It is true that the complaint does not state the extent of the
23 inflation. At the pleading stage, however, it would be most unfair to insist that the complaint
24 establish the extent of any excess. No counsel could ethically pin this down at the pleading
25 stage. It should suffice if the complaint sets forth facts from which the charge of excessiveness
26 is specific and plausible. Here, it is alleged that $372 million was paid in revenue sharing
27 over five years. This was a huge number. It is a solid number. This number is based on
28

Wells Fargo's own admissions. Other well-pled allegations establish that the fees charged were indeed excessive (Compl. ¶¶ 182–83, 190–91, 204, 206, 209–14).[3]

Other well-pled allegations establish that the inflated fees were disguised as payments for distribution. For example, one email by a high-ranking Wells Fargo executive stated that the revenue-sharing payments would be "structured as Sub TA [transfer agency fees]" (Compl. ¶ 137).[4] In other words, Wells Fargo specifically "structured," *i.e.*, dressed up its revenue-sharing payments as otherwise legitimate fees. Another Wells Fargo letter to a broker-dealer firm structured the revenue-sharing payments to rise or fall as a fixed percentage of the management fees charged by the sponsor (Compl. ¶ 139). In other words, even before it was lifted from the common fund, a secret percentage of every dollar of the management fee was predestined for the brokers. In a similar vein, the SEC's investigator wrote Wells Fargo (Compl. ¶ 138):

> After reviewing all the documents provided by Wells Fargo Funds, along with my file of notes and emails, I can only arrive at the following conclusion: Wells Fargo Fund shareholders pay a high fee for "Administrative Services" (relative to the industry norm). Our concern is that the portion of this fee in excess of the industry norm may constitute payment for distribution.
>
> According to the Admin Agreement you provided (Exhibit A to your letter dated Nov. 18, 2004) investors pay up to 33 bps on assets for administrative fees. You've adequately described the services received for that payment, but nothing you've provided me thus far justifies the amount of the fee.

---

[3] This order expressly reiterates that *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923 (2d Cir. 1982), does not control a Section 10 claim that is founded on an allegation that excessive fees were used for undisclosed purposes. The review of the trial judgment on a Section 36(b) claim in *Gartenberg* is of marginal value when assessing whether a plaintiff has successfully pled the materiality of misrepresentations or omissions in connection with the purchase or sale of securities.

[4] Similarly, paragraph 133 of the pleading states:

> Likewise, in a December 7, 2000 revenue sharing letter of understanding with the Bank of New York and Wells Fargo, signed by Rabusch, under the subject line "Revenue Share Agreement", it states that "Wells Fargo will pay, on an annualized basis, the Fund Expense Ratio less 13.5 bps points on the average daily net assets. The payments will be made monthly." In other words, instead of using the Expense Ratio, which is the total amount of fees paid by investors for supposed legitimate services such as portfolio management, Defendant WFFM was funneling almost the entire amount of these fees as a kickback to Bank of New York.

> \*   \*   \*
>
> Also, you wrote in the 11/18/04 letter that you don't consider payments made for transfer, sub-transfer agent or record-keeping purposes to constitute rev sharing. I would agree, with the following caveat; as long as the fees associated with such services are not excessively high, effectively masking an extra fee for a service that may not fall under the admin category (such as rev shr).

These specific allegations are sufficient at the pleading stage to establish that Wells Fargo masqueraded its revenue-sharing payments as otherwise legitimate fees and charged them directly against the common fund.

    It is true, perhaps, that the board approved all fees. But there was only one board for approximately one hundred Wells Fargo funds. It would have been hard for a single board to supervise and monitor one hundred different fee structures and to keep the fiduciary from overreaching (Compl. ¶ 230). This weakness in the oversight of the sponsors left the investors' money at greater risk. In this connection, instead of setting realistic breakpoints to give the investors the benefit of the expanded investor base and the economies of scale, the board simply rubber-stamped a schedule of breakpoints that were illusory as rarely or never attainable (Compl. ¶¶ 274–44). The result was that the sponsors raked in ever larger fees without having to do any significant extra work. All of the economies of scale were appropriated to the sponsors rather than the investors.

    To repeat, the allegations need only be specific enough to satisfy Rule 9(b) — they do not have to prove the case at the pleading stage. This order holds that the complaint is specific enough in alleging that the fees were intentionally inflated to surreptitiously cover the ongoing expense of distribution.

    The defense insists that unless we know the extent of the excess, we cannot tell whether the amounts would have been material. Maybe, they suggest, the excess was tiny. We must not forget that defendants themselves specifically referred to the payments at issue as "significant." This was set forth in most of the prospectuses at issue. Although those disclosures were allegedly inadequate in a multiple of ways, they repeatedly referred to the payments as

1  "significant" (Compl. ¶¶ 61, 70, 88, 95, 105).  Defendants may not walk away from these
2  admissions.
3      Moreover, *any* intentional misappropriation from the common fund would have been
4  material to investors.  The integrity of management is always of importance to investors.  That a
5  fiduciary has been misappropriating the common fund — even in small amounts — would be
6  important to investors, for the next misappropriation or defalcation could be larger.  Intentional
7  misappropriation would always be a red flag, a negative risk factor of material interest to
8  investors.  *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 56 n.5 (1977); *Zell v. Intercapital
9  Income Sec. Inc.*, 675 F.2d 1041, 1046 (9th Cir. 1982).
10     Even as to a numerical analysis, the defense is wrong to focus on a percentage of the
11 overall common fund, portraying the excess as minuscule by comparison to the ocean of funds
12 laid in by investors.  The more realistic benchmark is the extent to which the diversions reduced
13 investor earnings compared against safe investments.  For example, investors always have the
14 easy and safe option of simply investing in insured CDs or government bonds.  A mutual fund,
15 therefore, must hold out the prospect of a greater return to compensate for its greater risk and
16 transactional costs.  For example, if insured CDs will yield five percent, an investor will
17 reasonably insist on a greater return from the typical mutual fund in order to compensate for the
18 downside risk and transactional costs.  If a mutual fund would hold out, for example,
19 8.5 percent *without* any misappropriation versus their eight percent *with* misappropriations, the
20 half point would make a significant difference, increasing the incremental return by
21 sixteen percent.
22     The Commission has made this point over the years in urging investors to take annual
23 fees into account.  "A 1% annual fee, for example, will reduce an ending account balance by
24 17% on an investment held for 20 years."  *Testimony of Arthur Levitt, Chairman U.S. Securities
25 and Exchange Commission, before House Subcommittee on Finance and Hazardous Materials,
26 Committee on Commerce, Concerning Transparency in the United States Debt Market and
27 Mutual Fund Fees and Expenses*, Sept. 29, 1998, *available at* 1998 WL 717068 at 7.
28 The Commission has a more specific example in its *Invest Wisely:  An Introduction to Mutual*

13

1  *Funds*: "If you invested $10,000 in a fund that produced a 10% annual return before expenses
2  and had annual operating expenses of 1.5%, then after 20 years, you would have roughly
3  $49,725. But if the fund had expenses of only 0.5%, then you would end up with $60,858 —
4  an 18% difference." The same investment with annual operating expenses of one percent would
5  yield roughly $55,024 after twenty years — a nine percent difference. SEC, *Invest Wisely:*
6  *An Introduction to Mutual Funds* (2006), http://www.sec.gov/investor/pubs/inwsmf.htm
7  (last visited Apr. 12, 2007). Materiality is satisfied.[5]

8  For the reasons above, prospective shareholders should have been warned of the scope
9  and sources of the Wells Fargo revenue-sharing payments. Were they warned? This question
10 raises the adequacy of the disclosures.

11 As set forth above, the third amended complaint marches through the various
12 prospectuses and sets forth what was and was not disclosed. The earliest prospectus
13 (dated February 1, 2000) was plainly insufficient, at least at the pleading stage (Compl.
14 ¶¶ 38–45). The prospectus described the distribution plan under rule 12b-1. It stated
15 (at page 87): "The Plan authorizes the payment of all or part of all of the cost of preparing and
16 distributing prospectuses and distribution-related services including ongoing compensation to
17 selling agents." It further stated that the annual fees were .75 percent and only for Class B and
18 C shares.[6]

19 This implied — incorrectly — that no part of any other fees was imposed to finance
20 ongoing distribution. And, the prospectus was incorrect in implying that Class A shares did not,
21 at least indirectly, bear the burden of ongoing distribution. According to the allegations,
22 Class A shares *were* burdened with inflated fees used to finance ongoing distribution. And the
23 prospectus left the impression that the board had followed the requirements of rule 12b-1 when,

---

[5] In its cease-and-desist order, the Commission found repeated instances of abuse and nondisclosure. The scope of revenue sharing in those cases was obviously material according to the Commission (*see also OppenheimerFunds, Inc.*, Exch. Act Release No. 52,420 at ¶¶ 3–6); *Putnam Inv. Mgmt., LLC*, Inv. Advisers Act of 1940 Release No. 2,370 at ¶¶ 5, 8, 30). The Wells Fargo funds competed with the same funds over the same period. It is reasonable to conclude that the scope of revenue sharing by Wells Fargo was at least of the same order of magnitude as by the institutions fined by the Commission inasmuch as they were competing for the same investor dollars through the same channels of distribution.

[6] This prospectus covered the twelve funds described at paragraph 38 of the pleading.

14

according to the complaint (Compl. ¶ 45), the board had not done so. Other fees were described, such as the advisory fees. But the descriptions were misleading in leaving the impression that they were for the designated purposes when, in fact, the sponsors had inflated the fees to finance ongoing distribution. No reference whatsoever, even an oblique one, was made to revenue sharing. The same criticism pertains to the prospectus dated February 1, 2001 (Compl. ¶¶ 46–52).

As time went on and the Commission continued its investigation into the practice of revenue sharing, including its investigation of Wells Fargo. Additional disclosures were added. The prospectus dated February 1, 2002, added the following statement:

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the Adviser, the Distributor, or their affiliates in connection with the sale of Fund shares.

This was not adequate disclosure. It wholly failed to reveal the scope of the then-thriving revenue-sharing scheme. In truth, the revenue-sharing payments for ongoing distribution were many times greater than the rule 12b-1 fees for ongoing distribution, which were disclosed. The sponsor's conflict of interest and temptation to charge inflated fees to finance ongoing distributions were not disclosed. It further left the impression that the sponsors might or might not make such "significant additional payments" when, in truth, the payments were a foregone and robust conclusion. The sentence did not reveal the true source of the funds, *i.e.*, that the fees had been inflated to finance ongoing distribution.

Moreover, this language was tucked away without any heading between sections labeled "You Can Buy Fund Shares" and "Minimum Investments." It was on a page entitled "Your Account" and which began "This section tells you how Fund shares are priced, how to open an account and how to buy, sell or exchange Fund shares once your account is opened." The placement was calculated, according to the pleading, to mislead — an important subject was buried on a page of routine information having little or no connection to the subject. Anyone reading the lead-in and heading would never have guessed that a disclosure of the type at issue was about to occur. The same was true for the prospectuses dated February 1, 2003

15

(Compl. ¶¶ 62–70) and June 9, 2003 (Compl. ¶¶ 71–79). At least at the pleading stage, these allegations are specific and adequate.

Although still buried in the same curious location, better disclosure was added starting with the prospectus dated February 1, 2004. It stated (Compl. ¶ 88):

> In addition to payments received from the Funds, selling or shareholder servicing agents may receive significant additional payments directly from the adviser, the distributor, or their affiliates in connection with the same of Fund shares. These amounts may be fixed dollar amounts or a percentage of sales or both, and may be up-front or ongoing payments or both. Agents may agree to provide a marketing or servicing advantages to the Funds in return for the payments. Selling or shareholder servicing agents, in turn, may pay some or all of these amounts to their employees who recommend or sell Funds shares or make investment decisions on behalf of clients. Payments made with respect to the Funds may differ from those made with respect to other mutual funds available through the agent and could influence the agent's recommendations or decisions. Prospective investors should consult with their selling or shareholder servicing agent if they wish to request further information regarding these matters.

This language, however, still suffered from the same shortcomings referenced above: (i) the vast scope of the program was omitted; (ii) the sponsors' conflict of interest was omitted; (iii) the suggestion was that such payments might not be made when in fact they were a certainty; and (iv) the true source of the payments was misrepresented.

The final version appeared in the prospectus dated February 1, 2005 (Compl. ¶ 103). The passage was still under "Your Account" but was moved under a subheading entitled "Minimum Investments." It stated:

> In addition to payments received from the Funds for distribution and shareholder servicing, the Adviser, the Funds' distributor or their affiliates, may pay out of their own assets, and at no cost to the Funds, significant amounts to selling or shareholder servicing agents in connection with the sale and distribution of shares of the Funds or for services to the Funds and their shareholders. In return for these payments, the Funds may receive certain marketing or servicing advantages including, without limitation, inclusion of the Funds on a selling agent's "preferred list"; providing "shelf space" for the placement of the funds on a list of mutual funds offered as investment options to its clients; granting access to a selling agent's registered representatives; providing assistance in training and educating the selling agent's registered representatives and furnishing marketing support and other related services. Additionally, the Funds and their shareholders may receive certain services including, but not limited to, establishing

16

> and maintaining accounts and records; answering inquiries regarding purchases, exchanges and redemptions; processing and verifying purchase, redemption and exchange transactions; furnishing account statements and confirmations of transactions; processing and mailing monthly statements, prospectuses, shareholder reports and other SEC-required communications, and providing services that might typically be provided by a Funds' transfer agent (*e.g.*, the maintenance of omnibus or omnibus-like accounts, the use of the National Securities Clearing Corporation for the transmission of transaction information and the transmission of shareholder mailings).
>
> Payments made by the Funds' Adviser, distributor or their affiliates, for the advantages and services described above, may be fixed dollar amounts, may be based on a percentage of sales and/or assets under management or a combination of the above, and may be up-front or ongoing payments or both. Such payments may be based on the number of customer accounts maintained by the selling or shareholder servicing agent, or based on a percentage of the value of shares sold to, or held by, customers of the selling or shareholder servicing agent, and may differ among selling and shareholder servicing agents.
>
> In addition, representatives of the Funds' distributor visit selling agents on a regular basis to educate their registered representatives and to encourage the sale of Fund shares. The costs associated with such visits and any arrangement, such as sponsoring various contests and promotions to encourage the sale of Fund shares, may be paid for by the Adviser, the Funds' distributor or its affiliates, subject to applicable NASD regulations.

This language was better in that more detail was provided as to what "might" happen. Contrast, however, the last paragraph with the others. The last paragraph stated that the visits to selling agent *did* regularly occur. But the rest of the passage stated merely that payments "may" be made, leading the reader to believe that perhaps such payments for ongoing distribution might or might not be made, concealing the absolute certainty that large sums were being paid. Note also that the passage expressly assured readers that the payments, if made, would be made at "no cost to the Funds." In truth, it is alleged that there *was* a cost to the Funds via the large fee structure inflated to cover the revenue-sharing payments. The same deficiencies as set forth above continued to persist with the expanded language.

The prospectus dated April 11, 2005, used the same language (Compl. ¶¶ 104–118). At the pleading stage, this order holds that the foregoing allegations are sufficient to show that the prospectuses were misleading on issues material to investors' decisions.

\* \* \*

With respect to scienter, the Court incorporates its reasons from pages 19–21 of the March 9 order. In brief, Wells Fargo and its key officers plainly *knew* about its vast and secret programs of revenue sharing. They could easily see that the secret program was not fairly disclosed in the prospectus. That they went to some trouble to allude to it in vague and incomplete language and buried the passages in unexpected placements indicates that they knew of its significance, yet chose to mislead. The revised complaint raises a strong inference of intentional misleading on a material investment consideration.

Defendants argue that plaintiffs have not adequately pled scienter as to Wells Fargo Funds Trust, the registrant of the funds. This argument lacks merit. Wells Fargo Funds Trust issued the misleading prospectuses. The complaint further alleges that the directors recklessly disregarded the revenue-sharing scheme implemented by Wells Fargo Funds Management. The board of directors of Wells Fargo Funds Trust was responsible for overseeing the fee structure but disregarded the fact that the funds had an excessively high fee structure. The complaint also alleges that the board deliberately ignored Wells Fargo Funds Management's use of those fees to fund revenue sharing, neglecting the board's duty to oversee the funds and the adviser (Compl. ¶¶ 172, 230–44). These facts give rise to a strong inference of deliberate recklessness because they reflect "some degree of intentional or conscious misconduct." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).

\* \* \*

The claims against the Wells Fargo Total Return Bond Fund are **DISMISSED**. With respect to that fund, all the complaint alleges is that McKenna *sold* the fund in July 2001 during the class period. But Wells Fargo only acquired the fund from Montgomery Asset Management in 2003. Plaintiffs concede that McKenna's purchase and sale of this fund occurred before it was ever controlled or managed by the Wells Fargo defendants in this action (Opp. 10). McKenna therefore cannot allege that he relied on any misstatement by defendants when he purchased or sold the Total Return Bond Fund. This dismissal is without prejudice to the possibility that purchasers of the same fund, after it became acquired by Wells Fargo, will

be included in the class. Whether to allow those claims will be considered at the class-certification stage.

## CONCLUSION

For the foregoing reasons, the motion to dismiss the third amended complaint is **DENIED**. Any argument not addressed in this order has been adequately addressed in the March 2007 and August 2006 orders.

**IT IS SO ORDERED.**

Dated: April 17, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE