IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD SIEMERS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & CO.,WELLS FARGO FUNDS MANAGEMENT, LLC, WELLS CAPITAL MANAGEMENT, INC., WELLS FARGO INVESTMENTS, LLC, STEPHENS, INC., and WELLS FARGO FUNDS TRUST,<br><br>    Defendants.<br>_____/ | No. C 05-04518 WHA<br><br>**ORDER GRANTING CLASS CERTIFICATION AND CONFIRMING CLASS REPRESENTATIVE AND CLASS COUNSEL** |

**INTRODUCTION**

In this securities-fraud action, this order certifies the following class:

> All purchasers of shares (of any class) bought between November 4, 2000, and June 8, 2005, in any of the following mutual funds: Wells Fargo Advantage Small Cap Growth Fund, Wells Fargo TR Montgomery Emerging Markets Focus Fund, and Wells Fargo Diversified Equity Fund.

**STATEMENT**

The fact pattern and remaining claims in this action are summarized in the orders dated March 9, April 17, and May 23, 2007. In brief, the Wells Fargo defendants sponsored a number of mutual funds. As advisors and managers, they took money out of the funds in the form of fees. The fees were usually a percentage of the size of the fund. It was thus to their advantage to attract more and more investors and thereby increase the fee base. To this end, the

Wells Fargo sponsors allegedly made cash payments to various brokerage houses to induce them to steer their clients into the Wells Fargo funds irrespective of the merits of the investments.

Via a crackdown on this practice by the Securities and Exchange Commission, payments of this type have come to be known as "revenue sharing," *i.e.*, the fund advisor "shares" its "revenue" with the broker-dealers with direct access to the investing public. Because such payments resemble kickbacks and because such payments incentivize broker-dealers to violate professional standards requiring objective recommendations, all parties to such arrangements had motives to keep them secret. As described by the Commission (and in the March 9 and April 17 orders cited above), one of the evils of revenue sharing has been that the sponsors have been tempted, given the magnitude of the revenue-sharing load, to use the investors' money rather than to use their own to finance such ongoing distribution. One legitimate way to do so is through so-called Rule 12b-1 fees, which are expressly allowed for that purpose. On the other hand, the Commission has denounced any sham increase in advisory (or other) fees as a conduit for financing ongoing distribution and/or the use of directed brokerage to reward the brokerage firms for steering their clients into the funds.

Over time, the Wells Fargo revenue-sharing payments grew in size and reached large magnitudes. The Wells Fargo sponsors allegedly had strong incentives to keep their advisory fees high in order to finance their ongoing revenue sharing, *i.e.*, to maintain excessive fees in order to use the investors' money to finance ongoing distribution rather than to use their own money to do so. The Wells Fargo program grew to include $372 million in "kickbacks" to 472 brokers over a five-year period — or so it is alleged.

Through its prospectuses and otherwise, Wells Fargo promoted its mutual funds but allegedly made a point of concealing as much as possible about the nature and scope of its revenue-sharing arrangements. During the class period (November 4, 2000, through June 8, 2005), successive versions of the prospectuses included more and more hints at the arrangements but none ever came clean and disclosed the full story — or so it is alleged. In essence, the primary concealments were (i) that some portion of the advisory (and other)

2

1 fees imposed on the fund (and thus the investors) was not for the stated purpose but was a
2 charade and really just a conduit for financing the undisclosed program of revenue sharing
3 and (ii) that the undisclosed revenue-sharing program had reached such magnitude that the
4 advisors had a conflict of interest in extracting fees from the fund, having a duty to subtract
5 only justifiable fees.  As the Commission has said in somewhat similar circumstances, it was
6 incumbent on the sponsors to disclose the large-scale program so that investors could decide
7 for themselves whether to place their money in the hands of a fiduciary under such conflicting
8 financial pressure.  *See, e.g.*, *Mass. Fin. Srvs. Co.*, Inv. Advisers Act of 1940 Release
9 No. 2,224/Inv. Co. Act of 1940 Release No. 26,409 at ¶¶ 24–25 (Mar. 31, 2004).

10 Ronald Siemers was one such investor.  He invested in the three Wells Fargo funds
11 stated above.  He is the lead plaintiff.

\*     \*     \*

13 Five prior rounds of substantive motions have been addressed.  Defendants' first round
14 of motions to dismiss were ruled on in an order dated August 14, 2006.  That order allowed a
15 significant portion of the case to go forward, specifically the claims brought under Sections 12
16 and 15 of the Securities Act of 1933 and Sections 10 and 20 of the Securities Exchange Act
17 of 1934.  The claim under Section 36 of the Investment Company Act of 1940 was dismissed
18 for lack of standing.  Lead plaintiff Siemers, however, was allowed to cure this defect by
19 alleging that he had standing by virtue of his continued ownership in any of the funds at issue.
20 Counsel filed a second amended complaint.

21 Defendants' second motion to dismiss was directed, in significant part, at the issue of
22 standing.  An order dated October 24, 2006, held that lead plaintiff Siemers had not adequately
23 alleged standing as to mutual funds he did not own.  Counsel were allowed to cure this claim
24 by attempting to find other potential class representatives who had owned other funds that had
25 engaged in revenue sharing.  Counsel were directed to move for leave to file a third amended
26 complaint and to propose further named plaintiffs.  They did so.

27 Extensive briefing and several rounds of supplemental briefing were directed at the
28 motion for leave to file a third amended complaint.  It was not until that point that the vastness

3

of counsel's agenda emerged. An order dated March 9, 2007, laid out a comprehensive discussion of the entire case and set forth why counsel's proposed case would be entirely unmanageable. Thousands of individual funds — the vast majority having nothing to do with Wells Fargo fund sponsors — would be potentially at issue. For reasons covered in detail in that order, the Section 10 claims against the broker defendants were dismissed and all claims related to non-Wells Fargo funds were severed and stayed. Only one proposed named plaintiff, Forrest McKenna, was allowed to join as a potential class representative, Mr. McKenna having represented that he had purchased several Wells Fargo funds. Plaintiffs were then allowed to file a third amended complaint in an attempt to strengthen the pleading allegations, in accordance with the March 9 order, as to the more limited universe of claims.

Following the filing of the third amended complaint, defendants filed a third motion to dismiss, directed only at the Section 10 claims. By order dated April 17, 2007, the Court denied defendants' motion. The order sustained, for pleading purposes, the Section 10 claims as to the remaining defendants.

Just prior to the filing deadline for the motion for class certification, defendants filed a motion for judgment on the pleadings, directed at the claims under the 1933 Act. By order dated May 17, 2007, defendants' motion was granted in full. Because lead plaintiff Siemers had not suffered any rescissionary damages — the only measure of damage allowed under Section 12 — he had no damages claim under the 1933 Act. Moreover, all of McKenna's 1933 Act claims were time-barred. Following ruling on that motion, the only remaining claims were those brought under Sections 10 and 20 of the 1934 Act and Section 36 of the 1940 Act.

Finally, one issue raised by defendants in opposition to the pending motion has already been addressed. All agree that no defendant in this case had issued any mutual fund shares in any fund acquired by McKenna. McKenna, both sides agree, is not an appropriate class representative in this case. His motion to represent the class was denied by order dated May 23, 2007, leaving only Siemers as the putative class representative.

4

**ANALYSIS**

The remainder of this order explains why the class set forth on page one is now certified under Rule 23.

**1.    RULE 23(a)(1) — NUMEROSITY.**

This requirement is satisfied, given the thousands who purchased the three funds during the class period. Defendants do not dispute this conclusion.

**2.    RULE 23(a)(2) — COMMON QUESTIONS.**

The necessary elements of a Section 10(b) claim were summarized in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (citations omitted):

> (1)  a material misrepresentation (or omission);
>
> (2)  scienter, *i.e.*, a wrongful state of mind;
>
> (3)  a connection with the purchase or sale of a security;
>
> (4)  reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation";
>
> (5)  economic loss; and
>
> (6)  "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.

By now, the undersigned has a tolerable appreciation for the fact pattern of this case, given counsel's vigorous motion practice. Much of what will be presented at trial pertains to issues common not only to the three funds but to all 100+ Wells Fargo funds. The overall Wells Fargo revenue-sharing program and secret payments of $372 million to the web of broker-dealers, for example, will be common proof as to all 100+ funds. The wording of the prospectuses for the three funds will be common, not only to the three but many others as well, namely in what was omitted as stated above. Thus, the first three elements of a Section 10(b) claim, as set forth in *Dura*, lend themselves to common class-wide proof.

One contested issue is reliance/transaction causation. Normally, plaintiffs have the burden to prove reliance by all class members via some acceptable method of class-wide proof. Plaintiffs seek to do so by characterizing this case as primarily relying on omissions rather than affirmatively false statements, invoking *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

1   128, 153–54 (1972). To see why *Affiliated Ute* is critical here, we must remember how this case
2   differs from the routine securities-fraud case. In the routine case, a fraud comes to light and the
3   stock price plummets. In such a case, the class invokes the fraud-on-the-market presumption to
4   establish reliance and transaction causation, as set out by *Basic Inc. v. Levison*, 485 U.S. 224,
5   242 (1988). Once a plaintiff proves that the shares were traded in an efficient market, the rule
6   presumes that all available public information was factored into the market stock price.
7   Thus, even if a stock purchaser neglected to read and rely on a prospectus, he or she was
8   nonetheless entitled to rely on the pending market price as reflecting all available public
9   information. If the market was misled, then all who have relied on the market price were also
10  misled. It does not matter whether the fraud was an omission or a positive statement. The *Basic*
11  presumption is the workhorse of the class part of most securities class actions.

12  With respect to mutual funds, however, the *Basic* presumption does not fit, for there is no
13  stock-price drop. The mutual fund is, instead, priced by the net asset value method. This is
14  based on the daily market closing prices for the underlying portfolio (such as portfolio shares in
15  General Motors, Exxon Corporation, etc.). The net asset value of the portfolio as a whole is then
16  divided by the number of shares outstanding in the mutual fund to derive the daily share value.
17  Bad news about the management of a mutual fund may lead to a downgrading by Morningstar,
18  but it will not provoke a precipitous drop in the net asset value of the fund itself. The underlying
19  portfolio will retain its inherent value despite any such bad news about the fund management.
20  The rise and fall of the daily share value in a mutual fund, therefore, does *not* capture the
21  publicly available information about the management of the fund in the way contemplated in
22  *Basic*. The *Basic* presumption of reliance does *not* fit our case — plaintiffs so agree.

23  Given the inapplicability of the usual presumption, the importance of *Affiliated Ute*
24  to the maintenance of this suit as a class action is thus apparent. *Affiliated Ute* itself was *not* a
25  class case, but it did hold that reliance need not be proven when there is a material omission.
26  The Ninth Circuit expressly extended *Affiliated Ute* to class cases in *Blackie v. Barrack*, 524
27  F.2d 891, 905–07 (9th Cir. 1975). That decision also noted that "materiality directly establishes
28  causation more likely than not." *Id*. at 906 n.22. In 1999, however, the Ninth Circuit limited the

class-wide use of *Affiliated Ute* to any case that "primarily alleges omissions." Even if an action is a "mixed case" involving both affirmative falsehoods as well as omissions, *Affiliated Ute* may *not* be applied unless the district court properly finds that the action "primarily alleges omissions." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999).

Applying this test to our own record, it is true that this action is a "mixed case." Both omissions and affirmative falsehoods are asserted. Some of the allegations highlight omissions (Compl. ¶¶ 4, 5, 25, 36, 44, 51, 59, 68, 130, 140, 161). Others reference affirmative misrepresentations (Compl. ¶¶ 44, 51, 59, 68). Having been immersed in this case through so many hearings, the Court is convinced that this action is primarily concerned with a key omission — the alleged studied refusal of the Wells Fargo sponsors to disclose their massive system of revenue sharing and its consequent financing such ongoing distribution from the investor's common fund (via sham fees) rather than from the sponsor's own money. Therefore, this case meets the *Binder/Blackie* test for class application of the *Affiliated Ute* rule.

Defendants say their evidence will demonstrate that few ever read any prospectuses. Without reaching all the issues this proffer suggests, it is enough to remember that *Blackie v. Barrack* expressly rejected arguments of this type, stating:

> The right of rebuttal, however, does not preclude the predominance of common questions. Causation as to each class member is commonly proved more likely than not by materiality. That showing will undoubtedly be conclusive as to most of the class. The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.

*Blackie*, 524 F.2d at 907 n.22.

When, however, it comes to establishing that the sponsors really did impose sham fees as conduits to finance ongoing distribution, proof on a class-wide basis will not be as simple as plaintiff has proposed. On this issue, class counsel will need to prove — fund by fund, fee by fee — that a sham was afoot. Each fee must be judged under the excessiveness factors set forth in *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923, 929–30 (2d Cir. 1982), there being no Ninth Circuit authority on point. The *Gartenberg* method of proof will require a

7

case-by-case analysis before the jury. (Of course, other broader themes may also be presented, such as the overall size of the allegedly secret program and Wells Fargo's allegedly desperate need to find ways to finance it.) Significantly, each case study will identically cover many hundreds, if not thousands, of investors, so even this method of proof will do common duty.

With respect to loss causation and damages, defendants are wrong to argue that a stock-price drop is the exclusive method for proving damages and loss causation. In churning cases under Section 10(b), for example, the Ninth Circuit has specifically approved a measure of damages based on the excess in commissions due to churning in an investment account. *Nesbit v. McNeill*, 896 F.2d 380, 385 (9th Cir. 1990). This is analogous to our case. It is true, of course, that *Dura Pharmaceuticals* called out a stock-price drop as one usual way to prove damages and loss causation. But the decision did not limit plaintiffs to that single method, instead saying that "it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 347. Using the *Gartenberg* factors, the churning analogy approved by the Ninth Circuit may be employed herein on a class-wide basis.

### 3.  RULE 23(a)(3) — TYPICALITY.

This order finds that the claim of lead plaintiff Ronald Siemers is typical of those by other members of the class, including those who bought other "classes" of the same funds as did he, for they were all victims to greater or lesser degree of the same undisclosed (alleged) scheme.

Contrary to defendants, a class representative does not have to have the exact liability claim as all other class members under Article III. Rather, once the class representative establishes his own Article III standing, such that there is a concrete case or controversy, then the issue shifts to whether his claims are sufficiently typical of absent class members such that they would be afforded due process by letting him, in a representative capacity, litigate (and potentially lose) the absent-member claims. *Cal. Rural Legal Assistance, Inc. v. Legal Services Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990). With respect to the Class A versus Class B versus Class C shares (all in the same fund), the variations in claims are so minor that

8

due process would not be offended in allowing our lead plaintiff to press all such claims to judgment, however well or poorly it may end.

The Article III argument has more traction when it comes to whether, as plaintiffs contend, the class should be extended to the 100+ funds sponsored by defendants. As to 97+ of the funds, our lead plaintiff was *not* an investor. Nonetheless, his claims are typical to a degree. For example, the overall massive program of revenue sharing will be common to all 100+ funds. A major difficulty flows from the necessity to prove on a fund-by-fund and fee-by-fee basis that excessive/sham fees were imposed. Out of some concern for insufficient typicality but out of more concern for manageability, as will be discussed below, this order declines to extend the class to all 100+ funds. (Nonetheless, other investors in other funds may derive some collateral-estoppel benefit from any findings made in favor of the more limited class certified herein.)

### 4. RULE 23(a)(4) — ADEQUACY OF REPRESENTATION.

For all of the reasons set forth in the order appointing Mr. Siemers as the lead plaintiff, which reasons are now reaffirmed, this order finds that he will adequately and fairly represent the class.

The main new attack on Mr. Siemers is his alleged conflict of interest. Because he is also pursuing a Section 36 claim under the 1940 Act on behalf of the Wells Fargo Advantage Small Cap Fund (but not as to the other two funds), there is a potential conflict. Under Section 36, the recovery would go back to the fund and thus would benefit *all current* investors. Under Section 10(b), the recovery goes to individual purchasers who bought within the Section 10(b) limitations period, some of whom may have sold and some of whom may still hold the shares, *i.e.*, the recovery does not go into the fund.

The supposed conflict is not as embarrassing as defendants claim. The Section 36 claim will be bifurcated and stayed. If the jury finds in the Section 10 trial that excessive fees were charged, then that finding will do double duty as the predicate for a later Section 36 trial. The total amount of any excess fees can be divided neatly between those who are eligible for

9

Section 10 recovery with the balance eventually going to the fund itself for the benefit of extant investors.

### 5. RULE 23(b)(3).

This order finds that the questions of law and fact common to the members of the certified class predominate over all questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Three of the factors called out by the rule need only brief consideration. With respect to "the interest of members of the class in individually controlling the prosecution or defense of separate actions," it is plain that there are no such other separate actions. The amounts involved are modest per investor. No single investor could hope to recover more than it would cost to prosecute an individual suit. With respect to "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," there is none other than the present suit, as stated. With respect to the "desirability or undesirability of concentrating the litigation of the claims in a particular forum," it seems undisputed that this venue, being the home of Wells Fargo, is a desirable and convenient place to concentrate the litigation, no other venue having been suggested. Again, there are no competing similar suits against these defendants.

Cutting a much larger figure is the final factor: "The difficulties likely to be encountered in the management of a class action." This factor decidedly militates against the massive class proposed by plaintiffs, a proposal to include all purchasers in all 100+ Wells Fargo mutual funds over the five-year period. To include such a large agenda would mean examination at trial of the fee structure and justifiability of one hundred or more separate funds over five years. It is true that many of the funds had similar fee structures and all had the same board and advisors. Yet, what might be an excessive fee for one fund might be fair for another. The difficulties and risks of advising and managing one fund versus another must be considered. The multiple *Gartenberg* factors must be weighed, fund by fund, fee by fee. And, the varying prospectuses (with their progressively better disclosures) for the 100+ funds, although many were identical

10

while others differed, would be a mess to track, even more so to track and to overlay on the fee scenarios. This can be managed for three funds but not for 100+ funds.

A jury must decide this case. A jury must be able to comprehend and to keep straight the evidence and the contentions. In the Court's judgment, it would be very hard for a jury, however conscientious, to manage the massive program served up by counsel. It would also be extremely difficult for the Court to manage such a project. It is not so simple as proving up liability and then later allowing a claims process. Proving up the amount of any excess/sham fee *is and will be* part of the *liability* case at trial, for if there were no sham fees then there can be no liability in the first place. Therefore, the Court will limit the class to the purchasers of the three funds actually purchased by our lead plaintiff.

*     *     *

This is a good place to address the extent to which reinvestment of dividends should be included in the class recovery. This order holds that dividends automatically reinvested in the same fund will be part of the class-wide purchases at issue as long as the shares from which the dividends were derived were purchased *within the class period*. Dividends derived from shares purchased beforehand will not be part of the class-wide purchases at issue, even if the reinvestments occurred in the class period. For example, if an investor purchased shares only in 1999, then he is out of the class — totally, including automatically reinvested dividends made during the class period. On the other hand, if the investor purchased within the class period, then his reinvested dividends (within the class period) will be part of the class. To try to enlarge the class to pick up all reinvestments within the class (including for pre-class purchasers) would be festooned with accounting headaches, would be confusing to class members, and would lead to minuscule recovery checks (if any) for those whose only stake was derived from reinvested dividends. Also, there is a potential statute of limitations problem in allowing those who decided to invest before November 4, 2000, to recover anything.

*     *     *

At the eleventh hour, plaintiff has attempted to represent a fourth fund — the Wells Fargo Money Market Fund — that has never before been included in any of the lead plaintiff

11

certifications filed in this case. This will not be allowed. In the April 2006 consolidated amended complaint, Siemers did not identify the Wells Fargo Money Market Fund as one of the funds at issue. The lead plaintiff certification filed therewith listed Wells Fargo Advantage Small Cap Growth Fund, Wells Fargo TR Montgomery Emerging Markets Focus Fund, and Wells Fargo Diversified Equity Fund as the *only* Wells Fargo funds purchased by Siemers. Plaintiff then refiled the *same* certification with the August 2006 second amended complaint and the March 2007 third amended complaint. Moreover, in December 2006, plaintiff was instructed to submit the *final* versions of any of the proposed plaintiffs' certifications. Siemers filed the exact same certification (again leaving out the Money Market Fund) as before. Plaintiff blames prior class counsel, the Milberg Weiss firm, for omitting the Money Market Fund from Siemers' original certification, which counsel blindly attached as the final certification to each of the operative complaints in this case. This is bogus. Attorney Reese *was* the former partner at Milberg Weiss who made the original filing and who *continued* to represent plaintiff on behalf of current class counsel, Gutride Safier Reese LLP, when he changed firms. Finding no good cause, the Court rejects plaintiff's last-minute attempt to add another fund, which may be subject to any number of unique defenses that could have been addressed in prior motions.

## CONCLUSION

For the foregoing reasons, the class described on page one is now **CERTIFIED** under Rule 23. This order **REAFFIRMS** lead plaintiff Ronald Siemers as the class representative and the lead plaintiff's choice of counsel as class counsel. By **NOON ON JUNE 8, 2007,** counsel shall meet and confer and submit a proposed form of class notice in plain English, a proposed method of serving and/or publication, and a timetable for effecting notices and receiving back any opt-outs, all to be done consistently with the case schedule previously set.

**IT IS SO ORDERED.**

Dated: June 1, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12